# EXHIBIT 3

# To Be Filed Under Seal

Page 1

|  | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF NEVADA |
| 3 | A.H., an individual,              ) Case No.: |

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3    A.H., an individual,              ) Case No.:

                                      ) 2:24-cv-01041-GMN-NJK

4    Plaintiff,                        )

                                      )

5    v.                               )

                                      )

6    WYNN LAS VEGAS,                   )

                                      )

7    Defendant.                       )

     _____

8

9              VIDEOTAPED 30(B)(6) DEPOSITION -

                  WYNN RESORT LAS VEGAS -

10                    TODD FASULO

11            Taken on Wednesday, July 9, 2025

                      at 9:00 a.m.

12

               Taken remotely via Zoom

13

14

15    Reported by Kimberly A. Ritter, RPR, CCR No. 1020

16

17

18

19

20

21

22

23

24

25

Page 2

```
1           A P P E A R A N C E S
2    For Plaintiff, A.H.:
3    THE 702 FIRM INJURY ATTORNEYS
         Michael C. Kane, Esq. (NBN 10096)
4        8335 West Flamingo Road
         Las Vegas, Nevada 89147
5        E-Mail: Mckteam@the702firm.com
6        LEVIN PAPANTONIO
         Matthew D. Schultz, Esq. (Pro hac vice)
7        316 South Baylen Street, Suite 600
         Pensacola, Florida  32502
8        E-Mail: Mschultz@levinlaw.com
9    For Defendants Wynn Las Vegas, LLC
         And Wynn Resorts, Limited:
10
         JONES DAY
11       Nicole Perry, Esq.
         717 Texas Street, Suite 3300
12       Houston, Texas  77002
         Email: Nmperry@jonesday.com
13
     For Defendant Venetian Las Vegas Gaming, LLC:
14
         DLA PIPER LLP
15       Alexa Ain, Esq.
         David S. Sager, Esq. (US)
16       51 John F. Kennedy Pkwy, Suite 120
         Short Hills, New Jersey  07078
17       Email: Alexa.ain@dlpiper.com
         David.sager@us.dlapiper.com
18
         Also Present:
19       Joey Biaggi - Videographer
         Vince Rosica - Technician
20
21
22
23
24
25
```

Page 3

```
1              INDEX
2                             PAGE
     EXAMINATION OF TODD FASULO:
3    July 9, 2025
4    By Mr. Schultz:                6
     By Ms. Perry:                202
5
6
     DEPOSITION EXHIBITS            MARKED
7
     Exhibit 3   2020 Environmental and Social      18
8       Governance Report
9    Exhibit 4   Training Video                     35
10   Exhibit 4A  News Story - "Man with Lengthy     50
        Criminal History Becomes Latest
11      Addition to Nevada's Black Book,"
        August 26th, 2022
12   Exhibit 5   Wynn A.H. 732                      59
13   Exhibit 6   Tab 5 - website U.S. Department of 63
        State Archives - 11.24.04 The Link
14      Between Prostitution and Sex
        Trafficking
15
     Exhibit 7   Tab 9 - Wayback                    71
16
     Exhibit 8   11.08.2012 ECPAT-USA              74
17
     Exhibit 9   Tab 6 - American Hotel and Lodging 78
18      Association's Educational Institute
        11.2012
19
     Exhibit 10  Tab 7 - BEST Alliance              83
20
     Exhibit 11  Tab 14 - Polaris Project 11.2013   88
21
     Exhibit 12  Tab 8 -website URL                 92
22
     Exhibit 13  Tab 15 - Press Release             95
23
     Exhibit 14  Tab 16 - Email                     97
24
     Exhibit 15  Tab 13 (Wynn-AH-4771)             104
25
```

Page 4

```
1    Exhibit 16   Tab 17 - Wynn Encore Corporate    126
         Investigations Training Manual
2        (Wynn-AH-3598)
3    Exhibit 17   Tab 18 - 2013 Wynn Annual         153
         Surveillance Plan (Wynn-AH-3576)
4
     Exhibit 18   Tab 23 - Wynn Las Vegas, LLC, and 167
5        Wynn Resorts Limited Answer and
         Affirmative Defenses
6
     Exhibit 20   Wynn-AH-3415                      200
7
8
9
10       INFORMATION REQUESTED:
             None
11
12       QUESTIONS INSTRUCTED NOT TO ANSWER:
             None
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1             P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Good morning.  We are
3    going on the record today as of 9:08 a.m. on July 9th,
4    2025.
5         This is media unit one of the video-recorded
6    deposition of 30(b)(6) Todd Fasulo for Wynn Resorts,
7    Limited, and Wynn Las Vegas, LLC, in the matter of
8    A.H., an individual, versus Wynn Las Vegas, et al.,
9    filed in the District of Nevada, case number
10   2:24-cv-01041-GMN-NJK.
11        We're located at Snell & Wilmer, LLP.
12        My name is Joey Biaggi representing Veritext,
13   and I'm your videographer.  Your court reporter is
14   Kimberly Ritter from Veritext.
15        Will counsel and all present, including
16   remotely, please state their appearances and
17   affiliations for the record, beginning with the
18   noticing attorney.
19        MR. SCHULTZ:  Yeah, Matt Schultz, Levin
20   Papantonio, law firm, Pensacola, Florida, for the
21   Plaintiff.
22        MR. KANE:  Michael Kane for the Plaintiff.
23        MS. PERRY:  Nicole Perry of Jones Day for
24   Wynn Resorts, Limited, and Wynn Las Vegas, LLC.
25        With me is my colleague, Clare Baldwin, also
```

2 (Pages 2 - 5)

Page 6

1 with Jones Day. And we have Eric Adrian from Wynn
2 present as well.
3       MR. SAGER: David Sager, DLA Piper, on behalf
4 of Venetian Casino and Resort.
5       MS. AIN: Alexa Ain from DLA Piper as well
6 behalf of the MGM entities, which are Aria Resort and
7 Casino, LLC, Aria Resort and Casino Holdings, LLC, MGM
8 Resorts International, New York New York Hotel and
9 Casino, LLC, and CityCenter Land, LLC.
10       THE VIDEOGRAPHER: Will the court reporter
11 please swear in the witness, and then counsel may
12 proceed.
13       THE STENOGRAPHER: Sir, would you raise your
14 right hand for me, please.
15       (Witness oath administered.)
16       THE DEPONENT: I do.
17       THE STENOGRAPHER: Thank you.
18             TODD FASULO,
19 having been first duly sworn to state the whole truth,
20 testified as follows:
21             EXAMINATION
22 BY MR. SCHULTZ:
23    Q.   Good morning. Can you state your name for
24 the record, please.
25    A.   Todd Fasulo.

Page 7

1    Q.   And are you currently employed with a Wynn
2 entity, Mr. Fasulo?
3    A.   Yes, I am.
4    Q.   And which entity?
5    A.   Wynn Las Vegas.
6    Q.   And is that Wynn Las Vegas, LLC?
7    A.   Yes.
8    Q.   And what's your position?
9    A.   I'm the senior vice president of security,
10 corporate investigations, surveillance, and crisis
11 management.
12    Q.   What does the "crisis management" refer to in
13 your title?
14    A.   It's to emergency management processes and
15 procedures for the -- for the property.
16    Q.   And when did you first come to Wynn?
17    A.   February 6th of 2018.
18    Q.   And did you come and take on the position
19 that you're currently in?
20    A.   No. I originally came as executive director
21 of crisis management. It was a -- new entity on the
22 property. And then shortly afterwards I was promoted
23 and took over security, and then shortly after that I
24 took over in my current role.
25    Q.   To your understanding -- and I'll clarify, to

Page 8

1 your personal understanding, was there some particular
2 crisis that you were called in that they created the
3 position for?
4    A.   I came in after the 1 October shooting.
5    Q.   Gotcha.
6       So there are two Wynn entities who are
7 Defendants in this case, Wynn Resorts, Limited, and
8 Wynn Las Vegas, LLC. And you understand, although you
9 are the witness here today in person, you are speaking
10 on behalf of those entities?
11    A.   Yes.
12    Q.   And when I refer to "Wynn" or "the hotel" or
13 "the company" or "Wynn hotels" or "you," I will be
14 referring to those Wynn entities. Okay?
15    A.   Okay.
16    Q.   And I will do my best, if I try -- like I did
17 a moment ago, if I ask you something that in -- a
18 question for which I'm seeking your personal knowledge,
19 I'll try to say "you personally" to make that
20 distinction. Okay?
21    A.   Yes.
22    Q.   And I'll be referring to both Wynn entities.
23 If there's some reason in responding that you should
24 distinguish between one or the other, feel free to do
25 so. Okay?

Page 9

1    A.   Okay.
2    Q.   And you understand you're under oath just as
3 if you were at trial?
4    A.   I do.
5    Q.   And you understand that this deposition or
6 portions of it may actually be played to a jury at some
7 point?
8    A.   I do.
9    Q.   Have you been deposed before?
10    A.   Multiple times.
11    Q.   In what context?
12    A.   Both as an assistant sheriff at Metro, a
13 local police department here and, also, for Wynn.
14    Q.   Have you been deposed either personally or as
15 a corporate rep for Wynn in connection with any case
16 where there were allegations of sex trafficking?
17    A.   No.
18    Q.   So I'm sure you understand, but if your
19 lawyer, Ms. Perry, objects, you are to answer the
20 question unless she instructs you not to?
21    A.   Yes.
22    Q.   And if I happen to ask whether you've
23 reviewed a particular document in preparing for the
24 deposition, you can tell me whether you reviewed it. I
25 don't want to know whether you reviewed it at the

3 (Pages 6 - 9)

Page 10

1 request of an attorney. Okay?
2    A.  Okay.
3    Q.  And, similarly, your communications with Wynn
4 counsel are privileged. I'm not entitled to know the
5 content of those communications and I don't want to.
6        But if I ask for a fact, you're obligated to
7 tell me the facts that you know, even if you learned
8 those facts from a lawyer. Just don't tell me you
9 learned them from a lawyer.
10       Does that make sense?
11    A.  Yes.
12    Q.  How much time have you spent preparing for
13 today's deposition?
14    A.  Roughly 15 hours, 16 hours.
15    Q.  And did that include meetings with Wynn
16 counsel?
17    A.  Yes.
18    Q.  Did it include document review?
19    A.  Yes.
20    Q.  Did it include -- how would you estimate how
21 much -- strike that.
22       Can you estimate how much time you spent in
23 meetings versus document review?
24    A.  Roughly 9 hours in meetings, and the rest of
25 the time would have been in document review.

Page 11

1    Q.  Have you reviewed, that is, read or watched,
2 testimony from any other witness in the case?
3    A.  No.
4    Q.  Have you read any witness statements?
5    A.  No.
6    Q.  Have you read any incident report related to
7 the allegations in this particular case?
8    A.  No.
9    Q.  As I understand it, Wynn Las Vegas, LLC,
10 although there may be intermediary companies,
11 ultimately Wynn Resorts Limited is the parent of Wynn
12 Las Vegas, LLC; is that right?
13    A.  Yes.
14    Q.  And was that true in 2012 to 2014 timeframe?
15    A.  Yes.
16    Q.  If I am, you know, let's say a -- a security
17 officer for Wynn, do my paychecks come from Wynn
18 Resorts Limited or from Wynn Las Vegas?
19    A.  Wynn Las Vegas.
20    Q.  Do you agree that human trafficking is the
21 exploitation of human beings using force, fraud, or
22 coercion in order to control people or make money for
23 traffickers?
24    A.  Yes.
25    Q.  And that force can include physical violence?

Page 12

1    A.  Yes.
2    Q.  Punches?
3    A.  Yes.
4    Q.  Slaps?
5    A.  Yes.
6    Q.  Broken bones?
7    A.  Yes.
8    Q.  Internal injuries?
9    A.  Yes.
10    Q.  Do you agree that most people who engage in
11 human trafficking are masters of manipulation?
12    A.  Do I agree?
13    Q.  Yes, sir.
14    A.  I would say that they use manipulation. I
15 don't know -- I -- I think we could debate whether or
16 not they're masters at it.
17    Q.  Do you agree that when we're talking about
18 sex trafficking, the people who engage in human
19 trafficking are pimps?
20    A.  They are sometimes referred to as "pimps,"
21 yes.
22    Q.  Are they sometimes referred to as something
23 else?
24    A.  Their first name.
25    Q.  Do you agree that pimps target trafficking

Page 13

1 victims' vulnerabilities?
2    A.  Say that again.
3    Q.  Do you agree that pimps target trafficking
4 victims' vulnerabilities?
5    Q.  And you personally, actually, said that in a
6    Q.  And you personally, actually, said that in a
7 training video for Wynn, correct?
8    A.  Yes.
9    Q.  And you agree that pimps force and coerce
10 their victims into engaging in commercial sex?
11    A.  Yes.
12    Q.  Do you agree that when pimps are involved in
13 prostitution, sex trafficking is occurring?
14    A.  Do I -- say that again.
15    Q.  Yes, sir.
16       Do you agree that when pimps are involved in
17 prostitution, sex trafficking is occurring?
18    A.  It can be, yes.
19    Q.  In what circumstances would you contend a
20 pimp is involved in prostitution, but it's not sex
21 trafficking?
22       MS. PERRY: Objection, improper question.
23    A.  Do you want my personal opinion?
24    Q.  (By Mr. Schultz)  No. I'm asking you as
25 Wynn's corporate representative.

4 (Pages 10 - 13)

Page 14

1    A.   We --
2    Q.   Um --
3    A.   -- would -- we would have to know that that
4  is going on in the background to substantiate that it's
5  human trafficking.
6    Q.   Can you envision a circumstance in which a
7  commercial sex worker gives some or all of the money
8  that she earns through commercial sex to a pimp if she
9  were not being forced, defrauded, or coerced?
10    MS. PERRY:   Objection, improper hypothetical.
11    A.   It can happen if they are in a relationship
12  that is not involving in manipulation,
13  boyfriend/girlfriend.
14    Q.   (By Mr. Schultz)  If it doesn't involve
15  manipulation, would you call that person a pimp?
16    MS. PERRY:   Objection, vague and ambiguous.
17    A.   It depends.
18    Q.   (By Mr. Schultz)  On what?
19    A.   On what the boyfriend or a pimp does
20  specifically to further the commercial sex.
21    Q.   You're familiar, I presume, with the term
22  "Romeo pimp"?
23    A.   A little bit.
24    Q.   Would you agree that so-called Romeo pimps
25  are using fraud instead of force or coercion?

Page 15

1    MS. PERRY:   Objection, improper hypothetical.
2    A.   You'd have to give me an example so I
3  understand what you're trying to get at.
4    Q.   (By Mr. Schultz)  Do you agree that
5  preventing or deterring prostitution would necessarily
6  prevent or deter human trafficking as well?
7    A.   It can, yes.
8    Q.   Wouldn't it always, to some extent?
9    Let me re-ask that question.
10    If Wynn Hotels successfully deters or
11  prevents prostitution on its properties, it is
12  necessarily deterring or preventing sex trafficking as
13  well, true?
14    MS. PERRY:   Objection, vague and ambiguous.
15    A.   It's hard to know what occurs off our
16  property.  I -- I would say that, yeah, it's -- it's
17  not being done on our property.  But what happens off
18  our property, I can't definitively tell you that it's
19  preventing it.
20    Q.   (By Mr. Schultz)  Right.  Let me clarify.
21    When prostitution is occurring on Wynn's
22  premises, would Wynn agree that some proportion of
23  that, no matter how much, but necessarily some of it is
24  sex trafficking?
25    MS. PERRY:   Objection, vague and ambiguous as

Page 16

1  to time.
2    A.   It -- it -- yeah, it could.  But I mean it
3  depends on the circumstances and what we know at the
4  time.
5    Q.   (By Mr. Schultz)  And if there are 100
6  prostitutes in Wynn's premises at any given time, how
7  many of them do you think are being sex trafficked?
8    MS. PERRY:   Objection, improper hypothetical.
9    A.   I wouldn't be able to answer that question.
10  I wouldn't know.
11    Q.   (By Mr. Schultz)  But you -- you will not
12  agree with me that we are absolutely sure some of them
13  would be sex trafficked?
14    A.   I would agree that some probably are.
15    Q.   So my question was not that they probably
16  are.  It is that we can say with certainty that if
17  there are 100 prostitutes on Wynn's premises, some of
18  them are being sex trafficked.
19    Can you agree with that or no?
20    MS. PERRY:   Objection, improper hypothetical.
21    A.   I could only say with certainty if I knew
22  other facts.  Just the fact that they've engaged in
23  prostitution, money for sex, doesn't necessarily mean
24  that they're being trafficked without having more
25  information.

Page 17

1    Q.   (By Mr. Schultz)  Would you agree -- as Wynn,
2  would you agree that sex trafficking has occurred on
3  Wynn's premises?
4    MS. PERRY:   Objection, vague, ambiguous as to
5  time.
6    A.   No, because we don't -- we wouldn't know
7  that.
8    Q.   (By Mr. Schultz)  Why wouldn't you know it?
9    A.   Because we don't know what the woman does
10  when she leaves our property.
11    Q.   Do you agree that when a young woman is
12  forced to have sex, that's rape?
13    A.   When a woman is forced to have sex, it's
14  rape?
15    MS. PERRY:   Objection, calls for legal
16  conclusion.
17    A.   It can be considered rape in a legal sense,
18  yes.
19    And I'm -- you know, if you're talking about
20  Nevada state statute, what sexual assault is.
21    Q.   (By Mr. Schultz)  Let me ask you what
22  would -- as a layperson, how would you define "rape"?
23    A.   "Rape" is the unlawful penetration of any
24  person, male or female, by another using force or
25  violence and against their will.

5 (Pages 14 - 17)

1     Q.   You'd agree that trafficking victims may not
2  even realize they're being taken advantage of until
3  it's too late?
4         MS. PERRY:  Objection, improper hypothetical.
5     A.   Yes, I've been told that.
6     Q.   (By Mr. Schultz)  And you've actually said
7  that yourself, right?
8     A.   Yes.
9     Q.   I'm going to pull out what I'll mark as
10  Exhibit 3.
11        (Fasulo Deposition Exhibit 3 was marked for
12  identification.)
13        THE STENOGRAPHER:  And, counsel, when you
14  object, if you can please speak up a little bit.
15        MS. PERRY:  Sure.  Thank you, Kimberly.
16        MR. SCHULTZ:  I'll hand this to Ms. Perry to
17  hand to you.
18     Q.   (By Mr. Schultz)  So what I've handed you,
19  Mr. Fasulo -- sorry -- no, I gave you the right copy.
20  Strike that.
21        What I've handed you, Mr. Fasulo, is the
22  2020 Environmental Social and Governance Report for
23  Wynn Resorts.
24        Are you familiar with ESG reports or the fact
25  that -- that Wynn issues one?

1     A.   Yes.
2     Q.   And what is an ESG report?
3     A.   It's --
4         MS. PERRY:  Objection, outside the scope of
5  the designated topics.
6     A.   It's the Environmental and Social Governance
7  Report for the company.
8     Q.   (By Mr. Schultz)  Have you reviewed these in
9  the past?
10     A.   Yes.
11     Q.   For what purpose?
12     A.   For my own situational awareness and, also,
13  for accuracy on topics that are in my -- within my --
14  my job.
15     Q.   So if we turn over to page 42 --
16        MR. SCHULTZ:  And, Vince, I don't know if
17  this is pdf page 42, but it's the page number in the
18  document itself.
19     Q.   (By Mr. Schultz)  Do you see the heading on
20  page 42, Mr. Fasulo, Preventing Human Trafficking?
21     A.   I do.
22     Q.   It begins, Human trafficking is a global
23  issue that requires local efforts to combat.  The
24  hospitality industry must play an important role in
25  helping to prevent it.

