# EXHIBIT 5

# To Be Filed Under Seal

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                    DISTRICT OF NEVADA
 3    A.H., an individual,           ) Case No.:
                                     ) 2:24-cv-01041-GMN-NJK
 4    Plaintiff,                     )
                                     )
 5    v.                             )
                                     )
 6    WYNN LAS VEGAS,                )
                                     )
 7    Defendant.                     )
      _____
 8
 9              VIDEOTAPED 30(B)(6) DEPOSITION -
                   VENETIAN LAS VEGAS -
10                    MIKE MACKERLEY
11             Taken on Thursday, July 10, 2025
                        at 9:08 a.m.
12
                  Taken remotely via Zoom
13
14
15      Reported by Kimberly A. Ritter, RPR, CCR No. 1020
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 2

```
 1         A P P E A R A N C E S
 2    For Plaintiff, A.H.:
 3    THE 702 FIRM INJURY ATTORNEYS
      Michael C. Kane, Esq. (NBN 10096)
 4         8335 West Flamingo Road
           Las Vegas, Nevada 89147
 5    E-Mail: Mckteam@the702firm.com
 6         LEVIN PAPANTONIO
      Matthew D. Schultz, Esq. (Pro hac vice)
 7         316 South Baylen Street, Suite 600
           Pensacola, Florida 32502
 8    E-Mail: Mschultz@levinlaw.com
 9    For Defendants Wynn Las Vegas, LLC
      And Wynn Resorts Limited:
10
           JONES DAY
11    Clare Baldwin, Esq.
           717 Texas Street, Suite 3300
12         Houston, Texas 77002
      Email: Cbaldwin@jonesday.com
13
      Attorney for Venetian:
14
           KEMP JONES
15    Nathaneal Rulis, Esq.
      Wells Fargo Tower, 17th Floor
16    3800 Howard Hughes Parkway
      Las Vegas, Nevada 89169
17    Email: N.rulis@kempjones.com
18    Attorney for Aria Resort and Casino, LLC, Aria Resort
      and Casino Holdings, LLC, MGM Resorts International,
19    New York New York Hotel and Casino, LLC, and CityCenter
      Land, LLC:
20
           DLA PIPER
21    Alexa Ain, Esq.
      David S. Sager, Esq. (US)
22    51 John F. Kennedy Pkwy, Suite 120
      Short Hills, New Jersey 07078
23    Email: Alexa.ain@us.dlapiper.com
      David.sager@us.dlapiper.com
24
25
```

Page 3

```
 1    Attorney for Venetian Las Vegas Gaming:
 2         DLA PIPER
      Caroline Montfort, Esq.
 3    2525 East Camelback Road, Suite 1000
      Phoenix, Arizona 85016
 4    Email: Caroline.montfort@us.dlapiper.com
 5    For the MGM:
 6         DLA PIPER
      Alexa Ain, Esq.
 7    51 John F. Kennedy Pkwy, Suite 120
      Short Hills, New Jersey 07078
 8    Email: Alexa.ain@us.dlapiper.com
 9    Also Present:
      Joey Biaggi - Videographer
10    Vince Rosica - Technician
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2                        PAGE
      EXAMINATION OF MIKE MACKERLEY:
 3    July 10, 2025
 4    By Mr. Kane:              7
 5
 6    DEPOSITION EXHIBITS            MARKED
 7    Exhibit 1   Exhibit 7 Venetian-AH-00432      64
 8    Exhibit 2   Venetian Security Incident Report -   72
                  Venetian-AH-2200
 9
      Exhibit 3   Excerpt human trafficking information    75
10        or guidelines (Venetian-AH-2955)
11    Exhibit 4   Venetian-AH-2957-2958)        77
12    Exhibit 5   Venetian-AH-0000431          103
13    Exhibit 6   Venetian-AH-445-448          105
14
15
16
17              INFORMATION REQUESTED:
18        None
19
      QUESTIONS INSTRUCTED NOT TO ANSWER:
20        None
21
22
23
24
25
```

Page 5

```
 1         P R O C E E D I N G S
 2         THE VIDEOGRAPHER:  Good morning.  We are
 3    going on the record today as of 9:06 a.m. on July 10th
 4    of 2025.
 5         This is media unit one of the video-recorded
 6    deposition of 30(b)(6) Mike Mackerley for Venetian
 7    Gaming, LLC, in the matter of A.H., an individual,
 8    versus Wynn Las Vegas, et al., filed in the District
 9    Court of Nevada, case number 2:24-cv-01041-GMN-NJK.
10         We're located at Kemp Jones.
11         My name is Joey Biaggi representing Veritext,
12    and I'm the videographer.  Your court reporter is
13    Kimberly Ritter from Veritext.
14         Will counsel and all present including
15    remotely please state their appearances and
16    affiliations for the record, beginning with the
17    noticing attorney.
18         MR. KANE:  Michael Kane on behalf of A.H.
19         MR. SCHULTZ:  Matt Schultz, Levin Papantonio,
20    Pensacola, Florida, on behalf of the Plaintiff.
21         MR. SAGER:  David Sager, DLA Piper, on behalf
22    of Venetian Las Vegas Gaming, LLC, and witness.
23         MR. RULIS:  Nathaneal Rulis, Kemp Jones, on
24    behalf of Venetian.
25         MS. BALDWIN:  Clare Baldwin from Jones Day on
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1 behalf of Wynn Las Vegas, LLC, and Wynn Resorts
2 Limited.
3        MS. AIN:  Alexa Ain from DLA Piper as well on
4 behalf of the MGM entities, which are Aria Resort and
5 Casino, LLC, Aria Resort and Casino Holdings, LLC, MGM
6 Resorts, International, New York New York Hotel and
7 Casino, LLC, and CityCenter Land, LLC.
8        MS. MONTFORT:  Caroline Montfort on behalf of
9 the Defendant, Venetian Las Vegas Gaming.
10        THE VIDEOGRAPHER:  Will the court reporter
11 please swear in the witness, and then counsel may
12 proceed.
13        THE STENOGRAPHER:  Good morning.  My name is
14 Kimberly Ritter, and I'm the court reporter for today's
15 deposition.  My Nevada certificate number is 1020.
16        Mr. Macker -- Mackerley, would you raise your
17 right hand for me, please.
18        (Witness oath administered.)
19        THE DEPONENT:  Yes.
20        THE STENOGRAPHER:  Thank you.
21        MIKE MACKERLEY,
22 having been first duly sworn to state the whole truth,
23 testified as follows:
24
25

Page 7

1        EXAMINATION
2 BY MR. KANE:
3    Q.   Good morning.  Can you please state your name
4 for the record.
5    A.   It is Mike Mackerley, M-a-c-k-e-r-l-e-y.
6    Q.   Mr. Mackerley, have you ever given deposition
7 testimony before?
8    A.   I have.
9    Q.   Approximately how many times?
10    A.   25 to 30 times.
11    Q.   When was the last time you gave deposition
12 testimony?
13    A.   I would say approximately about five years
14 ago.
15    Q.   Have you ever given a deposition as a
16 corporate representative for Venetian or
17 Venetian corporations?
18    A.   I have.
19    Q.   When was the last time that you gave a
20 deposition on behalf of Venetian?
21    A.   Same answer, five years ago approximately.
22    Q.   Do you understand that you're speaking as the
23 voice of the Venetian today?
24    A.   Correct.
25    Q.   Okay.  Unless I specifically ask you

Page 8

1 personally regarding the question, I'm going to assume
2 that you're answering on behalf of Venetian or the
3 Venetian Corporation, Defendant Venetian.
4        Do you understand that?
5    A.   I do.
6    Q.   Okay.  Did you prepare for the deposition
7 today?
8    A.   I have.
9    Q.   And approximately how long did you prepare?
10    A.   Probably for the last three -- or two to
11 three weeks, a couple hours a week.
12    Q.   Less than 10 hours?
13    A.   I would say more than 10 hours.
14    Q.   More than 10.
15        And did you review documents in preparation
16 for your deposition?
17    A.   I did.
18    Q.   Were those documents provided to you by your
19 attorney?
20    A.   They were.
21    Q.   Did you review any documents that were not
22 provided by your attorney?
23    A.   Some did I review through my own, you know,
24 looking into.
25    Q.   Okay.  What were those documents?

Page 9

1    A.   Spoke with the vice president of -- the
2 director of surveillance on anything that -- relative
3 to this case with, you know, video retention.
4    Q.   And who is the vice president of
5 surveillance?
6    A.   That'd be Dan Eitnier, E-i-t-n-i-e-r, the
7 vice president.
8    Q.   And was Dan the vice president in -- from
9 2012 to 2014?
10    A.   He was.
11    Q.   And was he the vice president of surveillance
12 in 2012 to 2014 as well, sir?
13    A.   He was.
14    Q.   What conversations did you have with the VP
15 of surveillance specifically regarding your deposition?
16    A.   It was more of an e-mail.  It was just more
17 asking him the retention policies and if there was any
18 specific policies that were in place with
19 surveillance involving policies of human trafficking.
20    Q.   And regarding what timeframe?
21    A.   2012 to 2014.
22    Q.   And was he able to provide you with any
23 documents?
24    A.   I -- not at that time.  He didn't have any
25 documents specifically on human trafficking, but he did

3 (Pages 6 - 9)

Page 10

1  advise me of the retention policies.
2    Q.  Did he inform you that there -- he wasn't
3  aware of any policies in surveillance regarding human
4  trafficking or that he just didn't have possession of
5  those?
6    A.  He stated that there were no policies at the
7  time.
8    Q.  And did he provide you with any documentation
9  that you requested?
10    A.  No.
11    Q.  What did -- and correspondence just happened
12  over e-mail between you and Mr. Eitnier?
13    A.  That's correct.
14    Q.  And did he provide you information regarding
15  the retention policy of surveillance footage from 2012
16  to 2014?
17    A.  He did.
18    Q.  And what was that policy?
19    A.  There -- there's multiple layers.  The first
20  one is a seven-day retention, which is partial of the
21  casino.  They're the slot machines, the non --
22  non-gaming areas, the back of the house, you know,
23  front entrances and they're, again, not gaming related
24  or cash related.
25      Then there was the -- we have a 14- or 15-day

Page 11

1  policy where there was more gaming cameras, you know,
2  the tables, cash areas.
3      Then the mall security or mall level, which
4  was not owned by the Venetian at that time, it's here
5  owned by the general growth properties on that.
6      And then there's the 30-day retention where
7  it was more of the private -- private lounges, gaming
8  lounges when it was set up when opened, we would record
9  a 30-day retention.
10      And then there -- and 40-day -- day retention
11  would be the interviewing rooms and the holding rooms
12  for the security.
13      And all that video was stored in their own
14  network in -- in surveillance, that's -- that's not
15  connected to the -- the Venetian network.  It's their
16  own sole, separate network that's inside surveillance
17  the area.
18    Q.  And what's the network called?
19    A.  That -- Surveillus is that -- that network
20  called.
21    Q.  It's called Surveillus?
22    A.  Surveillus.
23    Q.  Can you spell that, please.
24    A.  I believe it's S-u-r-v-i-l-l-u-s [sic].
25    Q.  And that would be utilized in 2012 to 2014?

Page 12

1    A.  Correct.
2    Q.  Is that still being utilized today?
3    A.  No.
4    Q.  When did they -- when did surveillance stop
5  using Surveillus?
6    A.  I believe it was 2018 or 20 -- between 2018
7  and 2020.
8    Q.  Are the retention policies the same today as
9  they were from 2012 to 2014?
10    A.  They are.
11    Q.  Are there occasions that video footage or
12  audio footage captured within the casino -- any place
13  in the casino are held or retained longer than 40 days?
14    A.  No.  Again, the retention policy is 15 on the
15  casino floor or 7.
16    Q.  Is any video -- surveillance video held
17  longer than 40 days?
18    A.  If they store it for an incident, it would be
19  stored in Surveillus.
20    Q.  And what's an "incident"?
21    A.  Anything they -- they want to document where
22  they feel a suspicious activity, a crime, or anything
23  they deem that they -- they wish to -- to store.  Could
24  be a slip and fall, or anything where they seem -- deem
25  that they wish to store the -- or secure the video.

Page 13

1    Q.  And was that the same in 2012 to 2014?
2    A.  Other than the -- the slip and falls,
3  everything else, yes.
4    Q.  And is there a certain policy or procedure --
5  a written policy or procedure regarding what an
6  incident is and for when to store an incident for
7  surveillance?
8    A.  That he did not provide.
9    Q.  Did you ask?
10    A.  I asked specifically for if he had anything
11  with human trafficking, that's what I asked.
12    Q.  What about currently?  Is there any policy or
13  procedure for surveillance that would describe where to
14  find what an incident is, when to store video footage
15  for longer than 40 days?
16    A.  Currently, I believe there is a policy
17  stating a procedure, but I'm not sure if it
18  specifically states what an -- defines "incidences"
19  or -- or anything like that.
20    Q.  So if there was an incident that occurred or
21  a crime that occurred in 2012 to 2014 and the video was
22  stored, how long -- how long does Venetian retain that?
23    A.  Indefinitely.
24    Q.  Is their retention policy the same today as
25  it was in 2012, 2014?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1    A.  It is.
2    Q.  All right.  Did you have any other
3  conversations with the -- Mr. Eitnier regarding
4  surveillance, retention, or human trafficking?
5    A.  No, that's the extent.
6    Q.  And just to be clear, he never provided you
7  with any documentation, policies, or procedures or
8  otherwise?
9    A.  That's not relative to '12 -- 2012 to '14,
10  no.
11    Q.  Did he -- did he provide you any
12  documentation that would not be relevant to 2012, 2014
13  then?
14    A.  He did provide me that -- the current policy
15  that's in place, but not when it was in 2012 to 2014.
16    Q.  Is that the 2018 policy?
17    A.  I don't know the date of that.  I just know
18  that he stated or communicated that he didn't have
19  anything between '12 -- 2012, 2014.  So I don't know
20  the date of that policy.
21    Q.  Did you review the policy that he provided?
22    A.  I did.
23    Q.  Did it have a date on it?
24    A.  Yeah, I -- I would not know.  I didn't --
25  didn't see the -- the date.  I didn't look for a date.

Page 15

1    Q.  Did you ask him when surveillance started
2  using that particular policy?
3    A.  I did not.
4    Q.  Did you ask him what prompted the policy to
5  be drafted?
6    A.  I did not.
7    Q.  Did he provide you any other documents?
8    A.  No.
9    Q.  Did you speak with anybody else in
10  preparation for your deposition today, other than your
11  attorney, Mr. Sager?
12    A.  I also spoke to the current training --
13  security training staff that we have in the security
14  department.  I asked if they had any, you know,
15  training materials or documents relating to human
16  trafficking or training during the 2012-2014 years, and
17  they confirmed that they did not have anything --
18  documents -- excuse me -- other than a video that we
19  show incoming security personnel during their
20  introductory period for the security department.
21    Q.  And does that video have to do with human
22  trafficking?
23    A.  More that -- how to handle a crime scene if
24  there was a -- a trick-roll involving a -- a prostitute
25  and/or a guest with a guest in a suite.

Page 16

1    Q.  Did you review that video in preparation for
2  your deposition?
3    A.  I did.
4    Q.  Did you think it was relevant to human
5  trafficking?
6    MR. SAGER:  Objection.
7    You can answer.
8    A.  There's prostitution involved, so...
9    Q.  (By Mr. Kane)  Prostitution is synonymous
10  with human trafficking, correct?
11    MR. SAGER:  I'm sorry, could you -- I didn't
12  hear the question.
13    Q.  (By Mr. Kane)  Prostitution's synonymous with
14  human trafficking?
15    MR. SAGER:  Objection.
16    A.  I -- I wouldn't say that, because -- I mean I
17  don't know if she's being trafficked or is it by
18  herself or -- voluntary, involuntary.
19    Q.  (By Mr. Kane)  The video regarding the -- I'm
20  going to call it trick-roll, do you know when that was
21  produced?
22    A.  I do not.  It's actually -- it was produced
23  or created by the Las Vegas Metropolitan Police
24  Department, not by the Venetian itself.  It's provided
25  to us for that training.

Page 17

1    Q.  And when did Venetian start using the
2  trick-roll video as training purposes for security?
3    A.  We couldn't find a date, but I just remember
4  it being -- I've been there for 26 years and I don't
5  remember it not being used.  So I don't -- couldn't
6  coun -- come up with a date when it was implemented.
7    Q.  So it was being used during that 2012 to 2014
8  timeframe, to the best of your knowledge?