1         Now, of course, this is in a Wynn ESG report.
2  But let me ask you if that is consistent with Wynn
3  policy, as you understand it?
4     A.   Yes.
5     Q.   It continues, At Wynn Resorts we rallied
6  around the issue in 2020, developing new training
7  programs and security procedures that are being
8  implemented in 2021 in order to do our part to combat
9  this terrible crime.
10        Are you familiar with the new training
11  programs and security procedures that are referred to
12  here?
13     A.   Yes.
14     Q.   Were there old training programs or was this
15  the first with regard to human trafficking
16  specifically?
17     A.   There was old training that -- we've always
18  had training pertaining to prostitution.
19     Q.   Right.
20        But you did not agree with me a few minutes
21  ago that -- that prostitution -- that some measure of
22  it is necessarily trafficking.  I've asked you a
23  question about trafficking training, and you answered
24  saying that you train on prostitution.
25        Do you feel that training on prostitution is

1  the same thing as training on human trafficking?
2         MS. PERRY:  Objection, misstates the
3  testimony.
4     A.   I would say that when you take steps to
5  minimize prostitution activity on your property, it
6  could have a benefit to things going on outside of your
7  property that you're not aware of.
8     Q.   (By Mr. Schultz)  If you take steps to
9  minimize prostitution on the property, you are taking
10  steps, necessarily, to minimize sex trafficking as
11  well, correct?
12     A.   You could say that.
13     Q.   I'm asking you if you would say that.
14     A.   Yeah, I would say that.
15     Q.   And what is the old training that you're
16  referring to that you said Wynn has always had?
17     A.   It -- it pertains to -- that -- well, first
18  off, all of our policies at Wynn -- any of or
19  properties pertain to guest safety.  That's the
20  overarching theme of all of our policies and security
21  is guest safety and the guest experience.
22        So when you look at prostitution on the
23  property, it's a violation of local law.  And we treat
24  that just like we do any other violation of the law on
25  the property, because it's not good conduct to have

Page 22

1  that in a gaming facility or any other hospitality.
2       So our training would have been about how
3  to -- when we engage with someone that has participated
4  in prostitution, we would trespass them and/or turn
5  them over to local authorities if we believe that they
6  need to look at a specific crime.
7    Q.  And who received this training?
8    A.  All of security would get that training.
9    Q.  Beginning when?
10   A.  When they're hired.
11   Q.  I'm sorry.  Fair answer.
12      Beginning at -- at what point in time did
13 Wynn implement?
14   A.  That has been since the existence of the
15 company.
16   Q.  And when is the first time Wynn had
17 trafficking -- excuse me -- strike that.
18      When is the first time Wynn had training that
19 included the term "trafficking" as distinguished from
20 "prostitution"?
21   A.  It would have been back in 2020'ish, around
22 that timeframe.  And that --
23   Q.  Is that a training?
24   A.  -- is when -- yes, that's when that term
25 became very prevalent in the industry.

Page 23

1    Q.  2020 is when the term became prevalent in the
2  industry?
3    A.  Yes.
4    Q.  The term -- the term being "trafficking"?
5    A.  Human trafficking, yes.
6    Q.  And I'm sorry for talking over you.
7       Down below in the document we were looking
8  at, the ESG Report, it says -- below that first
9  paragraph in blue, it says, In expanding to Las Vegas,
10 Wynn has partnered with the non-profit I Empathize to
11 produce training videos and virtual curriculum that
12 will be required of all Wynn North America employees in
13 2021.
14      Do you know what is referred to there by the
15 term "virtual curriculum"?
16   A.  Yeah.  That was the training videos and other
17 on-line training curriculum for all of -- all of our
18 employees.
19   Q.  So you said training videos, plural.  Is
20 there more than one?
21   A.  There was specific training that was
22 completed for different employee types.
23   Q.  Are there different videos for different
24 employee types?
25   A.  Um, I'd have to go back and look at them

Page 24

1  again to refresh my memory on that.  But they were
2  designed to be -- to target certain classifications of
3  employee, based on where they work and what their job
4  duties were.
5    Q.  When is the first time Wynn instituted
6  training for security, or anyone else, that
7  specifically addressed the red flags or indicators of
8  prostitution?
9    A.  It would have been the same timeframe.
10   Q.  And this says that --
11   A.  For -- for human trafficking.
12      Prostitution would have been since the very
13 beginning.
14   Q.  But limited to security personnel?
15   A.  It would have -- it would have been anybody
16 that would have interacted with a person that could
17 have been engaged in prostitution, but primarily
18 security, yes.
19   Q.  And so would that include front desk, for
20 example?
21   A.  Cocktail servers, bartenders.  It -- it could
22 involve the front desk, depending on the -- that -- the
23 specific year.
24   Q.  And -- so if I'm understanding your
25 testimony, Wynn has always had training for

Page 25

1  guest-facing positions that included indicators of
2  prostitution?
3    A.  It -- yeah.  There would have been training
4  specifically for security.
5       As far as front guest-facing services, that
6  training could have been merely on-the-job training and
7  not a formalized training plan.
8       MS. PERRY:  I object to misstates the
9  testimony (indiscernible).
10   Q.  (By Mr. Schultz)  And, um, would the training
11 that you're referring to for security, would it include
12 things like PowerPoints or handouts or quizzes?
13      MS. PERRY:  Objection, vague and ambiguous.
14   A.  Training does include -- general security
15 training does include PowerPoints and handouts.
16   Q.  (By Mr. Schultz)  And if I understood your
17 testimony the first time, guest-facing positions,
18 including security, receive training on the indicators
19 of trafficking specifically would have been in this
20 2020/2021 timeframe?
21   A.  Yes.
22   Q.  And it says in the document, as I just read
23 it, that it would be required of all Wynn North America
24 employees in 2021.
25      But back-of-house employees still don't

Page 26

1 receive trafficking training, do they?
2    A.  All employees get human trafficking training.
3    Q.  Including housekeepers?
4    A.  Everyone gets it in new hire orientation.
5    Q.  And has that been true since the 2020/2021
6 timeframe?
7    A.  Yes.
8    Q.  It continues, the document I'm referring to,
9 Exhibit 3, The purpose of the training is for employees
10 in both guest-facing roles and back-of-house operations
11 to develop an empathetic victim centric awareness of
12 the risks of human trafficking.  This will help
13 employees spot suspicious behaviors and take the
14 quickest and safest procedures for alerting Wynn
15 security.
16        Is that -- would you characterize the
17 overarching purpose of Wynn's trafficking training to
18 be training on how to identify and report suspected
19 trafficking?
20    MS. PERRY:  Objection, the document speaks
21 for itself.
22    A.  Yes.  I mean it's what the document says.
23    Q.  (By Mr. Schultz)  Right.
24        Putting aside the document, would you agree
25 the primary purpose of trafficking training for

Page 27

1 guest-facing or back-of-house employees is to identify
2 the indicators of sex trafficking and to report it?
3    A.  The potential indicators, yes.
4    Q.  Fair enough.
5        Are you familiar with the AHLA?
6    A.  AHLA?
7    Q.  It's not in the doc -- I don't think it's in
8 the document.
9        The American Hotel Lodging Association?
10    A.  Yes.
11    Q.  Do you know whether Wynn is a member of the
12 AHLA?
13    A.  I believe we are.
14    Q.  Do you know how long Wynn has been a member
15 of the AHLA?
16    A.  No.
17    Q.  Are you aware that AHLA had hotel-specific
18 anti-human trafficking training available as early as
19 2012?
20    A.  No, I did not know that.
21    Q.  You can set aside Exhibit 3.
22        The -- there was a video produced to us, a
23 trafficking training video, and I'm wondering if that
24 is the only trafficking video that has ever been used
25 to train Wynn employees, whatever their position, or

Page 28

1 whether there are variations or updates to the video.
2    A.  There -- from my understanding there's not
3 been update to that specific video.
4        You're talking about the one that I'm in?
5    Q.  Yes, sir.
6    A.  From my understanding there's not been an
7 update to that video.  There was specialized training
8 that was put together for the different job
9 classifications.
10    Q.  And your employees, do -- strike that.
11        Does the training occur through your learning
12 management system?
13    A.  Yes, through Learning and Development.
14    Q.  And walk me through, if you would, just in
15 general terms.  If I'm an employee, I presume I'm
16 assigned training in some fashion, told you need to
17 take this training?
18    A.  Yes.
19    Q.  And what do I do in order to accomplish that?
20    A.  You either take it in person, depending on
21 the course and curriculum, or you can take it virtually
22 from a computer.
23    Q.  Would it be the same training depending on
24 whether I do it virtually versus in person?
25    A.  Yes.

Page 29

1    Q.  And what is it -- so let's say I -- I -- I
2 log into the system.  What happens at that point?
3    A.  You would navigate to the class that you're
4 going to take, and then you would click on the class
5 that you're going to take and it would start the
6 curriculum.
7    Q.  And when you say "to the class you're going
8 to take," would there only be one, like -- well,
9 there's how to clean a room and there's human
10 trafficking and I'm clicking on trafficking, or are
11 there variations of trafficking available?
12    MS. PERRY:  Objection, form.
13    A.  No.  It would be there's one human
14 trafficking type training.
15    Q.  (By Mr. Schultz)  And --
16    A.  You wouldn't get that at the same time you're
17 learning how to clean a room.
18    Q.  Right.
19        I'm just trying to visualize the interface as
20 an employee.  You know, do I have four trafficking
21 training options or, you know -- is there only one,
22 and you told me there's only one.
23        Does it begin with the video?
24    A.  I believe it does.  I'd have to go back and
25 look at it again.  It's been a while since I've watched

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

Page 30

1 it.
2    Q.   And does it continue -- let's say once the
3 video is over, are there other materials that are
4 presented?
5    A.   There could be PowerPoint slide presentation
6 with narration.  There could be written -- written
7 documentation on the screen.
8    Q.   And is that what you were referring to
9 earlier when you said it might vary depending on what
10 position I'm in?
11    A.   Correct.
12    Q.   And so to be clear, there are PowerPoints and
13 there are written documents, but which ones I might see
14 would vary depending on my role in the company?
15    A.   When it comes to the overarching theme of
16 preventing human trafficking, you're going to have a
17 consistent presentation.
18        When it comes to the specific indicators that
19 might be more conducive to the job classification,
20 that's where it would differ.
21    Q.   And so how, for example, would the
22 indicators, if they differ between, say, housekeeping
23 and front desk clerk, how would they differ, if they
24 differ?
25    A.   It would be -- it would be designed to depict

Page 31

1 the circumstances in which a front desk agent might be
2 engaged with somebody or interact with somebody that's
3 involved in human trafficking versus a guest room
4 attendant that is in a room and comes across somebody
5 that -- that has indicators that they believe involve
6 the human trafficking.
7    Q.   And if your boss said, Mr. Fasulo, can you
8 please go and get me the PowerPoints that would be
9 presented during the trafficking training for
10 housekeepers, could you do that?
11    A.   I would call Learning and Development and get
12 it from them.
13    Q.   All right.  Are there quizzes or any kind
14 of -- well, are there quizzes at the end of it to -- to
15 test what was learned or not learned?
16    A.   I'd have to go back and look at it to refresh
17 my memory.  You're talking about five years ago, so I'd
18 have to look at it.
19    Q.   Have you taken the training yourself?
20    A.   Yes.  I mean I was part of it.
21    Q.   And how often, if at all, are employees
22 retrained?
23    A.   It is brought up in the workplace yearly, and
24 it's also touched on in new hire orientation when a new
25 employee is hired.

Page 32

1    Q.   When you say "touched on," does that mean
2 there's some -- am I getting the full-on training that
3 you've described or is there some different version for
4 onboarding new hires?
5    A.   The last that I saw it was the -- it was
6 the -- it was not the complete full version.  It was
7 the more overarching global policy of anti-human
8 trafficking.  And then the departments, when they get
9 to their department, that's when they would be involved
10 in the specifics.
11    Q.   And then everyone is required -- if I
12 understood, everyone is required to retrain annually?
13    A.   They are supposed to, yes.
14    Q.   And what does Wynn do to ensure that they are
15 doing what they're supposed to in that regard?
16    A.   I don't work in Learning and Development, but
17 I know they have the capability of checking to see
18 how -- what the completion rate is.
19    Q.   Who is in charge of Learning and Development?
20    A.   Right now it's Monique -- Monique Moncrief, I
21 believe, is her name.
22    Q.   And from 2020 until today, has there -- has
23 there been someone else in that position before her?
24    A.   Yes.  There's been a -- a couple of people.
25 They roll up under human resources.

Page 33

1    Q.   And who are they?
2    A.   Courtney Prescott is our VP over human
3 resources right now, and we've had a couple people
4 before Monique that are no longer with the company.
5    Q.   Do you recall their names?
6    A.   Erin Macy was in Learning and Development;
7 Alicia -- I can't remember her last name.  It's
8 Alicia-something.  This goes way back.  And then there
9 was another person that left us and went to Red Rock,
10 went to Stations, but I can't -- Damon, Damon, I think,
11 is the first time.
12    Q.   And would all of these folks, who you've
13 named, be in the HR department?
14    A.   They all fall under HR, yes.
15    Q.   If we go back to earlier training on red
16 flags of prostitution that you referred to earlier, who
17 would have been in charge of conducting that training?
18    A.   It would --
19        MS. PERRY:  Objection, vague as to time.
20        A.   When -- when specifically are you talking?
21    Q.   (By Mr. Schultz)  Well, let's go back to the
22 2012 to 2014 timeframe.
23    A.   It would have been in security, and we have
24 our own training department.
25    Q.   Do you know who was in charge of it during

9 (Pages 30 - 33)

Page 34

1 that timeframe?
2    A.   In charge of what specifically?
3    Q.   Security's trainings -- security department's
4 own training?
5    A.   There was a gentleman when -- I -- I don't
6 rem -- I don't know for sure all the names that were in
7 training at the time. There was Joe Rosa. But there
8 are a few different people that were over security at
9 the time.
10   Q.   I saw in the spreadsheet that was produced to
11 us, Gary Deel, was -- had training in his title, but he
12 didn't cover the whole 2012 to 2014 timeframe.
13       Do you recognize his name?
14   A.   I've heard that name. I don't know him
15 personally.
16   Q.   Who developed the PowerPoints that employees
17 view when they log in and take the training or come in
18 person and take the training?
19   A.   It would have been a combination of Learning
20 and Development and our legal department.
21   Q.   And would there be someone -- you've given me
22 the names of people who were in charge of Learning and
23 Development. Would there be somebody in a -- a
24 lower -- below the -- the actual head of the department
25 who had hands-on experience in developing the training?

Page 35

1    A.   There was a -- couple of people. I mean I
2 was involved in that; Laurie Jamison was involved in
3 that.
4    Q.   Is she still with the company?
5    A.   Yes, sir.
6    Q.   And if I come in person -- we've talked about
7 logging onto the system and doing the training. If I
8 come in person, is it a -- like a group of people in a
9 room and somebody giving a presentation of more or less
10 the same materials?
11   A.   Yes.
12   Q.   How frequently does that occur?
13   A.   I'd have to go back and look in -- look at
14 the schedule to -- to answer you accurately.
15       MR. SCHULTZ: Let's pull up, if we can,
16 Exhibit 4. This is the training video that was
17 produced to us.
18       (Fasulo Deposition Exhibit 4 was marked for
19 identification.)
20   Q.   (By Mr. Schultz) And this might be slightly
21 obnoxious, but we're going to watch the video. I think
22 it's about 20 minutes long. And I'm going to pause
23 from time to time and ask you questions as they come
24 up.
25   A.   Sure.

Page 36

1       (Video played off the record.)
2    Q.   (By Mr. Schultz) Mr. Fasulo, were you
3 involved in any way in the creation of this video?
4    A.   I gave input, but I'm not the creator of it.
5    Q.   Did you --
6    A.   I participated.
7    Q.   I'm sorry.
8       Were you involved in investigating sex
9 trafficking in your time in law enforcement?
10   A.   Yes.
11   Q.   Would you agree that the -- the story we just
12 heard is a -- sort of textbook example of a pimp
13 using force, fraud, and coercion on this woman?
14   A.   Yes.
15   Q.   And do you know whether she was trafficked at
16 the Wynn?
17   A.   I don't believe she was.
18       MR. SCHULTZ: All right. We can continue.
19       (Video played off the record.)
20       MR. SCHULTZ: Let's pause it there, please,
21 Vince.
22   Q.   (By Mr. Schultz) So Ms. Krum?
23   A.   Yes.
24   Q.   She's general counsel for Wynn?
25   A.   She's general counsel for Wynn Resorts.

Page 37

1    Q.   And she says that Wynn knows that human
2 traffickers use hotels and motels to conduct their
3 criminal activity, correct?
4    A.   That's what she said.
5    Q.   And, of course, the Wynn is among those
6 hotels and motels, it's not an exception, right?
7    A.   Correct.
8    Q.   And so we know that sex trafficking,
9 therefore, has occurred at Wynn, because Wynn knows
10 that it -- traffickers use hotels and motels, right?
11       MS. PERRY: Objection, misstates his
12 testimony.
13   A.   No. We know that prostitution has occurred
14 on property. Whether or not we know that human
15 trafficking has occurred is a -- is a whole
16 different -- different question.
17   Q.   (By Mr. Schultz) So is Wynn saying that, in
18 fact, it is an exception. It knows that human
19 traffickers use hotels and motels to conduct their
20 activity, but not at Wynn?
21   A.   No.
22       MS. PERRY: Objection, misstates the
23 testimony.
24   A.   No. We know that hotel rooms are used to
25 facilitate human trafficking or prostitution. If -- I

10 (Pages 34 - 37)

Page 38

1 mean, we're a hotel, so we could be -- our rooms could
2 be used just like any other hotel's rooms could be
3 used.
4     Q.   (By Mr. Schultz)  At what point in time did
5 Wynn first know that human traffickers use hotels and
6 motels to conduct their criminal activity?
7     A.   Well, I think if you look back over time and
8 you look at how human trafficking, the topic itself has
9 evolved, back in the early 2000s and even into the mid
10 2000s and into the late 2000s, you know, up into 2010,
11 2012, 2015, human trafficking wasn't even a known term.
12 It was all about prostitution.  Even in law enforcement
13 it was -- the term was just "prostitution."
14         Then it evolved into -- as the awareness grew
15 around the topic of trafficking, that's when law
16 enforcement and the federal law enforcement entities
17 all started to use the term "human trafficking."  And
18 that's what led us into, in the hotel industry, to
19 start using looking into human trafficking.
20         So it's evolved over time, so it's hard to
21 answer your question because that wasn't even a term
22 used back then.  In -- in all my years in law
23 enforcement I never even heard the term "human
24 trafficking" until late in my career, it was always
25 just about prostitution.

Page 39

1         So I -- I don't know if that answers your
2 question.
3     Q.   (By Mr. Schultz)  You mentioned 2010, 2012,
4 2015.  Can you narrow that down?
5         At what point in that window of time did Wynn
6 become aware of trafficking as an issue?
7         MS. PERRY:  Objection, misstates the
8 testimony.
9     A.   I think that it -- the -- human trafficking
10 became a mainstream topic in the -- in the industry in
11 2019/2020.
12     Q.   (By Mr. Schultz)  Would you say therefore,
13 then, that Wynn was on the forefront in the industry in
14 instituting trafficking training when it did so in --
15 for employees in the 2020/2021 timeframe?
16     A.   I would.
17     Q.   And Wynn is aware the Trafficking Victims
18 Protection Act was passed in 2000, correct?
19     A.   I believe that our legal department would
20 know that, yes.
21     Q.   And in 2008, it was the Trafficking Victims
22 Protection Re-Authorization Act was passed, and it
23 included provisions that provided for civil liability
24 for businesses like hotels if they benefited by
25 participating in a venture that included a violation of

Page 40

1 sex trafficking policies.
2         Is Wynn aware of that when it happened?
3         MS. PERRY:  Objection, calls for a legal
4 conclusion, misstates the statute.
5         MR. SCHULTZ:  I'm asking for Wynn's
6 awareness.
7     A.   Yeah --
8         MS. PERRY:  Same objections.
9     A.   -- I would -- I would -- I would imagine that
10 our legal team would understand what the legal terms
11 are that you're speaking of or what that resolution was
12 or law.
13         But, like I said, back in 2019/2020 is when
14 we started to emphasize on the actual issue of human
15 trafficking in the sense of how it is today.
16         MR. SCHULTZ:  Let's continue the video,
17 please, Vince.
18         (Video played off the record.)
19         MR. SCHULTZ:  Let's pause here.
20     Q.   (By Mr. Schultz)  So one of the speakers on
21 behalf of Wynn said that Wynn Hotels has a
22 responsibility to stop trafficking from occurring.
23         Did you hear that?
24     A.   Yes.
25     Q.   And would you agree that Wynn had that

Page 41

1 responsibility when it -- at the earliest when it first
2 knew that trafficking was occurring?
3         MS. PERRY:  Objection, calls for a legal
4 conclusion.
5     A.   I would say that we have a responsibility to
6 stop any crime from occurring.  That's our -- that is a
7 fundamental aspect of our company.
8     Q.   (By Mr. Schultz)  Right.  My question is a
9 little more focused than that.
10         Wynn states in the video that it has a
11 responsibility to stop trafficking from occurring.
12         I'm asking you, do you agree that
13 responsibility arose when Wynn Hotels first learned
14 that trafficking was occurring?
15         MS. PERRY:  Objection, calls for a legal
16 conclusion.
17     A.   I would -- I would -- I would say that you
18 have an obligation to stop a crime from occurring no
19 matter when it is that you find out that it has
20 occurred.
21     Q.   (By Mr. Schultz)  Okay.  And would you agree
22 that at whatever point Wynn became aware that
23 trafficking occurred on its premises, from that moment
24 forward it was foreseeable that trafficking would occur
25 again?