9    A.  Correct.
10    Q.  And that same video is -- is being used today
11  to train new security employees?
12    A.  Correct.
13    Q.  Who did you speak with the current security
14  training staff specifically?
15    A.  So I spoke with Ken Wilson, he is the
16  training manager.
17    Q.  And was Ken Wilson the training -- is it
18  training manager for security?
19    A.  Correct.
20    Q.  And was Ken Wilson the training manager for
21  security in -- from 2012 to 2014 as well?
22    A.  No, he was not.
23    Q.  Did you speak with anybody else within the
24  training staff for security other than Ken Wilson?
25    A.  His -- his staff was there, but I

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1  specifically spoke with Ken.
2      Q.  Who else was present during the conversation?
3      A.  Mike Hetzel.  He is the -- a training --
4  training coordinator or just trainer.  I think it was
5  the other ones that I spoke with -- the other were in
6  and out of the offices, but they weren't really part of
7  the conversation.
8      Q.  Is it H-e-t-z-e-l?
9      A.  Correct.
10     Q.  And Mr. Hetzel, was he part of the security
11  staff for training from 2012 to 2014?
12     A.  He was not.
13     Q.  Did you do any independent research other
14  than reaching out to Ken Wilson and speaking in the
15  presence of Mr. Hetzel regarding any policies or
16  procedures for human trafficking that would have --
17  would have been in place from 2012 to 2014 in the
18  security department?
19     A.  I did.  I looked at all my -- my e-mails or
20  any -- my old folders from in that timeframe or any
21  databases that we would -- would have, and I was unable
22  to find anything specifically for human trafficking.
23     Q.  What would the databases that -- that you
24  would service that would have been in place between
25  2012 and 2014 at the Venetian?

Page 19

1      A.  Like I said, my e-mails.  So it would have
2  been Microsoft on that, or the network, the Venetian
3  network, IT network, specifically, would be storing all
4  those.  That's pretty much the -- in 2012, that's all I
5  looked for during that timeframe.
6      Q.  So when you said that you looked in e-mails,
7  folders, and databases -- "databases," you meant was
8  Microsoft the e-mail provider?
9      A.  Yeah.  More of my -- on my computer, you
10  know, the folders that I -- that I would create myself.
11     Q.  I'm sorry, I didn't ask you, what's your --
12  what's your current position at Venetian?
13     A.  Currently the executive director of security
14  options.
15     Q.  And how long have you been in that role?
16     A.  Approximately five -- five to six years.
17     Q.  How long have you been with the company?
18     A.  It would be going on about 26-and-a-half
19  years.
20     Q.  And then prior to your current position, what
21  was your title?
22     A.  I was the director of security operations.
23     Q.  From 2012 to 2014, what was your position?
24     A.  I was a ser -- assistant director of
25  security.

Page 20

1      Q.  When you were the assistant director of
2  security, do you recall ever receiving any policies or
3  procedures regarding human trafficking, sex
4  trafficking, labor trafficking?
5      A.  No.
6      Q.  Did you know what human trafficking was in
7  2012, 2014?
8      A.  Not specifically the term "human
9  trafficking," no.  "Solicitation," yes, but not "human
10  trafficking."
11     Q.  What's "solicitation"?
12     A.  Well, when an individual, you know, um,
13  inquires or asks if somebody's interested in sexual
14  favors for, you know, exchange of money.
15     Q.  And that's a crime in Clark County?
16         MR. SAGER:  Objection.
17     A.  It is.
18     Q.  (By Mr. Kane)  It was a crime in 2012 to 2014
19  as well?
20     A.  It was.
21     Q.  Prostitution has always been illegal in Clark
22  County, right?
23     A.  Correct.
24     Q.  And what was Venetian's definition of
25  prostitution in 2012 to 2014?

Page 21

1         MR. SAGER:  Objection.
2      A.  As I stated before, somebody who's inquiring
3  if they want to exchange sexual activity for -- for
4  money.
5      Q.  (By Mr. Kane)  So is prostitution the same as
6  solicitation?
7         MR. SAGER:  In the way he's using it or as a
8  legal matter?
9         MR. KANE:  In the way that he's using it.
10        MR. SAGER:  That's fine.
11     A.  Yes.
12     Q.  (By Mr. Kane)  So other than Mr. Wilson,
13  Mr. Eitnier, Hetzel, did you speak with anybody else to
14  prepare for your deposition today?
15     A.  I've had conversations with the legal
16  department, a couple here and there.
17     Q.  So if you don't understand one of my
18  questions today, are you going to let me know that you
19  didn't understand it and ask me to rephrase it?
20     A.  I will.
21     Q.  Okay.  I appreciate it.
22        And that's important, because if you answer a
23  question, I'm going to assume that you gave your most
24  complete, honest answer on behalf of the Venetian.
25        Do you understand that?

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1    A.  I do.
2    Q.  Should you choose to review the deposition
3  transcript, that's all my questions, all your responses
4  and any objections or questions that the attorneys here
5  may have for you, check for accuracy and make any
6  changes to your deposition transcript at that time, do
7  you understand that?
8    A.  I do.
9    Q.  Do have to caution you, if Venetian makes any
10  changes to the testimony that you gave her today under
11  oath at any time after today, those changes are
12  probably going to be commented upon by myself or any
13  other attorneys working on the case and used to effect
14  the credibility or believability from a judge or jury
15  for Venetian.
16    Does that make sense?
17    MR. SAGER:  I don't know how this witness is
18  going to understand legal attacks on changes.
19    But if you have an independent recollection
20  or independent knowledge, you can answer.
21    A.  If you're asking me if I'm aware of any
22  changes as -- as subject to -- to be reviewed, I do.
23  I'm aware.
24    Q.  (By Mr. Kane)  I don't want to know anything
25  that you and your attorney spoke about in preparation

Page 23

1  for your deposition, or anyone in the legal department
2  for that matter regarding your deposition -- regarding
3  your deposition today.
4    Does that make sense?
5    A.  It does.
6    Q.  Who did you speak with in the legal
7  department?
8    A.  Calvin Siemer.  He's the chief legal officer.
9    Q.  And was he in the legal department from 2012
10  to 2014?
11    A.  He was.
12    Q.  And what topics specifically did you talk to
13  Mr. Siemer on?
14    MR. SAGER:  So here I'd just instruct you, as
15  Mr. Kane already did, don't disclose anything that
16  could be confidential, but you can refer to general
17  topics.  And then if Mr. Kane decides to ask more
18  questions, we can address them then.  Okay?
19    So, for instance, you can say -- well, you
20  say whatever you want.
21    A.  Again, the topics we're, you know, discussing
22  the policies of human trafficking, what was in place,
23  if we had anything in place, if there was policies or
24  practices or any type of training at that -- during
25  that timeframe.

Page 24

1    Q.  (By Mr. Kane)  Was he able to provide you
2  with any policies or procedures -- written policies or
3  procedures during that timeframe?
4    A.  For between 2012 and '14, no.
5    Q.  What about any unwritten policies or
6  procedures?
7    A.  No.
8    Q.  Did you speak with anybody else at the
9  Venetian in preparation for your deposition today?
10    A.  Also spoke with Yuri Kim.  I'm not sure
11  exactly what her title is.  I think she might be vice
12  president or general counsel.
13    MR. SAGER:  She's in the legal department.
14    Q.  (By Mr. Kane)  What was the purpose of
15  talking to Ms. Kim?
16    A.  It was the same topics that I spoke with
17  Mr. Siemer.
18    Q.  Was it a -- a separate conversation or was
19  Ms. Kim, Mr. Siemer together?
20    A.  There were times they were together and there
21  was times when I just spoke with Ms. Kim -- or
22  communicated with Ms. Kim.
23    Q.  How long was the meeting with -- or
24  meetings -- how many times did you meet with Ms. Kim or
25  Mr. Siemer?

Page 25

1    A.  I think two or three times, probably about an
2  hour, a little over an hour each time.
3    Q.  And was (indiscernible).
4    THE STENOGRAPHER:  I'm sorry, counsel, I --
5  you were very mumbled there.  Could you repeat that?
6    MR. KANE:  Yeah.
7    Q.  (By Mr. Kane)  I said were all three -- two
8  or three of those meetings to become knowledgeable on
9  any certain topics in our 30(b)(6) notice?
10    A.  Yeah.  I mean it was all the topics that we
11  went through, the expectations.
12    Q.  Did you speak with anybody else in
13  preparation for your deposition?
14    A.  You know, Mr. Sager's team.
15    Q.  Have you told me everybody that you spoke
16  with in preparation to become the 30(b)(6) deponent
17  today?
18    A.  No.  I also spoke with two personnel, names
19  Nicholas Coronado, C-o-r-r-o-n-a-d-o [sic], Coronado.
20  He was a field training officer, an FTO, at the time of
21  that timeframe.  And I inquired with him if he
22  recollects any -- any policies or procedures.  Same
23  topics that I talked with on that.  I mean he doesn't
24  remember.
25    And then I also spoke with Justin Hagan,

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1  H-a-g-a-n, at that time. And he doesn't recollect.
2  And I spoke with them both at the same time, and he
3  didn't recollect any specific policies or -- or -- or
4  training relating to human trafficking.
5       Again, they both brought up the -- the
6  trick-roll video, but that's all they brought up.
7     Q. And the trick-roll video, that's shown to all
8  new hires in security?
9     A. Correct.
10    Q. What about other employees, like, bartenders,
11 waitresses, dealers?
12    A. No.
13    Q. That's a video that's just shown to security
14 and surveillance or just security?
15    A. Just security.
16    Q. Mr. Coronado, he was -- he was the FTO
17 during that timeframe, 2012 to 2014?
18    A. In that timeframe, yes, but not -- might not
19 have been the full two years, but he was part of it.
20    Q. Understood.
21       And what's his current position?
22    A. He's the assistant director of security
23 operations.
24    Q. And what about Mr. Hagan?
25    A. He's a current day shift manager.

Page 27

1     Q. And was he employed at Venetian from 2012 to
2  2014?
3     A. Correct.
4     Q. What was his position during that time?
5     A. I believe he was an officer.
6     Q. Is that a security officer?
7     A. Security officer.
8     Q. All right. Is that -- have we exhausted
9  everybody that you spoke with in prep for the
10 deposition today?
11    A. Correct.
12    Q. So I think Venetian opened its doors in 1999?
13    A. Correct.
14    Q. When they opened their doors, how many guest
15 rooms did they have?
16    A. I don't know how many rooms they -- they had,
17 but not all the floors were open just due to not having
18 the temporary Certificate of Occupancy.
19    Q. Currently there's over 7,000 rooms at
20 Venetian?
21    A. Approximately 7,100.
22    Q. And those are guest rooms?
23    A. Correct.
24    Q. And who's your employer?
25    A. My employer is the Venetian Resort.

Page 28

1     Q. Is it Venetian Las Vegas Limited Liability
2  Company? Is it Venetian Casino Resort, LLC?
3     A. I'm just aware of -- I'm aware of just Las
4  Vegas Resort -- Las Vegas Resort. It might be LLC.
5     Q. And then from 2012 to 2014, did Venetian own
6  the Palazzo as well?
7     A. It did.
8     Q. And does Venetian currently own the Palazzo?
9     A. It does.
10    Q. And the Palazzo has approximately how many
11 rooms?
12    A. Right around -- I'd say a little over 3,200,
13 give or take.
14    Q. Thir -- a little over --
15    A. 3,000 -- 3,200.
16    Q. And then Venetian opened a sister property,
17 Macao, in 2009?
18    A. I don't know the exact date, but that sounds
19 approximately in the -- right around that time.
20    Q. So do you know how many rooms the Macao
21 property has?
22    A. I do not.
23    Q. Does Venetian own -- or did they own from
24 2012 to 2014 any other properties, casino resort
25 properties here in Las Vegas?

Page 29

1     A. They owned the -- the -- the Sands Expo.
2     Q. The coneps --
3     A. Convention center. Sorry.
4     Q. There's no guest rooms at the convention
5  center, right?
6     A. No.
7     Q. Correct?
8     A. Correct.
9     Q. What -- what is the Sands Corporation?
10    A. Sands Corporation was the corporation that
11 owned all the properties from the Venetian, the -- the
12 Expo, and the overseas properties at the time.
13    Q. So from 2012 to 2014, Sands Corp. owned
14 Venetian Las Vegas, Palazzo, the Sands Expo and
15 Venetian Macao?
16    A. Correct.
17    Q. And other than Venetian Macao, during that
18 same time period did Sands Corp. own any other casino
19 resort -- foreign casino resorts?
20    A. I'm not sure exactly the dates or what
21 they -- other properties they had at Macao. That was
22 where the Macao Venetian -- Venetian Macao was located.
23 So I don't know what properties at that time were
24 opened or were being built.
25    Q. Are you aware of -- well, does Sands Corp.

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1 still own Venetian Palazzo, the Expo, and Macao?
2    A. It does not.
3    Q. Who owns that now?
4    A. Well, it's two. Apollo operates the
5 management function, and then I'm drawing a blank who
6 owns the actual property and the real estate. I'm
7 drawing a blank on who owns that, so it's a dual
8 entity.
9    Q. Can you give me an approximate -- approximate
10 time in that shift change of ownership?
11    A. I believe it was beginning of first quarter
12 of 2022.
13    Q. From 2012 to 2014, were there any -- it was a
14 publicly traded company, the Sands Corp. at that time?
15    A. It was.
16    Q. Were there any majority stockholders?
17    A. I believe Mr. -- Mr. Adelson was a majority
18 stockholder.
19    Q. Meaning, he had greater than 51 percent hold
20 of the stock?
21    A. To my knowledge, yes.
22    Q. Is -- does Mr. Adelson -- is he still a
23 majority stockholder?
24    A. He is not.
25    Q. From 2012 to 2014, was he on the Board?

Page 31

1    A. Yes, he was.
2    Q. Is he currently on the Board?
3    A. Unfortunately, he's passed.
4    Q. Oh, he did?
5    A. Yes.
6    Q. When?
7    A. I would say two, two-and-a-half, three years
8 ago.
9    Q. Did you -- were you -- other than the
10 Complaint filed in this case, any other Complaints that
11 would have been filed from 2010 to 2018 against
12 Venetian, Sands Corp., or Mr. Adelson?
13    A. In -- relating to what? What's the -- I
14 apologize, I don't understand the question.
15    Q. I'm just asking generally if you would review
16 any Complaints that were filed here in Clark County
17 against Venetian, Mr. Adelson, or the Sands Corp.?
18    A. I did not.
19    Q. This is going to be a question to you
20 personally.
21       Have you ever trained any employees during
22 your tenure with the Venetian regarding human
23 trafficking, solicitation, or prostitution?
24    A. I have not.
25       During that timeframe, I apologize? 2012 and

Page 32

1 2014?
2    Q. During your tenure, full-time, 26 years?
3    A. And then the answer is still no.
4    Q. During your employment with the Venetian,
5 have you ever undergone any type of training on human
6 trafficking, prostitution, or solicitation?
7    A. I have.
8    Q. And can you give me a general timeframe when
9 you were first undergone that training?
10    A. I believe the implementation of that type of
11 training was 2018.
12    Q. And what happened in 2018 that Venetian
13 implemented the human trafficking training?
14       MR. SAGER: Objection.
15    A. I'm not sure if there was a specific reason
16 or anything that just -- I think it was just more of
17 the awareness that we want to -- to present to the team
18 members to implement that type of training just through
19 education.
20    Q. (By Mr. Kane) What was the training that
21 started in 2018?
22    A. Compliance initiated that type of training
23 through on-line services, going through on-line for all
24 team members. And it's basically when it started
25 identifying human trafficking, what to look for, how to

Page 33

1 look for, how to report, where to report. Just the
2 overall process of, you know, how to handle that
3 situation.
4    Q. And so in 2018, all employees and new
5 employees from the point that the -- the training
6 started would have undergone the human trafficking
7 training?
8       MR. SAGER: Objection. I have no problem
9 with the witness answering the questions. I just note
10 that they're outside the scope of the deposition
11 notice.
12       But you can go ahead.
13    A. Can you repeat the question?
14    Q. (By Mr. Kane) Yeah.
15       So starting in 2018 would all Venetian
16 employees have undergone the human trafficking
17 training?
18       MR. SAGER: Same objection to scope.
19    A. I believe it was a part of their, yeah,
20 introductory period required training.
21    Q. (By Mr. Kane) Like an onboarding for new
22 hires?