11 (Pages 38 - 41)

Page 42

1    MS. PERRY:  Objection, calls for a legal
2  conclusion.
3    A.   If I understand your question correctly, I
4  think that you -- one could assume that human
5  trafficking occurs in our city.  It's a clandestine
6  type crime.  So we have an obligation as a company or
7  as a property to enforce the states and the local laws
8  that pertain to any crime that could occur on our
9  property, including human trafficking.
10   Q.   (By Mr. Schultz)  At what point in time did
11 Wynn's Board of Directors begin discussing the issue of
12 sex trafficking at Wynn?
13   MS. PERRY:  Objection, outside the scope of
14 the designated topics.
15   A.   I wouldn't know that answer.  I'm not on the
16 Board.
17   Q.   (By Mr. Schultz)  At what point in time, if
18 you know, did the Board of Directors begin discussing
19 the potential need to train staff on human trafficking?
20   MS. PERRY:  Same objection.
21   A.   Same answer.  I'm not part of the Board, so I
22 don't know.  I'm not privy to those conversations.
23   Q.   (By Mr. Schultz)  Whenever those discussions
24 occurred -- well, strike that.
25   Would you agree -- well, let me ask you this.

Page 43

1    In order for this video to be made and for
2  Wynn to have a policy to show it to employees, would
3  that be a Board of Directors decision?
4    MS. PERRY:  Objection, outside the scope of
5  the designated topics.
6    A.   I -- I don't know.  I don't know the
7  intricate workings of the Board.  I'm familiar with our
8  Board of Directors.
9    But I think the implementation of this type
10 of video could come from the Board, it could come from
11 our CEO, it could come from the property president.
12   Q.   (By Mr. Schultz)  You saw the red flags that
13 went up on the screen there a few moments ago, correct?
14   A.   Yes.
15   Q.   Does Wynn train any employees, including
16 security, on any red flags other than the ones that we
17 see in the video?
18   A.   Yes, depending on the classification of their
19 job.
20   Q.   And would those indicators, other than those
21 that we saw in the video, be in, for example, the
22 PowerPoints or other written materials that you
23 referred to earlier?
24   A.   Yes.  And you're talking about from 2020
25 forward, right?

Page 44

1    Q.   Yes, sir.
2    A.   Yes.
3    Q.   Would you agree that Wynn instituted this
4  trafficking training and training on the indicators for
5  trafficking, because training employees increases the
6  likelihood trafficking on the premises will be
7  recognized and reported?
8    A.   Yes.
9    MR. SCHULTZ:  All right.  We can continue.
10   (Video played off the record.)
11   Q.   (By Mr. Schultz)  Would you agree the --
12 Ms. Rangel, the victim who was speaking in that video,
13 that her pimp was exercising force and coercion --
14 and/or coercion over her even though he wasn't
15 physically present with her?
16   A.   The way she describes it, yes.
17   Q.   Do you have any reason to believe, you, Wynn,
18 that our client, A.H., is not telling the truth when
19 she says she was sex trafficked at the Wynn Hotel?
20   A.   Do we have -- say that again.
21   Q.   Does Wynn have any reason to believe that our
22 client, A.H., is being untruthful when she alleges that
23 she was trafficked at the Wynn Hotel?
24   A.   I would say that we don't have any evidence
25 to suggest that she wasn't trafficked, whether she was

Page 45

1  at our property is a different conversation.
2    Q.   At your time at Wynn are you aware of any
3  confirmed -- rather than suspected -- confirmed
4  incident of sex trafficking on the premises?
5    A.   What time?
6    Q.   From the time that you began at the company
7  through today?
8    A.   Yes.
9    Q.   How many?
10   A.   I know of -- I -- I think it's two confirmed.
11   Q.   Do you know whether either of the victims or
12 any of the victims in those two incidents has filed a
13 lawsuit against Wynn?
14   A.   I don't know that.
15   Q.   Are you aware of any confirmed incidents of
16 sex trafficking before you arrived at the company?
17   A.   No.
18   Q.   Does Wynn take any efforts to measure the
19 effectiveness of the training that it provides for
20 employees?
21   A.   In what regard?
22   Give me an example of what you're looking
23 for.
24   Q.   Well, I'm not sure what it would look like.
25   I'm just curious whether Wynn says, you know,

12 (Pages 42 - 45)

Page 46

1  we were going to mandate this training to teach
2  employees how to recognize potential indicators of
3  trafficking and how to report it.
4      Has there been followup to find out if it's
5  actually had effect?
6    A.  Since this training went out?
7    Q.  Yes, sir.
8    A.  Video went out?
9        I think the results speak for itself.  I mean
10  the fact that we had two women that had asked for
11  intervention or help.  What ultimately became of them,
12  I have no idea, because that's out of our hands at that
13  point.  The fact that we trespass a number of people
14  every single month from the property that engage in
15  prostitution like behavior on the property, shows that
16  that training is working.
17        The fact that I have bartenders or cocktail
18  servers or other employees reporting suspected
19  behavior, tells me that the training is working.
20    Q.  Have you personally gotten feedback from
21  employees at any point saying, You know what, that
22  trafficking training really opened my eyes, or I
23  learned a lot through this training that was provided?
24    A.  I've heard more conversation around just
25  that, yes, that they -- that -- that it was good video,

Page 47

1  it was good training, and they have a better
2  understanding as to what the term "human trafficking"
3  is.
4    Q.  Did Wynn reach out to anyone, other than I
5  Empathize, when it began formulating the initial
6  formulation of its trafficking training?
7    A.  Not that I'm aware of.  That doesn't mean
8  that they didn't, I just may not be aware of it.
9    Q.  Did Wynn feel the need to go out and
10  empirically validate the effectiveness -- effectiveness
11  of trafficking training before mandating that training
12  for employees?
13    A.  I -- I don't believe so.
14        MR. SCHULTZ:  It's probably a good time for a
15  break.  I'm going to change gears a little bit.
16        MS. PERRY:  Sure.
17        THE VIDEOGRAPHER:  We're going off record as
18  of 12:12 [sic] a.m.
19        (A recess was taken.)
20        THE VIDEOGRAPHER:  We are back on record as
21  of 10:30 a.m.
22    Q.  (By Mr. Schultz)  Mr. Fasulo, you mentioned
23  two confirmed instances of trafficking at the Wynn that
24  you are aware of.
25        Were both of those situations where the

Page 48

1  victim came forward or were they situations where she
2  was identified by someone at the hotel as a potential
3  victim?
4    A.  It would have been based on their involvement
5  in prostitution on the property and they were caught,
6  and then we offer services.
7    Q.  And when did you all begin doing that?
8    A.  Which part?
9    Q.  Offering services.
10    A.  It would have been back in 2020/2021.
11    Q.  And from that point forward, does Wynn, when
12  you detain somebody for prostitution during the -- the
13  interview or trespass process, do you ask them as a
14  matter of routine whether they have a pimp?
15    A.  Well, when you say "a matter of routine"
16  asking them if they have a pimp, I -- it wouldn't be
17  that specific type of terminology.  It would be more
18  geared around that there are services for people that
19  may be trafficked or in a predicament where they feel
20  that they need help.
21        So -- and it -- it also would depend on
22  how the officer at the time wants to word that, but
23  it's usually based with empathy.
24        And -- and I just -- I want to be clear
25  because you keep saying Wynn.  I'm talking specifically

Page 49

1  about Wynn, LLC, Las Vegas, not Wynn Resorts.  So
2  everything I've been talking about has been at Wynn Las
3  Vegas.
4    Q.  Right.
5        (Indiscernible due to simultaneous crosstalk
6  among the parties.)
7    Q.  -- the operation?
8    A.  Yeah.  You keep saying "Wynn."  I just want
9  to make the distinction, we're not talking about Wynn
10  Resorts, we're talking about Wynn Las Vegas.
11    Q.  Right.  Under --
12    A.  Okay.
13    Q.  -- stood.
14        And it's not your concern, but we have an
15  agreement between counsel regarding the testimony, so
16  we don't have to state this through the deposition.
17    A.  Okay.  I just --
18        THE STENOGRAPHER:  And, I'm sorry, can we
19  move the microphone a little bit closer.  I could not
20  hear counsel.
21        MR. SCHULTZ:  Is this better?
22        THE STENOGRAPHER:  Yes.
23        MR. SCHULTZ:  All right.
24        THE STENOGRAPHER:  Thank you.
25    Q.  (By Mr. Schultz)  And does Wynn -- or has

13 (Pages 46 - 49)

Page 50

1 Wynn since this 2020 timeframe asked or offered
2 services to every person who is trespassed as a
3 prostitute?
4    A.   Yes.
5    Q.   And is that because Wynn recognizes that all
6 of those people are potential human trafficking
7 victims?
8    A.   It's because we don't know what's going on in
9 their life.  We're just offering that help in case
10 there is the potential that they were being trafficked.
11    Q.   And would the offer of services be reflected
12 in the incident reports that are generated in
13 connection with the trespasses?
14    A.   Not always.
15    Q.   I'm going to hand you what I've marked as
16 Exhibit 4.
17         (Fasulo Deposition Exhibit 4A was marked for
18 identification.)
19    Q.   (By Mr. Schultz)  And Exhibit 4, Mr. Fasulo,
20 is an article -- a news story titled "Man with Lengthy
21 Criminal History Becomes Latest Addition to Nevada's
22 Black Book," from Friday, August 26th, 2022.
23         And I'll tell you, you are quoted in this
24 article.  Are you familiar with the article?
25    A.   I'm familiar with it -- with the topic.  I'm

Page 51

1 not familiar with this specific article.
2    Q.   Do you recall being interviewed?
3    A.   Yes.
4    Q.   And do you recall the -- the incident?  And
5 by "incident," I mean the -- this trafficker going into
6 Black Book?
7    A.   Yes.
8    Q.   What is the Black Book?
9    A.   The Black Book is a gaming -- it's part of
10 our gaming regulation where if you are entered in by
11 the Gaming Control Board into the Black Book, you're no
12 longer allowed to enter into any gaming facility in the
13 state of Nevada otherwise you're committing a crime.
14    Q.   The article begins, Las Vegas Metropolitan
15 Police Captain Fred Haas is fed up.  Quote, We will not
16 allow sex trafficking in our community, he says.  It's
17 about the safety of our kids, our daughters, and our
18 women.
19         Do you know Captain Haas?
20    A.   I do.
21    Q.   And did you work with him personally when you
22 were in law enforcement?
23    A.   He worked for me.
24         THE VIDEOGRAPHER:  Counsel, I apologize for
25 interrupting.

Page 52

1    Q.   Do you have a tab number?
2         MR. SCHULTZ:  Oh, I'm sorry, yes.  It's 11,
3 and it's Exhibit 4 [sic] to the deposition.
4    Q.   (By Mr. Schultz)  Sir, the article goes on.
5 It describes that there was testimony, and the Gaming
6 Board voted unanimously to add 44-year-old Kendrick
7 Laronte Weatherspoon to Nevada's "so-called" Black
8 Book.
9         Were you at the actual proceedings for this
10 before the Commission?
11    A.   I was.
12    Q.   And why were you there?
13    A.   To testify on behalf of -- or advocating for
14 him to be entered into the Black Book.
15    Q.   Do you know where he carried out trafficking
16 activities at the Wynn?
17    A.   I don't remember specifically.
18    Q.   The article continues, The reasons cited for
19 him being put in the Black Book included Weatherspoon's
20 history of violence against women.  Police say that
21 that includes forcing his victims into prostitution
22 along the Las Vegas strip.
23         So he's a pimp, right?
24         MS. PERRY:  Objection.
25         THE DEPONENT:  I'm sorry, what?

Page 53

1         MS. PERRY:  Objection.
2    A.   You could -- that's the generalized term
3 that's used for people in the industry.
4    Q.   (By Mr. Schultz)  He's a sex trafficker?
5    A.   He could be.
6    Q.   Could be.
7         You -- you're not comfortable saying that
8 this --
9    A.   No, yeah, he -- he was.  It was --
10    Q.   Yes.
11    A.   -- proven that he was.
12    Q.   That's what I was asking.
13    A.   Okay.
14    Q.   Down below it says, Todd Fasulo, vice
15 president of corporate security for Wynn Las Vegas,
16 said that while not all traffickers can be added to the
17 Black Book, this example sends a strong message.
18         Do you recall commenting that not all
19 traffickers can be added to the Black Book?
20    A.   Yes.
21    Q.   Why not?
22    A.   Because it takes a hearing in order to get
23 them into the Black Book.  We don't have control over
24 that.
25    Q.   Your quote, as quoted here continues, This

14 (Pages 50 - 53)

Page 54

1 should be strictly for the worst, most violent criminal
2 that preys upon a woman, says Fasulo. And they become
3 a victim most of the time through no fault of their
4 own, and they use casinos to facilitate that crime.
5       Do you believe that's an accurate quote?
6   A.   Yes, I said it.
7   Q.   And below it says, The Black Book typically
8 includes people tied to organized crime and gaming
9 cheats.
10       So why would it be that hearing process or no
11 hearing process, people cheating at games go into the
12 Black Book, but human traffickers shouldn't?
13       MS. PERRY:  Objection, misstates the
14 testimony.
15   A.   Yeah.  Well, I never said that a human
16 trafficker shouldn't go into the Black Book.
17       But if you're correl -- if you're comparing a
18 gaming cheat, or an organized crime figure to a human
19 trafficker, the -- the gaming regulations are pretty
20 clear in Nevada that as a licensee you have to run a
21 clean establishment and you can't have people that are
22 reputable or people running around knowingly committing
23 crimes on your property.
24       So there's an obligation that -- you know, to
25 protect the integrity of our industry, the gaming

Page 55

1 industry, and the livelihood of the state of Nevada,
2 you don't want organized crime, you don't want cheats,
3 and you don't want anybody else committing crimes on
4 your property at any level, whether it's organized
5 crime or -- or cheating or human trafficking.
6       I mean you could say that about theft.  You
7 could say that about a lot of different types of crimes
8 that goes on in our environment.
9   Q.   If you had it your way, the Wynn, would
10 everyone who is confirmed as a sex trafficker at a
11 casino in Las Vegas be in the Black Book?
12   A.   I would -- I would say that if they go
13 through due process and they're given the opportunity
14 to have that process done and the decision's to put
15 them in the Black Book, then, yes.
16   Q.   In the two instances where Wynn confirmed sex
17 trafficking occurring on its property, were the sex
18 traffickers identified?
19       MS. PERRY:  Objection, misstates the
20 testimony.
21   A.   I -- I don't know.  All we know is that we
22 offered help, they took the help.  What happens after
23 that, we don't know.  It's off our property.
24   Q.   (By Mr. Schultz) You recognize under Nevada
25 law it is unlawful for a prostitute to engage in

Page 56

1 prostitution or solicitation therefore, except in a
2 licensed house of prostitution?
3   A.   Yes.
4   Q.   And are you aware that it is unlawful for a
5 customer to engage in prostitution or solicitation
6 therefore, except in a licensed house of prostitution?
7   A.   Yes.
8   Q.   And, of course, the Wynn is not a licensed
9 house of prostitution, right?
10   A.   It is not.
11   Q.   So when a customer solicits or engages with a
12 prostitute at the Wynn, both of them are committing a
13 crime, right?
14   A.   Potentially, yes.
15   Q.   And so when a prostitute solicits a customer
16 and the customer engages with the prostitute, in that
17 instance, no matter who's approaching who, they're both
18 committing a crime under Nevada law, right?
19       MS. PERRY:  Objection, improper hypothetical.
20   A.   So I want to make sure I understand your --
21 your question.  So I want to answer it --
22   Q.   Sure.
23   A.   -- in this manner.
24       A man and a woman speaking to each other is
25 not a crime, even if she's a prostitute.  The minute

Page 57

1 there's a conversation of sex for money, now you have a
2 crime.
3   Q.   Right.
4       A -- a guest at the Wynn hotel, a registered
5 guest, who solicits prostitution or engages in
6 prostitution with a prostitute, is in violation of
7 Nevada law, right?
8   A.   As --
9       MS. PERRY:  Calls for a legal conclusion.
10   A.   Yes.  As long as there was sex for money.
11   Q.   (By Mr. Schultz) Does there have to actually
12 be a sex act, to your understanding, or is solicitation
13 for prostitution itself sufficient?
14   A.   That's sufficient.
15       MS. PERRY:  Same objection.
16   A.   That's sufficient.
17   Q.   (By Mr. Schultz) Does Wynn have a policy of
18 trespassing every guest known to have committed the
19 crime of solicitation or engaging with a prostitute?
20   A.   Yes.
21   Q.   And how many times has that occurred?
22   A.   Since when?
23   Q.   That you're aware of.
24   A.   We trespass hundreds of people a month, not
25 all for prostitution.  If you break the law, we

15 (Pages 54 - 57)

Page 58

1  trespass you.  If we knowingly know that you break the
2  law, we trespass you.
3     Q.  Does Wynn notify guests in any manner that
4  prostitution is illegal in Clark County?
5     A.  Yes.  If they ask or it's apparent to an
6  employee that that's a -- that that's the behavior
7  that's being done, then, yeah, the employee would most
8  likely say something to the guest and tell them that
9  it's illegal.
10    Or if they're asked, there are -- I can think
11  of a few different times where even our, like, security
12  or our operating team in our nightclubs get asked for a
13  woman, and we tell them that it's illegal in the state
14  of Nevada or in this county, nor do we condone it on
15  our -- on our property.
16    Q.  And does Wynn -- aside from those
17  interactions in real-time, so-to-speak, does Wynn have
18  any signage or, you know, communications, for example,
19  through the reservation telling people, hey, look, you
20  come to Las Vegas, understand prostitution is illegal?
21    A.  Yeah.  I -- I -- I don't remember
22  specifically what's on the -- in the fine print of our
23  registration process, but I do know that we have
24  signage in restroom stalls that -- that -- that goes
25  towards the whole prostitution issue.

Page 59

1     Q.  What is the iTrack system?
2     A.  It is a records management system for all
3  security incidents that we have on our property.
4     Q.  And if a guest is deemed to have solicited or
5  engaged in prostitution in violation of the law and is
6  trespassed, that would be reflected in iTrack, correct?
7     A.  Yes, it would.
8     Q.  Every instance?
9     A.  Yes.
10    Q.  If Wynn wanted to deter sex trafficking on
11  its premises -- and I'm not suggesting in my question
12  it doesn't want to -- but if it wanted to, wouldn't you
13  agree it would be effective to build a reputation as a
14  hotel that will trespass and/or turn over to police any
15  guest that engages with a prostitute?
16    A.  If we believe that a crime has occurred, yes.
17    MR. SCHULTZ:  Let's pull up next, please,
18  Tab 12.  And this will be Exhibit 5.
19    (Fasulo Deposition Exhibit 5 was marked for
20  identification.)
21    Q.  (By Mr. Schultz)  And for the record, what
22  I'm handing you as Exhibit 5, Mr. Fasulo, is a document
23  produced to us by Wynn with a Bates number of
24  Wynn A.H. 732.  And just take a moment and -- and look
25  at it.

Page 60

1     My first question would be whether you've
2  seen this before?
3     A.  I have.
4     Q.  It's a memorandum to supervisors and above
5  from Susie McDaniel, senior vice president of human
6  resources; subject: Human Trafficking Awareness
7  Training Launched, correct?
8     A.  Yes.
9



Page 61

1



Golkow Technologies,
A Veritext Division

877-370-3377                                www.veritext.com

Page 62



Page 63

1

6    Q.   Thank you.  You can set that aside.
7        MR. SCHULTZ:  Let's pull up Tab 5, Vince.
8  And I'll mark this document as Exhibit 6 to your
9  deposition.
10       (Fasulo Deposition Exhibit 6 was marked for
11  identification.)
12       Q.   (By Mr. Schultz)  This is a somewhat lengthy
13  and very small print, for which I apologize, document
14  that I've marked as Exhibit 6.
15       And I'll give you a moment, Mr. Fasulo, to
16  look it over, as I would be surprised if you've seen it
17  before.
18       MR. SCHULTZ:  And for the record, this is the
19  website U.S. Department of State Archives that we page
20  vaulted, as you can see from the confirmation on the
21  second page.
22       Q.   (By Mr. Schultz)  And it's titled The Link
23  Between Prostitution and Sex Trafficking.  And it's
24  dated November 24th, 2004.
25       Do you see that?