23    A. Correct.
24    Q. What about the employees that were already
25 employed, did they have to undergo the training as

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1　well?
2　　　A.　It's required for all team members.
3　　　Q.　And you said that they received the training
4　through on-line services?
5　　　　MR. SAGER:　So I don't have to interrupt you,
6　can I have a standing objection on scope to questions
7　about 2018 training?
8　　　　MR. KANE:　Sure.　That's fine.
9　　　　MR. SAGER:　Okay.
10　　　A.　They just have to go through -- through the
11　computer, through the network and the -- the training
12　will be assigned to them.　And they would just have to
13　log onto the company computer to complete that
14　training.
15　　　Q.　(By Mr. Kane)　What's the -- is there a
16　specific portal?　Does it have a name, the system?
17　　　A.　I believe at that time when we started it was
18　MyHR.
19　　　Q.　You're referring to 2018?
20　　　A.　Correct.
21　　　Q.　And is MyHR still being used for those
22　training materials?
23　　　A.　It is.
24　　　Q.　Are there any other portal or databases that
25　Venetian uses to house or train on human trafficking

Page 35

1　post-2018?
2　　　A.　I don't believe so.
3　　　Q.　Did -- are there videos as part of the
4　training for human trafficking on MyHR?
5　　　A.　There is.
6　　　Q.　Do employees, as of 2018, have to take a test
7　once they reviewed the -- or undergo the human
8　trafficking training?
9　　　A.　There's multiple ques -- multiple decisions
10　or questions that they got to take, correct.
11　　　Q.　Is it -- is it multiple choice or do they
12　actually type into the system?
13　　　A.　Multiple choice.
14　　　Q.　The safe -- the -- when the human trafficking
15　training through MyHR started in 2018, has it evolved
16　to today or is it the same materials that are being
17　used to train new employees?
18　　　A.　I wouldn't remember.　I don't remember even
19　taking the exact training in 2018 to what it is.　I
20　just know what we're -- it's continuous training.　But
21　does it evolve?　I don't know.　I'm sure that they're
22　always looking at to -- to improve the -- the training.
23　　　　But the answer to that I wouldn't -- wouldn't
24　be able to answer.
25　　　Q.　Is that something that you would discuss with

Page 36

1　Ms. -- Mr. Hagan, Mr. Siemer, Ms. Kim, Mr. Wilson, any
2　of those individuals?
3　　　A.　Well, with Mr. Wilson and Hagan, no, because,
4　again, that's not part of their initiating or
5　implementing that type of training.　But that topic
6　just didn't come up, or I didn't raise that topic
7　either.
8　　　Q.　Since I'm assuming, correct me if I'm wrong,
9　but you would have undergone the -- the human
10　trafficking training in 2018 in person?
11　　　A.　Correct.
12　　　Q.　And since undergoing that training on human
13　trafficking, have you undergone any additional training
14　on human trafficking?
15　　　A.　Just the continuous training.
16　　　Q.　What's that?
17　　　A.　The continuous training of human trafficking
18　that they implemented in 2018.
19　　　Q.　What's "continuous training"?
20　　　A.　Annual training each year.
21　　　Q.　Can you tell me generally what that would be?
22　　　A.　What, the -- the training itself?
23　　　Q.　The continuous training.
24　　　　So you went up -- you've undergone the -- the
25　human trafficking training in 2018, and then the

Page 37

1　continuous training.　And what is -- what are -- what
2　are the annuals, updates, or supplements that you
3　undergo?
4　　　A.　It's -- it's the same training.　So the 2018,
5　you -- you did the 219 -- or 2019 to '20.　Again, I
6　don't know if there was any changes, but it's the same
7　material that's being covered each year.　So...
8　　　Q.　It's the same video?
9　　　A.　Yeah.　I couldn't answer that.　I don't know
10　if it's the same video in 2018 to 2026.　It's just the
11　same material.
12　　　Q.　Is there a PowerPoint presentation for it?
13　　　A.　There is.
14　　　　Can I go back to your --
15　　　Q.　I'm sorry?
16　　　A.　-- question?
17　　　　You asked if that was part of -- you know,
18　asked if there was an involvement, right, or -- and --
19　you know, a -- changes in -- in the video from 2018 on
20　that.
21　　　　You know, I don't know if I would ask that
22　question to the point -- you know, that wasn't part of
23　my scope between 2012 to '14.　So the reason why I
24　wasn't asking those materials was because that was not
25　what I was -- you know, my scope of looking at.

10 (Pages 34 - 37)

Page 38

1  So I'm not aware, you know, exactly what
2  you're asking. So I'm not really prepared truly to
3  answer those, because it's not in the scope that I was
4  provided to between 2012 to 2014. Just -- I just want
5  to make sure that's clear.
6  Q. No, I appreciate it.
7  So did you do the annual refresher this year
8  already on human trafficking?
9  A. They -- I can't remember if it's part of the
10  first quarter or if there's a third -- third quarter.
11  There's a lot of training that's coming back. I can't
12  remember if it's -- what quarter it is.
13  Q. But this particular training is the only
14  training related to human trafficking, though, correct?
15  A. Currently, yes.
16  Q. Right.
17  A. Now it's a little bit different from --
18  again, I didn't -- you know, I'm not prepared for it,
19  but we do -- the security itself has some additional
20  training on -- on human traffic through the academy.
21  But, again, to my -- to my point previously,
22  you know, I did not review those or speak on behalf of
23  that -- that type of training because it wasn't
24  occurring in 2012, '14, outside the scope.
25  Q. Okay. I appreciate that.

Page 39

1  A. Okay.
2  Q. So all employees from 2018 to present receive
3  the MyHR human trafficking training; is that fair?
4  A. That's fair.
5  Q. And it sounds like security gets additional
6  training in human trafficking?
7  A. Not in 2012 and '14, but currently they do
8  receive additional training.
9  Q. Okay. When did that start?
10  A. 2018, I think, or give it -- same -- same
11  timeframe. Might be '17 or '18.
12  Q. And can you tell me what -- generally, what
13  the difference is between the general human trafficking
14  training that all employees get and the -- the
15  additional training that security does?
16  A. I think the -- the overall arching for all
17  team members is just more of a general defining what
18  human trafficking and what to look for versus security
19  gets additional how to actually handle such activity,
20  illegal activity.
21  Q. So is it they receive training on how to --
22  to handle criminal activity generally or human
23  trafficking crimes?
24  A. In security you're ran on all -- all types of
25  suspicious activity, illegal activity, all that. So

Page 40

1  they were receiving both human trafficking and --
2  and -- and illegal activity.
3  Q. And did you undergo the specialized security
4  human trafficking training, you personally?
5  A. Not in my role at that time.
6  Q. What was your position at that time?
7  A. It would have been the director of security.
8  Q. So do directors not have to undergo the human
9  trafficking training for security?
10  A. When you say "directors," define dir --
11  what -- now are you talking security directors?
12  I just want to make sure.
13  Q. Yeah. Directors, yes.
14  A. Yeah. So directors involve -- we don't have
15  that face time or the -- the front line, so we
16  generally do not go through that type of training.
17  Q. From 2012 to 2014, would new hires and the
18  security have to go through the academy?
19  A. They do. They would.
20  Q. What -- where -- where's the academy?
21  A. It's out in the -- the Venetian. We have a
22  security training room -- training area that we conduct
23  that type of training.
24  Q. And how long is the academy?
25  A. Two weeks.

Page 41

1  Q. And, I'm sorry, did the new hires in security
2  would have to go through the academy in 2012 to 2014,
3  correct?
4  A. Correct.
5  Q. And new hires, the academy continues today?
6  A. For security, yes.
7  Q. If someone goes and is hired as a bartender,
8  do they have to go through an academy?
9  A. Not to my knowledge.
10  Q. I'm just wondering if it's called the same
11  thing.
12  A. There's a -- a new hire orientation, if
13  that's what you're asking. All team members have to go
14  through the new hire orientation to include security
15  officers, but I think that's the -- their only onboard
16  training.
17  Q. In 2012, 2014, prostitution was taking place
18  at the Venetian's rooms, right?
19  MR. SAGER: Objection.
20  A. I wouldn't be able to answer that. I mean I
21  don't know what goes on specifically in each and every
22  room.
23  Q. (By Mr. Kane) Is it Venetian doesn't know if
24  prostitution was taking place in the rooms in 2012 to
25  2014?

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1    MR. SAGER: Objection.
2    A.  No, we're aware it's occurring, but I
3  wouldn't say we specifically know that, you know,
4  prostitution is occurring in our suites unless we
5  identify that.
6       Now have we?  Yes, if that's what you're
7  asking.  Have we been involved in calls that
8  involvements inc -- you know, alleged?  Yes.
9    Q.  (By Mr. Kane)  Are all the rooms called
10 "suites"?
11   A.  Correct.
12   Q.  So -- so Venetian from 2012 to 2014 was aware
13 that prostitution was happening in their suites,
14 correct?
15       MR. SAGER: Objection.
16   A.  When we were -- you know, again, when we were
17 called to a situation or somebody was -- that we were
18 aware of or -- or brought to that situation or to that
19 call -- to that suite, yes.
20   Q.  (By Mr. Kane)  And from 2012 to 2014,
21 prostitution was occurring at the suites at Venetian
22 Macao as well, correct?
23       MR. SAGER: Objection, scope, and objection,
24 form.
25   A.  I would not know that.  I wasn't -- I'm not

Page 43

1  privileged to that information.
2    Q.  (By Mr. Kane)  In 2012 to 2014, prostitution
3  was occurring within the suites at the Palazzo,
4  correct?
5       MR. SAGER: Objection.
6    A.  My same answer would be with the Venetian.
7  If we were called or dispatched to a alleged
8  solicitation or prostitution that was being occurred,
9  yes.
10   Q.  (By Mr. Kane)  How many guest suite towers
11 are there at Venetian?
12   A.  Currently three.
13   Q.  And are they all operated at one elevator
14 bay, one area for the elevators?
15   A.  They are not.
16   Q.  Does each tower have their own elevators?
17   A.  Each tower has two -- two elevator lobbies
18 that -- to gain access to each tower.
19   Q.  From 2012 to 2014, was there security at the
20 elevators for the guest towers?
21   A.  There was.
22   Q.  What was the purpose of having security at
23 the guest tower elevators?
24   A.  To verify that anybody who's gaining access
25 as a purpose or a guest or a legitimate reason to -- to

Page 44

1  gain access to -- to the tower suites.
2    Q.  And how were the security officers that would
3  be at the elevators, how would they verify that?  How
4  were they trained to verify that?
5    A.  They were -- they were trained to -- to ask
6  all guests who were entering to verify that they had a
7  suite.  And if there was multiple, you know, people who
8  didn't have, they'd have to verify that they are
9  with -- with -- with that guest who has that suite.
10   Q.  And from 2012 to 2014, were they electronic
11 suite doors, need a key card to get in, as opposed to,
12 like, a regular key?
13   A.  Correct, they were.
14   Q.  So from 2012 to 2014, the security guards
15 that were positioned at the elevators at Venetian would
16 verify just simply by asking a guest if they have a
17 suite?
18   A.  No.  They would verify that they just have a
19 suite -- suite key in their hand.  And if there was
20 additional people that they wanted to claim that they
21 were going to the suite with them or a part of their --
22 their party, we would -- we would val -- verify that
23 they're with them and then allow them up to access the
24 tower.
25   Q.  And how would security verify those

Page 45

1  individuals are with them?
2    A.  The guest would state that to us.
3    Q.  So you just simply ask them, hey, are these
4  people with you?
5    A.  Correct.  Or they would say these people are
6  with me prior to us asking.
7    Q.  From 2012 to 2014, were the security officers
8  positioned at the elevators trained on any red flags
9  regarding either prostitution or human trafficking?
10       MR. SAGER: Objection.
11   A.  They were.  They would -- they were -- look
12 for loitering or somebody going up multiple -- up to
13 multiple times and suites with dif -- different
14 individuals or loitering in the -- in the tower.
15   Q.  (By Mr. Kane)  So were -- and that's they
16 were trained to try to identify what you just told me?
17   A.  I think it was more of, yeah, a best
18 practice, you know, an understanding this is what we're
19 trying to look for to identify, you know, people who
20 are soliciting on -- on those occasions.
21   Q.  In 2012 to 2014, are -- were there security
22 cameras on each of the guest floors?
23   A.  Only in the elevator lobbies on each floor,
24 but not the -- not the hallways.
25   Q.  So did -- were there cameras in the

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1 elevators?
2    A.   Yes.
3    Q.   And then there would be a camera positioned
4 outside of the elevator focused on the front of the
5 elevator on each floor?
6    A.   No.  There would be one camera focused up
7 towards the -- the rotunda where the towers would meet,
8 the camera would face that way.  So all the elevators
9 would be on one camera, the -- that or entering, but
10 not each in individual elevators.
11    Q.   So when you say "rotunda," is that the main
12 floor or are you talking on each guest floor?
13    A.   Each guest floor where each hallway would
14 meet to get into the guest elevator lobby on each
15 floor.
16    Q.   From 2012 to 2014, would security be
17 positioned on each floor, each guest floor?
18    A.   No.
19    Q.   From 2012 to 2014, generally, how many
20 security officers would be positioned by the -- the
21 tower elevators?
22    A.   There would be one officer on each entrance
23 of the -- the tower.  And if it got busy, then we would
24 ask for assistance for a second officer.
25    Q.   During that same time period from 2012 to

Page 47

1 2014, would security ever check a guest's ID prior to
2 allowing them to get on the elevator?
3    A.   No.
4    Q.   What about any of the individuals that may be
5 with the guest who are trying to go up to the suite?
6    A.   Now you stated with the guest?
7    Q.   Correct.
8    A.   As long as the guest stated that -- that this
9 person is with -- with them, no.
10    Q.   From 2012 to 2014, did you have to be 18 or
11 21 to rent a room?
12    A.   21.
13    Q.   And from 2012 to 2014, could cash pay for a
14 room?
15    A.   I'm not sure.  I think it was -- you know,
16 you have the option to do that, but I think it was more
17 of you had to have $100 cash deposit placed in lieu
18 also with a credit card.
19    Q.   Can -- I guess, do you just not know if you
20 could pay cash for a room from 2012 to 2014?
21    A.   Yeah.  I'm aware of the -- the cash that's
22 needed to be for a deposit for $100, but I'm not sure
23 if you're -- sure, if you were able to pay solely cash.
24    Q.   Got it.
25       And do you know if I go to Venetian today,

Page 48

1 can I pay cash for a room?
2    A.   I don't believe so.
3    Q.   So let me go back now to some of the red
4 flags that we were talking about.
5       And those are red flags from 2012 to 2014 for
6 security officers to identify soliciting?
7       MR. SAGER:  Objection.
8    Q.   (By Mr. Kane)  Is that what you said?
9    A.   Correct.  Soliciting, loitering, you know,
10 walking around with no gaming intent, no purpose on the
11 casino floor or showing no purpose on there, looking
12 around or approaching multiple guests for -- for no
13 particular reason other than that, you know -- you know
14 identifying possibly solicitation of --
15    Q.   My question was bad.  I apologize.
16       I'm talking about red flags for the -- the
17 security that's positioned at the elevators.
18    A.   Okay.
19    Q.   And I think you said -- I think you said
20 loitering, going up multiple times to different suites
21 with different individuals?
22       MR. SAGER:  Objection.
23    A.   That's what I stated.
24    Q.   (By Mr. Kane)  What you were referring to as
25 one person that would go up with different guests to

Page 49

1 different floors at different times in the same day or
2 night?
3    A.   Correct.
4    Q.   And that would be a red flag for what?
5    A.   Again, we -- you know, if you have one
6 individual going up with multiple guests, it's just a
7 red flag of if she's continuously -- or he's going --
8 continuously going to different floors throughout
9 the -- throughout the night with different individuals,
10 it's going to -- red flag of, you know, what's the
11 purpose of -- of that.  You know, it's not a normal
12 thing for -- for a person to go up to multiple suites,
13 just not normal.
14    Q.   So, you know, and then you train -- in that
15 timeframe, 2012 to 2014, the security officers
16 positioned at the elevators were they trained to
17 identify specifically that red flag?
18    A.   I think it was more of a best practice just
19 telling them, you know, overall this is what we need to
20 be looking for.  I wouldn't say we specifically, um,
21 stated to -- to those specific officers, but I think it
22 was just more of a general best practice.
23    Q.   Obviously, that -- that had occurred on the
24 property, Venetian was aware that that was occurring
25 prior to 2012, correct?