Page 64

1    A.   I do.
2    Q.   And it begins -- let me ask you, have you
3  ever seen this before?
4    A.   No.
5    Q.   The U.S. government adopted a strong position
6  against legalized prostitution in a December 2002
7  national security presidential directive, based on
8  evidence that prostitution is inherently harmful and
9  dehumanizing and fuels trafficking in persons, a form
10  of modern-day slavery.
11       Now at least as we sit here today, would the
12  Wynn hotel agree that prostitution is inherently
13  harmful and dehumanizing and fuels trafficking in
14  persons?
15    A.   Yes.
16    Q.   And as I understand it, despite the fact that
17  the Trafficking Victims Protection Act was passed
18  25 years ago, Wynn would not have had that awareness
19  back in 2004 when the Department of State issued this,
20  true?
21    A.   Say that again.
22       MS. PERRY:  Objection, outside the scope of
23  the topics.
24    A.   Say that again.
25    Q.   (By Mr. Schultz)  I'm not sure I can say it

Page 65

1  again.
2        MR. SCHULTZ:  Can we read it back?
3        THE STENOGRAPHER:  Yes.
4        And as I understand it, despite the fact that
5  the Trafficking Victims Protection Act was passed
6  25 years ago, Wynn would not have had that awareness
7  back in 2004 when the Department of State issued this,
8  true?
9        MS. PERRY:  Objection, outside the scope of
10  the designated topics.
11    A.   I don't know what they would have known back
12  in 2004.
13    Q.   (By Mr. Schultz)  If --
14       MS. PERRY:  Yeah, Wynn wasn't open in 2004.
15       MR. SCHULTZ:  All right.  That's a fair
16  point, so they definitely didn't know.
17    Q.   (By Mr. Schultz)  Let me ask you this.  The
18  -- the Department of State, as evidenced here, more
19  than 20 years ago recognized the link between
20  prostitution and sex trafficking in -- if I understand
21  your testimony -- correct me if I'm wrong -- Wynn first
22  drew that connection somewhere at or after 2015?
23    A.   So the distinction of human trafficking --
24  the Wynn's always known about prostitution.  Over time,
25  since Wynn Las Vegas was built and opened, prostitution

17 (Pages 62 - 65)

Page 66

1  was considered just like any other crime in the state
2  of Nevada or in Clark County.
3      As you move forward and you get to 2018/2019,
4  that's when human trafficking really started to become
5  prevalent in the -- in the city as far as a term used
6  by local law enforcement, which is what prompted all of
7  the hotel industry to start using the term of "human
8  trafficking."
9      We always recognized that prostitution was a
10  violation of the law and that it was immoral and that
11  it was dehumanizing and -- and was not condoned on --
12  on any property.
13      And -- I -- I mean I can't speak for the
14  other properties in the city, but we all take the same
15  stance with that.
16      So I think as you talk about the evolution of
17  human trafficking, you -- I mean prostitution goes back
18  hundreds of years.  But the evolution of human
19  trafficking, where they put the correlation between
20  then started to build out education programs around
21  that, really, didn't start to pop up in Clark County
22  until 2019/2020.  It was still considered prostitution.
23      But the act of prostitution and the
24  indicators of someone engaged in prostitution are
25  somewhat the same as what human trafficking is looked

Page 67

1  upon today.  So, you know, it -- I think it's only fair
2  to, really, look at the evolution of the issue and the
3  problem when you look at the totality of the questions
4  that you're asking me, because it actually has evolved.
5      But prostitution is prostitution, it's
6  against the law.  We've never tolerated that.  And
7  human trafficking can be correlated to prostitution,
8  there's no denying that.
9      But because human trafficking in the true
10  sense of the definition is such a clandestine crime,
11  not everyone is going to know that that woman or man is
12  being trafficked in the sense of the definition of
13  "human trafficking."  But we do know that prostitution
14  is illegal and we know what the indicators are, and
15  they actually sometimes overlap each other.
16      Q.  Based on that response, is it fair to say sex
17  trafficking was occurring before 2018 -- strike that.
18      Is it fair to say sex trafficking was
19  occurring in Las Vegas hotels before 2019, but it was
20  around the 2018/2019 timeframe that Wynn started to
21  understand the connection between prostitution and sex
22  trafficking?
23      A.  Yes.
24      Q.  In other words, sex trafficking was occurring
25  before 2018/2019, but Wynn just hadn't connected the

Page 68

1  dots between sex trafficking and prostitution?
2      A.  No.  What --
3      MS. PERRY:  Objection vague.
4      A.  No.  What I would say, to keep that
5  simplified, is that I think Wynn has always known that
6  prostitution existed, Wynn has always known that it was
7  a crime.  Wynn has always maintained the -- the --
8  customer safety is the most important aspect of our
9  business, so we always took efforts to combat that
10  issue from occurring on our property.
11      When it comes to human trafficking, it was
12  later in those years that you talk about that the
13  definition became more prevalent and the connection
14  between the two was more readily adopted in verbiage,
15  and -- and then the training came out.
16      So, again, I go back to the whole evolution
17  of how we get to human trafficking.
18      Q.  Was Wynn hotels aware in 2008 that Congress
19  passed the Trafficking Victims Protection
20  Re-Authorization Act?
21      MS. PERRY:  Objection, asked and answered.
22      A.  I don't know what the -- our legal department
23  or the company knew at that -- that time.
24      Q.  (By Mr. Schultz)  Are -- is Wynn aware today
25  that the TVPRA defines sex trafficking as the

Page 69

1  recruitment, harboring, transportation, provision,
2  obtaining, patronizing or soliciting of a person for
3  the purpose of a commercial sex act?
4      MS. PERRY:  Objection, calls for a legal
5  conclusion.
6      MR. SCHULTZ:  I'm asking what they know.
7      MS. PERRY:  Also, the statute speaks for
8  itself.
9      THE DEPONENT:  Yeah, that's --
10      MR. SCHULTZ:  I'm asking what they know.
11      A.  So what's that -- what was the abbreviation
12  you used at the beginning?
13      Q.  (By Mr. Schultz)  The TVPRA, the Trafficking
14  Victims Protection Re-Authorization Act.
15      A.  And you're asking if Wynn knew about that --
16      Q.  Right.
17      A.  -- specifically?
18      Q.  It includes the definition that I just read
19  to you.
20      And I'm asking whether Wynn is aware, as we
21  sit here today, that the TVPRA defines sex trafficking
22  in that manner?
23      A.  I would assume that they do.
24      Q.  And --
25      A.  We have a good legal team.

18 (Pages 66 - 69)

Page 70

1    Q.   So you would expect that when the TVPRA was
2  passed, potentially imposing liability on Wynn and
3  other businesses, if they benefit by participating in a
4  venture in violation of the sex trafficking laws, that
5  they would have known about it then as well, correct?
6         MS. PERRY:  Objection, misstates the statute.
7    A.   I -- I think -- say that again.
8    Q.   (By Mr. Schultz)  Sure.
9         You mentioned you have a good legal team.
10 And my question is, therefore, might we infer that the
11 legal team knew in 2008 that Congress passed a statute
12 that exposed Wynn and other businesses to civil
13 liability if they benefited by participation in a
14 venture that included an act in violation of the sex
15 trafficking laws?
16        MS. PERRY:  Objection, misstates the statute.
17   A.   I would assume that they would know or
18 understand about any issue that could expose the
19 property to civil liability.  Any participation in a
20 crime could do that.
21   Q.   (By Mr. Schultz)  Do you know whether --
22        MS. PERRY:  I, also, object to the last
23 question as outside the scope of the designated topics.
24   Q.   (By Mr. Schultz)  Do you know whether Wynn
25 engaged in any lobbying activities around the passage

Page 71

1  of the TVPRA?
2    A.   I --
3         MS. PERRY:  Objection, outside the scope of
4  the designated topics.
5    A.   I don't know.
6         MR. SCHULTZ:  We can pull out number 9,
7  Vince.
8         (Fasulo Deposition Exhibit 7 was marked for
9  identification.)
10        THE TECHNICIAN:  Are you marking this
11 Exhibit 7, counsel?
12        MR. SCHULTZ:  Yes, sir.
13   Q.   (By Mr. Schultz)  So I will hand you what
14 I've marked as Exhibit 7, which is, you will see, a
15 Wayback.
16        Are you familiar with the Wayback machine on
17 the internet?
18   A.   No.
19   Q.   So the Wayback is -- is a -- a website that
20 archives other websites over time and has done so for a
21 long time.
22        So what you're looking at -- and please feel
23 free to take a moment and look it over, but just to
24 orient you, you can see the URL at the bottom of the
25 page that shows the web archive is from 2011-04-30, so

Page 72

1  April 2011.
2         And if you want to take a moment, just let me
3  know.
4    A.   Yeah, I do, please.
5    Q.   Sure.
6         (Pause.)
7    Q.   Have you heard of ECPAT, Mr. Fasulo?
8    A.   I may have.  I don't recall off the top of my
9  head.
10   Q.   If you -- having just read over this, you
11 recognize under the heading, What we do on their 2011
12 website, ECPAT says, ECPAT-USA protects children from
13 commercial sexual exploitation.
14        Do you see that in the first line?
15   A.   I do.
16   Q.   Do you know how long ECPAT-USA had been in
17 existence before 2011?
18        MS. PERRY:  Objection, outside the scope of
19 the designated topics.  Objection, form.
20   A.   I do not.
21   Q.   (By Mr. Schultz)  If you look down in the
22 third full paragraph it says, We are not a direct
23 service provider, which means we do not have beds or
24 staff trained in counseling services.
25        We do, however, conduct research, develop

Page 73

1  policy, advocate and spread awareness.  In addition, we
2  train law enforcement members of the hospitality
3  industry and members of the community at large to
4  recognize the signs of child sex trafficking and how to
5  properly respond to such situations.
6         Do you see that there?
7         MS. PERRY:  Same objections.
8    A.   Yes.
9    Q.   (By Mr. Schultz)  And so at least according
10 to ECPAT in 2011, so roughly seven to eight years
11 before Wynn drew the connection between trafficking and
12 prostitution, there was training available through
13 ECPAT on that very issue --
14        MS. PERRY:  Objection --
15   Q.   (By Mr. Schultz) -- true?
16        MS. PERRY:  -- outside the scope of the
17 designated topics.  Objection, form, and assumes facts
18 not in evidence.
19   A.   Well, I'm reading the same thing you are.  I
20 mean the date is clear 2011, and this was back in 2011.
21   Q.   (By Mr. Schultz)  Did Wynn Hotels reach out
22 to ECPAT in 2011, or at any point after 2011 but before
23 it instituted trafficking training, to inquire what
24 services ECPAT might offer in that respect?
25        MS. PERRY:  Objection, form, outside the

19 (Pages 70 - 73)

Page 74

1  scope of the designated topics.
2      A.  I don't know if they did or not.
3      Q.  (By Mr. Schultz)  Do you know what ECPAT
4  stands for?
5          MS. PERRY:  Same objection.
6      A.  No.
7      Q.  All right.  We can set that aside.
8          MR. SCHULTZ:  Pull up number 10, please,
9  Vince.
10         (Fasulo Deposition Exhibit 8 was marked for
11  identification.)
12     Q.  (By Mr. Schultz)  I'm going to mark as
13  Exhibit 8, Mr. Fasulo, is another ECPAT-USA archive of
14  a web page.  And if you look down on the bottom, as
15  with the previous exhibit, you can see the date on this
16  is November 8th of 2012.
17         And, again, feel free to take a few moments
18  to look through this.
19         (Pause.)
20     Q.  Mr. Fasulo, have you ever heard of the ECPAT
21  code referred to as "the code"?
22     A.  No.
23     Q.  This newsletter from ECPAT back in 2012, if
24  you look at the second page under the heading
25  Millennium Hotel, says, ECPAT-USA is thrilled that

Page 75

1  another U.S. hotel is signing the Tourism Code of
2  Conduct on July 12th.
3          The Millennium Hotel in St. Louis will
4  publicly declare their commitment to fight child sexual
5  exploitation.  In signing the code, they agree to
6  develop policies that will train employees to identify
7  possible trafficking activity as well as raise
8  awareness of the issue among their customer base and
9  stakeholders.
10         And the trafficking training that Wynn
11  instituted in 2021/2022 was designed at least in part,
12  and I think you've already told me primarily, to train
13  employees to identify possible trafficking activity and
14  how to report on that, true?
15     A.  Yes.
16         MS. PERRY:  Objection, form, misstates prior
17  testimony.
18     A.  Yes.
19     Q.  (By Mr. Schultz)  And back in 2012, according
20  to ECPAT, we've got a hotel signing the code and
21  agreeing to train their employees to identify possible
22  tracking -- trafficking activity, as stated here,
23  right?
24         MS. PERRY:  Objection, form.
25     A.  That's what this paragraph says, yes.

Page 76

1      Q.  (By Mr. Schultz)  Would you agree that the
2  Millennium Hotel's evolution -- infer from this that
3  the Millennium Hotel's evolution on the understanding
4  of the connection between prostitution and sex
5  trafficking was years ahead of Wynn Hotels?
6          MS. PERRY:  Objection, form, misstates the
7  testimony.
8      A.  No, I wouldn't.
9      Q.  (By Mr. Schultz)  Why not?
10     A.  Because, like I said before, there's --
11  prostitution has existed for hundreds of years.  The
12  indicators of prostitution and human trafficking
13  overlapping can be the same.
14         Wynn Las Vegas has always had procedures in
15  place to identify prostitution on the property.  So to
16  say that if -- and I'm only going based on this
17  paragraph, that if Millennium Hotels developed policies
18  that will train employees to identify possible
19  trafficking activity, as well as raise awareness of the
20  issue among their customer base and stakeholders, that
21  tells me they had no training, they had nothing in
22  place at the time, whereas, we've had something in
23  place as of the day we opened the front doors.
24     Q.  Why did Wynn launch trafficking-specific
25  training in 2021/2022 if it had more or less always

Page 77

1  been training on it, if that's what I'm hearing in your
2  testimony?
3          MS. PERRY:  Objection, misstates the prior
4  testimony.
5      A.  I think what we did was we expanded that
6  training and we evolved, just like the industry did,
7  and -- and the topic of human training people over
8  time.
9      Q.  Right.
10         In 2012, Wynn did not have policies that will
11  train employees to identify possible trafficking
12  activity, correct?
13         MS. PERRY:  Objection, form.
14     A.  No.  I think we're playing semantics now,
15  because we've always trained certain employees about
16  prostitution.  And the indicators of the behaviors of a
17  prostitute are the same types of behaviors of someone
18  that could be or may be being trafficked.
19         So to say that we didn't train anybody is not
20  an accurate statement.
21     Q.  (By Mr. Schultz)  I didn't say it didn't
22  train anybody.  I said train anybody on human
23  trafficking.  And it is a semantic distinction that
24  matters.
25         Hence, my question, why did Wynn institute

20 (Pages 74 - 77)

Page 78

1  trafficking specific training in '21/'22 if it always
2  had more less the same training?
3       MS. PERRY:  Objection, misstates the
4  testimony.
5       A.  I'm not stating that the pol -- that the
6  training was identical.  I'm saying that we trained a
7  more broader-base of employees on what indicators were,
8  but we always trained security on the indicators of
9  prostitution and treated that crime just like we did
10  any other crime.
11       And that's -- that's how I would answer that.
12       Q.  (By Mr. Schultz)  All right.  You can set the
13  exhibit aside.
14       MR. SCHULTZ:  Let's pull up number 6, Vince,
15  which I'll mark as Exhibit 9.
16       (Fasulo Deposition Exhibit 9 was marked for
17  identification.)
18       Q.  (By Mr. Schultz)  And what I've marked as
19  Exhibit 9, Mr. Fasulo, is a -- an archive version of
20  the American Hotel and Lodging Association's
21  Educational Institute web page from November of 2012.
22       If you want to take a moment and look it
23  over.
24       MS. PERRY:  Let me just clarify how we know
25  this is 2012 since the archive page is (indiscernible).

Page 79

1       MR. SCHULTZ:  The copyright.
2       MS. PERRY:  That's not a mistake.
3       MR. SCHULTZ:  The copyright?
4       MS. PERRY:  Yeah.
5       MR. SCHULTZ:  Yeah, I don't know.  That's --
6       (Indiscernible due to simultaneous crosstalk
7  among the parties.)
8       MR. SCHULTZ:  -- argument for admissibility
9  that you will have the opportunity to take up at the
10  appropriate time.
11       Q.  (By Mr. Schultz)  So, Mr. Fasulo, I believe
12  you told me earlier that Wynn at least as of today is a
13  member of the American Hotel Lodging Association?
14       A.  I believe we are, yes.
15       Q.  Do you know whether it was a member in 2012?
16       A.  I don't know off the top of my head.
17       Q.  So what I've handed you and marked as
18  Exhibit 9 is titled Safety Source, Human Trafficking
19  Awareness DVD.  And there's a copyright of 2012 down
20  toward the bottom.
21       Do you see that?
22       A.  Where it says 2012, eight minutes?
23       Q.  Yes, sir.
24       A.  I see that, yes.
25       Q.  And the text for this on the left-hand side,

Page 80

1  first of all, identifies this as Human Trafficking
2  Awareness; Increase awareness of human trafficking
3  signs and how to respond.
4       Do you see that?
5       A.  Yes.
6       Q.  And it continues -- oh, by the way, under the
7  title it says, The price for this training video is
8  $152, presumably for non-members, because it says the
9  member price is $129.20.
10       Do you see that?
11       A.  Yes.
12       Q.  And the website says, Authorities estimate
13  that between 600- and 800,000 people are trafficked
14  across borders every year.  Often these victims are
15  lured into a promise of a better life... and carries
16  on.
17       I want to direct your attention to the
18  following sentence.  It says, Law enforcement sources
19  have indicated the illegal transportation of humans
20  from one location to another is often facilitated
21  through the use of hotels as stop-over points.
22       Additionally, sexual exploitation has been
23  known to sometimes occur in hotel rooms and hotel
24  lounges.
25       Let me ask first, does the training that Wynn

Page 81

1  currently provides to employees include a labor
2  trafficking component or is it restricted to sex
3  trafficking?
4       A.  It's both.
5       Q.  And if we continue in this document it says,
6  The Trafficking Victims Protection Act of 2000 makes
7  this activity a federal crime in the United States.
8  Many organizations, including hotels, airlines, and
9  others, are stepping up to help combat this growing
10  problem.
11       So you -- Wynn, first of all, did not
12  purchase this training video and -- and use it with its
13  employees back in 2012, true?
14       MS. PERRY:  Objection, form.
15       A.  I don't know if they purchased this or not.
16       Q.  (By Mr. Schultz)  I think you told me earlier
17  that certainly in 2012 Wynn was not providing training
18  to anyone that used the term "trafficking"
19  specifically, true?
20       A.  We were -- we were doing training on
21  prostitution and prostitution behavior inside the
22  hotel.
23       Q.  And not having seen the content of this human
24  trafficking awareness DVD, you can't know sitting here
25  whether the prostitution-related training that Wynn was

21 (Pages 78 - 81)

Page 82

1  providing is similar to, identical to, different from
2  the human trafficking training that was available
3  through the AHLA, true?
4      A.  Yeah, I don't know what's in this video, so,
5  no.
6      Q.  You recognize that by virtue of what we're
7  looking at here, the American Hotel Lodging
8  Association, which is what -- how would you describe
9  AHLA, what its purpose is?
10     A.  I would describe it as a organization, a
11  profess -- like any other professional organization
12  that creates research or provides information on things
13  that may affect a certain specific type of industry
14  or -- or employee.
15     Q.  Yeah.  A trade organization with members,
16  including hotels?
17     A.  Yes.
18     Q.  Have you ever attended any AHLA proceedings
19  or conferences?
20     A.  No.
21     Q.  Are you aware that AHLA sponsored human
22  trafficking-specific training among hotel security
23  chiefs as early as 2011?
24     MS. PERRY:  Objection, assumes facts not in
25  evidence.

Page 83

1      A.  I'm not aware of that.
2      Q.  (By Mr. Schultz)  You do recognize, though,
3  that at least in 2012 that AHLA even if it was not
4  nomenclature used by Wynn, AHLA was using the term
5  "human trafficking" in connection with available
6  training?
7      MS. PERRY:  Objection, form.
8      A.  I would agree that that's what they call it
9  on -- on this specific DVD.  And it is my understanding
10 that human trafficking is different than sex
11 trafficking.
12     Q.  (By Mr. Schultz)  Sex trafficking is a form
13 of human trafficking?
14     A.  Yes.
15     Q.  Labor trafficking is a form of human
16 trafficking?
17     A.  Yes.
18     Q.  And -- all right.  You can set aside
19 Number 9.
20     MR. SCHULTZ:  Let's pull up number 7, Vince.
21     (Fasulo Deposition Exhibit 10 was marked for
22 identification.)
23     Q.  (By Mr. Schultz)  What I'll hand you,
24 Mr. Fasulo, and mark as Exhibit 10 is a page vaulted
25 copy of the website for BEST Alliance.