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1    A.  If it was, if that's what we were
2  communicating, then, yes.
3    Q.  And you were, in fact, communicating that to
4  the security officers that were positioned at the
5  elevators?
6    A.  At that time, yes.
7    Q.  And so -- I understand it can be male or
8  female.  But during that same time period, do you
9  identify a male or female that's going up over the
10  course of the night to multiple floors with multi --
11  different individuals, it's a red flag for what?
12    A.  As I stated before, it's just not normal
13  for -- for our guests to go up to multiple suites.  So
14  we -- we would just inquire when we would see that
15  individual come back onto a -- to -- to that lobby
16  where that officer noticed it, we would just inquire
17  why or the purpose for -- for going up to their
18  suites -- to multiple suites with multiple individuals.
19    Q.  Were the security officers trained to just
20  wait for that individual to come back down and then
21  ask, or ask before the individual goes up with the
22  second or third different guest?
23    MR. SAGER:  Objection.
24    A.  At that time the direction was wait for that
25  person to come back down .

Page 51

1    Q.  (By Mr. Kane)  Wait for?
2    A.  The -- the -- the -- the -- the individual
3  that -- that we're interested in for going up to those
4  suites.
5    Q.  I'm just going to say a few things.
6    A.  Okay.
7    Q.  If you know this case.  (Indiscernible).
8    But so they're trained to -- to wait for the
9  female to come back down after they've noticed that she
10  went up with multiple guests?
11    A.  In that timeframe, yes.
12    Q.  And so how -- how are they trained to -- to
13  confront that -- that female when she comes back down?
14    A.  We -- that -- that -- that officer would call
15  our dispatch and ask for assistance for additional
16  officers to approach that female.
17    Q.  Okay.  And so best -- is that a best practice
18  or is that a policy and procedure?
19    A.  Best practice.
20    Q.  And so that's -- those security officers in
21  2012 to 2014, if they identified a female guest who has
22  now gone up multiple times with different guests to
23  different floors, they're -- they're to call dispatch
24  and ask for assistance?
25    A.  The officer would call dispatch and ask for

Page 52

1  additional officers to respond, and those two officers
2  would then make contact with that female.
3    Q.  Got it.
4    So when she comes off the elevator, the security
5  guard has known now and said red flag, he calls
6  elevators with a second or third different guest, or do
7  they call dispatch when that female comes back down
8  after she's gone up with two or three different guests?
9    MR. SAGER:  Objection.
10    A.  When that guest would come down, or that
11  female would come down.
12    Q.  (By Mr. Kane)  Got it.
13    So she comes off the elevator, the security
14  guard has known now and said red flag, he calls
15  dispatch, that female continues to walk.  Who stops
16  her?
17    A.  As I mentioned, he'll call dispatch, two
18  officers will respond, and those two officers would
19  then make contact with the female.
20    Q.  Got it.
21    And so any call that's made to dispatch, is
22  that -- is that stored?
23    A.  It is.
24    Q.  And then what's the system called that you
25  would store specifically for calls from security to

Page 53

1  dispatch?
2    A.  Our dispatch system's called Cyrun,
3  C-y-r-u-n.
4    Q.  And is Cyrun the same system that would
5  store, for instance, trespass documents or incident
6  reports?
7    A.  It does.
8    Q.  And so -- and what's the retention for -- for
9  calls to dispatch through Cyrun?
10    A.  Indefinite.
11    Q.  And so the Venetian was using Cyrun in 2012
12  to 2014?
13    A.  Correct.
14    Q.  And they're still using Cyrun?
15    A.  Correct.
16    Q.  Does Palazzo use Cyrun as well?
17    A.  The -- the entire property, the security
18  property would be using it, all three towers.
19    Remember, you asked how many towers, I had
20  three.  We have the -- at that time the Venezia tower
21  that's on top of the garage.
22    Q.  Okay.
23    A.  Same -- same processes, the same policies, no
24  difference.
25    Q.  Got it.

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1      Policies and procedures --
2      A.  Best practices -- I apologize -- best
3  practices at that time.
4      Q.  Okay.  Same policies and procedures and/or
5  best practices at the Venetian and Palazzo from 2012 to
6  2014, they existed?
7      A.  Correct, one department.
8      Q.  Got it.
9          And so in 2012 to 2014, did the security
10 officers that would be on patrol or on the floors, did
11 they all have radios?
12     A.  They do.
13     Q.  And so can they hear -- if I'm at -- there's
14 a security officer at Venetian and the security officer
15 calls dispatch at Palazzo, could the Venetian officer
16 hear the call to dispatch?
17     A.  Two different radio channels.
18     Q.  But the same dispatch for both properties?
19     A.  Same dispatch area, but a dis -- two dis --
20 two dispatchers, one specifically for the Venetian and
21 one specifically for the Palazzo.
22     Q.  Got it.
23         But in the same room?
24     A.  Same room.
25     Q.  And is that at Venetian or Palazzo?

Page 55

1      A.  That would have been the Palazzo --
2  underneath the Palazzo tower.
3      Q.  Are you aware of any individuals from 2012 to
4  the present who would have been trespassed at Venetian
5  and Palazzo on the same day?
6      A.  If we would search the -- the database given,
7  you know, the dispatching system, if that information
8  was put in that day on either one, we would know.
9      Q.  Right.
10         It sounds like you had the capability to run
11 that search to answer the question.
12         But I'm asking, does Venetian know of that
13 actually happening from 2012 to 12 -- current?
14     MR. SAGER:  Objection, scope.
15     Q.  (By Mr. Kane)  Where an individual would have
16 trespassed from Venetian, and that same individual on
17 the same day would have been trespassed from Palazzo?
18     A.  Without searching the database, that would be
19 the reason the -- the way to do that.  Or if it was on
20 the same shift, they might be able -- would be able to
21 recognize or identify that person.
22     Q.  It doesn't sound like Venetian is aware of
23 that actually happening, but they can go back and
24 search to verify?
25     A.  I wouldn't say that because you have managers

Page 56

1  that -- that communicate that are on the same shift.
2  So one manager is listening to the Venetian, one
3  manager is listening to Palazzo, and they communicate.
4  So is there a possibility?  Yes.
5      Q.  So let's go back to the best practices of the
6  red flags for security at a position at the elevator in
7  2012 to 2014.
8      A.  Yes.
9      Q.  So what's the purpose of -- well, let's go
10 back.
11         So after that -- that same female comes down
12 with multiple guests and the -- the security officer
13 calls dispatch for backup, then what happens?
14     A.  Yeah.  When you use the word "backup" for --
15 for them to respond to handle a situation, because that
16 officer who's at the lobby is not in there -- going in
17 there other than giving -- providing information,
18 because we don't want that officer to leave that post
19 because that's a -- posted them there.
20         So those two officers would make contact with
21 the female, um, and just do an FI, field interview, to
22 identify the purposes of why she's going up to the
23 tower with multiple -- multiple times, with multiple
24 individuals.
25     Q.  And so if there's a -- an FI done, or a field

Page 57

1  interview, does that -- does that have to be stored
2  or...
3      A.  Yeah.  I mean it's -- if -- if, um, that
4  field interview, we -- we store it in that same
5  database, Cyrun, indicating that field interview was
6  completed.
7      Q.  And from 2012 to 2014, if you had a security
8  officer that conducted that field interview, would they
9  have to then create a report?
10     A.  They would -- it would -- a report would be
11 completed in Cyrun just identifying as a field
12 interview.
13     Q.  Is that something dispatch would do or would
14 the actual security officer assist?
15     A.  The officers involved who was having that
16 conversation with that female would be the one
17 completing that FI.
18     Q.  Okay.  And so what's the purpose of the best
19 practice to actually confront that female guest now
20 that you've noticed she's gone up to multiple floors
21 with multiple guests?
22         What's the purpose?
23     A.  To your point, it's a red flag, right?  So we
24 want to identify, you know, it's suspicious activity,
25 behavior.  Um, so, you know, we're always looking

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  for -- for that type. And the reason for that is we
2  want to identify, um, what the activities -- suspicious
3  activity is. It's something that we do not want on the
4  property or she's not cooperative, or anything like
5  that, that could lead into a trespass from the
6  property.
7      Q.  But suspicious of -- of what, though?
8      A.  Again, I keep saying it's just not normal
9  behavior for an individual to continuously go up with
10  different males in different suites throughout the
11  night. It's just not normal and that's just a red
12  flag.
13     Q.  What red flag did -- for what? I mean
14  what -- what could it be in -- at Venetian? What's she
15  doing?
16     A.  Again, I -- I don't know how to answer this
17  other than, you know, it's just not normal. She could
18  be, um, as you stated, you know, soliciting, she's
19  soliciting and -- and conducting sexual acts. And so
20  we're going to inquire her business, not claim that
21  she's doing it, but, um, understand what and why she's
22  going up to -- to the suite.
23     Q.  And from 2012 to 2014, is -- is Venetian
24  aware of security that's positioned at the elevators
25  actually observing this happen and calling security

Page 59

1  to -- to make contact with individual?
2      A.  I can't give you a number, or anything
3  like -- but I'm just saying that -- and during that
4  timeframe that was the best practice back -- I wouldn't
5  be able to say, yeah, we -- 10, 12, or anything like
6  that.
7      Q.  Right. And I'm not asking for a specific
8  number. But I think can we agree that it's -- it
9  happens between that timeframe?
10     A.  Safe to say.
11     Q.  And was it part of the best practice as well
12  for that same type of scenario, red flag, to -- to make
13  contact to the guests, multiple guests, or just the --
14  the female that we've been talking about?
15     A.  At that time the directive was only the
16  female.
17     Q.  Okay. And when you say "directive," is that,
18  like, a formal policy, a document, or an e-mail that
19  would go out?
20     A.  And at the time who was the director of -- an
21  executive director of security at that time, that was
22  his direction. I can't remember if it was an e-mail or
23  a conversation with the management team, but, um, that
24  was just a dir -- his -- his directive at the time.
25     Q.  And who -- who would that have been?

Page 60

1      A.  At that time it would have been Tony Whiddon,
2  W-h-i-d-d-o-n.
3      Q.  And sometime -- when did that director go out
4  generally, if you can?
5      A.  Generally when the new vice president of
6  security, Jerry Markling, M-a-r-k-l-i-n-g, he's totally
7  different, he's no longer there, he changed that
8  directive of, um, if we believe, um, that we need to
9  intercept and have that conversation, then we'll --
10  we'll do it at that time, not wait for only the guest
11  to come back down. We'll intercept prior to them going
12  to the suite.
13     Q.  Got it.
14        Okay. So I got a little confused there. So
15  Tony -- Tony Whiddon is the one who issued the
16  directive that we're -- we're going to wait for the
17  female to come back down after multiple guests, and
18  we're only going to intercept the female and not talk
19  to the guests, correct?
20     A.  Not talk to the female with -- while the
21  guest is present, correct.
22     Q.  Okay. And I thought you said just talk to
23  the female, don't go up --
24     A.  Again, Tony Whiddon's directive was don't
25  talk to the female with the guest while they go up.

Page 61

1  Wait for the female to come down by herself and make
2  the contact then.
3      Q.  Okay. Well, was part of Tony Whiddon's
4  directive during that time to make contact with the
5  guest after you made -- intercepted the female after
6  she came down?
7      A.  If -- if she was alone, that's what we waited
8  for, for her to be by herself.
9      Q.  Well, I guess what I'm asking is if Venetian
10  knows the female was by herself and said, hey, I was
11  with, you know, Mike, he was in room -- Suite 434.
12  Would security then go to 434 and talk to the guest?
13        MR. SAGER: Objection.
14     Q.  (By Mr. Kane) Was that part of the directive
15  or was the directive --
16     A.  I don't recall that being part of the
17  directive, if it was or wasn't.
18     Q.  Was it pretty clear that Mr. Whiddon as part
19  of his directive was don't talk to the guest, we're
20  just going to talk to the female?
21     A.  Prior to going up to the suite, correct, that
22  I know.
23     Q.  Okay. And so at some point -- I guess my
24  original question was when -- when did that directive
25  start?

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1    Was that before 2012?
2    A.  I don't know, other than that was his
3    directive and that was during his tenure.
4    Q.  Okay.
5    A.  I don't know what it started in his tenure,
6    but I know that was part of his tenure.
7    Q.  Got it.
8    A.  And it was changed.
9    Q.  Okay.  And he was -- he was the VP?
10   A.  He was executive director of security.
11   Q.  Is that higher or lower than the VP of
12   security?
13   A.  It would have been a step lower.
14   Q.  And then Markling, did he replace Whiddon?
15   A.  He did.
16   Q.  Can -- do you know what year, approximately?
17   A.  I think it was 2014, the -- the last quarter
18   or beginning of 2015.
19   Q.  And just give me what he changed or something
20   that stood out if he changed the directive somehow?
21   A.  His directive, we'll -- we'll approach the --
22   the female regardless if -- if that female was with a
23   guest or not prior to going up to the -- to the suite.
24   Q.  And does Venetian know why Mr. Markling
25   changed that directive?

Page 63

1    A.  No.  I mean not -- not to my -- I can't
2    recall his decision of making that change just other
3    than that was his direction.
4    Q.  Does -- does Venetian have an opinion on it,
5    why?
6        MR. SAGER:  Objection, scope.  Objection,
7    form.
8    A.  Yeah, I -- again, I don't know.  I didn't
9    speak with Mr. Markling on that.
10   Q.  (By Mr. Kane)  And this directive change, did
11   that go out in, like, a formal document or an e-mail?
12   A.  To my knowledge, again, it was just one of
13   those communications best practices that we need to
14   change.
15   Q.  So just word of mouth to all the security
16   officers?
17   A.  To all security personnel, not just the
18   officers.
19   Q.  Did -- does Venetian think Mr. Markling
20   wanted to try to -- stop the crime before it
21   happened, as opposed to allowing the crime that you
22   suspect is happening to happen in your guest suites,
23   and then wait and talk to the female after it's already
24   happened?
25       MR. SAGER:  Objection, form.  Objection,

Page 64

1    scope.
2    A.  Yeah, I don't know.  I wouldn't know what --
3    there other than we want to intervene at that time.
4    Q.  (By Mr. Kane)  If a -- if a female guest is
5    going up with multiple guests to multiple floors at
6    different times in the same day or night, if it's --
7    she could be a prostitute, right?
8    A.  Could.
9    Q.  What other red flags, other than what we've
10   been discussing, were the security officers positioned
11   at the elevators trained to -- to identify?
12   A.  Again, you know, if they're -- they're in the
13   area just loitering, approaching guests, um, you know,
14   multiple guests throughout there.  And then, you know,
15   at that time, you know, meeting individuals and going
16   up to the -- the suite with that -- that individual,
17   that would be a red flag.  I mean -- or -- and are just
18   in that area with no -- no reason and just mul --
19   reaching out to multiple guests.
20       MR. KANE:  Is it Vince?
21       Hey, Vince, can you put up -- it's Venetian
22   AH 00432?  On the index it's Exhibit 7, but we'll --
23   we're going to label it as Exhibit 1, please.
24       (Mackerley Deposition Exhibit 1 was marked
25   for identification.)

Page 65

1        (Discussion off the record.)
2        MR. KANE:  Just for purposes of organization,
3    I'm going to write a 1 on it.  And then you guys can
4    put a sticker over it later, or do whatever you want
5    for now, just so we can keep track.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

17 (Pages 62 - 65)

CONFIDENTIAL



Page 66

Golkow Technologies,
A Veritext Division

877-370-3377                                                                    www.veritext.com

CONFIDENTIAL

Page 70



12    Q.  I think we talked about -- we -- I understand
13  that there's no training regarding human trafficking
14  prior to 2 -- was it 2018?
15    A.  Correct.
16    Q.  I don't want to know about the knowledge of
17  Venetian.
18        Did Venetian, did they know in 2014 that
19  there were people being trafficked?
20    A.  Again, I'd have to -- to go back and -- and
21  look into that and get that answer to -- to you.  I
22  don't want to just guess, or anything.  So I would have
23  to go back to -- and -- and clarify that question.
24    Q.  All right.  Who are you going to talk to?
25    A.  Well, I would start with my -- the legal

Page 71

1  team.  I did not specifically ask that question, if
2  that's what you're asking.
3    Q.  You -- when Venetian became aware that human
4  trafficking was a thing?
5    MR. SAGER:  Objection.
6    A.  Correct.  I did not ask that specific
7  question.