Page 84

1      And as before, feel free to take a look at
2  it.  But I'll ask you initially, have you ever heard of
3  BEST Alliance?
4      A.  I have not, that I remember.  I may have
5  heard the -- name, but I don't remember
6  specifically.
7      Q.  I want to make sure I've got the -- the
8  timeframes right.  And I'm sorry to belabor this, but
9  if we go back to the 2012/2014 timeframes, am I correct
10 that Wynn was training security personnel on indicators
11 for prostitution, but it was not providing training to
12 anyone that used the terminology "human trafficking" or
13 "sex trafficking"?
14     A.  The -- the -- I believe that would be
15 correct.  Human trafficking was not currently used
16 until 2019/2020, in that timeframe.
17     Q.  And for non-security personnel, that is other
18 staff employees, is it your testimony that Wynn was
19 providing training on the indicators of prostitution,
20 but, again, not specifically using terminology around
21 trafficking?
22     A.  Yes.
23     Q.  And what form did that training take?
24     A.  In the security academy and on-the-job
25 training, once the officers get out of the academy, it

Page 85

1  could have been done in those pre-shifts, in other
2  departments, reinforced in the security pre-shifts
3  before shift, that's how.
4      Q.  Right.
5      And I apologize.  My question the second time
6  was limited to non-security personnel.  So if we're
7  talking about housekeepers, front desk, whomever --
8      A.  Yeah.
9      Q.  -- am I right that, again, Wynn was training
10 those staff, non-security, on indicators of
11 prostitution, but not specifically using trafficking
12 terminology?
13     A.  Yes.
14     Q.  And what form did that training take?
15     A.  It would have likely taken place in
16 pre-shifts or in manager, supervisor, line level
17 conversation --
18     Q.  And --
19     A.  -- or in new hire orientation.
20     Q.  Would it include materials, PowerPoints or
21 handouts?
22     A.  Yeah, it could.  And it would also be
23 emphasized in training on our code of conduct, where it
24 talks about our obligations to report all crimes and
25 that would include prostitution.

22 (Pages 82 - 85)

Page 86

1    Q.    And how would the -- the people conducting
2  these pre-shifts, the -- the more supervisory, how
3  would they know what to tell line-level employees?
4        In other words, what training would they have
5  received in order to pass it on?
6    A.    Whatever the Learning and Development or
7  human resources department or legal department was
8  putting out at the time.
9    Q.    And, again, we're in 2012 to 2014 timeframe?
10    A.    Yes.
11    Q.    Okay.  And what I should have asked is that
12  was true in the 2012 to 2014 timeframe?
13    A.    Yes, I believe so.
14    Q.    If you look at what I've marked as
15  Exhibit 10, the BEST Alliance website, the second page
16  under Our Vision, it reads, BEST is a non-profit
17  organization that launched in 2012 with a single
18  vision, prevent human trafficking.
19        And if you flip over a couple of pages to
20  page 4, you can see in 2013, according to BEST, they
21  launched the inhospitable to human trafficking training
22  course in partnership with the Washington Lodging
23  Association.
24        Have you ever seen or heard of the
25  Inhospitable to Human Trafficking training course?

Page 87

1    A.    No.
2    Q.    Do you know whether Wynn at any point in time
3  has reached out to BEST Alliance to seek out
4  opportunities for training hotel staff on trafficking
5  issues?
6    A.    I don't know.
7    Q.    And am I correct that Wynn did not in the
8  2013/2014 timeframe provide training in the form of
9  BEST Alliance's Inhospitable to Human Trafficking
10  training course?
11    A.    I'm not aware of it.
12    Q.    Do you feel like you would be aware of it, if
13  it happened?
14    A.    If we had -- if we had something that
15  indicated that we did, then, yes.
16    Q.    Right.
17        I guess I'm asking --
18    A.    -- it's not coming to me now.
19        (Indiscernible due to simultaneous crosstalk
20  among the parties.)
21    Q.    -- whether by virtue of your preparation for
22  deposition or whether just through your course and
23  scope of your work at the hotel, if Wynn was providing
24  the Inhospitable to Human Traffic training course to
25  employees back in 2013 to 2014 when it became

Page 88

1  available, you would know that, wouldn't you?
2        MS. PERRY:  Objection, outside the scope of
3  the designated topics.
4    A.    If -- if there was record of -- that we had
5  that, it would have been provided to me.
6    Q.    (By Mr. Schultz)  And do you think there's a
7  realistic probability that the training -- this
8  training was provided, but there's no record of it?
9    A.    I can't answer that question.
10        I mean this looks like it's based in
11  Washington.
12    Q.    You can set aside Exhibit 10.
13        MR. SCHULTZ:  And let's pull up Number 14,
14  please.
15        (Fasulo Deposition Exhibit 11 was marked for
16  identification.)
17    Q.    (By Mr. Schultz)  I'll mark as Exhibit 11,
18  Mr. Fasulo, a web archive for Polaris Project from
19  November of 2013.
20        MS. PERRY:  That would be a -- I just want to
21  note for the record that all but one of the first 11
22  exhibits that we've been using have not been produced
23  in discovery in this case, notwithstanding the fact
24  that you've produced thousands of pages.  And so we
25  would object on that ground as improper.

Page 89

1        MR. SCHULTZ:  Then I have to give you all my
2  impeachment materials.
3        MS. PERRY:  This is not impeachment at this
4  point.  You're asking him questions within the scope of
5  the topics for today.
6        MR. SCHULTZ:  Okay.
7    Q.    (By Mr. Schultz)  Have you heard of Polaris
8  Project, Mr. Fasulo?
9    A.    Yes.
10    Q.    And are you aware that Polaris is an
11  organization that among other things provides training
12  for hotels and motels around sex trafficking issues?
13    A.    Can I read this first?
14    Q.    Yes, sir.
15        (Pause.)
16    Q.    In developing the trafficking training that
17  eventually came about in the 2021/2022 timeframe, in
18  the course of -- of developing that training, Wynn,
19  actually, reached out to Polaris, true?
20    A.    I believe so, but I'd have to refresh my
21  memory with our -- our documents.
22    Q.    What I've marked as Exhibit 11, again, a 2013
23  archive Polaris web page, identifies Polaris Project at
24  the top and says, Through the National Training and
25  Technical Assistance Program, NTTAP, we work to ensure

23 (Pages 86 - 89)

Page 90

1 the implementation and institutionalization of
2 anti-trafficking efforts. We conduct trainings, offer
3 consultations and technical assistance, develop
4 specialized curriculum and assist task force, its
5 coalitions and advocates, with capacity building and
6 sustainability. This includes providing current
7 information on federal and state laws, promising
8 practices, victim identification and assessment, and
9 recent human trafficking trends.
10     Do you see that there?
11   A. I do.
12   Q. And do you see at the bottom that there's an
13 option to request training you simply click on the
14 hyperlink?
15     MS. PERRY: Objection. The document speaks
16 for itself.
17   A. Are you talking about where it says, "Take
18 action today"?
19   Q. (By Mr. Schultz) No, sir. Down at the
20 bottom where it says, To request training --
21   A. Oh, (indiscernible)?
22   Q. Yes, sir.
23   A. Yeah, I see that.
24   Q. And so as of 2013, we've seen that
25 trafficking training was available through ECPAT, AHLA,

Page 91

1 BEST, and Polaris. But as of 2013, Wynn Hotels had not
2 reached out and sought-out opportunities to train with
3 any of these organizations, correct?
4     MS. PERRY: Objection, misstates the
5 testimony.
6   A. I'm not aware of who they reached out to back
7 then.
8   Q. (By Mr. Schultz) Are you aware of them
9 reaching out to any of these organizations to seek out
10 opportunities to train Wynn employees on human
11 trafficking?
12   A. No.
13   Q. And while Wynn didn't really begin talking
14 about prostitution in terms of trafficking until
15 2018/2019. Everything that we've seen from 2011 to
16 2013 so far is talking about trafficking in terms of
17 trafficking, true?
18     MS. PERRY: Objection, vague and ambiguous.
19   A. Yeah. I'm -- I'm -- I'm struggling to
20 understand what -- what your question is asking me.
21   Q. (By Mr. Schultz) Right.
22   A. What are you trying to solicit?
23   Q. Well, let me ask you this.
24     The web pages that we've seen that show the
25 availability of trafficking from AHLA, from ECPAT, from

Page 92

1 BEST, from Polaris, they're not offering what they call
2 "prostitution trafficking," they're offering
3 training -- excuse me -- "prostitution training,"
4 they're offering "trafficking training," right?
5     MS. PERRY: Objection, the document speaks
6 for itself.
7   A. Yeah. That's what -- that's what you've
8 shown me.
9   Q. (By Mr. Schultz) All right. Let's set that
10 aside, Number 11.
11     MR. SCHULTZ: And let's pull up, if we could,
12 Number 14.
13     THE TECHNICIAN: That was 14, counsel.
14     MR. SCHULTZ: Well, then let's pull up
15 another one. How about Number 8.
16     (Fasulo Deposition Exhibit 12 was marked for
17 identification.)
18   Q. (By Mr. Schultz) So I'm marking as
19 Exhibit 12, Mr. Fasulo, a website URL for which is
20 indicated in the document.
21     If you want to take a moment and look it
22 over.
23     MS. PERRY: Objection to questions on this
24 document, as the document was not previously produced.
25   A. Yes.

Page 93

1     MR. SCHULTZ: Let me ask just for the record,
2 what is the source of authority that I have to turn
3 over a document that I'm going to use in
4 cross-examination before I conduct the
5 cross-examination?
6     MS. PERRY: Rule 26.
7     MR. SCHULTZ: Which part?
8     MS. PERRY: Rule 26 --
9     MR. SCHULTZ: Yeah.
10     MS. PERRY: -- requires you to disclose
11 materials you plan to use in this case.
12     MR. SCHULTZ: Okay.
13     MS. PERRY: And you've not done that.
14   Q. (By Mr. Schultz) Mr. Fasulo, you see here
15 this website is announcing, and I quote, "Educational
16 Institute Partners with ECPAT-USA for on-line course to
17 increase awareness of human trafficking at hotels."
18     Do you see that?
19   A. I do.
20   Q. And over to the left -- and ECPAT, by the
21 way, we -- we've already discussed them earlier, right?
22   A. Yes.
23   Q. If you'd look over to the left there's a date
24 of 6 January, 2014. And it reads, ECPAT and American
25 Hotel and Lodging Educational Institute.

24 (Pages 90 - 93)

1     Down below that it says, For prostitution and
2 sex trafficking, hotel?
3     Do you see that?
4   A.  I do.
5   Q.  And below it says, the American Hotel and
6 Lodging Educational Institute, EI, has partnered with
7 ECPAT-USA to develop a new on-line training program for
8 hotel employees.  The 30-minute course provides hotel
9 staff and managers with the information they need to
10 identify and respond to crimes of human trafficking and
11 commercial sexual exploitation of children.
12     And that is, I think you've already told me,
13 the essence of -- or the core purpose in the training
14 that Wynn eventually provided in 2021/2022, was for
15 identification and responding to trafficking --
16 suspected trafficking, true?
17   A.  Yes.
18   Q.  It continues, Hotel managers and staff
19 throughout a property need to be alert to the signs of
20 potential child trafficking and know how to respond in
21 ways that will keep victims, guests, and the property
22 safe.
23     And Wynn would agree with that statement,
24 independent of this document, true?
25   A.  Yes.  We've always put guest safety in the

1 top of -- top of our priorities.
2   Q.  Have you seen any indication that in January
3 of 2014 Wynn reached out to AHLA or ECPAT in order to
4 seek out the opportunity to use this training with its
5 employees?
6     MS. PERRY:  Objection.
7   A.  No, I'm not aware of this.
8     MR. SCHULTZ:  We can set this aside.  And I'm
9 getting to a -- a breaking point here shortly, or maybe
10 I'm there, but give me a second.
11     UNIDENTIFIED SPEAKER:  I could use one.
12     MR. SCHULTZ:  Anybody that matters need a
13 break?  That was joke, back there on the record.
14     Let me pull up Number 15.
15     (Fasulo Deposition Exhibit 13 was marked for
16 identification.)
17   Q.  (By Mr. Schultz) I'll mark, Mr. Fasulo, as
18 Exhibit 13 a press release from Polaris.
19     And as before, feel free to take a look at
20 it.
21     MS. PERRY:  I'll note for the record that
22 Exhibit 13 has not been produced.
23   Q.  (By Mr. Schultz) Have you had an opportunity
24 to read that, Mr. Fasulo?
25   A.  Yes, briefly.

1   Q.  And so you see under Press Releases from the
2 Polaris website, November of 2014, the announcement,
3 Wyndham Hotel Group partners with Polaris to help
4 prevent human trafficking?
5     Do you see that?
6   A.  I do.
7   Q.  And it begins, Wyndham Hotel Group, the
8 world's largest hotel company with approximately 7,590
9 hotels and part of Wyndham Worldwide Corporation, today
10 announced its continued commitment to preventing human
11 trafficking by partnering with Polaris, a leader in the
12 global fight to eradicate modern slavery and restore
13 freedom to survivors.
14     Did I read that correctly?
15   A.  Yes.
16   Q.  It says, As part of a deep joint effort
17 Wyndham Hotel Group and Polaris are developing
18 comprehensive training and educational tools for hotel
19 owners and franchisees, property level staff, and
20 employees at its corporate offices and call centers to
21 educate them about all aspects of human trafficking.
22     Do you see that?
23   A.  Yes.
24   Q.  And if we turn over to the second page, the
25 fifth full paragraph indicates, Polaris training

1 programs have reached over 72,000 individuals in law
2 enforcement, Social Services, education, the healthcare
3 field, the military, the courts and Bar associations,
4 private industry, and communities throughout the U.S.
5 and around the world.
6     My first question is, do you have any reason
7 to doubt the veracity of Polaris' assertion that by
8 November 2014 they had trained over 72,000 individuals,
9 including individuals in private industry, on human
10 trafficking?
11     MS. PERRY:  Objection --
12   A.  Are you asking me in layman's terms if I
13 believe the article?
14   Q.  (By Mr. Schultz) I'm asking you whether you
15 have any reason to think that it's not true?
16   A.  No.
17   Q.  Polaris had not by November of 2014 trained
18 any Wynn employees, correct?
19   A.  Not that I'm aware of.
20     MR. SCHULTZ:  All right.  You can set that
21 aside.  And one last one, and we can take a break.
22     What I've marked as Exhibit 14, this is a
23 document produced to us by Polaris in response to a
24 subpoena in this case.
25     (Fasulo Deposition Exhibit 14 was marked for

25 (Pages 94 - 97)

Page 98

1 identification.)
2        THE TECHNICIAN:  Is there a way during a
3 break I can get copies of the exhibits, Nicole, the
4 copies you've been given?
5        MS. PERRY:  Sure.
6        THE TECHNICIAN:  Just because --
7        MS. PERRY:  Yeah, we can ask.
8        THE TECHNICIAN:  That'd be great.  I
9 appreciate it.
10        MR. SCHULTZ:  Yeah.  I'm sorry, it was a big
11 haul just to bring that.
12        UNIDENTIFIED SPEAKER:  No, it's fine.  I just
13 like to deal with...
14        THE TECHNICIAN:  Counsel, do you have a tab
15 number for this?
16        MR. SCHULTZ:  I do.  16.
17        THE TECHNICIAN:  Thank you.
18        UNIDENTIFIED SPEAKER:  Good?
19        THE DEPONENT:  Yes.
20     Q.   (By Mr. Schultz) So what I've marked as
21 Exhibit 14, Mr. Fasulo, is an e-mail from Erin Macy,
22 dated January 8, 2020, to
23 corporateengagement@polarisproject.org, correct?
24     A.   Yes.
25     Q.   And were you -- yeah, were you involved or

Page 99

1 aware of -- let me ask, you personally, involved or
2 aware of the outreach to Polaris at this time?
3     A.   No.
4     Q.   Ms. Macy is identified as division training
5 manager, Learning and Development, correct?
6     A.   Yes.
7     Q.   Do you know who her boss would have been at
8 this time?
9     A.   It would have been -- I believe it was
10 Alicia.  And for the life of me, her last name is
11 escaping me.  I can picture her face.  But I believe it
12 was Alicia at the time.
13     Q.   Sure.  If it comes to you at any point, feel
14 free to -- to just let us know.
15     A.   Okay.
16     Q.   She writes to Polaris, We are interested in
17 launching a human trafficking awareness initiative here
18 at the Wynn and Encore Las Vegas.  Based on Polaris'
19 track record and reputation with this on a global
20 scale, we believe you are the non-profit organization
21 that would be best for us to seek guidance from
22 regarding how to successfully accomplish this goal.
23        So that's what Ms. Macy at Wynn wrote to
24 Polaris in January of 2020, correct?
25     A.   Yes.

Page 100

1     Q.   Do you -- I doubt you do, but do you know how
2 Ms. Macy came into possession of the e-mail address
3 that she's corresponding with here,
4 corporateengagement@polarisproject.org?
5     A.   I don't.
6     Q.   Do you know if there were any phone calls or
7 meetings that preceded this e-mail between Wynn
8 representatives and Polaris?
9     A.   Not that I remember or know of.
10     Q.   Do you know for how long Wynn Hotel was aware
11 of Polaris' track record and reputation on a global
12 scale with human trafficking issues?
13     A.   No.
14     Q.   Ms. Macy continues, Our VP of human
15 resources -- and let me pause there.
16        Who would that be?
17     A.   In 2020, it would have been -- oh, it was
18 either Troy Mitchum -- it may have been Troy Mitchum or
19 Courtney Prescott.
20     Q.   Is Courtney Prescott a female?
21     A.   Yes.
22     Q.   So I'll start over.
23        She said -- Ms. Macy writes, Our VP of human
24 resources for all of Wynn Resorts would like to
25 schedule a call with the appropriate individual as soon

Page 101

1 as possible.
2        Right?
3     A.   Yes.
4     Q.   Do you know why it was "as soon as possible"?
5     A.   I do not.
6     Q.   You understand from what we've already seen,
7 Polaris has been offering training on human trafficking
8 for at least seven years before this, right?
9     A.   According to the articles you're showing me,
10 yes.
11     Q.   Do you know what came of this outreach?  And
12 by that, I mean, were there meetings, phone calls, that
13 you're aware of between Wynn and Polaris?
14     A.   I do not.
15     Q.   Do you know whether Polaris supplied any
16 sample training materials or model training materials
17 as a result of this interaction?
18     A.   I do not.  I don't believe so.  I think it
19 would have been produced, if they did.
20     Q.   Right.
21        The video that we've seen was with
22 I Empathize?
23     A.   Yes.
24     Q.   And do you know why Wynn opted to consult
25 with or retain I Empathize instead of Polaris?

26 (Pages 98 - 101)

Page 102

1 A. It -- well, I know part of the reason was
2 because of their capability to put that type of a video
3 together and their involvement in that -- in -- in the
4 topic itself.
5 Q. Do you know --
6 A. I was not part of the team that -- that
7 researched them or brought them in.
8 Q. Fair enough. And sorry for interrupting.
9 Do you know whether around this timeframe or
10 after, Wynn reached out to ECPAT or BEST Alliance, or
11 any other organizations, to seek out discussions around
12 trafficking training?
13 A. I do not.
14 Q. Do you know whether Wynn has signed the ECPAT
15 code at this point?
16 MS. PERRY: Objection, form.
17 A. I don't know what Wynn has signed in that
18 regard.
19 Q. (By Mr. Schultz) Do you know whether Wynn
20 has pledged in any form to abide by the ECPAT code, as
21 we sit here in 2025?
22 MS. PERRY: Objection, form.
23 A. No, I don't know that. I know that we have
24 pledged to abide by our company's code of conduct,
25 which includes what you put out in the environmental

Page 103

1 guide at the very beginning and -- and our code of
2 conduct when it pertains to abiding by state, local,
3 and federal law.
4 MR. SCHULTZ: It's a good time for a break.
5 I do want to note -- and we can talk about it off the
6 record, but I want it noted on the record that it
7 sounds to me like we've talked about a whole lot of --
8 maybe "a whole lot" is a little strong, but we've
9 talked about training materials that were used that
10 have not been produced. And --
11 MS. PERRY: Yeah. Sure. We will -- I think
12 as we were preparing for this we identified that we'd
13 (indiscernible). We'll follow up on that.
14 MR. SCHULTZ: All right. Thank you.
15 MS. PERRY: Of course.
16 MR. SCHULTZ: Do you all want -- I mean
17 I'm -- can we go off the record?
18 THE VIDEOGRAPHER: We're going off the record
19 as of 11:48 a.m.
20 (A recess was taken.)
21 THE VIDEOGRAPHER: We are back on record as
22 of 12:29 p.m.
23 THE STENOGRAPHER: My name is Kimberly
24 Ritter, and I'm the court reporter for today's
25 deposition. My Nevada certificate number is 1020.