8    Q.  (By Mr. Kane)  I'm assuming at some point
9  Venetian did realize that human trafficking occurs
10  throughout the world, right?
11    MR. SAGER:  Objection.
12    A.  Yes.
13    Q.  (By Mr. Kane)  And that would have been
14  sometime in 2018?
15    MR. SAGER:  Objection, scope.
16    A.  I mean that's -- the training is when it
17  started in 2018, human traffic training.
18    Q.  (By Mr. Kane)  In 2014, what was Venetian's,
19  I guess, stance on human trafficking?
20        Did they have a public stance regarding human
21  trafficking?
22    MR. SAGER:  Objection.
23    A.  They had a business code and ethics, you
24  know, making sure that we're following all laws and
25  ethics, pretty much giving us principal guidelines to

Page 72

1  perform our jobs in common sense and good judgment and
2  good faith to -- to prevent, you know, illegal
3  activity, or anything like that, on the property.
4    Q.  (By Mr. Kane)  So what -- what was the
5  business code in 2014 as it relates to human
6  trafficking specifically?
7    A.  There was nothing specifically stating human
8  trafficking, other than, you know, um, how to act in
9  good faith when it comes to your job and, um,
10  performing your task and -- and doing the work.
11    Q.  And what ethics were -- were in place at the
12  Venetian specifically dealing with human trafficking in
13  2014?
14    A.  I don't believe there's any specific ethics
15  other than, you know, just, um, in your principal
16  guidelines on how to perform your job and -- and --
17  with, um, legal -- you know, looking for illegal
18  activity or, um, in good -- and performing your job in
19  good -- good faith and good performance.
20    Q.  And any principal guidelines from 2012 to
21  2014 specifically for human trafficking and...
22    A.  No.
23



19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

6    Q.  From 2012 to 2014, were there house phones
7    on -- on the property where an individual that's in the
8    casino could pick up the phone and call up a guest
9    room?
10    A.  Throughout the property there was.
11    Q.  Sorry.  From 2012 to 2014, the guests could
12    just -- wherever they're positioned on the walls, could
13    just pick up and then dial a room number?
14    A.  I don't know if it's a -- you went through
15    the room, dial with the room number, or you had to go
16    through the operator.  Either one you had to go that
17    route to go through the hotel operator.
18    Q.  Would Venetian agree that hotels are a
19    significant target for human trafficking as of today?
20    MR. SAGER:  Today?  Objection.
21    You can answer.
22    A.  As of today, yes.
23    Q.  (By Mr. Kane)  What about from 2012 to 2014?
24    MR. SAGER:  Objection.
25    A.  Yeah.  I'd have to go back to not -- that

Page 77

1    answer I said, you know, I'd have to get -- go back and
2    get that confirmation or I would have to speak with the
3    legal team to -- to see if there -- if they used that
4    term, are aware of the human trafficking specifically.
5    I've answered that previously that way.
6    THE STENOGRAPHER:  And, counsel, we've been
7    going for about an hour and 45 minutes.  If we could
8    take a break at a good time, I would appreciate it.
9    MR. KANE:  Okay.
10    THE VIDEOGRAPHER:  We're going off record as
11    of 10:57 a.m.
12    (A recess was taken.)
13    THE VIDEOGRAPHER:  We are back on record as
14    of 11:08 a.m.



Golkow Technologies,
A Veritext Division

877-370-3377    www.veritext.com

CONFIDENTIAL

Page 78



13    Q.  Would it surprise you that human trafficking
14  month in January started in 2010?
15    A.  Yeah, I -- I would not know.
16    Q.  An opportunity to raise awareness of the
17  situation of victims of human trafficking and for the
18  promotion and protection of their rights.
19      From 2012 to 2014, what did Venetian do to
20  raise awareness of the situation of victims of human
21  trafficking?
22    MR. SAGER:  Objection, asked and answered.
23    You can answer again.
24    A.  Again, you know, just for, you know, us
25  looking for solicitation, suspicious activity, um,

Page 79

1  security department, you know, we're -- we're doing
2  that on -- handling that as solicitation and
3  prostitution.
4    Q.  And you may not have known or used the term
5  "human trafficking" during that period, 2012 to 2014.
6  But in hindsight, knowing what Venetian knows now, it
7  was happening, and that's why you had the red flags to
8  look out for on the property, correct?
9    A.  The solicitation of prostitution, yes.
10    Q.  Right.
11      And if there's a pimp involved in
12  prostitution, Venetian now knows that that by
13  definition is human trafficking, right?
14    MR. SAGER:  Objection, form.  Objection, so
15  far as it calls for a legal conclusion.
16    You can answer.
17    A.  At this time, yes, if that's what you're
18  asking.
19    Q.  (By Mr. Kane)  Venetian knows that that's
20  their opinion, right?
21    MR. SAGER:  Objection, scope.  Objection,
22  form.
23    You can answer.
24    A.  Are you asking in 2012 and '14 or --
25    Q.  (By Mr. Kane)  No, I'm asking right now.

Page 80

1    A.  Oh, okay.  Yes.  Obviously, it's documented.
2    Q.  Wouldn't it make sense, then, if there was a
3  pimp involved in prostitution from 2012 to 2014, even
4  if you didn't know the term "human trafficking,"
5  looking back, that was -- those individuals were being
6  trafficked, you would agree with that?
7    MR. SAGER:  Objection, form.  Objection calls
8  for a legal conclusion.  Objection, no foundation.
9    You can answer.
10    A.  Looking back what we know now, yes.
11    Q.  (By Mr. Kane)  And you would agree that
12  during that timeframe in -- in Clark County, more than
13  90 percent of -- of prostitutes are actually being
14  trafficked?
15      Would you agree with that?
16    MR. SAGER:  Objection, no foundation.
17  Objection scope.
18    A.  I -- I wouldn't be able to answer that.  I'm
19  answering to Clark County, no.  I'm here for the
20  Venetian.
21    Q.  (By Mr. Kane)  I didn't say you were.  I said
22  here in Clark County.
23    Venetian is in unincorporated Clark County,
24  correct?
25    A.  Correct.  And I wouldn't be able to answer

Page 81

1  if -- if 90 percent of prostitutes are being
2  trafficked.  I don't know that percentage.
3    Q.  If -- from 2012 to 2014, were there
4  undercover security officers in plain clothes
5  patrolling the Venetian and Palazzo?
6    A.  There was.
7    Q.  And were they -- what -- what would I call
8  them?  Are they different or are they security
9  officers?
10    A.  At that time they were counter surveillance
11  team, CST.
12    Q.  CST.
13      And then what is -- I think there's an SST?
14    A.  Correct.  But that wasn't -- SST was not
15  during that timeframe.
16    Q.  What is SST?
17    A.  That would be security saturation team.
18    Q.  And when did SST start, approximately?
19    A.  2015 and '16.
20    Q.  Okay.  So what does the SS -- what is SST --
21  what -- what does that team do?
22    A.  At that time or still at this time, we
23  identify issues or concerns throughout the property,
24  um, we would saturate that area to show force and to
25  alleviate the -- the situation, or anything like that.

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  And they -- they would walk the floors and look for
2  suspicious activity, criminal activity, to deter it
3  from occurring.
4      Q.  Okay.
5      A.  And, also, they're also our crowd response
6  team.  So if there's an active shooter or anybody who
7  is carrying a weapon, or anything like that, they would
8  be deployed.
9      Q.  Got it.
10         And are they plain clothes or are they
11  wearing uniform?
12     A.  The SST is uniformed; the CST is
13  un-uniformed.
14     Q.  Got it.
15         And so from 2012 to 2014, plain clothes'd,
16  CST?
17     A.  Correct.
18     Q.  And tell me what CST stands for again.
19     A.  Counter surveillance team.
20     Q.  Okay.
21         And does the CST team exist presently?
22     A.  They do.
23     Q.  Okay.  Was -- in 2012 to 2014, was there a
24  specific team dedicated to the prevention and
25  identification of prostitution?

Page 83

1      A.  No.
2      Q.  Okay.  Would -- what does CST do?
3      A.  At that time and currently they -- they
4  would, um, roam -- rove the properties looking for
5  individuals who are possibly casing, looking
6  suspicious.
7         Um, if we were dealing with a uniformed
8  division was handling a situation or dealing with a
9  situation, that counter surveillance team would be the
10  outside layer approach of security looking for other
11  individuals who are being part of that group or looking
12  at what we're doing.  So they're more an observation
13  and report function.
14     Q.  It -- was prostitution more prevalent at
15  Venetian and Palazzo from 2012 to 2014 or is it more
16  prevalent now, or is there no difference?
17     A.  I would say no difference.  I don't -- I
18  don't see a spike, or anything like that, no.
19     Q.  Just kind of remained the same from 2012
20  to -- to currently?
21     A.  Without looking at the numbers, I would have
22  to say remains the same, but, you know, I wouldn't give
23  you a clear answer, as I'd have to run the numbers.
24     Q.  Okay.  You would agree that prostitution, by
25  its very definition requires a buyer, a John, and

Page 84

1  someone engaging in the sexual act with the John,
2  correct?
3      A.  Correct.
4      Q.  You would agree that the -- the John is
5  committing a crime just like the prostitute is
6  committing a crime?
7         MR. SAGER:  Objection.
8      A.  Can you repeat the question?
9      Q.  (By Mr. Kane)  Yeah.
10         The John is committing a crime of
11  prostitution when he buys the prostitute, correct?
12         MR. SAGER:  Objection.
13     A.  For exchange of money, yes.
14     Q.  (By Mr. Kane)  All right.  He's committing
15  the same crime as the female in the scenario, correct?
16         MR. SAGER:  Objection.
17     A.  Correct.
18     Q.  (By Mr. Kane)  That -- that's the same from
19  2012 to 2014, right?
20     A.  Correct.
21     Q.  It's the same as it is today?
22     A.  Correct.
23     Q.  And Venetian from 2012 to 2014, I would
24  assume that it would be their opinion that the John is
25  just as bad as the prostitute, right?

Page 85

1         MR. SAGER:  Objection, form.  Objection,
2  scope.
3      A.  Correct.
4      Q.  (By Mr. Kane)  And if -- males can solicit
5  and then -- at the Venetian and Palazzo?  You're aware
6  of that happening, right?
7      A.  I'm sure it occurs.
8      Q.  What -- can -- can the Venetian and Palazzo,
9  can they stop prostitution on their properties?
10         MR. SAGER:  Objection, form.  Objection,
11  scope.
12     A.  We do the best that we can, you know, but we
13  do it to prevent it from occurring.  Completely
14  stopping it, I don't think you can have -- you know,
15  have that answer yes or no.  But I think we do as --
16  what we can and reasonable function to -- to prevent it
17  from occurring on our properties.
18     Q.  (By Mr. Kane)  And is the goal to -- to
19  eradicate prostitution at the Venetian properties?
20     A.  Well, the goal is, you know, to -- to -- to
21  eliminate, you know, that -- that type of activity
22  occurring, yes.
23     Q.  And I'm assuming that's a -- that's probably
24  been Venetian's goal since they opened the doors in
25  '99?

CONFIDENTIAL

Page 86

1          MR. SAGER: Objection, scope.
2     A.   To my knowledge, yes.
3     Q.   (By Mr. Kane) And so from -- from 2012 to
4 2014, what -- what was the Venetian and Palazzo doing
5 to -- to prevent prostitution from taking place on the
6 properties?
7          MR. SAGER: Objection, asked and answered.
8          You can answer again.
9     A.   As I stated before, you know, the security
10 was proactive of -- of, you know, looking for
11 suspicious -- any suspicious -- any criminal activity,
12 any solicitation. It didn't necessarily have to be a
13 prostitution, but any -- any type of solicitation from,
14 you know, selling jewelry, or anything like that.
15          So any type of activity that we did not want
16 on part of the -- our property, security would
17 intervene and -- and do their field interview and
18 investigation portion. And if they were not
19 cooperative where we identify a crime as committed, we
20 would trespass them from property for a lifetime. We
21 advise of that.
22     Q.   And then let's fast forward to 2025.
23          Are all those steps still in place or
24 additional ones as well to prevent prostitution from
25 occurring at Venetian properties?

Page 87

1          MR. SAGER: Objection, scope. Objection,
2 asked and answered.
3          You can answer it.
4     A.   Yes, those -- all those are still being
5 performed. But now with the SST team, as I talked
6 about, where we said they see a pattern or influx, we
7 would deploy that team to a certain area for that
8 criminal activity or suspicious activity or those --
9 those activities being performed that that area.
10     Q.   (By Mr. Kane) When prostitution occurs at
11 Venetian, um, in Venetian guest suites, Venetian
12 profits from that crime, right?
13          MR. SAGER: Objection, scope. Objection,
14 form. Objection, calls for a legal conclusion.
15          You can answer.
16     A.   I would say no.
17     Q.   (By Mr. Kane) Did -- the guest rents a room
18 at the Venetian. Does the -- the Venetian doesn't
19 generate revenue off that rental?
20     A.   Sure, for that reason. But there's guests
21 that generate revenue for many reasons while somebody's
22 there. So I -- I wouldn't say that they're
23 specifically generating revenue for solicitation of
24 prostitution.
25     Q.   Okay. Are you aware of -- let's do this.

Page 88

1          In -- in 2012 to 2014, what did Venetian do
2 when individuals check into the hotel?
3          Did -- did they educate them on prostitution
4 is illegal in Clark County?
5     A.   No.
6     Q.   Did -- did the Venetian just expect their
7 guests from all over the country and all over the world
8 that are staying on their property would -- would know
9 that prostitution is illegal in Clark County from 2012,
10 2014?
11     A.   I wouldn't use the word "expect," but they
12 just didn't bring it up. We didn't advise the guests.
13     Q.   Why? Why not?
14          MR. SAGER: Objection.
15     A.   It's just -- again, it's not a topic that
16 they -- um, that they handled. Security is one who
17 approached and handled that.
18     Q.   (By Mr. Kane) Does -- are there policies and
19 procedures in place for the front desk, for reception
20 currently, if you know, to -- where they are trained to
21 advise hotel guests that, you know, prostitution
22 solicitation is -- is illegal in Clark County?
23          MR. SAGER: Objection, scope.
24     A.   I do not know that since it was -- you're
25 asking for current, outside of this 2012. I do -- I'm

Page 89

1 not aware.
2     Q.   (By Mr. Kane) All right. You don't know one
3 way or the other?
4     A.   One way or another.
5     Q.   Got it.
6          And 2012 to 2014, any signs on the property,
7 Palazzo or Venetian, that was like no prostitution,
8 prostitution is illegal?
9          Anything like that?
10     A.   We did have signs. We actually had signs in
11 the -- the interviewing rooms and we also had them
12 throughout the -- the bathrooms and -- and, um,
13 bathroom stalls.
14     Q.   From 2012 to 2014?
15     A.   Correct.
16     Q.   Okay. What did the signs say in the stalls?
17     A.   They basically just inquired -- or advised if
18 you're -- you know, if you're, um, in solicitation or
19 prostitution, or something like that, and you need help
20 or assistance, it kind of provided a resource and some
21 phone numbers where you can reach out and contact to
22 get assistance.
23     Q.   Did the signs say if you're being trafficked
24 or you think someone's being trafficked, call this
25 number?

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1     A. I can't recall. It was -- they -- you know,
2 they've been replaced. So I would not know what --
3 specifically the verbiage, other than intent is kind of
4 what the reception -- what the sign said.
5     Q. And those would have been in both the male
6 and female restrooms?
7     A. I know the females, but I'm not quite sure on
8 the males during that time.
9     Q. I'm assuming that they're in all bathrooms
10 now?
11     MR. SAGER: Objection, scope.
12     A. I believe they are.
13     Q. (By Mr. Kane) How would -- who -- who would
14 I ask for a picture of the sign that would have been in
15 place from 2012 to 2014 or where would that be
16 archived?
17     A. I would start with maybe marketing or
18 compliance.
19     Q. Did the signs specifically state that
20 prostitution is illegal?
21     A. As I stated before, I don't know exactly what
22 the verbiage was on it, other than I know that the --
23 that the message was, you know, how -- how to get help.
24     I don't know exactly what the verbiage was.
25     Q. Okay. It wasn't a warning prostitution is a

Page 91

1 crime punishable as a misdemeanor, six months
2 potentially in jail?
3     It's more of, hey, if you're a prostitute and
4 you need help, call this number?
5     A. Yeah, I would not say it was ordinances are
6 criminal verbiage on that. It was more of how do I get
7 to assistance, yes.