Page 104

1 Thank you, counsel.
2 MR. SCHULTZ: And I want to note for the
3 record, the court reporter pointed out on the break
4 that we got the numbering -- I got the numbering out of
5 order, because I marked the video as Exhibit 4, but I
6 didn't use a sticker on it. So we agreed to figure
7 that out, resolve it by just calling what I did mark
8 Exhibit 4, 4A. And I've handwritten the "A" under the
9 original so we don't have to re-number everything that
10 came after.
11 Let's pull up, Vince, if we could, Number 13.
12 (Fasulo Deposition Exhibit 15 was marked for
13 identification.)
14 Q. (By Mr. Schultz) So I'll mark, Mr. Fasulo,
15 as Exhibit 15 a PowerPoint produced to us by Wynn in
16 litigation with the Bates number of Wynn-AH-4771.
17 THE STENOGRAPHER: Counsel, it says 4770 on
18 the page you are showing.
19 MR. SCHULTZ: You're right, sorry. I've got
20 two per page, and I looked down at the bottom.
21 So it is, correction, Wynn-4770.
22



Page 105

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com



Golkow Technologies,
A Veritext Division
877-370-3377                                www.veritext.com



Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com



Page 114

Golkow Technologies,
A Veritext Division
877-370-3377                                                                 www.veritext.com



877-370-3377    Golkow Technologies,
A Veritext Division    www.veritext.com



Page 122

Page 124

1 Before that, yes, there's -- there could be
2 correlation between pimps and prostitution without the
3 term of "trafficking" being used. But when you look at
4 it, generally speaking, it's the same thing, just
5 different terminology. So I don't -- I want to -- I
6 don't want to -- I don't want to convolute it by making
7 that there's a clear distinction between the two,
8 right?
9 Prior to 2020, you would talk about the
10 indicators of prostitution, and some of those
11 indicators are the same as human trafficking. The
12 widely acceptable term of "human trafficking" or "sex
13 trafficking" became more prevalent, especially in law
14 enforcement pushing out to the industry was in 2020.
15 Q. So before 2020, in any training that was done
16 by Wynn of any of its employees, even if it didn't use
17 the word "trafficking," did it draw a distinction
18 between voluntary or consensual commercial sex workers
19 and sex workers who were being coerced or forced by
20 pimps?
21 A. Yeah. There could be correlation in the
22 conversation around prostitution pertaining to that,
23 but not necessarily in the exact terms that you just
24 stated.
25 Q. Has Wynn ever implemented a policy or

Page 125

1 procedure of checking IDs at all hotel entrances even
2 if randomly for prior trespasses?
3 A. No. We check all ID going into a nightclub
4 or day club. And we also ID anyone that we believe to
5 be under the age of 30 that is on the gaming floor or
6 attempting to enter into an environment where we have,
7 like, bottle service going on where there's going to be
8 flowing alcohol, other than going to a bartender to get
9 a -- to get a drink.
10 Q. And if Wynn is carding at all nightclubs, for
11 example, I assume that routinely you run across --
12 "routinely" may be a little strong, but that you run
13 across people who are prior trespasses for
14 prostitution?
15 A. You know, we can.
16 Q. And are they turned away?
17 A. No. If there were a prior trespass, we take
18 them into custody and turn them over to Metro.
19 Q. And so if Wynn is implementing that policy of
20 carding in nightclubs, I assume it's catching, if not
21 100 percent, pretty close to 100 percent of prior
22 trespasses who show their true ID, right?
23 A. If we know that they're a prior trespassed.
24 Q. And if I am a prior trespass at Wynn and I go
25 into a nightclub and I hand them my true ID, do they

6 Q. Okay. We can set that aside.
7 Does Wynn's trafficking training -- and I'm
8 referring here to the materials other than the video.
9 I'm familiar with what's on the video, but I've not
10 seen the other materials you've referenced in the
11 deposition.
12 Does any of that material inform employees or
13 teach employees that most prostitutes are being forced
14 or coerced by pimps?
15 A. Which timeframe?
16 Q. Well, I'm referring to the 2020 and after
17 training that --
18 A. Then, yes, it would.
19 (Indiscernible due to simultaneous crosstalk
20 among the parties.)
21 Q. (By Mr. Schultz) Does it teach employees
22 about the relationship between pimps and prostitutes?
23 A. So let me go back to your previous question.
24 The term "trafficking" was heav -- more
25 heavily used and introduced in 2020'ish timeframe.

32 (Pages 122 - 125)



Page 126

1  call up and say, Hey, is this a person a prior
2  trespass?
3      A.  No.
4      Q.  Is it practical for them to do so?
5      A.  No.
6      Q.  Would it be?
7      A.  No.  You're talking about 5,000 people at
8  night going into a nightclub.  The carding in a
9  nightclub is to ensure that we abide by gaming and
10 state statutes to make sure we don't have a minor that
11 enters into a facility or serving alcohol to a minor.
12        MR. SCHULTZ:  Let's pull up Number 17,
13 Victor.
14        (Fasulo Deposition Exhibit 16 was marked for
15 identification.)
16     Q.  (By Mr. Schultz)  I'm going to mark as
17 Exhibit 16 the Wynn Encore Corporate Investigations
18 Training Manual with a Bates of Wynn AH 3598 that was
19 produced to us by Wynn in this case.
20        Are you familiar with this document?
21     A.  Yes.
22     Q.  So I will tell you the file name on the
23 document as produced to us is CI Training Manual 2019.
24        Do you know whether there was a corporate
25 investigations training manual before 2019?

Page 127

1      A.  I don't remember if there was or not.  This
2  is the one that I'm familiar with.
3      Q.  Do you recall there being a corporate
4  investigations training manual that you were introduced
5  to at the time you came to Wynn in 2018?
6      A.  No.
7      Q.  I'll just note on the second page, which is
8  Bates 3599 as used in this manual, quote, Wynn, end
9  quote, refers to Wynn Resorts, Limited; Wynn Las Vegas,
10 LLC, which include Wynn Las Vegas and Encore at Wynn
11 Las Vegas, correct?
12     A.  Yes, that's what it says.
13

Golkow Technologies,
A Veritext Division
877-370-3377                                                        www.veritext.com



Golkow Technologies,
A Veritext Division

877-370-3377                                                                    www.veritext.com



Golkow Technologies,
A Veritext Division

877-370-3377                                                                    www.veritext.com



Page 138

Golkow Technologies,
A Veritext Division

877-370-3377                                                                    www.veritext.com



Golkow Technologies,
A Veritext Division

877-370-3377                                                      www.veritext.com



Page 146

Golkow Technologies,
A Veritext Division

877-370-3377                                                        www.veritext.com



Page 150

Page 152

1    Q.  Let me ask the same question now.  I -- I was
2  specific to security before, but in the 2012 to 2014
3  timeframe are you aware of Metro or other third
4  parties, UNLV, FBI were mentioned, coming in and doing
5  what I've described as formal training on prostitution
6  for non-security personnel?
7    A.  I'm not aware of that.
8    Q.  Wynn has policies, doesn't it based on Nevada
9  law regarding the presence of minors in certain areas
10  of the premises?
11    A.  Yes.
12    Q.  And no one under the age of 21 is permitted
13  to gamble or to loiter in the casino, correct?
14    A.  No one under the age of 21 is allowed to
15  game, loiter in the casino, that is correct.
16    Q.  And the casino area, Wynn considers any room
17  or premises where gambling is operated or conducted,
18  true?
19    A.  Correct.
20    Q.  And no one under the age of 21 is permitted
21  in the bar areas, right?
22    A.  That is correct.
23    Q.  Anyone under the age of 21 is permitted to
24  pass through the casino, but only on clearly marked
25  walkways, right?

Page 153

1    A.  Correct.
2    Q.  And Wynn policies say the best rule is -- and
3  I think you may have referenced this earlier -- is to
4  check identification of any person who appears to be
5  under the age of 30 if they are found in any of those
6  areas, right?
7    A.  Correct.
8      MR. SCHULTZ:  Can we take a quick break?
9      MS. PERRY:  Yes.
10      THE VIDEOGRAPHER:  We're going off record as
11  of 1:39 p.m.
12      (A recess was taken.)
13      THE VIDEOGRAPHER:  We are back on record as
14  of 2:06 p.m.
15      MR. SCHULTZ:  So let's pull up Number 18,
16  Vince, please.
17    Q.  (By Mr. Schultz)  We'll make a quick look at
18  this, Mr. Fasulo.  I'm going to mark as Exhibit 17 the
19  Wynn 2013 Annual Submission on its -- of its
20  surveillance plan.
21    A.  Okay.
22      (Fasulo Deposition Exhibit 17 was marked for
23  identification.)
24      MR. SCHULTZ:  And for the record, it's Wynn
25  AH 3576 as produced by Wynn to us in this litigation.

39 (Pages 150 - 153)

Page 154

1    Q.  (By Mr. Schultz)  While I would not expect
2  you to be familiar with the details of the 2013 plan,
3  are you familiar generally with the notion or the
4  requirement for submission of an annual surveillance
5  plan?
6    A.  I am.
7



Golkow Technologies,
A Veritext Division
877-370-3377                              www.veritext.com

Page 158



8      In terms of coverage, does -- and I want to
9  get back to the 2012 to 20 -- really, 2013 to 2014
10 timeframe, if it makes a difference.
11      Would surveillance cameras -- security
12 cameras cover all entrances and exits to the hotel?
13      A.  In some fashion, yes.
14      Q.  Would they cover all gaming areas?
15      A.  Absolutely.
16      Q.  Would they cover all bars and lounges?
17      A.  Generally speaking, yes, to include
18 point-of-sale.
19      Q.  And would that include both indoor and
20 outdoor bars?
21      A.  Yes.
22      Q.  Would they cover elevators, all elevators?
23      A.  Yes.
24      Q.  Does that include interior and exterior; in
25 other words, elevator entrances and inside the



Page 161

1  elevators?
2       A.  Yes.
3       Q.  Would they cover the garage main points of
4  entry and exit for garages?
5       A.  Yes.
6       Q.  Would they include stairwells in garages,
7  covered stairwells in garages?
8       A.  Yes.  Generally speaking, yes.
9       Q.  Would they cover ballrooms and convention
10 rooms?
11      A.  Not all.
12      Q.  Okay.  Would they cover the front desk?
13      A.  Yes.  That's a -- considered a point-of-sale.
14      Q.  And would they cover hallways where -- in --
15 within the towers where the guest rooms are?
16      A.  No.
17      Q.  All right.  No coverage at all in the
18 hallways?
19      A.  No.
20      Q.  Okay.  And is there a particular policy
21 reason for that?
22      A.  Not that I'm aware of.
23      Q.  And so if you have, for example, somebody
24 gets beaten up in the hallway on the 20th floor, you
25 would not have the ability to pull video surveillance

41 (Pages 158 - 161)

Page 162

1 on that?
2   A.  No.  I'd be able to pull video surveillance
3 of anybody entering into the elevator bank and getting
4 into the elevator either going up or down to the 20th
5 floor.
6   Q.   And would that include coverage of the --
7 them getting out at the elevator on the 20th floor?
8   A.  If I understand your question correctly, it
9 would be a shot of inside the elevator.  The doors
10 opening would show the floor number, and then walking
11 out onto the floor.  There may be a couple camera shots
12 that are in the, for lack of a better term, foyer area
13 or bank area, but beyond that, no.
14   Q.   If I'm following you, meaning the -- like,
15 typically, you'll have where people stand when they're
16 waiting for the elevator?
17   A.  Correct.
18   Q.   Oh you mentioned earlier -- and -- and I'm
19 not going to get this exactly right, but I was asking
20 you about the statistical reports, and you told me
21 about the first one.  Then the -- the
22 prostitution-specific one.
23       And then if I heard you correctly, you
24 mentioned that more recently there was a report, and
25 you used the phrase, if I'm recalling correctly, that

Page 163

1 would include people who have prior contact with Metro.
2       Does that sound familiar?
3   A.  Yeah.  But that -- that -- you're just taking
4 a piece of what I said.
5   Q.   No.  I'm -- I'm just trying to put a pin on
6 what it was you said, because I don't think I
7 understood it.  So I was going to try and --
8   A.  I keep --
9   Q.   -- hash it out.
10   A.  We keep track of anybody that we have on
11 property that law enforcement has taken an enforcement
12 legal action on.  So if they've given them a citation
13 or they've arrested them, I track that.
14   Q.   And how do you know when such a person's on
15 the property?
16   A.  Because we take them into custody and we turn
17 them over to Metro.
18   Q.   Oh, I see what you're saying.
19   A.  And Metro usually -- 99.9 percent of the time
20 we know they're on property.  And if they take somebody
21 into custody, we're going to -- because I'm going to
22 trespass them if Metro is taking them into custody and
23 we had no interaction with that guest to begin with.
24   Q.   And so if somebody is on the property, they
25 are detained, let's say, on suspicion of prostitution,

Page 164

1 at what point do you determine -- and my -- my
2 hypothetical may be wrong in terms of procedure, but at
3 what point would you make the determination of whether
4 they've had prior contact with Metro?
5   A.  We would only know by checking our records in
6 iTrack since we don't have access to the criminal
7 databases that Metro uses.
8   Q.   And does that happen after you've brought
9 them into the interview room or could it happen while
10 they're out on the floor --
11   A.  Could happen while they're on the floor.
12   Q.   Okay.  And would that be, again, a check ID
13 callback to central command or what-have-you?
14   A.  Yes.
15   Q.   Okay.  Has that resulted in more arrests for
16 prostitution, as opposed to just trespasses?
17   A.  Has what?
18   Q.   Implementing that procedure, or has that
19 always been the procedure?
20   A.  What?
21   Q.   In other words, you -- let me back up.  And
22 I -- again, this maybe my misapprehension.
23       As I understand it, you're saying that you
24 started tracking more recently people who've had prior
25 contact with Metro.  That can happen.  You can make

Page 165

1 that determination out on the floor, you can make it in
2 the interview room?
3   A.  No.  So here is where I think you're not
4 understanding.  We always have kept track of anybody
5 that's had interaction with the police.  That's always
6 been there.
7       The spreadsheet that I'm talking about is
8 anybody from when I started it going forward.  We're
9 tracking what happens to that person if they're cited
10 or arrested in court.
11   Q.   Oh I see.
12   A.  I'm checking to see what the outcome is
13 through the DA's office, the judge, public defender,
14 all of that.
15   Q.   And why?  Like, why is that important for you
16 to know?
17   A.  Because it allows me to bridge my
18 relationships in the criminal justice system to get
19 adequate prosecution for crimes that we believe is a
20 detriment to the community and affects the entire
21 resort corridor.
22   Q.   And is that prostitution -- include
23 prostitution?
24   A.  Absolutely.
25   Q.   So that comes to the question I was trying to

42 (Pages 162 - 165)

Page 166

1 ask earlier.
2      Does that mean that your efforts to track
3 this has resulted in more prosecutions for
4 prostitution-related activity?
5    A.  I would -- I would say, generally speaking,
6 yes.
7    Q.  Have you seen fewer repeat trespassers since
8 instituting this procedure?
9    A.  Since instituting the tracker, no.  From
10 instituting two corporate investigators focused on
11 reducing prostitution on the property, yes.
12   Q.  And to what do you attribute that?
13   A.  But let me -- let me back up.
14      We also have seen a reduction in certain
15 types of crimes because we're keeping track of it as
16 well.
17   Q.  Right.
18   A.  So if you were to -- you know, if I take off
19 my -- if I put on a police hat when you follow the
20 criminal justice process and you have an act that is
21 in -- ultimately law enforcement has taken action on
22 and the district attorney files a criminal charge, and
23 ultimately they either take a plea or they're convicted
24 in court, that naturally theoretically would have an
25 impact on future related crime.

Page 167

1      If none of those things occur, then there's
2 no incentive to stop committing a crime.
3    Q.  And I don't think I asked this before, but do
4 you in any of these statistical reports have a -- a
5 column, if you will, or some other designation for
6 pandering or pimping?
7    A.  No.
8    Q.  Okay.  All right.
9      MR. SCHULTZ:  We can pull up Tab 23, Vince.
10      (Fasulo Deposition Exhibit 18 was marked for
11 identification.)
12   Q.  (By Mr. Schultz)  What I'm going to mark,
13 Mr. Fasulo, is Wynn Las Vegas, LLC, and Wynn Resorts,
14 Limited Answer and Affirmative Defenses.
15      You told me earlier that you had seen the
16 deposition Notice for this deposition, correct?
17   A.  Yes.
18   Q.  So I'll mark this as Exhibit 18.
19      And you understand there was a -- a topic
20 concerning facts or factual assumptions underlying
21 certain affirmative defenses?
22   A.  Yes.
23   Q.  And to be clear, I'm not asking for legal
24 positions.  And I say this just as a -- as a courtesy
25 to -- to preface the questions I'll ask, which I think

Page 168

1 will be pretty obvious.
2      But just like a plaintiff who files a lawsuit
3 has to have a factual basis for the allegations, an
4 affirmative defense has to have a factual basis for the
5 allegations, and it's the factual basis for the
6 allegations that we'll be walking through that I'm
7 interested in.
8      Does that make sense?
9    A.  I think so.
10   Q.  All right.  Well, let's take a look, if we
11 could, if we flip over --
12      MR. SCHULTZ:  I just marked this as 18?
13      MS. PERRY:  Yes.
14      MR. SCHULTZ:  Okay.
15   Q.  (By Mr. Schultz)  There were a handful of
16 affirmative defenses identified in the Notice, the
17 first of which is paragraph 269 at page 33.
18      The defense states, The incidents in question
19 and all damages complained of and claimed by Plaintiff,
20 if any, were the fault of other parties not under the
21 exercise or control of Wynn.
22      Plaintiffs alleged injuries and damages were
23 caused in whole or in part by the criminal acts of
24 third parties not a party to this litigation.
25      Do you see that?

Page 169

1    A.  Which paragraph was that?
2    Q.  269.
3    A.  I was still turning pages when you started
4 talking.
5    Q.  Sure.  Take a moment and read it, if you
6 will.
7      THE TECHNICIAN:  Counsel, just a head's up, I
8 don't have Tab 23.
9      MR. SCHULTZ:  Here, I can get it to you.
10      UNIDENTIFIED SPEAKER:  Yeah, I --
11      MR. SCHULTZ:  Sorry about that.  Are you on
12 the -- on the wi-fi?
13      UNIDENTIFIED SPEAKER:  Yes.
14      MR. SCHULTZ:  Do you have a copy on your hard
15 drive, because I'm not on the wi-fi.  I can hook up to
16 a hot spot.
17      Sorry about that, Vince.
18      THE TECHNICIAN:  No problem.
19      MR. SCHULTZ:  I'm going to send it out now,
20 Vince, to you.
21      UNIDENTIFIED SPEAKER:  I just received it.
22      MR. SCHULTZ:  Okay.  Great.
23   Q.  (By Mr. Schultz)  So while he is pulling that
24 up, let me read into the record again 269 so everyone
25 will know what we're talking about while Vince pulls it

43 (Pages 166 - 169)

Page 170

1 up.
2    The affirmative defense is that the incidents
3 in question and all damages complained of and claimed
4 by Plaintiff, if any, were the fault of other parties
5 not under the exercise or control of Wynn.
6    Plaintiffs alleged injuries and damages were
7 caused in whole or in part by the criminal acts of
8 third-parties, not a party to this litigation.
9    The simple question, who are, if anyone
10 specifically, does Wynn intend to identify when it says
11 "other parties and third-parties not a party to this
12 litigation"?
13    A.  That would be whoever caused her bodily
14 injuries, because it was not the Wynn.
15    Q.  Right.
16    When you say it was not the Wynn, you mean no
17 one at the Wynn physically assaulted or battered A.H.,
18 right?
19    A.  Correct, or facilitated.  As matter of fact,
20 we don't even have any evidence that she was on the
21 property.
22    Q.  What do you mean when you say "facilitated"?
23 Facilitated what?
24    A.  If we -- facilitated would mean that someone
25 or an employee of Wynn Las Vegas allowed her to be

Page 171

1 injured on our property.
2    Q.  All right.  So --
3    A.  That couldn't have happened because she
4 wasn't on our property.
5    Q.  So you're saying she was never on the
6 property?
7    A.  We have no evidence to support that she was
8 on our property.
9    Q.  As a law enforcement officer and -- and given
10 your role at the Wynn, I'm sure you appreciate the
11 distinction between saying she was never on the
12 property and saying we don't have evidence --
13    A.  I am saying --
14    Q.  -- that she was on the property?
15    A.  Yeah, you're -- you're right.  So let me
16 rephrase it.
17    So in the time period that she's disclosed,
18 we have no evidence to support that she was on our
19 property.
20    Q.  Okay.  And so I presume at a minimum this
21 affirmative defense refers to her traffickers.
22    Would that be true?
23    A.  Yes.
24    Q.  Is there anyone else that you're aware of
25 that might be within the scope of the other parties or

Page 172

1 third-parties not a party to this litigation as alleged
2 here?
3    A.  Not that I'm aware of.
4    Q.  Thank you.
5    We move to the next affirmative defense.  It
6 says, The incidents -- and that's paragraph 270.  The
7 incidents in question and all damages complained of and
8 claimed by Plaintiff, if any, were the fault of one or
9 more independent acts or omissions destroying any
10 causal connection between any act or omission of Wynn,
11 which are denied in the alleged injury to Plaintiff.
12    So my question there very simply would be,
13 would the independent acts or omissions referred to in
14 that affirmative defense be independent acts or
15 omissions by anyone that Wynn is aware of, other than
16 A.H.'s traffickers?
17    A.  I don't understand what you're getting at.
18    Q.  Well, the affirmative defense is saying there
19 are independent acts or omissions that caused whatever
20 damages Plaintiff is alleging.
21    And my question is, are the actors who either
22 acted or omitted as alleged here, the traffickers, the
23 traffickers and someone else, or some other set of
24 people?
25    A.  It could be all the above; it could also be

Page 173

1 her.
2    Q.  All right.  So let's break that down.
3    "Traffickers" I understand.  Independent acts
4 or omissions, as used here, might refer to the traf --
5 does refer to the traffickers as those who acted or
6 failed to act, true?
7    A.  True.
8    Q.  Does it include any -- now I'm putting aside
9 the Plaintiff -- anyone other than the trafficker of
10 which Wynn -- of whom Wynn has knowledge, as we sit
11 here today?
12    A.  Does it include -- it would not include
13 anybody at Wynn because no one at Wynn committed those
14 acts.
15    Q.  All right.  "The acts," are you, again,
16 talking about physical harm to Plaintiff?
17    A.  Yes.
18    Q.  And so let me ask it a different way.
19    Putting aside the traffickers and Plaintiff
20 herself, is there anyone else at Wynn, outside Wynn,
21 anywhere in the world, who is referred to as the
22 "actors" when you talk about independent acts or
23 omissions?
24    MS. PERRY:  Can I make one clarification?
25    MR. SCHULTZ:  Sure.