8     Q. And so from 2012 to -- to 2014, what were you
9 complying with to -- to have those in the bathrooms?
10     A. I don't think we were complying. I think we
11 were just trying to -- to help. I think with any type
12 of compliance or anything were following, it was more
13 than, you know, helping those individuals who wanted
14 help.
15     Q. Is it -- did it -- are you talk -- the
16 individuals that want help, are those the individuals
17 that are being trafficked?
18     A. Again, I don't want to use the word
19 "traffic." I think more of if they wanted -- you know,
20 if they're a part of prostitution and wanted to get out
21 of that -- that line of work, um, here's the avenues for
22 do so.
23     Q. And the number, does -- does it go to the
24 front desk of Venetian? Did it go to dispatch at
25 Palazzo, or what?

Page 92

1     A. I think it was more of a -- outside
2 resources, you know, um, outside agencies that would --
3 you know, they're the experts and they would address
4 those situations if they made those calls.
5     Q. Has the Venetian ever identified a victim of
6 human trafficking on the property and then helped that
7 individual?
8     MR. SAGER: Objection, scope.
9     You can answer.
10     A. They -- they have.
11     Q. (By Mr. Kane) Do -- do you recall how many
12 times or generally the timeframe that this was?
13     A. Around 2012, '14, I think, we have a report
14 indicating that one female requested assistance through
15 Metro Las Vegas Police Department while on our
16 property.
17     Q. Right.
18     She came onto the property and then herself
19 went to security to self-report that she had been
20 trafficked, correct?
21     A. No. My understanding is she was -- the Las
22 Vegas metropolitan Police Department Vice was on
23 property, there was a solicitation while she was in the
24 presence of Las -- Metropolitan Police Department.
25     We don't get too involved in what -- Metro

Page 93

1 Vice called stings while on property. We're just
2 more of a support. I think she reported it to those
3 law -- those law enforcement officers. And then they
4 then called tactic. They're the Vice who -- who handle
5 those, or however that process goes. And they came up
6 and gave her assistance and -- and the phone numbers,
7 according to the report we got. So...
8     Q. It was Metro. So she -- she solicited Metro,
9 and then she told Metro that she had a pimp, that she's
10 being trafficked, and then Metro helped her?
11     A. Correct. While on our property, yes.
12     Q. Got it.
13     Has the Venetian -- any employees of
14 Venetian, using their training, identified a victim of
15 human trafficking on their properties?
16     MR. SAGER: Objection, scope.
17     A. In 2012 and '14, we're a little bit more for
18 solicitation. We are able to identify that she said,
19 um, that, yeah, I am -- I'm a prostitute or I'm here --
20 if they identified that to us, um, that's how we would
21 identify them. And then we would move forward with the
22 trespass.
23     Q. Say -- are you aware at any time since 1999
24 of any employee at the Venetian using their training
25 and experience identifying and helping a human -- or

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 victim of human trafficking?
2         MR. SAGER:  Objection, scope.
3     A.  Not to my knowledge.
4     Q.  (By Mr. Kane)  It -- it has not happened,
5 correct?
6         MR. SAGER:  Objection.
7     A.  I can't say it hasn't, I just don't recollect
8 it in my knowledge.
9     Q.  (By Mr. Kane)  What about at the Palazzo?
10        MR. SAGER:  Same objection.
11    A.  When I speak, I speak on behalf of the
12 Venetian and the Palazzo at the same time.  So if I
13 would say it, I wouldn't differentiate, but --
14    Q.  (By Mr. Kane)  I appreciate that.
15    A.  Yeah.
16    Q.  What about the Macao?  Are you -- are you
17 bumping Macao up into --
18    A.  No.
19    Q.  Okay.  Is human trafficking in China
20 different than human trafficking that occurs in the
21 United States?
22        MR. SAGER:  Objection, scope.  Objection,
23 form.
24    A.  I wouldn't know that -- an answer to that.
25 I'm not familiar with human trafficking in China, their

Page 95

1 customs or their laws.
2     Q.  (By Mr. Kane)  From 2012 to 2014, is Venetian
3 aware of any pimps gambling on their property?
4     A.  Not that we were able to identify.  Maybe
5 possibly, um, suspicious of maybe being a -- a pimp.
6 But I wouldn't say that we specifically identified a
7 pimp who would be, um, conducting that.
8     Q.  From 2012 to 2014, what would -- maybe red
9 flags.  What would be the red flags that the employees
10 of Venetian are trying to look for to potentially
11 identify a pimp?
12        MR. SAGER:  Objection.
13    A.  Again, I would -- I would relate more to what
14 the security was looking for is if a -- you know, a
15 male would keep track of a female, constantly following
16 them, um, you know, following and arriving with a group
17 of females on that way, directing them to certain
18 individuals or certain locations.
19        You know, we just -- observe and -- and
20 reporting a pattern, again, that's not normal of
21 directing females or, um -- to areas of the casino or
22 handling them or continuously talking to them where
23 they're coming back and forth to -- to the possible
24 pimp.
25    Q.  And so from 2012 to 2014, were there any

Page 96

1 pimps that were -- were trespassed at Venetian
2 properties?
3     A.  No, I don't think anything we identified
4 as -- as a pimp or of a suspicious of possibly.
5     Q.  So -- so no trespasses for -- for pimps
6 during that time period?
7         MR. SAGER:  Objection, mischaracterizes his
8 experience.
9     A.  Again, unless we're able to specifically
10 identify them as a pimp, um, but we've had trespass
11 people with suspicious of possibly being a pimp.
12        But, again, we're not the experts.  We can't
13 identify them as, you know, a specific pimp unless
14 they -- the -- the girl or the -- says that is my pimp.
15 But that doesn't really occur.
16    Q.  (By Mr. Kane)  And so you can -- you can
17 trespass pimps on suspicion of being a pimp?
18    A.  No.  We're suspicious when we do a field
19 interview and he's not cooperative and not providing
20 the information we're asking for.  So we're not
21 trespassing him for being a pimp, we're trespassing him
22 for being -- his activity and not being cooperative.
23    Q.  Okay.  For -- from not admitting to you that
24 your suspicion is correct and admitting that he would
25 be a pimp?

Page 97

1         MR. SAGER:  Objection, form.
2     A.  I don't -- we're not going to label him as a
3 pimp.  We're not going to say, you're a pimp, we know
4 you're a pimp.  We're just -- as we ask what your --
5 what's your reason of being on property, why are you on
6 property, what's it for.  And if he's not cooperative
7 and not providing information and he continues to walk
8 away or walks away, then we'll initiate the trespass.
9 We're not going the identify him specifically as a
10 pimp.  It's more of it's the activity.
11    Q.  (By Mr. Kane)  I appreciate that.
12        Let me -- not to jump around and skip gears
13 real quick.
14        Do you guys have facial recognition now
15 through surveillance?
16    A.  At this time we do.
17    Q.  And when did that start?
18    A.  2017.
19    Q.  And I think you said this before, just so
20 we're clear, that would be at Palazzo and Venetian
21 unless you otherwise state differently?
22    A.  Correct.
23    Q.  And so let's -- let me know if you under --
24 understand what I'm asking you here, because it's going
25 to be a little convoluted.

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1    If you take a video from 2012, is there a way
2 to then use facial recognition on that video in order
3 to determine if an individual is in the -- the -- the
4 view?
5    Does that make sense?
6    A.  Are you talking currently?
7    Q.  Yes.
8    A.  Yeah, if -- if -- it has to get to a certain
9 degree where the program will accept a photo.  So not
10 all photos inputted will be accepted.  The program has
11 to have a certain match or -- or acceptance and saying
12 this is a quality photo to -- utilize.  And then
13 that system will accept it and be able to utilize it.
14 So not all photos can be.
15    Q.  What about video?  Are you able to run facial
16 recognition over a -- an older video?
17    A.  I'm not sure on that.  I -- I'd have to ask.
18    Q.  And what's the system called that you'd plug
19 the -- the photo into?
20    A.  Um, it's -- it's OOO.  There's no acronym for
21 it, but the facial recognition program is OOO.  It used
22 to be NE Vision, but now it's OOO.
23    Q.  Is it O period O period O period?
24    A.  The end is totally -- it's OOO.
25    Q.  Any idea how many cameras around the property

Page 99

1 in -- from 2012 to 2014?
2    A.  I think it was right around 5,000 cameras
3 totality.
4    Q.  So Palazzo and Venetian?
5    A.  Correct.
6    Q.  And how many now currently, do you know?
7    A.  I do not know the -- the current count.
8    Q.  Can you assume that it's more or do you not
9 know either way?
10    A.  It would be safe to say there's more.
11    Q.  How many times, um, should an individual have
12 to be trespassed from the property before not coming
13 back on the property?
14    Does that make sense?
15    MR. SAGER:  Objection.
16    A.  It make sense.
17    I mean we advise them, um, the first time we
18 trespass that we tell them it's a lifetime ban, and we
19 explain to them it's the Venetian, the Palazzo and the
20 Sands Expo.  So we expect them to do it the first time.
21    Q.  (By Mr. Kane) So -- so you trespass an
22 individual by reading them the statutory language?
23    A.  Yes.
24    Q.  Okay.  And then you -- you tell the
25 individual that you have a lifetime ban from our

Page 100

1 properties, Palazzo, Venetian and Sands Expo?
2    A.  Correct.
3    Q.  And Sands Expo, that's the same security as
4 Venetian and Palazzo, right?
5    A.  At that time, no, it was -- they had their
6 own security entity that was still under Sands, but not
7 the Venetian, um --
8    Q.  Thank you.
9    Did they have the separate dispatch?
10    A.  They did.
11    Q.  Okay.  Did -- did they have a -- a different
12 system of storing data for incident reports?
13    A.  They did.
14    Q.  And what -- what would -- where would they
15 store incident reports?
16    A.  I'm unaware of that system or where -- how
17 they stored it.  Wasn't under our -- our hierarchy at
18 that time, so I -- I would not know.
19    Q.  Okay.  And would the same be true, same
20 response for the Sands whether it stored any type of
21 surveillance video?
22    A.  I -- what was the question, first part?
23    Q.  What system would they use to store any type
24 of audio or video footage?
25    A.  Same answer.  I would not know.

Page 101

1    Q.  Okay.  Did -- the Expo, did they have
2 separate policies and procedures apart from Palazzo and
3 Venetian for their employees?
4    MR. SAGER:  Objection, scope.
5    A.  To my knowledge, I believe they did.
6    Q.  (By Mr. Kane) Did -- do you have a copy of
7 the policies and procedures that were in effect for --
8 for the -- the Expo employees from 2012 to 2014?
9    A.  I do not.
10    Q.  Do you know if the Expo had human trafficking
11 training prior to -- to 2018 for their employees?
12    A.  I do not know.
13    Q.  But in -- from 2012 to 2014 they're all --
14 all three were -- were owned by the Sands Corp., right?
15    A.  Correct.  But they were a separate -- their
16 own HR, their own hiring.  So we didn't have -- in the
17 Venetian and Palazzo did not have much involvement with
18 the operations with team members or HR when it came to
19 Sands Expo.  They were, you know, union personnel.  And
20 so they had their own HR, and their own -- all that to
21 handle their training.
22    Q.  Is Venetian and Palazzo, are they union now?
23    MR. SAGER:  I'm sorry , are they what now?
24    Q.  (By Mr. Kane) Are their employees -- are
25 they unionized?

26 (Pages 98 - 101)

CONFIDENTIAL



Page 102

1  A.  There are certain departments that are union
2  at this time.
3  Q.  From 2012 to turn 2014 were they not?
4  A.  The Venetian and Palazzo, no, they were not.
5  Q.  But that -- that Expo was?
6  A.  They had personnel in a -- in union, yes.
7  Q.  And they had their own -- their separate HR
8  department, their separate policies and procedures,
9  separate hiring policies, separate security policies.
10     But would assume separate retention policies
11 then, probably?
12 A.  Everything, yes.  But I would not know about
13 their retention policy.
14 Q.  Okay.  And who would have -- who ran the Expo
15 in 2012 to 2014?
16     MR. SAGER:  Objection, scope.
17 A.  I'm not sure if Kirsten Dimond, D-i-a-m-o-n-d
18 [sic], she's -- she's currently the -- the vice -- or
19 senior vice president of Sands Expo.  I don't know if
20 she just got there or moved over from the Venetian to
21 the Palazzo during that timeframe.  But I don't recall
22 anyone -- or I can't recall a person prior to her.
23 Q.  (By Mr. Kane)  And so it would have been 2018
24 when the Venetian rolled out their human trafficking
25 policies and procedures, red flags for identification.

Page 103

6  Q.  This is Venetian AH 445.
7  A.  You want to go through the rest of the names
8  or --
9  Q.  No, I don't.  I don't need the rest of them.
10     MR. SAGER:  Don't feed him any questions.
11     MR. KANE:  Well, I --
12     THE DEPONENT:  I thought I'd ask.
13     (Mackerley Deposition Exhibit 6 was marked
14 for identification.)
15 Q.  (By Mr. Kane)  Unless you want to go through
16 them?
17 A.  No.
18 Q.  This is Exhibit 6.
19     Okay.  So this -- it's Venetian 445
20 through 448.
21     And do you see it says, Corporate counsel at
22 ALM up top?
23 A.  I do.
24 Q.  Do you -- do you know what ALM is?
25 A.  I can only assume that's an outside, um,

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1  company or e-mail that's being sent to Calvin.
2      Q.  This is Weekend Roundup.  Is that a company
3  that Venetian or Palazzo pays to provide general
4  counsel at Venetian updates on what's happening
5  throughout the country legally?
6          MR. SAGER:  Objection, scope.
7      A.  I'm unaware of -- of this group, counsel.
8      Q.  You're -- you do know Calvin Siemer?
9      A.  I'm aware of Calvin.  I'm not aware of
10  corporate counsel Weekend Roundup.
11     Q.  Did you and -- did you and Calvin take a look
12  at this -- this document in prep for your deposition?
13     A.  We did not.
14     Q.  So does Venetian know the purpose of these
15  Weekly [sic] Roundup e-mails are?
16         MR. SAGER:  Objection, scope.
17     A.  Again, with -- without talking to Calvin
18  about this specifically, I wouldn't be able to answer
19  that.
20     Q.  (By Mr. Kane)  Do you know if -- if this
21  would be something that -- that Calvin signed up for to
22  receive these type of e-mails, these weekly e-mails?
23         MR. SAGER:  Objection, scope.
24     A.  Again, without talking to Calvin about this,
25  um, I wouldn't be able to answer that.

Page 107

1      Q.  (By Mr. Kane)  Would -- I mean I'm assuming
2  that, um, Venetian's general counsel, you know, if
3  there was a trend that they were seeing legally
4  throughout the country or in gaming specifically here
5  in Nevada that they would -- they'd probably educate
6  the -- the employees that it would effect at Venetian.
7          Is that something that took place in 2012 to
8  2014?
9          MR. SAGER:  Objection, scope.
10         And just in the off chance that there was a
11  communication from Mr. Siemer to you that was
12  privileged and confidential; in other words, not to be
13  shared outside, I would just ask that you not share
14  that.
15     A.  Again, I don't have any knowledge of --
16  having to speak with Calvin.
17     Q.  (By Mr. Kane)  No, no, no.  I didn't ask what
18  you and Calvin spoke about.
19         I'm asking in 2012 to 2014 would general
20  counsel of Venetian educate or train employees any way
21  up the hierarchy or the chain of command regarding
22  trends or legal issues that were in the news or
23  relevant?
24         MR. SAGER:  Objection, scope.
25     A.  I would not know.  I don't -- I don't re -- I

Page 108

1  don't recall any type of training.  I'm not saying I
2  didn't, but I don't recall hearing that we did.
3      Q.  (By Mr. Kane)  Like, you know, the headlines
4  in this e-mail, it says -- one of them is, you know,
5  Savvy practices can curtail human trafficking.
6          Do you see that?  It's in that first
7  paragraph under Headlines.
8      A.  What page?
9      Q.  It's right -- you see where it says
10  Headlines?
11     A.  Yeah.
12     Q.  And if you go down the left bullet point it
13  says --
14     A.  Okay.
15     Q.  -- Savvy practices can curtail human
16  trafficking?
17     A.  I see it.
18     Q.  Did -- did Mr. Siemer, did he -- did he tell
19  anybody about the -- the savvy practices that can
20  curtail human trafficking at Venetian?