44 (Pages 170 - 173)

Page 174

1    MS. PERRY: When you say "traffickers," are
2  you referring to (indiscernible) as well?
3        MR. SCHULTZ: Well, we -- I assume you all
4  would at some point. We alleged in the Complaint and
5  we alleged in the Complaint that she was a trafficker.
6  But she was also a bottom, so...
7        MS. PERRY: Yeah. It's complicated in other
8  words.
9        So I just want to make sure that for the
10 purpose of this line of questions, when he's making --
11       (Indiscernible due to simultaneous crosstalk
12 among the parties.)
13       MS. PERRY: -- as to traffickers, it would be
14 (indiscernible) as well.
15       MR. SCHULTZ: That's fair. And Slume Steely
16 or whatever, although I don't think he really enters
17 the picture.
18       MS. PERRY: Okay.
19       Q. (By Mr. Schultz) So let me ask it again.
20       The allegation is that in -- and one or more
21 independent acts or missions destroyed any causal
22 connection between any act or omission by Wynn. To
23 have independent acts or omissions, you have to have
24 actors. You've already told me the traffickers are
25 within that set of actors referred to here.

Page 175

1        Putting aside Plaintiff for the moment, is
2  there anyone else in that set of actors that committed
3  these independent acts or omissions of which Wynn has
4  knowledge?
5        A. No.
6        Q. And what is it that Plaintiff -- what
7  independent acts or omissions did Plaintiff commit that
8  are encompassed within this affirmative defense?
9        A. So the -- the only information that we have
10 is during the time that it was disclosed that she
11 claims to have been on property. A review of all of
12 our records, to include call logs, dispatch logs,
13 iTrack reports, trespass reports, surveillance reports,
14 archive footage, nothing would substantiate that she
15 was on the property during that time.
16       Q. How is that an independent act or omission on
17 her part that caused her harm?
18       A. Because if that harm -- well, if the harm
19 occurred off of our property, that's what I'm saying.
20 Didn't occur on our property, if I'm understanding your
21 question the right way.
22       Q. Sure.
23       And when you say -- I'm just trying to figure
24 out what it is Wynn says our client did to harm
25 herself. And you told me you've gone through all this

Page 176

1  evidence, and you see no evidence that she was on the
2  property.
3        I don't understand the connection between
4  that and what I'm asking you, which is what is it --
5  what independent act or omission did she commit that
6  caused her own harm?
7        A. Well, like you stated earlier today, she has
8  a choice. She could have said something to someone or
9  whether -- whether when she was on -- or if on our
10 property or -- or anyone else for that matter.
11       Q. All right. So if Plaintiff's allegations --
12 even if they are true, everything alleged in the
13 Complaint, Wynn's position is she had a choice to tell
14 someone that she was being trafficked?
15       MS. PERRY: Objection, mischaracterizes the
16 testimony.
17       MR. SCHULTZ: I'm asking. I'm asking if
18 that's what he's saying.
19       A. I think everybody has a choice in that -- in
20 that regard, yes.
21       Q. (By Mr. Schultz) Okay.
22       A. Whether they choose to make it is a whole
23 'nother story.
24       Q. And you mentioned archive footage. Have you
25 gone back through videos from the 2012 to 2014

Page 177

1  timeframe to see if you can find our client on the
2  property?
3        A. We -- all of our archive footage would be
4  related to an iTrack record. So if there's no iTrack
5  report, no call log, there will be no surveillance
6  footage.
7        Q. You mentioned earlier, and I may have
8  misunderstood. I think I'm following what you're
9  saying. If there was an incident report, you would
10 have footage relating to that incident report, that
11 incident, even if it was back in this timeframe, but
12 because there's no incident report for A.H., there's no
13 footage for A.H.
14       Am I right?
15       A. That's correct.
16       Q. Have you made an effort to go back through --
17 strike that.
18       If you went from, let's say, March, mid-March
19 of 2014 through the end of June 2014 -- and I'm asking
20 for a ballpark here -- and you went through every
21 second of footage that you have for that time period on
22 the property, do you have any idea how many hours of
23 footage we'd be talking about?
24       A. Hundreds, maybe thousands.
25       Q. And was any effort made -- I understand

45 (Pages 174 - 177)

Page 178

1 that -- I understood you to say that you went through
2 the archived footage.
3        Did you mean by that that there was no
4 archived footage to go through?
5    A.  Because there was no iTrack report.
6    Q.  But if someone had the time and the patience,
7 they could, as a practical matter, review every moment
8 of footage that you have during the time period our
9 client says that she was trafficked to see if we find
10 her anywhere on the property, that is possible to do,
11 correct?
12    A.  No, it's not.
13    Q.  Why?
14    A.  Because the only footage that's archived is
15 attached to a security report in iTrack.
16    Q.  No, I understand.
17        But there could be, for example, and this is
18 what I have in mind, an incident that occurred and
19 she's standing 5 feet away in the footage.  It's not
20 related to her, no incident relating to her, but she's
21 there and that's what I mean.
22        If somebody had the time and the patience to
23 go through all of the footage they could go through,
24 there's no practical impediment preventing them from
25 going through and looking for images of her in that --

Page 179

1 the archived footage, true?
2        MS. PERRY:  Objection, form.
3        THE DEPONENT:  What did you say?
4        MS. PERRY:  I just objected to form.
5    A.  Yeah.  I mean, look, anybody can go back and
6 look at footage, and I -- I use that generally
7 speaking.  Not anyone can go back and look at the
8 footage --
9    Q.  (By Mr. Schultz)  Well --
10    A.  -- by authority.
11    Q.  I understand.
12    A.  Okay.
13    Q.  And where is the footage?  Like, if you want
14 to access it on the network so-to-speak, I may be using
15 the wrong term, where does it live?
16    A.  It lives on a server in the network.
17    Q.  Is it under a particular -- like, in my firm
18 I have my C drive and our network drive is called the H
19 drive.
20        Is there a name for the drive where this
21 lives or is it all just one big network?
22    A.  No.  It's under a surveillance network.  It's
23 a completely separate network away from our IT system.
24 It's a closed network.  Nothing touches it.
25    Q.  All right.  If we look at paragraph 271, the

Page 180

1 affirmative defense is, The incidents in question and
2 all damages complained of and claimed by Plaintiff, if
3 any, were caused by the superseding and intervening
4 acts of the parties over whom Wynn had no right of
5 control.  And this conduct, either by omission or
6 commission, interrupted the natural and proximate causal
7 relationship, if any, between any act or omission of
8 Wynn, which are denied, and the injury to Plaintiff.
9        I guess my question there would be, when --
10 in terms of supporting facts, does the phrase
11 "superseding and intervening acts of parties over whom
12 Wynn had no right of control," refer to any acts or
13 omissions that are not encompassed by the preceding
14 affirmative defense?
15    A.  That's the way I would understand that.
16    Q.  And the reference there -- well, put it this
17 way.  Anybody who committed any superseding or
18 intervening act, the parties referred to in 271 would
19 be the same people referred to and no others referred
20 to in paragraphs 269 and 270, right?
21    A.  Yeah.  But it could be anybody else for that
22 matter, too, that we're unaware of.
23    Q.  Right.
24        But I'm only asking what you're aware of?
25    A.  Yeah.  Then that's -- that's what I would

Page 181

1 agree with.
2    Q.  The next paragraph, 272, says, The causes of
3 action asserted in the Amended Complaint and any
4 damages claimed are barred in whole or in part based on
5 a failure to mitigate damages.
6        Does that refer to a failure on the part of
7 Plaintiff, A.H.?
8    A.  Let me read this.
9        Yes.
10    Q.  And in what way did A.H. fail to mitigate her
11 damages?
12    A.  She could have asked for help.
13    Q.  Okay.  We talked about that.
14        Is there any other -- does this refer, in
15 fact -- does it refer -- strike that.
16        Does paragraph 272 refer to any facts other
17 than what you just told us, which is she could have
18 called security?
19    A.  She could have left wherever -- whatever
20 environment she was in.  She wasn't at the Wynn, if she
21 was even there.
22    Q.  All right.  Does this paragraph refer to any
23 other facts than those two that you just described,
24 failure to mitigate?
25    A.  Not -- not that I can think of right now.

46 (Pages 178 - 181)

Page 182

1    Q.  274 says, The causes of action asserted in
2  the Amended Complaint and any damages claimed are
3  barred in whole or in part, because to the extent that
4  any employee committed any actionable acts or
5  omissions, such acts or omissions were committed
6  outside the scope of authority conferred.
7      I think based on your previous answers I'm
8  safe in -- in presuming that Wynn doesn't believe there
9  were any acts or omissions on the part of its employees
10 that relate in any way to the damages Plaintiff claims;
11 is that true?
12   A.  Correct.
13   Q.  All right.  There are two more, that's
14 paragraphs 285 and 286.  285 says, Any injuries and/or
15 damages alleged by Plaintiff were the result of an
16 unforeseeable series of events over which Wynn had no
17 control and for which Wynn cannot be held liable.
18      The phrase "unforeseeable series of events,"
19 does it refer to anything that you've not already
20 responded to in the context of any facts that you've
21 not already described in response to my earlier
22 questions on the affirmative defenses?
23   A.  No.
24   Q.  Okay.  If you understand -- I mean I'm just
25 trying to make sure this doesn't refer to something new

Page 183

1  that we haven't already talked about?
2    A.  No.
3    Q.  Okay.  The last of the affirmative defenses
4  that we identified is 286.  To the extent that Wynn is
5  found liable, it reserves the right to seek
6  indemnification from any party so liable as a matter of
7  law or by contractual right.  Nothing contained herein
8  shall be construed as a waiver of that right.
9      Does this refer to any known and specific
10 indemnification agreement between either Wynn entity
11 and any other entity?
12   A.  No, it doesn't, if I understand the question
13 right.
14   Q.  Based on your understanding for acts of the
15 sort alleged here in the timeframes alleged here, is it
16 your understanding that Wynn Resorts, either through
17 indemnification expressly or through just the nature of
18 the corporate relationship, would Wynn Resorts
19 ultimately be financially responsible or liable for any
20 judgment entered against Wynn Las Vegas, LLC?
21   A.  No.  My understanding is it would be Wynn,
22 LLC, Las Vegas.
23   Q.  Does Wynn Las Vegas, LLC, have its own Board
24 of Directors?
25   A.  No.

Page 184

1    Q.  Is the -- the Wynn Resorts Limited Board of
2  Directors would exercise control over Wynn Las
3  Vegas, LLC?
4      MS. PERRY:  Objection, form.
5    A.  Well, it depends on what -- what specifically
6  you're talking about.
7    Q.  (By Mr. Schultz)  Well, let me ask you.
8      If -- if the Board of Directors for Wynn Las
9  Vegas -- excuse me -- for Wynn Resorts Limited said
10 we're going to impose mandatory trafficking for all
11 employees, does Wynn Las Vegas, LLC, have the right to
12 say, Well, we're not going to do it, or does Wynn Las
13 Vegas, LLC, have to do what the Board says?
14   A.  No.  They would do what Wynn Resorts says,
15 but they would develop a method at the property level.
16   Q.  Right.
17      So they have the operational control?
18   A.  Correct.
19   Q.  But the decision itself whether to do it
20 resides with Wynn Resorts Limited?
21   A.  True.  Yes.
22   Q.  And when you said it's your understanding
23 that Wynn Las Vegas would be responsible for any
24 judgment in a case like this, what's that based on?
25      And I don't want to know that a lawyer told

Page 185

1  you.  I just want to know what factual basis is in your
2  mind when you say that?
3    A.  Because we are all our own commercial entity,
4  and the acts that are alleged to have occurred were on
5  a specific property, not at the parent company, as far
6  as to say it in a layman's term.
7    Q.  No, that makes sense.
8      All right.  I think that's gone.
9      Oh, let me just ask directly.  Are you
10 aware -- because it was part of a much longer and
11 tortuous question.
12      Are you aware of any Indemnification
13 Agreement between Wynn Las Vegas, LLC, and Wynn Resorts
14 Limited that would be implicated by the -- the
15 allegations in this lawsuit?
16   A.  I -- I don't know.
17   Q.  Okay.  Thanks.  You can put that aside.
18      Do you agree that the presence of pimps and
19 prostitutes on the property generates revenue for Wynn
20 through various means, including if they happen to be
21 gaming, buying food, buying drinks, et cetera?
22   A.  In the general way that you're stating it,
23 yes, somebody that games or buys food or any other type
24 of purchase on the property would generate revenue.
25   Q.  Right.

47 (Pages 182 - 185)

Page 186

1    A.   That goes for anybody.
2    Q.   And paying guests who brought prostitutes
3 back to their room, also, were generating revenue for
4 Wynn.  In other words, room rentals generate revenue
5 for Wynn whether they are used for prostitution or not
6 used for prostitution, true?
7        MS. PERRY:  Objection, assumes facts not in
8 evidence.
9    A.   Yeah, you rent a room, it's revenue for the
10 property.
11    Q.   (By Mr. Schultz)  Did you review any
12 documents in preparation for the deposition that were
13 not provided to you by counsel or directed to you by
14 counsel?
15    A.   No.
16    Q.   Are you aware of any employee at Wynn during
17 your tenure with the company being involved in
18 promotion of prostitution on the property?
19        MS. PERRY:  Objection, vague as to time.
20        MR. SCHULTZ:  Since he'd come to the company.
21    A.   No.
22    Q.   (By Mr. Schultz)  Are you aware of any such
23 incident having occurred before you came to the
24 company?
25    A.   I vaguely remember an e-mail that I read that

Page 187

1 was produced.  I'd have to go back and look at it
2 again.
3    Q.   It's your understanding it was produced in
4 the litigation?
5    A.   I think -- I think it was, but I'd have to
6 look at it again --
7    Q.   Okay.
8    A.   -- to make sure.
9    Q.   And give me the, like, top level what you
10 remember from it so I can see if I recognize it.
11    A.   Well, I'm (indiscernible) right now.
12        I remember seeing an e-mail about an employee
13 that was terminated and it was a summary from -- I
14 think it may have been Sam Bieber.  But I'm trying to
15 remember what the -- I'd have to read to it refresh my
16 memory on the circumstances.
17    Q.   Do you -- do you recall the timeframe even
18 generally?
19    A.   It would have been '18.
20    Q.   2018?
21    A.   Yeah.
22    Q.   'Ish?
23    A.   Yeah.
24    Q.   Have you been convicted of a felony --
25    A.   No.

Page 188

1    Q.   -- at any point?
2    A.   No.
3    Q.   I've got to ask.
4    A.   No.  Nor have I ever been arrested.
5    Q.   Does the name Robert Sharp, III, mean
6 anything to you?
7    A.   Robert Sharp, III, yes, I've heard that name.
8    Q.   Would you have heard that name outside of the
9 context of this litigation?
10    A.   No.
11    Q.   Does the name Autumn Richards mean anything
12 to you?
13    A.   Autumn Richards?
14    Q.   Yes, sir.
15    A.   No -- I mean I may have heard the name, but
16 not off the top of my head.
17    Q.   Okay.  I asked you -- we've talked a lot
18 about iTrack, I think I have a handle on it, but does
19 Wynn or has Wynn, to your knowledge, at any point used
20 any third-party vendor for archiving or analyzing its
21 reports?
22        And I have in mind -- I've seen other hotels
23 NAVAX, Red Flags, systems like that.
24    A.   Yes, we've used NAVAX in most recent years.
25 How far back that goes, I have no idea.

Page 189

1    Q.   Was it in place when you came to the company?
2    A.   I don't believe so.
3    Q.   And just in general terms, because it sounds
4 like it's not something that's going to be of interest
5 to us, but why use NAVAX when you have the in-house
6 analytical iTrack system?
7    A.   Because my understanding was NAVAX was used
8 more for internal HR-type components and not
9 necessarily criminal complaints like what we put into
10 iTrack.
11    Q.   So you would not expect a -- the trespass of
12 a given sex worker for prostitution at the hotel to
13 show up in NAVAX; is that fair?
14    A.   Not unless it involved an employee.
15    Q.   Gotcha.
16        How about there's -- there's other distinct
17 risk management software -- and I have in my risk
18 connect specifically that I know it's been used by
19 hotels.
20        Is there any other system besides NAVAX that
21 -- where incidents of prostitution/potential human
22 trafficking might be reported outside of iTrack?
23    A.   No.
24    Q.   It's a terrible question, but thank you.
25        Are you familiar with Medallia?

Page 190

1    A.  Yes.
2    Q.  Does Wynn use Medallia?
3    A.  Yes.
4    Q.  For how long has Wynn used Medallia?
5    A.  I don't know.
6    Q.  Was this --
7    A.  As long as I've been there.
8    Q.  And for what does Wynn use Medallia, to your
9  understanding?
10    A.  It's guest feedback.
11    Q.  Through on-line travel agencies?
12    A.  Yeah.  You -- it's -- you can provide
13  feedback to the company on -- on your guest experience.
14    Q.  Do you review Medallia data?
15    A.  Not regularly, no.
16    Q.  On the occasions that you have, why would you
17  review it?
18    A.  If it was a significant complaint or I needed
19  to understand the perspective of the guest, instead of
20  getting it second or third-hand from someone else or I
21  needed to verify it with my own eyes.
22    Q.  And what is your understanding of -- so --
23  strike that.
24      Wynn has to pay for the Medallia data, right?
25    A.  Yes.

Page 191

1    Q.  And for what use does Wynn make of the
2  Medallia data such that it's valuable enough for Wynn
3  to pay for it?
4    A.  Because it allows us to have an interaction
5  with a guest that believes that they had a negative
6  experience, because we're about improving the
7  experience.
8    Q.  And aside from what -- let me ask you first.
9      Does Wynn use any other service that provides
10  the same type of data as Medallia other than Medallia
11  itself?
12    A.  We use Forbes and we do our own internal
13  shops.
14    Q.  When you say interim shops, you mean going
15  out and looking at on-line travel agency reviews, that
16  sort of thing?
17    A.  No.  We have our own people that will pretend
18  to be a guest in the hotel and rate their experience
19  and interactions with employees.
20    Q.  Gotcha.
21      Is that within the auspice of the security
22  department?
23    A.  No.
24    Q.  Who -- who handles that?
25    A.  That is handled by -- I knew you were going

Page 192

1  to ask me that, I know it, I just can't remember the
2  name of it.  Not private access.  Just give me a
3  minute, I'm going to think of it.
4    Q.  Sure.
5      And is it external or internal?
6    A.  It's internal.
7    Q.  Okay.  And you say Forbes.  What are -- what
8  are you referring to there when you said --
9    A.  The Forbes standards, 5-star standard.  We're
10  a 5-star resort.
11    Q.  And so --
12    A.  We meet certain standards in order to receive
13  a Forbes 5-star rating, whether it's a restaurant...
14    Q.  And how do -- so what data does that generate
15  for the company?
16    A.  Well, it's almost like the best way to
17  explain it would be like an accreditation process,
18  right, that you have certain standards in place, and
19  they come in and ensure that you have met those
20  standards to maintain your 5-star rating or 4-star
21  rating or 3-star rating.
22    Q.  And would it, the data that they review in
23  making that determination, include things like
24  prevalence or rates of crime, including prostitution
25  on the track -- or, excuse me -- on the property?

Page 193

1    A.  It -- it could be based on what they believe
2  to have been a crime, but it's more service-related.
3    Q.  And would they look, if you know, anywhere
4  other than iTrack for data on criminal activity on the
5  property?
6    A.  They wouldn't look in iTrack.
7    Q.  Where would they look?
8    A.  They don't look anywhere.  They come in and
9  rate us on those standards.
10      So -- to really break this down.  A
11  standard would be, like, you have to have a live plant
12  inside of your hotel room.  That's a standard.
13      They stay in the hotel, there's no live plant
14  in the hotel room, then they mark that down as you
15  didn't meet that standard.
16      That, you know, the employee that they
17  interacted with, like security at the elevator bank met
18  them with a smile or said, Good Morning, Good
19  Afternoon, Good Evening, that's all part of the
20  standards that are implemented within the hotel.
21    Q.  And are there any performance standards --
22  you may have answered this -- such as those that relate
23  in any way to prevalence or rate of criminal activity?
24    A.  They would only mention it if they see it.
25    Q.  Understood.