21         MR. SAGER:  Is that to Siemers?  There's no
22  waiver out loud the answer it yes or no.  I don't want
23  him --
24         MR. KANE:  No, that's fine.  I'm not going to
25  say there's a waiver of attorney-client privilege.

Page 109

1      A.  So the question is?
2      Q.  (By Mr. Kane)  Did he -- did Mr. Siemer tell
3  anybody about the savvy practices, what savvy practices
4  can curtail human trafficking?
5      A.  Um, I'm not aware of him telling me that he
6  did, so I'm not aware if he did or not.
7      Q.  Do you know if Hewlett Packard -- they were
8  part of the ECPAT in 2014?
9      A.  I'm unaware.
10     Q.  Do you -- does Venetian have any opinion on
11  how human trafficking would affect Hewlett Packard sex
12  trafficking?
13         MR. SAGER:  Objection, scope.
14     A.  I wouldn't know how Hewlett Packard -- I mean
15  it's their own policies and procedures.  So I don't --
16  I don't know how it would affect them or speak on
17  behalf of them.
18     Q.  (By Mr. Kane)  Do you know -- have any idea
19  when Hewlett Packard signed the ECPAT pledge as a
20  company?
21         MR. SAGER:  Objection, foundation.
22  Objection, code -- objection, scope.
23     A.  Again, I don't -- I didn't know they even
24  signed one.
25     Q.  (By Mr. Kane)  Venetian would agree that all

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  of itself employees have a responsibility to ensure
2  critical human rights and safety issues are addressed
3  on its property, correct?
4      A.  Correct.
5      Q.  So from 2012 to 2014 if a bartender or
6  waitress or any employee at the front of the house
7  calls dispatch under the suspicion of prostitution,
8  solicitation or a victim of human trafficking, that
9  call would be stored in the -- what system?
10     A.  I can't recall the name, but it is recorded
11  to facilities.
12     Q.  That's the name of the --
13     A.  That's the department.
14         So it's -- we don't have a program -- I don't
15  see -- we don't.  The security does not store that, you
16  know, through PBX and -- and facilities are the ones
17  who handles the storage.  I can't remember the name,
18  though.
19     Q.  What's PBX?
20     A.  Public Broadcasting or -- you know, the
21  telecom communications operator.  S I think it was PBX
22  at the time.
23     Q.  Okay.  But it's the department is the
24  facilities who handles it?
25         Do you use HotSOS?

Page 111

1      A.  The -- the company does.  But, um, at the
2  time in 2012 and '14 security did not.
3      Q.  Okay.  So the -- if there was maintenance
4  called to a room, would that be called in through
5  HotSOS or through facilities?
6      A.  So HotSOS would go through facilities.  So
7  facilities dispatch, so they have their own dispatch,
8  right?  And they're the ones who are monitoring HotSOS.
9  Security did not monitor HotSOS.
10     Q.  Okay.  And then how were -- are
11  housekeepers -- are they back-of-the-house or
12  front-of-the-house or housekeeping?
13         What department are they?
14     A.  Housekeeping is housekeeping.  They're the
15  ones who are tending to the -- the guest suites.  So
16  primarily their job function is front-of-the-house.
17     Q.  Okay.  And so how are they trained to
18  identify red flags of prostitution during a guest's
19  stay?
20         MR. SAGER:  Objection, scope.
21     A.  My understanding is, you know, they -- they
22  will look for, um, you know, um, guest material, um,
23  propaganda, um, you know, sexual toys or anything like
24  that that's what's in there that -- that would raise a
25  flag.  Cameras, anything like that.

Page 112

1      Q.  (By Mr. Kane)  Okay.  And so when that --
2  that would be while a guest is staying?
3      A.  While that suite is occupied, yes.
4      Q.  Right.  Okay.
5         But what about like when they're --
6  they're -- the guest has already checked out, they're
7  cleaning the room for the next guest?
8      A.  What?
9      Q.  Are they looking for any signs that
10  prostitution may have occurred in that room?
11     A.  I would just say they're just looking at when
12  the guest checks out, they're looking at it continuous,
13  when checking in, checking out, and while they're
14  there.
15         So I wouldn't say they're only doing it while
16  the guest is checking out.  They're continuously, you
17  know, throughout the stay.
18     Q.  Yeah.  I think I understand.
19         And so let's say that they find some red
20  flags or suspicious items, propaganda.
21         Who would they tell?
22     A.  They would contact their -- their manager,
23  their direct manager or supervisor, um, and then they
24  would more than likely contact security.
25     Q.  Okay.  And so when they -- when they call

Page 113

1  their manager, do they have to go through dispatch?
2      A.  Correct.
3      Q.  Okay.  And so the housekeeper has found
4  propaganda, toys, cameras, suspicious items like condom
5  wrappers, excessive amounts of condoms.  Um, there
6  would be -- and she called her manager.  There would be
7  documentation of that from 2012 to 2014, right?
8         MR. SAGER:  Objection.
9      A.  I'm not aware that reporting process.  I'm
10  not sure if they -- if it's just more of a
11  communication and they would contact us on that.  I
12  don't know if there was documentation.  I'm not aware
13  of documentation.
14     Q.  (By Mr. Kane)  The housekeeper thinks that
15  there was suspicious activity that happened during the
16  guest's stay based on her or his training and the
17  identification of propaganda, toys, and excessive
18  amounts of condoms, maybe blood, drugs, and she reports
19  that to the manager, there would be documentation of
20  that report, right?
21     A.  Again, I'm not sure that -- the documentation
22  would be more on our side, saying, you know, this
23  housekeeper reported it to this manager, this manager
24  reported it to us.  And then we would document it in
25  Cyrun basically what they advised us.  And then that --

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 the report would be generated. So there is a
2 documentation.
3    Q. I -- okay.
4       So housekeeping manager to security, and then
5 once it hits security, you guys are going to go check
6 it out and then there would be a report generated?
7    A. Correct. We would start the documentation
8 from -- from beginning what the -- the team member
9 would write the voluntary statement, this is what she
10 saw, what she did -- what she did. Then we would move
11 forward with the documentation and the security report
12 and also in the Cyrun database.
13    Q. Okay. And this question I'm not trying to
14 elicit a specific number, I just wanted to get a
15 general idea.
16       So looking at about -- let's just call it
17 10,000 rooms between the Palazzo and the Venetian. On
18 average what is -- on average, how many rooms are
19 rented on a daily basis?
20    A. I would say, you know, 96 -- you know,
21 between 94 and 96 percent.
22    Q. Okay. So almost 10,000 customers a day just
23 staying on the two properties, right?
24    A. Safe to say.
25    Q. Ten-thousand minimum, that's only one person

Page 115

1 in the room, right?
2    A. Well, if we're going back to the 7,100 rooms,
3 we would say 7,100 guests.
4    Q. Well, no, 3,000 rooms next door at Palazzo?
5    A. No, no, no, 71- counts for all three towers.
6    Q. Palazzo -- 71- total including Palazzo?
7    A. Palazzo, the Venetian --
8    Q. Oh, okay.
9    A. -- and the Venezia.
10    Q. Gotcha.
11       So my bad. I missed that.
12       So about 7,000 customers just staying on the
13 property on a daily basis?
14    A. Correct. Safe to say.
15    Q. Okay. What was -- what was more prevalent
16 in -- from 2012 to 2014? Was it suicide in the rooms
17 or prostitution?
18       MR. SAGER: Objection, form. Objection,
19 scope.
20    A. Again, you know, we're aware of specific
21 suicides. But, again, when it comes to prostitution,
22 unless we're able to identify prostitution, we don't
23 have a number specifically how often it occurs.
24       So, you know, that would be hard to quantify
25 which one is more prevalent. Does -- have we

Page 116

1 identified prostitution occurring? When we're aware of
2 it, yes. Suicides, yes, because there's an actual --
3 we're aware of it. So that's a hard -- to -- to define
4 either or.
5    Q. (By Mr. Kane) From 2012 to 2014, um, was
6 there a difference between an escort and a prostitute?
7       MR. SAGER: Objection.
8    A. Same -- same activity, right? If it's, you
9 know, eliciting sex, regardless if it's an escort or
10 prostitution, it's the same crime.
11    Q. And in 2012 to 2014, um, if I called the
12 front desk and asked for you to -- somebody at the
13 front desk, whoever is working, to connect me to
14 Room 3240, assuming that's a real room, would the front
15 desk just put me through?
16    A. No. They would go through telecom or
17 communication. They would -- basically they would --
18 they would call the guest, say, hey, we have such and
19 such. Because we're not going to give up a room
20 because, you know, confidentiality. So it's more of a
21 we just don't blind call and -- and just transfer them.
22 We would, you know, confirm that they know somebody or
23 are aware of somebody or -- and accept the phone call.
24    Q. Um, were there legal licensed escorts working
25 at Venetian and Palazzo from 2012 to 2014 that you're

Page 117

1 aware of?
2       MR. SAGER: Objection, form. Objection,
3 scope.
4    A. Not that we identified.
5    Q. (By Mr. Kane) Is there audio in the elevator
6 security cameras?
7    A. There is not.
8    Q. Are there any other cameras that do not have
9 audio?
10    A. The only ones are, again, the interview
11 rooms, security interview rooms. Those are the only
12 ones that have audio.
13    Q. Okay. Oh, the only ones that have audio?
14    A. That have audio.
15    Q. Got it, thank you.
16       And from 2012 to 2014, asked something
17 similar earlier, but not the belabor the point. But
18 did Venetian patrol the suite floors, meaning, would it
19 be part of security's job duties and responsibilities
20 to once an hour walk the floors of the guest floors?
21    A. We had officers assigned to -- to the towers.
22 Not specific -- well, specific areas, um, to each tower
23 we had specific off -- specific -- sorry -- specific
24 amount of officers at each tower.
25    Q. Okay. How -- how many at each tower?

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1    A.  Would have been three in the Venetian, three
2  on the Palazzo and two in the Venezia.
3    Q.  Okay.  And were those the -- the elevator
4  security guys we were talking about earlier?
5    A.  No.
6    Q.  Okay.  But how often would -- would they
7  patrol the guest floors?
8    A.  They're continuously patrolling the -- the
9  guest floors.  Now how often they get to a certain
10  floor, it could differentiate depending on calls, guest
11  assists, you know, anything that's required for them to
12  be there.
13      So I wouldn't be able to answer how many
14  times they get to each floor, but they are continuously
15  doing a -- floor patrols.
16    Q.  When it comes to, um, the red flags of
17  spotting a potential victim of human trafficking, are
18  the employees at Venetian -- are they taught if you see
19  one red flag you need to report it, or is there -- the
20  threshold higher?
21      MR. SAGER:  Objection, scope.
22    A.  I think communication, you know, just us
23  dealing with them, it's if you see something suspicion,
24  regardless if it's one, two or five, you know, to reach
25  out to security to address the issue.

Page 119

1    Q.  (By Mr. Kane) Okay.  So you -- based on your
2  training, if you see one red flag, you -- you should
3  reach out to -- to security and report it?
4      MR. SAGER:  Same objection.
5    A.  Yes, that's the expectation.
6    Q.  (By Mr. Kane)  And if -- not to belabor
7  again.  But when they call security, that's going to be
8  documented?
9    A.  Correct.
10    Q.  Are you aware of the -- any employees
11  or -- or management ever reporting red flags of
12  suspected human trafficking to security?
13    A.  We have.
14    Q.  Who had what -- who -- you're aware of --
15    A.  Yeah.
16    Q.  -- employees?
17    A.  We're aware that we've receive calls,
18  security has received calls, um, of team members
19  reporting, you know, suspicion activity, whether it's
20  crimes, solicitation, anything like that if they see
21  that it warrants our -- security's attention.
22    Q.  So if -- if the employee calls with, you
23  know, suspicious activity that they think is
24  solicitation is happening and they witness, that would
25  be, you know, documented as potential solicitation,

Page 120

1  right?
2    A.  No.  I mean, again, we're not labeling it
3  until we can identify if it is or not.  We've got to --
4  you know, we might be just an informational that we
5  need contact.  We're not going to label the incident or
6  the call or the report as solicitation unless we were
7  able to -- she states that she's doing it, the guest
8  states that or law enforcement comes and we assist
9  them.  So...
10    Q.  If, um -- if -- if an individual is being
11  forced to -- to have sex with individuals for money,
12  each time that individual engages in that, that's --
13  they're being raped, right?
14      MR. SAGER:  Objection, calls for a legal
15  conclusion.
16      You can answer.
17    A.  I don't -- I wouldn't say rape, but I would
18  say it's -- you know, it's something that, you know,
19  hopefully that she more likely -- she doesn't want to
20  do.  But I guess you could call it rape, yeah,
21  definition-wise, yeah.  I don't know about the legal
22  term.
23    Q.  (By Mr. Kane) But the Venetian would share
24  that opinion that that would essentially amount to
25  rape?

Page 121

1    A.  Yeah.  I mean safe to say.
2    Q.  Right.
3      In that same scenario would Venetian agree
4  that the woman isn't committing a crime?
5      MR. SAGER:  Objection, scope.  Objection,
6  calls for a legal conclusion.
7      You can answer.
8    A.  Well, again, it's -- if she initiates in
9  solicitation, there's the crime.  And then the John,
10  having the second part of the -- the crime, they both
11  have committed the crime.
12    Q.  (By Mr. Kane)  Right.
13      But if she's being forced to do it by threats
14  of violence or death, is she -- does Venetian still
15  think she's committing a crime?
16      MR. SAGER:  Objection, an incomplete
17  hypothetical and asks for a legal conclusion.
18      But you can answer.
19    A.  Again, with not getting too legal with that,
20  I mean, again, if she states that she's been raped,
21  then, yes.
22      But if she doesn't report that she's --
23  again, not legally, but if she doesn't tell us that
24  she's being raped, then, you know, we can't come to
25  that conclusion unless she defines I was just raped.

CONFIDENTIAL

Page 122

1    Q.   (By Mr. Kane)  Is -- is the prevalence of sex
2  trafficking more so locally here in Las Vegas or
3  overseas in Macao?
4        MR. SAGER:  Objection, form.  Objection,
5  scope.
6    A.   And I'm only aware of the Venetian, Palazzo,
7  Venetian itself.
8    Q.   (By Mr. Kane)  Does the Venetian -- is that
9  the biggest, does it have the most rooms on the strip?
10   A.   It does.  It -- with integration, you know,
11 with all connected as one, it is considered one -- one
12 hotel.  So it is the largest.
13   Q.   What's -- what's more important, stopping
14 money laundering through the Venetian casino or -- or
15 stopping human trafficking?
16       MR. SAGER:  Objection scope.  Objection,
17 form.
18   A.   They are both -- both bad.  But the human
19 element with the type of prostitution or trafficking,
20 solicitation is taken more seriously.  There's a human
21 element.
22   Q.   (By Mr. Kane)  The -- has A.H. trafficked on
23 your properties?
24       MR. SAGER:  Objection, form.  Objection,
25 scope.  Objection, calls for a legal conclusion.

Page 123

1        You can answer.
2        And objection to foundation.
3    A.   We don't have any records of her being on the
4  property.
5    Q.   (By Mr. Kane)  What would you do to -- to
6  look for that?
7    A.   We looked through the hotel registration.  We
8  didn't see any -- any names affiliated with her or her
9  trafficker.  We looked in our security databases if we
10 trespassed her or her trafficker, which we didn't.  So
11 nothing there, documentation showing that she was on
12 property.
13   Q.   Did you -- did you review the surveillance
14 footage from the period she alleged in her Complaint
15 that she was trafficked at the Venetian?
16   A.   No, because, again, it's past the retention
17 time.  It would have been past the seven days or the --
18 the max retention times, you know.
19   Q.   I see.
20       So if somebody got trespassed that day, say,
21 March 12th of -- of 2014, there would be video of --
22 surveillance video of that individual who was
23 trespassed while they were on the casino floor, right?
24   A.   Correct.  We don't show her has being
25 trespassed.

Page 124

1    Q.   No.  Understood.
2    A.   Okay.
3    Q.   But you could go back and look at who was
4  trespassed and look to see if A.H. was potentially in
5  one of the -- the views of the surveillance videos that
6  was kept from the time period, correct?  That's -- it's
7  possible to do that?
8    A.   Is it possible?  Anything is pos -- yes, it
9  would be possible.
10   Q.   Do you agree that preventing human
11 trafficking goes to the core of Venetian's code of
12 business conduct and ethics?
13   A.   Agreed.
14   Q.   And that Venetian's efforts to follow the
15 code and their employees to follow the code play an
16 instrumental role in preventing human trafficking?