49 (Pages 190 - 193)

Page 194

1    Is wynnlasvegas.com a business domain
2  assigned to employees for business-related
3  communications?
4    A.  wynnlasvegas.com?
5    Q.  Yeah, @wynnlasvegas.com.
6    A.  That's our e-mail.  So, like, my e-mail ends
7  in wynnlasvegas.com.
8    Q.  Right.
9    And my question is, does each employee get
10 a -- an e-mail assigned with that domain for the
11 purposes of sending business-related communications?
12   A.  No.
13   Q.  Who doesn't get it?
14   A.  Line-level employee, normally they don't need
15 to use e-mail.  They normally won't get that.
16   Q.  And --
17   A.  Their job function doesn't require them to be
18 on e-mail.
19   Q.  Is there an expectation, written policy,
20 informal policy at Wynn that Wynn business e-mail
21 domains are to be used only for business purposes?
22   A.  Yes.  It should only -- it should be -- I
23 don't remember the specifics of a policy for that, but,
24 yeah -- I mean it's -- to me, that's common sense, you
25 use your work e-mail for work-related purposes.

Page 195

1    Q.  Going back to 2012 to 2014 timeframe, did
2  Wynn have any policy or procedure intended to prevent
3  posting on a hotel wi-fi from Backpage or other
4  classified advertising websites associated with
5  commercial sex?
6    MS. PERRY:  Objection, outside the scope of
7  the designated topics.
8    A.  Did we have anything to prevent those sites
9  from being accessed?
10   Q.  (By Mr. Schultz)  Anything oriented towards
11 prevention of access of Backpage or similar sites via
12 Wynn wi-fi?
13   A.  I don't know what they had back in 2014
14 pertaining to that, but, like, right now you can't hit
15 Backpage.
16   Q.  And how is that achieved, if you know?
17   A.  Through our cyber security team.
18   Q.  They part of the security department?
19   A.  No, they're a separate entity that fall up
20 under IT, but when required, they work closely with my
21 team.
22   Q.  And is it a -- a -- so help me understand.
23 Is it that if I'm on Wynn wi-fi I simply can't access
24 those pages or is it more we're monitoring people who
25 access pages like that?

Page 196

1    A.  I don't think that you -- well, I thought you
2  were talking about employees.
3    As an employee you can't hit any of those
4  websites.
5    Q.  Gotcha.
6    A.  I'm not sure what a guest on the wi-fi could
7  hit.
8    Q.  Okay.
9    A.  I've never been on the wi-fi and tried.
10   Q.  Do you know whether Wynn, as of today at
11 least, has the technological capability to prevent
12 guests using wi-fi from accessing Backpage or similar
13 websites?
14   MS. PERRY:  Objection, outside the scope of
15 the designated topics.
16   A.  Yeah, I would imagine so, but I don't know.
17 I'm not an IT expert.
18   Q.  (By Mr. Schultz)  Are you familiar with the
19 fact that escort services operate in Las Vegas?
20   A.  Yes.
21   Q.  And they're regulated by the municipal code,
22 correct?
23   A.  Yes.
24   Q.  And so we're clear, escort services would
25 include someone for hire to consort or accompany

Page 197

1  another or others to social affairs, entertainment,
2  places of amusement, or any private quarters.
3    Does that sound right?
4    A.  Well, I'm assuming you are reading the
5  statute, so yes.
6    Q.  Would you agree that escorts consort or
7  accompany others to private hotel rooms in Las Vegas?
8    A.  Yes.
9    Q.  Does that happen at Wynn?
10   A.  I -- I would say that it can happen at Wynn.
11   Q.  At any time between 2012 and 2022 did Wynn
12 have -- or does it have formal policies or procedures
13 regarding escort services provided on its premises?
14   A.  I don't know if there was a specific policy
15 in '14 that was titled Escort Services, but there are
16 certain types of behavior that we don't allow onto the
17 property.
18   Q.  Such as?
19   A.  We don't let just anybody come in and perform
20 massage therapy in a hotel room.  We don't let DJs come
21 in with equipment.  We wouldn't let an escort come in
22 with any type of equipment, like a pole, that kind of
23 stuff.
24   Q.  Does Wynn distinguish between licensed and
25 unlicensed escort services and how it deals with them?

50 (Pages 194 - 197)

Page 198

1      MS. PERRY:  Objection, vague as to time.
2      Q.  (By Mr. Schultz)  Same timeframe, any time
3  2012 to 2022.
4      A.  Well, the -- the distinction is that if it's
5  a legal escort service, it's legal.  If it's a
6  non-licensed escort business, then it's -- that --
7  they're in violation of the county code, just like any
8  other required licensed entity for any type of
9  business.
10      Q.  I agree.
11      I guess my question is, does Wynn ensure that
12  only licensed escort services enter or operate on its
13  premises?
14      A.  We would only -- only if we know that the
15  escort service is on the property.
16      Q.  Has Wynn between 2012 and 2022 had a policy
17  or procedure on whether to confirm for eskirt -- escort
18  services that a customer is in their room before the
19  escort is sent to the hotel?
20      A.  Say that again.
21      Q.  Sure.
22      Let me describe the scenario --
23      A.  Okay.
24      Q.  -- and then ask the question --
25      A.  That's probably the easy way.

Page 199

1      Q.  -- which is, we've seen evidence and it's not
2  specific to Wynn, but that escort services will call
3  ahead to the hotel and say we're sending someone over,
4  could you please check and see if John Jones is in Room
5  567, which is what we've been told before we send the
6  escort.
7      I'm asking whether Wynn has between 2012 and
8  2022 had a policy to address the potential for
9  something like that happening at Wynn?
10      MS. PERRY:  Objection, outside the scope of
11  the designated topics.
12      A.  So I don't know about a specific policy.  But
13  what I will tell you is, is that by matter of practice
14  and policy we do not divulge guest information to
15  anyone.
16      Q.  (By Mr. Schultz)  Does Wynn have or has it
17  between 2012 and 2022 had any type of policy that is
18  intended to ensure that escorts who arrive on the
19  property are not there for purposes of commercial sex?
20      A.  Yeah.  Our policy is, is that we don't do
21  anything to allow prostitution to occur on our property
22  if we know about it, so it doesn't matter if they're
23  licensed or unlicensed.  If they're engaging in that
24  type of behavior, we're not going to allow it.
25      Q.  I -- there's one document I want to ask you

Page 200

1  about that I know I forgot and it's very quick.
2      MR. SCHULTZ:  I have to take a potty break,
3  which will also serve as the, I think, last break for
4  me.  And I'm fine with five minutes, if you all are,
5  then I'm done.
6      MS. PERRY:  Sure.  Thank you.
7      MR. SCHULTZ:  Thank you.
8      THE VIDEOGRAPHER:  We're going off record as
9  of 3:07 p.m.
10      (A recess was taken.)
11      THE VIDEOGRAPHER:  We are back on record as
12  of 3:21 p.m.
13      (Fasulo Deposition Exhibit 20 was marked for
14  identification.)
15      Q.  (By Mr. Schultz)  Mr. Fasulo, I'm going to
16  hand you, just to be very clear, a document I've marked
17  as Exhibit 20 produced to us by Wynn with a Bates
18  number Wynn A.H. 3415.
19      And you -- we talked earlier about retention
20  of videos through which there are incident reports.
21  This document titled Video Library lays out procedures
22  for retention of video, you know, how long before or
23  how long after you keep video depending on the type of
24  incident.
25      I'm just wondering if this would be the

Page 201

1  policy that governs the retention of videos that you
2  and I discussed earlier?
3      A.  Yes.  This is the general retention policy.
4      Q.  And the third blue diamond on the first page
5  is procedure errors/requests for review/suspicious
6  activity, et cetera.
7      I'm just wondering if the incidents related
8  to suspected prostitution or confirmed prostitution
9  would fall under this retention requirement, which is
10  clips begin five minutes prior to and conclude five
11  minutes after the incident, et cetera?
12      A.  Yes.
13      Q.  Okay.  You can set that aside.
14      One question I failed to ask you when we were
15  talking about surveillance, let me ask about as we sit
16  here today.
17      Does Wynn through its surveillance technology
18  today have the ability to use facial recognition, for
19  example, to identify people on the premises that are
20  known prior trespasses?
21      A.  Yes.
22      Q.  How long has that been the case?
23      A.  I can't give you -- I don't remember the
24  specific date, but it was right around two-and-a-half
25  years ago, maybe three.

51 (Pages 198 - 201)

Page 202

1    Q.   And does Wynn make use of the technology in
2   order to identify people who have been trespassed for
3   whatever reason?
4    A.   Every day.
5    Q.   And used successfully every day?
6    A.   Every day.
7        MR. SCHULTZ:  All right.  I believe that's
8   all I have subject to any questions any other lawyers
9   might ask you.  I appreciate your time.
10       THE DEPONENT:  You're welcome.
11            EXAMINATION
12  BY MS. PERRY:
13   Q.   Mr. Fasulo, I just have a few follow-up
14  questions.  I'll try to honor that timeframe for
15  Mr. Sager here.
16       You were asked some questions about Wynn
17  Resorts Limited and its Board of Directors.
18       Do you recall that?
19   A.   Yes.
20   Q.   And, likewise, you were asked some questions
21  about policies or high-level guidance that might be
22  issued at the Wynn Resorts Limited level.
23       Do you recall that?
24   A.   Yes.
25   Q.   For the purposes of the questions you have

Page 203

1   answered today, when you have used "Wynn" or answered
2   questions where Mr. Schultz has used "Wynn," have those
3   been -- which entity have you been answering on behalf
4   of?
5    A.   Wynn Las Vegas, LLC.
6        MR. SCHULTZ:  I'll object to the form based
7   on our agreement.
8    Q.   (By Ms. Perry)  To be clear, you are here on
9   behalf of Wynn Resorts Limited and Wynn Las
10  Vegas, LLC, correct?
11   A.   Yes.
12   Q.   But what role does Wynn Las Vegas, LLC, have
13  with respect to all of the policies and procedures,
14  training, surveillance, and other issues that
15  Mr. Schultz has asked you about today?
16   A.   That those all apply to Wynn Las Vegas
17  property specific.
18   Q.   What role, if any, does Wynn Resorts Limited
19  have with respect to the conduct that we talked about
20  today?
21       MR. SCHULTZ:  Object to the form.
22   A.   They -- they provide guidance in overarching
23  visionary procedures or policies or culture.
24   Q.   (By Ms. Perry)  So, for example, which entity
25  would issue the code of conduct that would be

Page 204

1   applicable between 2012 and 2014?
2    A.   Wynn Resorts.  And then it would fall down to
3   Wynn Las Vegas, LLC.
4    Q.   To do what?
5    A.   To be enforced by the property.
6    Q.   And what action, if any, would Wynn Las
7   Vegas, LLC, take to enforce the code of conduct that's
8   been issued at the Wynn Resorts level?
9    A.   They would put out specific policy and
10  procedure that is very specific about the issues that
11  are contained in the code of conduct all the way down
12  to the department level that would flow up underneath
13  that code of conduct.
14   Q.   And with respect to the training that we
15  talked about today, which entity would issue the
16  training that's been discussed that would be applicable
17  to this case?
18   A.   Wynn Las Vegas.
19   Q.   And with respect to the surveillance
20  practices that have been discussed today, which entity
21  would issue those surveillance-related policies and
22  procedures?
23   A.   Wynn -- Wynn Las Vegas.  They're also the
24  ones responsible for submitting the gaming.
25   Q.   Is it your testimony that all of the

Page 205

1   licensing that's been discussed today that would be at
2   issue related to gaming activities is also Wynn Las
3   Vegas, LLC?
4    A.   Yes.
5    Q.   Switching gears.
6        Mr. Schultz asked you some questions about
7   whether Wynn believes A.H., our Plaintiff here, was
8   ever on the property in 2014?
9        Do you recall that?
10   A.   Yes.
11   Q.   Do you have an understanding as Wynn Las
12  Vegas, LLC,'s corporate representative of the
13  allegations in A.H.'s Complaint specific to the Wynn?
14   A.   Yes.
15   Q.   What is your understanding of those
16  allegations in the Complaint?
17   A.   That she was on the Wynn property and that
18  she made eye contact with a cocktail server who
19  allegedly had contacted security, security came down
20  and followed her out the front door while she was with
21  Mariah.
22   Q.   What evidence, if any, do you have to
23  substantiate that statement in the Complaint?
24   A.   I have -- we have none.  None.  Nothing to
25  support that.

52 (Pages 202 - 205)

Page 206

1  Q.  What have you looked into in an attempt to
2  support that statement?
3  A.  We looked for every report that would be
4  generated for a report to security.  So there would
5  have been a call log, which does not exist.  There
6  would have been a dispatch log, meaning that the
7  control room would have dispatched security, because
8  security wouldn't know just to walk over and follow
9  her, so we would have had to direct them.  And if
10  that -- if that happened there would have been a
11  document of that at a minimum as a call log, and there
12  is none of that.
13      We also did a search for any iTrack report
14  that had to do with a cocktail server, red hair, maroon
15  hair, auburn hair, Jane Doe, suspicious.  And there is
16  literally no record at all that anything remotely close
17  to what A.H. put in the pleading occurred on our
18  property.
19  Q.  What if A.H. had refused to engage with the
20  security personnel during this interaction that she
21  describes in her Complaint?
22      What, if any, record would have resulted from
23  that failure by A.H. to engage?
24      MR. SCHULTZ:  Object to form.
25  A.  We would have at a minimum had a call or

Page 207

1  dispatch log or both.
2  Q.  (By Ms. Perry)  What if she failed to provide
3  a notification?  Would you still have a call log in
4  that situation?
5  A.  And we would have record in the call log that
6  we attempted and then that person just ignored us and
7  continued walking in.
8      If the officer had asked for ID and she
9  refused, it would -- he -- he would have or she would
10  have radioed up to the control room, and that would
11  have been went into the call log.
12  Q.  Have you had security staff look for records
13  of unidentified persons during the alleged trafficking
14  period that matched the description of the situation
15  that A.H. describes in her Complaint?
16  A.  Yes.  That goes back to, like, the works that
17  I mentioned that we did a search for trying to look for
18  any type of record that would have correlated to the
19  description of the incident that she -- that she
20  describes.
21  Q.  Do you have an understanding that A.H.
22  alleges that she was with another female at the time of
23  this alleged interaction?
24  A.  Yes.
25  Q.  Okay.  Do you have an understanding that

Page 208

1  that -- that woman's name is Kariah Heiden?
2  A.  Yes.
3  Q.  What, if anything, did Wynn do to determine
4  whether it has ever interacted with Kariah Heiden at
5  any point in time?
6  A.  We did a search for her name as well.
7  Q.  And what, if any, results were there with
8  that search?
9  A.  We had interaction with her on our property
10  in 2018.  She was with another female on property who
11  had been previously trespassed for committing a theft.
12  And when they entered into the parking garage, the
13  license plate that we had entered into our license
14  plate reader system had notified us that the car was on
15  property, and we subsequently trespassed both of them
16  again.  Well, Kariah got trespassed a second time, or I
17  think we took enforcement action on her and -- or the
18  other lady had enforcement action, Kariah was
19  trespassed.
20  Q.  As part of this 2018 incident, was there a
21  record of that interaction?
22  A.  Yes.
23  Q.  And does that record indicate whether
24  security believed that any activity by either woman,
25  Ms. Heiden or her friend that was with her, were

Page 209

1  engaged in any way in suspected prostitution?
2  A.  No.
3  Q.  Are you aware that Plaintiff has an alleged
4  trafficker in this case?
5  A.  Yes.
6  Q.  What, if any, records has Wynn searched to
7  identify whether that alleged trafficker has ever been
8  present on Wynn's property at any time?
9  A.  We would have searched for that person
10  specifically, and we have no record to indicate that
11  he's been on our property.
12  Q.  Based on the searches that have been done
13  related to the allegations that we have from Plaintiff
14  in the Complaint, do we have any reason to believe --
15  did Wynn have any reason to believe that A.H. was ever
16  on Wynn's property in 2014?
17      UNIDENTIFIED SPEAKER:  Object to the form.
18  A.  No.
19  Q.  (By Ms. Perry)  Based on the records that
20  have been searched, does Wynn have any reason to
21  believe that Plaintiff A.H. was engaged or trying to
22  engage in prostitution activity at the Wynn property?
23  A.  No.
24      MS. PERRY:  I want to thank you for your
25  time.

53 (Pages 206 - 209)

Page 210

1    Unless there are no other questions, we will
2  read and sign, and then designate this as confidential
3  under a protective order until we can de-designate it
4  at the appropriate team.
5       MR. SCHULTZ: You mentioned MGM. Do you have
6  questions?
7       MS. PERRY: Alexa?
8       MS. AIN: No questions from MGM, thank you.
9       MR. SCHULTZ: Let me follow up real quick.
10           EXAMINATION
11  BY MR. SCHULTZ:
12    Q.  What was Kariah Heiden trespassed? Was it
13  just because she was in the company of somebody who had
14  formally been trespassed?
15    A.  Correct.
16    Q.  Okay.
17       MR. SCHULTZ: So I'd like to put orders on
18  the record. I'd like to mention, again, I think the
19  statistical reports that we -- that were discussed
20  would be responsive. They may or may not be in the
21  agreed timeframe.
22       MS. PERRY: Yeah.
23       MR. SCHULTZ: And then the other training
24  material. So we would -- we're not going to hold the
25  deposition open. I don't think that's even a thing

Page 211

1  under the rules, but we certainly would at least put
2  a -- a pin in the notion of coming back if we
3  subsequently receive training materials that we would
4  have asked about in this deposition, but that remains
5  to be seen in the chain.
6       MS. PERRY: Understood.
7       MR. SCHULTZ: And for the Plaintiffs, we
8  don't want video. I understand now Veritext
9  automatically sends unless you say you don't want it,
10  and so I'm saying we don't want it.
11       We'll take an E-tran, no index, if you charge
12  for the index. And we don't need an AI summary if that
13  is an option. I just learned to say that on the record
14  now after 20 years.
15       MS. PERRY: We don't need a rough transcript.
16  And everything else that Matt has said is consistent
17  with Wynn's needs. Thank you.
18       MR. SAGER: Same for Venetian. We do not
19  want the video.
20       MS. AIN: Same for MGM -- oh, sorry.
21       UNIDENTIFIED SPEAKER: Go ahead.
22       MS. AIN: Same for MGM, except we will take
23  an index, please.
24       THE STENOGRAPHER: Anyone else?
25       THE VIDEOGRAPHER: All good?

Page 212

1       Go ahead.
2       THE STENOGRAPHER: Anyone else? Okay.
3       THE VIDEOGRAPHER: Okay. This concludes the
4  video deposition of 30(b)(6) Todd Fasulo for Wynn
5  Resorts Limited and Wynn Las Vegas, LLC. We are going
6  off record as of 3:35 p.m.
7       (Off the record.)
8       WHEREUPON, the within proceedings were
9  concluded at the approximate hour of 3:35 p.m. on the
10  9th day of July, 2025.
11       *    *    *    *    *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 213

1       CERTIFICATION OF DEPONENT
2
3       I, TODD FASULO, do hereby certify that I have
4  read the above and foregoing deposition and that the
5  same is a true and accurate transcription of my
6  testimony, except for attached amendments, if any.
7       Amendments attached    ( ) Yes   ( ) No
8
9
10  _____
          TODD FASULO
11
12    The signature above of TODD FASULO was
13  subscribed and sworn to before me in the county of
14  _____, state of _____, this _____
15  day of _____, 2025.
16
17
18  _____
          Notary Public
     My commission expires
19
20
21
22  A.H. v. Wynn Las Vegas, 07/09/2025 (kar)
23
24
25

54 (Pages 210 - 213)

Page 214

1                    REPORTER'S CERTIFICATE
2
3        I, KIMBERLY A. RITTER, Registered
4  Professional Reporter, do hereby certify that previous
5  to the commencement of the examination, the said TODD
6  FASULO was duly sworn by me to testify to the truth in
7  relation to the matters in controversy between the
8  parties hereto; that the said deposition was taken in
9  machine shorthand by me at the time and place aforesaid
10 and was thereafter reduced to typewritten form,
11 consisting of 214 pages herein; that the foregoing is a
12 true transcript of the questions asked, testimony
13 given, and proceedings had.  I further certify that I
14 am not employed by, related to, nor of counsel for any
15 of the parties herein, nor otherwise interested in the
16 outcome of this litigation.
17       IN                       have affixed my
18 signatur                             5.
19



20        Kimberly A. Ritter
           Registered Professional Reporter
21        Nevada Certificate No. 1020
22
23
24
25

55 (Page 214)