17       MR. SAGER:  You're referring to the internal
18 code?
19       MR. KANE:  Yeah.
20       MR. SAGER:  Just because you had mentioned a
21 different code earlier.
22   A.   What -- I apologize, what are you speaking
23 on?  Can I see what you're...
24   Q.   (By Mr. Kane)  I'm just asking you.
25   A.   Well, I -- I want to make sure what -- I'm

Page 125

1  not sure exactly what --
2    Q.   I'm not looking at anything.  I just --
3    A.   Oh, you're not?  I apologize.  That's all
4  right I didn't know when you were reading a document
5  you provided.
6        Can you repeat the question?
7    Q.   (By Mr. Kane)  Yeah.
8        Venetian agrees that its employees'
9  continuous efforts to follow the code play an
10 instrumental role in preventing human trafficking?
11       MR. SAGER:  Objection, form.
12   A.   It's instrumental, but I don't believe the
13 word "human trafficking" is in the business code of
14 ethics.
15   Q.   (By Mr. Kane)  Has adherence to the code by
16 Venetian's employees, has it helped decrease human
17 trafficking at Venetian or Palazzo?
18       MR. SAGER:  Objection, form.  Objection,
19 foundation.
20   A.   As I stated before, without running the
21 numbers, I wouldn't be able to answer if there's an
22 increase, decrease of -- of that.  But, you know,
23 again, it's just the expectation of, you know, doesn't
24 matter what year, the expectation is to follow the
25 code.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    Q.  (By Mr. Kane) All right.  And it sounds a bit
2 from your prior testimony it's kind of stayed kind of
3 the same as far as prostitution, correct?
4        MR. SAGER:  Objection, mischaracterizes.
5 Objection, form.  Objection, scope.
6    A.  I think I'd say it's kind of stayed steady
7 or -- I -- I'd be comfortable with saying the word
8 "steady."
9    Q.  (By Mr. Kane)  Same year after year after
10 year after year?
11    A.  I don't want to say year after year after
12 year, but I'm comfortable saying that it's been steady.
13    Q.  What are -- what are red flag cards?  Have
14 you ever hard that term used in security or training or
15 HR at Venetian?
16        Red flag cards, c-a-r-d-s.
17    A.  I am not aware.
18    Q.  So do -- does Venetian agree that sex and
19 labor trafficking threatens the safety and well-being
20 of its team members?
21    A.  The Venetian's policy is team members,
22 guests, contractors, anybody that enters the property
23 is a serious, it's -- it's, you know, paramount that
24 safety of all personnel coming into the property is --
25 is -- needs to be addressed and handled.

Page 127

1    Q.  I appreciate that.
2        But does Venetian agree that sex and labor
3 trafficking threatens the safety and well-being of its
4 team members?
5        MR. SAGER:  Objection, scope.
6    A.  If you just want to relate it to -- to
7 security, we say security because we're dealing with
8 them and you don't know how the situation is going to
9 be -- be handled.  So when it comes to security's
10 prospective, I can answer to security's, yes, or -- you
11 know, the placing ourselves in situations, it could be
12 difficult.
13    Q.  (By Mr. Kane)  Okay.  Because pimps
14 dangerous?
15    A.  Not just the pimps, you know, the
16 prostitutes.  You know, they don't want to be
17 identified, they don't want to be dealt with, and they
18 don't want to do that.  So they, too, are also, you
19 know, violent.  So it's not just the pimps.
20    Q.  Venetian agrees that human trafficking is
21 modern day slavery, involves the use of force, fraud or
22 coercion to obtain some type of labor or commercial sex
23 act, correct?
24        MR. SAGER:  Objection, form.  Objection,
25 scope.

Page 128

1    A.  That's the legal term.  And...
2    Q.  (By Mr. Kane)  Is there -- is there any
3 difference if a child is being trafficked versus an
4 adult that's being trafficked?
5        MR. SAGER:  Objection, form.
6    A.  Traffic is traffic, doesn't matter the age.
7    Q.  And coercion can be force, manipulation or
8 fraud?
9        MR. SAGER:  Objection, insofar as it calls
10 for a legal conclusion.
11        You can answer.
12    A.  In a legal definition that's what it states.
13    Q.  (By Mr. Kane)  Um, this is really not the
14 trick-roll video that we were talking about a couple
15 hours ago.
16        Has that -- have you seen -- has that helped
17 decrease the number of trick-rolls that are occurring
18 at Venetian and Palazzo?
19        MR. SAGER:  Objection, scope.
20    A.  I don't think -- I wouldn't be able to answer
21 it, again, without having those numbers.  But it does
22 help the security personnel to -- to -- to address that
23 situation when it does occur.  So it does help the --
24 the officers to deal with it.
25    Q.  (By Mr. Kane)  Do you know who Steven Jacobs

Page 129

1 is?
2    A.  The name sounds familiar.
3    Q.  It -- are you able to go back and search, um,
4 Adelson's e-mails from 2012 to 2014?
5        MR. SAGER:  Objection, scope.
6    A.  I'm sure that -- I'm not capable, but I'm
7 sure the Venetian is capable.  If somebody in IT or
8 somebody...
9    Q.  (By Mr. Kane)  When you get up to, like, the
10 CEO, CFO, COO, CMO, do they operate on a different, um,
11 system, like, for e-mail and communication as opposed
12 to, like, I mean big employees?
13        MR. SAGER:  Objection, scope.
14    Q.  (By Mr. Kane)  Or other management?
15    A.  I understand they're all on the same network.
16        MR. KANE:  All right.  Let's take about a
17 five-minute break --
18        MR. SAGER:  Sure.
19        MR. KANE:  -- and then probably wrap up.
20        THE VIDEOGRAPHER:  We're going off record as
21 of 12:31 p.m.
22        (A recess was taken.)
23        THE VIDEOGRAPHER:  We are back on record as
24 of 12:39 p.m.
25    Q.  (By Mr. Kane)  All right.  Does Venetian,

Page 130

1 Palazzo use third-party vendor for -- for guest
2 reviews, on-line reviews and/or complaints?
3      MR. SAGER: Now or back in --
4      MR. KANE: 2012, 2014.
5   A. I believe we did provide a service.
6   Q. (By Mr. Kane) Would -- any other services?
7   A. Not that I'm aware of. That's the ones that
8 we dealt with any issues relating to in specific
9 departments.
10  Q. What about monitoring, like, Yelp reviews or
11 Trip Advisor reviews?
12  A. Back in 2012 and '14, I'm not sure. I don't
13 recall receiving anything from -- the security
14 department not receiving any -- any complaints or
15 monitoring that.
16  Q. And the Venetian has produced some guest
17 complaints.
18     Did you review those in preparation for your
19 deposition today?
20  A. I did not.
21  Q. Okay. Do you -- from 2012 to 2014 did
22 Venetian respond to the guests themselves or did they
23 also go through a third-party vendor like a Media
24 [sic]?
25  A. With Medallia we would, you know, reach out

Page 131

1 to the guests ourselves.
2   Q. And what's the retention of any type of
3 Medallia information, complaints, reaching back out to
4 the call -- the -- the guest?
5   A. It all depends on how you reach out. It
6 might be a phone call, it could be an e-mail. I mean
7 you don't actually respond through Medallia. It's more
8 of a -- through the -- through the net -- through the
9 hotel itself.
10  Q. Okay. Who would -- what department or what
11 job title would be responsible for responding to guest
12 complaints, 2012, 2014?
13  A. I would say the majority were, like, guest
14 services, relations, they had that. But if they would
15 feel that the department needed to address a specific
16 situation, then they would forward it to the -- that
17 specific department.
18  Q. Okay. And then if whoever would reach back
19 out to the guest regarding the complaint, whether it be
20 by e-mail -- well, let's just say if they called up,
21 would they have to document that somewhere that they
22 called the guest?
23  A. They would doc it back into the Medallia or
24 they would close out that-- it's called it an alert.
25 They would close out the alert basically stating, you

Page 132

1 know, what occurred, what they did, how they resolved
2 it or addressed the issue.
3   Q. Medallia, is that still being used at
4 Venetian, Palazzo?
5   A. It is.
6   Q. Are you currently using any other third-party
7 vendors for reviews or complaints?
8   A. No. I know marketing has, um, used the --
9 social media, if they see something like that or see
10 something that's a negative or a positive with a --
11 with the Venetian. So I believe the marketing and
12 public relations is, um, reviewing those.
13  Q. So they're -- they're monitoring social media
14 to make sure there's no negative reviews or comments
15 that could hurt publicity of Venetian possibly?
16     MR. SAGER: Objection, scope.
17  A. I don't know how they're monitoring it, other
18 than they're sometimes we'll get a -- an e-mail from
19 public relations saying, hey, we saw this or we have
20 this, how their they're doing it.
21  Q. Gotcha.
22     And are you aware of guest services actually
23 monitoring back 12 -- 2012 to 2014, like, on-line
24 reviews or negative reviews on-line at various
25 websites, or you just don't know if they were

Page 133

1 monitoring or not?
2     Does that make sense?
3   A. Yeah.
4     I'm not sure if they were or not.
5   Q. Okay. Was there a training manager for
6 security 2012 to 2014?
7   A. There was.
8   Q. And who was that?
9   A. Could have been Ted Wilkes, W-i-l-k-e-s. Um,
10 I think that's about the only one I can come up with in
11 that timeframe.
12  Q. Okay. Is Ted -- Mr. Wilkes, is he still with
13 the company?
14  A. He is not.
15  Q. Is he -- do you know if he's alive?
16  A. I don't.
17  Q. What was his -- what was his title?
18  A. Training manager.
19  Q. Training manager.
20     Just for security or for other departments as
21 well?
22  A. That training manager role is only for
23 security.
24  Q. Got it.
25     And would that be just training for security

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1  in the academy or also continuing education or
2  training?
3      A.  Specifically in the academy and anything
4  relating specific to security ongoing throughout, you
5  know, annual training, quarterly training on that.
6      Q.  Did I ask you if you knew who -- who was, um,
7  the manager of HR at the Expo from 2012 to 2014?
8      A.  You did not.
9          But first name is Raquel.  I can't recall the
10 last name.
11     Q.  With a "Q" or a "C"?
12     A.  "Q".
13     Q.  R-a-q-u --
14     A.  R-a-q-u-e-l.
15     Q.  Any, like, sounds like this last name?
16         Do you know if she's still with the company?
17     A.  She is.
18     Q.  She is.
19         So, um, what was your position with the
20 company in 2012, 2014 timeframe?
21     A.  The assistant director.
22     Q.  So walk me, um, up the chain of command from
23 you all the way up from 2012 to 2014.
24     A.  So I was a -- the assistant director, direct
25 report would have been Tony Wynn, who was the executive

Page 135

1  director.  And then his direct report was Brian Nagel.
2  He was the SVP chief security officer.  And then I
3  believe he reported to Mr. Adelson.
4      Q.  From 20 -- well, 2012 to 2014, did -- did
5  Mr. Adelson, did he have an office at Venetian?
6      A.  He did.
7      Q.  And was he there every day or most of the
8  time, hardly ever see him?
9      A.  I would see him frequent.  I wouldn't say
10 every day.  You know, I wasn't watching him, but he was
11 on property quite a bit.
12     Q.  Would you say that he was kind of in charge?
13     A.  Well, I mean, yeah, I mean he's the CEO.  So
14 I would say he is in charge.
15     Q.  Well, right.  I guess that's a stupid
16 question, but -- yeah.
17         Does -- in 2012 to 2014, did Venetian use
18 NAVAX or Riskonnect or Red Flagger or any other
19 third-party service in connection with human
20 trafficking or prostitution inst -- incidents?
21     A.  Not to my knowledge.
22     Q.  None of those?
23     A.  No.
24     Q.  Did any -- what about currently, any
25 third-party services in connection with human

Page 136

1  trafficking or prostitution incidents?
2          MR. SAGER:  Objection, scope.
3      A.  Since it's, you know, current, I wouldn't
4  have looked.  I'm not aware of.
5      Q.  (By Mr. Kane)  And the 2018 training that was
6  developed, was that -- human trafficking training that
7  was rolled out in 2018 at Venetian, was that developed
8  in-house or using a third-party consultant or vendor?
9      A.  I believe it's all in-house.
10     Q.  Would that have been through HR?
11     A.  Correct.
12     Q.  Do -- probably in tandem with security
13 depending?
14     A.  No, I wouldn't say security had, you know,
15 input in the training.  But it was more of a HR or
16 compliance.
17         MR. SAGER:  Did -- did you mean rolled out
18 mechanically or rolled out in terms of preparation of
19 content?
20         MR. KANE:  Well, I --
21     Q.  (By Mr. Kane)  You started human trafficking
22 training in 2018?
23     A.  Correct.
24     Q.  I guess that's what I was talking about.
25         So the training, the handouts, the

Page 137

1  PowerPoints, that was all created in-house?
2          MR. SAGER:  Objection, scope.
3      A.  I don't know how it was created.  I just know
4  that it -- it was pushed out through my HR, the data
5  part, that dashboard, MyHR.  How it was created and --
6  and inserted there, I'm not sure.
7          MR. KANE:  Hey, I really appreciate your time
8  today.  Thanks for coming in.
9          MR. SAGER:  I have no questions.
10         UNIDENTIFIED SPEAKER:  No questions.
11         MR. SAGER:  Alexa?
12         MS. AIN:  No questions for MGM.
13         MR. SAGER:  All right.  I think we're done.
14         UNIDENTIFIED SPEAKER:  Do the orders.
15         THE VIDEOGRAPHER:  Yeah, before we go off
16 record, would anyone like video orders or any --
17         MR. KANE:  Yeah, for the Plaintiff no video.
18 We'll take an E-tran.  No index, if you charge for the
19 index, and we don't need an AI summary, if that is an
20 option.  Thanks.
21         THE VIDEOGRAPHER:  All right.  This concludes
22 the video deposition of 30(b)(6) Mike Mackerley for
23 Venetian.
24         We are going off record as of 12:50 p.m.
25         (Off the record.)

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    THE STENOGRAPHER:  Mr. Sager, did you want a
2  copy?
3    MR. SAGER:  Yes.  For Venetian, we'll take a
4  copy of the transcript.
5    I don't know what the criteria are that we
6  use.
7    THE STENOGRAPHER:  Thank you.
8    Anybody else?
9    MS. BALDWIN:  Yeah, we'll take a transcript
10  for Wynn as well, please.  No video.
11    THE STENOGRAPHER:  Thank you.
12    MS. AIN:  MGM will also take a transcript,
13  please, but we will request the index.  No AI summary
14  and no video, please.
15    WHEREUPON, the within proceedings were
16  concluded at the approximate hour of 12:51 p.m. on the
17  10th day of July, 2025.
18    *    *    *    *    *    *
19
20
21
22
23
24
25

Page 139

1    CERTIFICATION OF DEPONENT
2
3    I, MIKE MACKERLEY, do hereby certify that I
4  have read the above and foregoing deposition and that
5  the same is a true and accurate transcription of my
6  testimony, except for attached amendments, if any.
7    Amendments attached    ( ) Yes    ( ) No
8
9

10    _____
         MIKE MACKERLEY
11
12    The signature above of MIKE MACKERLEY was
13  subscribed and sworn to before me in the county of
14  _____, state of _____, this _____ day of
15  _____, 2025.
16
17

18    _____
            Notary Public
         My commission expires
19
20
21
22  AH v. Wynn Las Vegas, et al., 07/10/2025 (kar)
23
24
25

Page 140

1    REPORTER'S CERTIFICATE
2
3    I, KIMBERLY A. RITTER, Registered
4  Professional Reporter, do hereby certify that previous
5  to the commencement of the examination, the said MIKE
6  MACKERLEY was duly sworn by me to testify to the truth
7  in relation to the matters in controversy between the
8  parties hereto; that the said deposition was taken in
9  machine shorthand by me at the time and place aforesaid
10  and was thereafter reduced to typewritten form,
11  consisting of 140 pages herein; that the foregoing is a
12  true transcript of the questions asked, testimony
13  given, and proceedings had.  I further certify that I
14  am not employed by, related to, nor of counsel for any
15  of the parties herein, nor otherwise interested in the
16  outcome of this litigation.
17    IN                             have affixed my
18  signatur                                    5.
19

20    _____
         Kimberly A. Ritter
         Registered Professional Reporter
21    Nevada Certificate No. 1020
22
23
24
25

36 (Pages 138 - 140)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.