# EXHIBIT 12

**U.S. Department of Justice**
Office of Justice Programs



Annex 2

**Biennial Comprehensive Research and Statistical Review and Analysis of Severe Forms of Trafficking, Sex Trafficking and Unlawful Commercial Sex Acts in the United States**

**May 2009**

**by**

**Bureau of Justice Statistics**
**National Institute of Justice**

**U.S. Department of Justice**
Office of Justice Programs



## TABLE OF CONTENTS

Author's Note ...............................................................................................3

Executive Summary .....................................................................................4

Introduction ...............................................................................................10

Purpose and Methods of the Studies .........................................................10

Study 1: Severe Forms of Trafficking in Persons .....................................17

Study 2: Sex Trafficking and Unlawful Commercial Sex Acts...................25

Continuing Office of Justice Programs Activities..........................................45

**U.S. Department of Justice**
Office of Justice Programs



## AUTHORS' NOTE

This report delivers the information Congress requested in Section 201 of the Trafficking Victims Protection Reauthorization Act of 2005. The report is organized to conform to the format Congress requested. Specifically, the report begins with a discussion of common sources of data and research and then is broken out into two separate studies that rely at times on the same data. The questions that Congress posed for each study serve as the headers in each study's findings section. The report concludes with the Office of Justice Program's ongoing efforts to collect research and data on trafficking in persons.

**U.S. Department of Justice**
Office of Justice Programs



## EXECUTIVE SUMMARY

The Trafficking Victims Protection Act of 2000 (TVPA) and its 2003, 2005 and 2008 reauthorizations represent comprehensive federal legislation to combat human trafficking and to assist human trafficking victims. TVPA provides for a program to reduce trafficking in persons and demand for commercial sex acts in the United States. As part of that provision, Congress directed the Office of Justice Programs (OJP) in the U.S. Department of Justice (DOJ) to conduct a biennial comprehensive research and statistical review and analysis of incidents of severe forms of trafficking in persons and of sex trafficking and unlawful commercial sex acts in the United States. This report is the first biennial response to the congressional mandate.

OJP, through its Bureau of Justice Statistics (BJS) and National Institute of Justice (NIJ), supported three activities to develop estimates of severe human trafficking, sex trafficking and commercial sex acts:

- BJS first collected data from jurisdictions with DOJ-funded task forces designed to provide victim-centered support and a multi-agency approach to investigating and responding to suspected incidents of human trafficking. The Human Trafficking Reporting System (HTRS) provides a snapshot of the investigations opened by federally funded human trafficking task forces over a 21-month reporting period.

- NIJ simultaneously supported a second activity to collect data on human trafficking experiences among a random sample of 60 counties across the U.S., exclusive of jurisdictions with DOJ-funded human trafficking task forces (sample hereafter referred to as non-task force jurisdictions or NTFJ).

- Finally, NIJ also conducted an extensive review of the existing literature on unlawful commercial sex acts and sex trafficking, including books, articles, studies and other sources.

The findings from these activities in response to each congressional mandate are summarized in this executive summary and described more fully in the report to Congress.

**U.S. Department of Justice**
Office of Justice Programs



**STUDY 1: SEVERE FORMS OF TRAFFICKING IN PERSONS IN THE UNITED STATES**

### The estimated number and demographic characteristics of persons engaged in acts of severe forms of trafficking in persons

BJS and its partners developed the HTRS to collect information on alleged incidents of human trafficking. The system contains information on more than 1,200 incidents of suspected human trafficking reported by jurisdictions with DOJ-funded task forces over a 21-month reporting period. Although suspect and victim information was not available for each incident, nearly 900 suspects and more than 1,400 potential victims were identified by the task forces.[1] Suspects were most likely to be older males (35 years or older) of black or Hispanic race/ethnicity, although Asian suspects were more likely to be involved in labor trafficking than other races. While most suspects were U.S. citizens, about 24 percent were undocumented or qualified aliens. Potential human trafficking victims were overwhelmingly young females, particularly in incidents of sex trafficking.[2] Potential victims were also very likely to be Hispanic and undocumented or qualified aliens, particularly among labor-trafficking incidents.

### The estimated number of investigations, arrests, prosecutions and incarcerations of persons engaged in acts of severe forms of trafficking in persons by states and their political subdivisions

Over the 21-month reporting period captured by the HTRS, task forces reported investigating 1,229 alleged incidents of human trafficking. As of Sept. 30, 2008, nearly 83 percent of the reported incidents involved sex trafficking, 12 percent involved labor trafficking, and 5 percent involved other or unknown types of human trafficking. About 78 percent of the incidents were still under investigation at the end of the reporting period. Investigations were completed and closed during this period for the remaining 22 percent. Task forces reported arrest information for 216 (40 percent) of the 543 identified suspects in alleged human trafficking incidents. Over half (61 out of 113) of the suspects for whom adjudication information was available were convicted of some offense, 6 suspects had their case dismissed and 46 suspects were awaiting adjudication. During the reporting period, 16 suspects (36 percent of those suspects for whom sentencing information was available) were sentenced to probation, time served

---

[1] Given that many cases are still under investigation, of the 1,229 cases, 665 had identified one or more victims (about 2.1 per case) and 475 had identified a suspect (about 1.8 per case).
[2] This finding is due in part to the fact that the TVPA and HTRS define any commercial sex act involving someone under the age of 18 as human trafficking.

**U.S. Department of Justice**
Office of Justice Programs



or to prison or jail for less than one year, and 29 (64 percent) were sentenced to prison or jail for one year or more. Five suspects were sentenced to prison for more than 10 years.

**STUDY 2: SEX TRAFFICKING AND UNLAWFUL COMMERCIAL SEX ACTS IN THE UNITED STATES**

The most commonly reported and researched unlawful commercial sex act (CSA) in the U.S. is prostitution. Some of these CSAs may be trafficking related, but there is insufficient specificity in the available data to separate the extent to which trafficking is behind the activities currently recognized as CSAs. What does exist is a compilation of small scale surveys and assessments, anecdotes, thought pieces and official government data, which together provide a snapshot of the demographics of persons involved in CSAs, the number of arrests being made for CSA offenses and some demographic aspects of prostitutes and purchasers. Research on trafficking is better developed, with sex trafficking one of the most researched topics.

**The estimated number and demographic characteristics of persons engaged in sex trafficking and CSAs, including purchasers of CSAs**

NIJ reviewed several studies that provide some insight into the characteristics of persons engaged in sex trafficking and commercial sex acts. The most comprehensive analysis of purchasers was a survey of 1,342 "John School" participants in San Francisco, Santa Clara, Las Vegas and Portland. [3] The survey of John School participants found that whites were the majority of purchasers, though minorities comprised 40 percent of purchasers in San Francisco and Las Vegas — results that tended to mirror the ethnic composition of those cities. The age range of those in the John School program ranged from 18 to 84, with a mean age of 38. The age range of the first purchase of sex ranged from 9 to 62; the average age of the first prostitution encounter was 24. In terms of frequency, 20 percent claimed not to have been with a prostitute, 21 percent claimed they had not purchased sex within the last year, 28 percent claimed to have had at least one sex purchase in the past year, and 10 percent claimed to purchase sex more than once a month.

---

[3] Monto, Martin, and Nick McRee, "A Comparison of the Male Customers of Female Street Prostitutes with National Samples of Men," *International Journal of Offender Therapy and Comparative Criminology* 49 (2005). Educational treatment programs designed for men who have been arrested for soliciting the services of prostitutes are commonly referred to as "John Schools."

U.S. Department of Justice
Office of Justice Programs



Some of the scientifically rigorous studies of prostitutes, including sex trafficking victims, have focused on small geographic locales, such as cities, and revealed demographic profiles of prostitutes in those areas. Well over half of the prostitutes in a study of Chicago had started as juveniles or before their 18th birthday. A study in San Francisco found that 78 percent of street prostitutes reported starting as juveniles, with 60 percent starting when they were 16 years old or younger. For those who began as juveniles, 53 percent had household members who engaged in prostitution. The Chicago study also found a higher prevalence of drug use, multiple prostitution venues and health problems among prostitutes as compared the general population. Different forms of prostitution are often associated with different demographic profiles. For instance, Asian women, while generally not prevalent in any studies of street prostitution, are present in higher numbers in the hidden parts of the sex market, such as massage parlors. Violence and victimization are important components of any demographic profile of prostitution. Many women become targets of violence and other forms of victimization such as robbery and rape.

**The estimated value in dollars of the commercial sex economy, including the estimated average annual personal income derived from acts of sex trafficking**

Estimations of the size and value of the commercial sex industry are very difficult to derive for a host of reasons, including clandestine populations, lack of database development and funding limitations. One survey collected information from local law enforcement agencies located in 60 counties from across the nation. Overall, the analysis noted that the size and value of the illicit economy varied widely across counties, suggesting that it is difficult to develop a national estimate using county-level data. OJP examined one non-task force jurisdiction to estimate in more detail the value of three types of CSAs: illegal massage parlors, illegal escort services and street prostitution.[4] There were ten illegal massage parlors in this jurisdiction. Each massage parlor earned an average of $218,400 per year from unlawful CSAs. In the second major CSA, illegal escort services, one escort was found to earn a minimum of $9,000 per day and upwards of $1 million per annum. The last estimate was of street prostitution, which was found to earn $9.1 million per annum. The combined total earnings for the three types of CSAs are $12.5 million per annum for this one jurisdiction. While the CSA types described above were selected to capture

---

[4] While the county in question must remain anonymous per the conditions of the survey, the county in question ranks in the first quartile of both population and income per capita.

**U.S. Department of Justice**
Office of Justice Programs



as much of the value of the CSA economy as possible, these numbers represent only three specific CSA types and therefore may not be a good estimate of the true size of the commercial sex economy in this specific county.

**The number of investigations, arrests, prosecutions and incarcerations of persons engaged in sex trafficking and unlawful CSAs, including purchasers of commercial sex acts, by states and their political subdivisions**

Laws, ordinances and regulations related to CSAs differ greatly across jurisdictions. Vice enforcement is currently the only available information source on this topic and thus we are unable to differentiate data for sex trafficking and unlawful CSAs. The FBI's Uniform Crime Reports (UCRs) depict a reduction in prostitution arrests nationwide over a 12-year period. The statistics from the UCRs also suggest that there is either a difference in the incidence of prostitution by state or that policing tactics across the states result in different arrest rates. Furthermore, trends in prostitution arrest data may be masked by trends in other crimes that often co-occur with prostitution, such as drug crimes, as the UCR will only report the "top" charge from each event and prostitution is most often the "lowest" charge in the UCR's hierarchy.

The HTRS contained more specific information concerning arrests and adjudication of sex trafficking cases between state and federal agencies participating in DOJ-funded task forces. Overall, states were more active than federal agencies in making arrests and charging suspects through the task forces. Of 180 suspects arrested for sex trafficking, state agencies apprehended 149 suspects (83 percent). Out of 118 suspects charged by prosecuting agencies, states charged 88 suspects (75 percent).[5]

**A description of the differences in the enforcement of laws relating to unlawful CSAs across the U.S.**

Law enforcement and service providers in states with human trafficking laws on the books tended to engage in more proactive attempts to identify traffickers. State legal codes seemed to have an impact on awareness and perceptions of human trafficking and thus understanding differences in legal codes were important. OJP examined the impact of state-level legislation on local prosecution practices in four non-task force jurisdictions — two with state anti-trafficking laws and two without state legislation. Across the four jurisdictions,

---

[5] This number includes those suspects that state agencies apprehended directly and those apprehended in concert with federal partners.

**U.S. Department of Justice**
Office of Justice Programs



we conducted case reviews of 406 crimes charged under statutes that directly address human trafficking or are commonly associated with human trafficking crimes. The review found 35 cases (9 percent) that contained some elements suggestive of sex trafficking, such as an underage victim or perpetrator with pimp, or massage parlors with women who live on the premises and speak little or no English. Of these potential human trafficking cases, 77 percent came from states with anti-trafficking laws. The manner with which most of these 35 cases came to the attention of the authorities helps to explain the disproportionate results. Most were the result of proactive law enforcement strategies, with 43 percent derived from vice operations. Within those states with sex trafficking legal codes, one of the more problematic issues for law enforcement was their definition of sex trafficking. The definition of sex trafficking varied widely across state and local law enforcement agencies.

### CONTINUING OFFICE OF JUSTICE PROGRAM ACTIVITIES

The activities supported by OJP have helped to identify a number of areas to further explore in the human trafficking literature and data collection activities. BJS is working to enhance the quality of the data collected and ability to provide national-level estimates through its HTRS. The data entered into the HTRS are constantly updated and validated by the task forces and OJP so more complete and accurate estimates of severe human trafficking are continually available. In the three months since our most recent report was released (between October 1 and December 31, 2008), an additional 297 suspected incidents of human trafficking were entered into the system for a total of 1,526 incidents opened for investigation by the task forces since Jan. 1, 2007, including 1,157 suspects and 1,956 potential victims. These data will be included in our next report. OJP is also building on the lessons learned from the data collected in jurisdictions with and without task forces to enhance our reporting platform and develop more national-level estimates of human trafficking and sex trafficking.

NIJ continues to support research in human trafficking and is prioritizing those activities that use innovative methods to measure and quantify the extent of sex trafficking and unlawful CSAs in the U.S. Furthermore, NIJ seeks to support future studies that account for the varying views of the relationship between CSAs and human trafficking held by state and local stakeholders; the definitional variations that stem from state statutes that may lead to cases that meet the definition of human trafficking but are not prosecuted as such; the inability to generalize the HTRS findings to other jurisdictions; methodological

**U.S. Department of Justice**
Office of Justice Programs

concerns; and difficulties in reaching the populations involved in human trafficking.

**U.S. Department of Justice**
Office of Justice Programs



---

**Biennial Comprehensive Research and Statistical Review and
Analysis of Severe Forms of Trafficking, Sex Trafficking and
Unlawful Commercial Sex Acts in the United States**

## INTRODUCTION

This report contains the two studies that Congress mandated in the Trafficking
Victims Protection Reauthorization Act (TVPRA) of 2005. The report opens
with the discussion of the research and data collected for the studies. Study 1
responds directly to the questions contained in Section 201(a)(1)(B)(i) of the
TVPRA of 2005. Study 2 responds directly to the questions contained in Section
201(a)(1)(B)(ii) of the TVPRA of 2005. The report concludes with a discussion
on ongoing efforts within the Office of Justice Programs (OJP) to collect data
and research on trafficking in persons.

## PURPOSE AND METHODS OF THE STUDY

This report and the three OJP-sponsored activities that supported it used
definitions found in the Trafficking Victims Protection Act of 2000. The Act
specifically defines severe human trafficking as:

> sex trafficking in which a commercial sex act is induced by force,
> fraud, or coercion, or in which the person induced to perform
> such act has not attained 18 years of age; or the recruitment,
> harboring, transportation, provision, or obtaining of a person for
> labor or services, through the use of force, fraud, or coercion for
> the purpose of subjection to involuntary servitude, peonage, debt
> bondage, or slavery.

Sex trafficking is defined as the recruitment, harboring, transportation, provision
or obtaining of a person for the purpose of a commercial sex act.

A commercial sex act (CSA) is defined as any sex act on account of which
anything of value is given to or received by any person.

To provide the most comprehensive response to the congressional mandate, OJP
has combined the requested two studies into a single report. The report opens
with a detailed account of the efforts OJP undertook to answer the questions
Congress posed to the Department of Justice (DOJ), including details on the
methods used in the three activities that served as the primary contributions to

**U.S. Department of Justice**
Office of Justice Programs



this report. The following two sections provide the information that best responds to the studies that Congress requested on (1) severe forms of human trafficking and (2) commercial sex acts and sex trafficking. The report concludes with a discussion of required or requested next steps in order to prepare the next biennial report to Congress, due in 2011. All citations to external publications are provided as footnotes throughout the document.

OJP supported three primary activities to develop estimates of human trafficking, sex trafficking and commercial sex acts. The first activity collected data from locations not affiliated with federally-funded task forces to represent the diversity of municipalities and counties in the country as whole. We simultaneously supported a second project to survey locations where we expected to find incidents of human trafficking due to the existence of federally-funded task forces. Finally, OJP conducted a comprehensive review of existing literature on commercial sex acts.

### Estimates Developed From Non-Task-Force Jurisdictions

The National Opinion Research Center (NORC) at the University of Chicago received funding from the National Institute of Justice (NIJ) to examine human trafficking experiences among a random sample of 60 counties across the U.S. In contrast to prior research that has focused on federal authorities' handling of victims and perpetrators, this project examined experiences with human trafficking at the local level across the U.S. The sample excluded jurisdictions with DOJ-funded human trafficking task forces, and instead selected locations expected to reflect diversity in local ability to recognize and measure the extent of human trafficking. The research used a three-stage data collection approach. In stage one, a telephone screening of human trafficking stakeholders from the 60 counties was conducted. In stage two, separate mail-out surveys were sent to law enforcement, prosecutors and service providers who were identified in stage one.  The surveys were designed to collect information related to human trafficking and unlawful commercial sex in a way that would enhance data accuracy.

> The law enforcement survey asked about:
> - The number of trafficking investigations undertaken by the department.
> - The number of trafficking arrests made by the department.
> - The number of trafficking cases that remain open.

**U.S. Department of Justice**
Office of Justice Programs



- The number of trafficking cases accepted for prosecution.

The prosecutor survey asked about:
- The kinds of charges for trafficking perpetrators.
- Guilty pleas before and during trials.
- Number of trafficking defendants convicted.
- Number receiving incarceration.

The service providers were asked about:
- The number of trafficking clients served.
- The number of trafficking clients referred to law enforcement.
- The number of trafficking arrests, prosecutions and convictions resulting from referrals.

For stage three, NORC selected prosecutor's offices in four states and conducted site visits to determine if cases charged under statutes commonly associated with human trafficking crimes also met the federal criteria for human trafficking. Two of the counties had state anti-human-trafficking laws and two did not.

To learn about trafficking within the 60 sites, NORC began by asking law enforcement, prosecutors and service providers whether they had investigated, prosecuted or witnessed human trafficking cases or cases with human trafficking-like conduct. Further questions about labor and sex trafficking were asked separately. Of the 51 counties with law enforcement responses, 28 (55 percent) reported having no human trafficking cases. Interestingly, in four counties, respondents reported no labor trafficking cases but did report immigration cases in which the immigrant was forced to surrender his or her identification papers or legal documents. Related to sex trafficking, a law enforcement official in one county reported that although they had no trafficking cases he knew of, he did know of women being brought into the country to "service migrant workers." He also talked about witnessing migrant workers following or looking to a person — a "controller," as he put it — when they went to the grocery store. In general, respondents were uncomfortable attempting to provide a number of victims, in part because they were uncertain about the number and in part because they were uncertain whether the behaviors constituted human trafficking.

**U.S. Department of Justice**
Office of Justice Programs



Data collection in non-task force jurisdictions encountered challenges that previous studies of human trafficking have also documented. Specifically, the stakeholders and gatekeepers from law enforcement, prosecutors' offices and victim service agencies provided varying definitions of human trafficking and displayed a general lack of knowledge about the issue. This was an important finding of the project, but undermined its utility for the current biennial report, which seeks to provide more reliable estimates of the level of human trafficking. Also consistent with the literature, the analysis further found a lack of communication and coordination between agencies. In sum, we found that traffickers and trafficking victims are difficult to identify, especially for stakeholders who were not affiliated with task forces and have received little or no training.

**The Human Trafficking Reporting System**

NIJ developed the data collection in non-task force jurisdictions in an attempt to provide a national level estimate of severe human trafficking in areas without task forces. It was anticipated that this collection would identify and/or confirm some of the challenges to estimating the scope of the problem that had already been identified in the literature and serve as a guide for determining next steps.

Given the challenge associated with obtaining data to estimate human trafficking in areas without task forces, the Bureau of Justice Statistics (BJS) simultaneously supported another activity to collect data from jurisdictions with DOJ-funded task forces designed to build awareness and focus on trafficking in persons' issues and education and/or training. The Human Trafficking Reporting System (HTRS) was designed by the Institute of Race and Justice at Northeastern University and the Justice Policy Center at the Urban Institute in partnership with BJS. The HTRS provides data on human trafficking incidents investigated by the task forces. For the purposes of this report, those data were analyzed on all incidents opened for investigation between Jan. 1, 2007, and Sept. 30, 2008. The data represent a snapshot of the investigations opened by 38 federally funded human trafficking task forces.[6] Because these task forces were not selected to be statistically representative, the data do not represent all incidents of human trafficking nationwide. While attempts were made to collect completed data from all federal task forces, many task forces began collecting

---

[6] At the time of this report, 38 of the 41 task forces had entered information into HTRS. Ongoing efforts to improve data quality are expected to enhance the reporting capability of those task force jurisdictions not included in this report.

**U.S. Department of Justice**
Office of Justice Programs



data only recently and were able to provide only partial counts of human trafficking cases for the specified period. Combined, the task forces represented areas that covered nearly 25 percent of the nation's resident population at midyear 2008. Although the task forces are not representative of the entire nation, they are widely dispersed geographically. Furthermore, they were selected because they had characteristics that suggested a higher prevalence of human trafficking, such as being large urban areas or located near an international border. Therefore, while the jurisdictions serve approximately a quarter of the U.S. population, they should represent a larger proportion of the total number of human trafficking incidents nationwide.

**Figure 1**
**Task force locations and number of reported incidents**



Number of incidents reported between
January 1, 2007 and September 30, 2008

- Fewer than 10
- 10 - 19
- 20 - 49
- 50 or more

*Note: Excludes participating task forces in U.S. territories.*



For the purposes of the HTRS, human trafficking is defined as the recruitment, harboring, transportation, provision or obtaining of a person for one of three purposes:

- Labor or services, through the use of force, fraud or coercion for the purposes of subjection to involuntary servitude, peonage, debt bondage or slavery.
- A CSA through the use of force, fraud or coercion.
- Any CSA, if the person is under 18 years of age, regardless of whether any form of coercion is involved.

The HTRS is an incident-based system. An incident is defined as "any investigation into a claim of human trafficking or any investigation of other crimes in which elements of potential human trafficking were identified." An investigation is any effort in which the task force spent at least one hour looking into an alleged incident. The HTRS collected information on more than 1,200 incidents of suspected human trafficking over the current reporting period.

**Table 1**
**Alleged human trafficking incidents reported by task forces, 2007-08**

| Type of human trafficking incident | Total incidents | |
|---|---|---|
| | Number | Percent |
| **All incidents** | **1,229** | **100.0** |
| **Sex trafficking** | **1,018** | **82.8** |
| Prostitution | 596 | 48.5 |
| Child sex | 391 | 31.8 |
| Other sex trafficking | 31 | 2.5 |
| **Labor trafficking** | **146** | **11.9** |
| **Other/unknown** | **65** | **5.3** |

Among the numerous items collected in the HTRS, information on the status of the investigation (whether open or closed) was provided for all cases (100 percent). Items related to the type of human trafficking (97 percent) and identification of the lead investigating agency (94 percent) had the highest levels of reported data; items related to the number of known victims (54 percent), location of the incident (52 percent), confirmed human trafficking status (42 percent) and number of known suspects (39 percent) had the lowest.

Information about characteristics of victims was reported for slightly more than half of the 1,442 victims known to the task forces. Gender (100 percent) and age



(97 percent) had the highest levels of reported data, while citizenship status (73 percent) had the lowest. Information was reported for 543 of the 871 known suspects (62 percent). Among suspects for whom data were known and reported, gender was nearly always reported (542 suspects). Age (85 percent) and race/origin (81 percent) were reported less often.

A total of 216 suspects were reported to have been arrested. Of those arrested, 81 percent were reported to have had charges filed against them. The status of the case (whether convicted, dismissed or pending) was reported for 52 percent of the suspects who had been arrested.

To be confirmed as a human trafficking case, the case either must have led to an arrest and been subsequently confirmed by law enforcement, or the victims in the case must (1) have had a "continuing presence" requested on their behalf or (2) have received an endorsement for a T- or U-visa application. Of the 271 closed cases, 213 cases (79 percent) had "not been confirmed" as human trafficking. The task forces reported that victims refused or failed to cooperate with the investigation in 98 of these cases (46 percent). In 42 cases (20 percent), there was an indication of criminal activity other than human trafficking. This activity included prostitution, smuggling, domestic violence and child abuse. In 54 cases (25 percent), the accusations were determined to be unfounded, false upon investigation, or lacking sufficient evidence. The remaining cases (9 percent) were closed for other or unknown reasons.

Consistent with the ongoing nature of many human trafficking investigations, more recent reports of incidents were less likely to include information on suspects (33 percent) than those that occurred longer ago (46 percent). Victim information, in contrast, was reported for slightly more than half of all incidents, regardless of when the incident occurred.

### Review of Existing Literature

Finally, NIJ conducted a comprehensive review of the existing literature on unlawful CSAs and sex trafficking. One component of this project specifically cataloged 741 books, journal articles, official reports and works that addressed severe forms of trafficking. This review helped provide the most comprehensive information possible. In addition, NIJ staff conducted significant intramural research to discover the most applicable scientific studies on severe forms of trafficking and CSAs and sex trafficking. Studies included in this report are cited to provide a transparent recording of materials consulted for this report.

**U.S. Department of Justice**
Office of Justice Programs

## STUDY 1:    SEVERE FORMS OF TRAFFICKING IN PERSONS

### The Congressional Mandate

The TVPRA of 2005 (PL 109-164) requires biennial reporting on human trafficking using available data from state and local authorities. This study focuses on severe forms of trafficking in persons in the U.S., including:

   a.  The estimated number and demographic characteristics of persons engaged in acts of severe forms of trafficking in persons.

   b.  The estimated number of investigations, arrests, prosecutions and incarcerations of persons engaged in acts of severe forms of trafficking in persons by states and their political subdivisions.

### What Is Currently Known About Severe Forms of Trafficking in Persons?

The prevalence of human trafficking in the U.S. is very difficult to measure given available data and products on the subject. Among other gaps in the current state of knowledge about human trafficking, there are little systematic and reliable data on the scale of the phenomenon; there is limited understanding of the characteristics of victims (including the ability to differentiate between the special needs of adult and child victims, girls and boys, women and men), their life experiences and their trafficking trajectories; there is poor understanding of the *modus operandi* of traffickers and their networks; and there is a lack of evaluation research on the effectiveness of governmental anti-trafficking policies and the efficacy of rescue and restore programs. Such information is vital to helping decision-makers craft effective policies, service providers develop culturally sensitive and linguistically appropriate and efficacious programs, and law enforcement enhance their ability to identify and protect victims and prosecute traffickers.

Much of the public resources for combating human trafficking is tasked exclusively to provide services to trafficking victims from other countries and technical assistance to service providers assisting them. These activities, however, have taken place without a clear idea of the extent of the problem or a uniform methodology for determining the scope of the issue.[7] Assistance to victims has been provided without the benefit of empirical research to identify their service needs or to evaluate rehabilitation programs implemented to

---

[7] Bump, Micah et al., "2nd Conference on Identifying and Serving Child Victims of Trafficking," *International Migration* 41 (2005).

**U.S. Department of Justice**
Office of Justice Programs



integrate survivors of human trafficking into the wider society and prevent repeat victimization.

While media campaigns have raised public awareness and concern for victims of trafficking, this increased interest in human trafficking is not reflected in literature and little systematic research has been done on this issue. This limited knowledge is due partly to the fact that development of research methods on human trafficking remains in its infancy.[8] The NIJ-sponsored literature review found that the body of empirical research on human trafficking is particularly limited. Many studies rely on overviews, commentaries and anecdotal information. There are still no reliable data on the number of trafficking cases and the characteristics of the victims and perpetrators. The methodologies used to produce estimates of the scope of trafficking, especially in North America, are not very transparent; therefore it is hard to evaluate the validity and reliability of the data.

The difficulties of conducting empirical research on human trafficking, including impeded access to trafficked victims, law enforcement representatives, and prosecutors, as well as the length of time it takes to conduct empirical research, have also contributed to the predominance of nonempirical research on trafficking in persons. Where empirical research does exist, it relies primarily on qualitative data. The scarcity of quantitative studies stems from both the scarcity of datasets on trafficking in persons in general and the difficulty gaining access to existing databases. The difficulty of conducting empirical research on different aspects of human trafficking, however, goes beyond lack of access to quality datasets; it is also related to the overall lack of access to key informants, including victims and survivors of human trafficking, as well as representatives of law enforcement, policymakers, and health (including mental health) and social service providers engaged in anti-trafficking activities and service provision to victims.

These hurdles are further compounded by the fact that trafficking research has overwhelmingly focused on sexual exploitation. For example, the NIJ literature review found 39 journal articles on human trafficking that relied on empirical evidence and only 3 (8 percent) of these articles were focused on labor trafficking. Roughly the same percentages held for the review of 429 official reports, with 383 (89 percent) focusing on sex trafficking.

---

[8] DiNicola, Andrea et al. (eds.), *Prostitution and Human Trafficking: Focus on Clients,* Springer, 2009.

**U.S. Department of Justice**
Office of Justice Programs



### Findings

As described above, NIJ collected data in 60 non-task-force jurisdictions through a multistage sampling approach to develop estimates of human trafficking in the U.S. The resulting analysis found that there is both confusion about how human trafficking is defined and a general lack of awareness of the issue in locations that did not have DOJ-funded human trafficking task forces. In general, law enforcement, prosecutors and service provider respondents could not:

- Differentiate between severe and non severe forms of human trafficking.
- Distinguish trafficking from smuggling.
- Differentiate domestic and international trafficking.
- Identify types of trafficking (sexual and labor).
- State the elements of trafficking.

Most respondents provided definitions that contained some elements of the federal definition of human trafficking in layman's language, but were not comprehensive, were overly inclusive or vague, or focused on smuggling and included the need for some form of transportation. Respondents in general were uncomfortable attempting to provide a number of victims, partly because they were uncertain about the number and partly because they were uncertain whether the behavior constituted human trafficking.

Absences of definitive data on the amount of domestic human trafficking reflected not only a lack of awareness, but an absence of recordkeeping systems that keep track of human trafficking investigations. Thus, in addition to training, law enforcement and service providing organizations need accurate recordkeeping systems if we are to gain a fuller picture of the extent of human trafficking victimization in the U.S.

Our examination of interagency linkages further suggested that communication gaps among agencies may be another obstacle to identifying cases of human trafficking. Frequently, law enforcement officers could not identify individual service providers with whom we might talk about human trafficking issues. Although social service providers readily identified local law enforcement, they were often reluctant to contact them. There was more communication among law enforcement agencies within individual counties and with their local prosecutors, but this was not necessarily the case regarding human trafficking. Local and federal law enforcement agencies sometimes worked cooperatively on human

U.S. Department of Justice
Office of Justice Programs



trafficking cases, yet a number of jurisdictions identified tensions and a lack of cooperation that hampered investigations and accurate recordkeeping.

In sum, law enforcement officials in most of the 60 sampled non-task-force jurisdictions did not report many cases of either labor or sex trafficking. The exact cause for this low prevalence is hard to determine. It may be due to the lack of a clear understanding of what constitutes human trafficking on the part of the law enforcement respondents, gaps in recordkeeping or a lack of communication among relevant law enforcement and community organizations. Alternatively, the low prevalence reported may be a valid indicator of the actual level of human trafficking. The non-task-force jurisdictions are, by definition, areas where we would not expect to find as many cases. In other words, the jurisdictions with task forces were specifically chosen because they were urban areas, were located near international borders, or had other characteristics that would indicate a higher prevalence of human trafficking. In fact, the NIJ-sponsored research in the non-task-force jurisdictions found that large metropolitan areas and, to a lesser extent, counties on international borders, were more likely to experience trafficking in persons than were other parts of the country. The remaining discussion will therefore focus on DOJ-funded task force jurisdictions where we did find more reliable information on human trafficking incidents.

**Question 1a: The estimated number and demographic characteristics of persons engaged in acts of severe forms of trafficking in persons**

The HTRS, developed by BJS and its partners, was able to collect information about both the suspects and victims associated with incidents of suspected human trafficking investigated by the task force jurisdictions over a 21-month period between Jan. 1, 2007 and Sept. 30, 2008. Although HTRS contains information on more than 1,200 incidents of suspected human trafficking, suspect and victim information were not available for each incident, as noted below. Nearly 900 suspects and more than 1,400 potential victims were identified by the task forces. Suspects were most likely to be older males (35 years or older) of black or Hispanic race/ethnicity although Asian suspects were more likely to be involved in labor trafficking than other races. While most suspects were U.S. citizens, about 24 percent were undocumented or qualified



aliens.[9] Potential human trafficking victims were overwhelmingly young females, particularly in incidents of sex trafficking. Potential victims were also very likely to be Hispanic, particularly among labor trafficking incidents. Slightly more than half of the potential victims were U.S. citizens (55 percent), while the remainder were either undocumented or qualified aliens.

*Suspects*

A total of 871 suspects were involved in alleged human trafficking incidents reported by task forces, with an average of 1.8 suspects per incident. Among incidents where the number of suspects was available ($N = 475$), 62 percent had one suspect, 34 percent had two to five suspects and 4 percent had six or more suspects. Labor trafficking incidents were more likely to involve more than one suspect (47 percent) compared to sex trafficking incidents (37 percent).

Task forces reported information on the characteristics of 543 suspects in 322 alleged human trafficking incidents. Nearly 8 in 10 suspects in alleged human trafficking incidents were male. In labor trafficking incidents, about a third (31 percent) of the suspects were female. More than a fifth (21 percent) of the suspects in sex trafficking incidents were female. Among the suspects for whom information on race and origin were reported, blacks represented the largest category (36 percent), followed by Hispanics (31 percent). Asians and whites accounted for 16 percent and 13 percent of human trafficking suspects, respectively. Asians constituted the largest category of labor trafficking suspects (37 percent), while blacks accounted for the largest percentage of sex trafficking suspects (44 percent). About 40 percent of suspects were age 35 or older, while 28 percent were age 18 to 24. Nearly two-thirds of labor trafficking suspects (65 percent) were 35 years old or older. U.S. citizens accounted for the largest percentage of all suspects (66 percent), followed by undocumented aliens (18 percent) and permanent residents (7 percent). Nearly three-quarters of sex trafficking suspects were U.S. citizens (74 percent), compared with more than a third of labor trafficking suspects (33 percent). About 40 percent of suspects in labor trafficking incidents were undocumented or qualified aliens.

---

[9] A qualified alien is one that the Department of Health and Human Services defines as eligible for means-tested benefits programs. For more information, see http://www.cms.hhs.gov/MedicaidEligibility/downloads/alien1.pdf.



*Victims*

A total of 1,442 victims were involved in alleged human trafficking incidents reported by task forces, with an average of 2.1 victims per incident. Among the incidents where the number of victims was available ($N = 665$), 71 percent had one victim, 23 percent had two to five victims and 6 percent had six or more victims. A little over a quarter of alleged sex trafficking incidents had multiple victims, while nearly half of all labor trafficking incidents had more than one victim.

Task forces reported information on the characteristics of 776 victims in 429 alleged human trafficking incidents. Over 90 percent of victims in alleged human trafficking incidents were female. Nearly 40 percent of victims of labor trafficking incidents were male, while 99 percent of sex trafficking victims were female. Among the alleged human trafficking victims for whom information on race and origin was reported, Hispanics accounted for the largest percentage (40 percent). Nearly equal percentages of victims were white (23 percent) or black (21 percent). Over half (56 percent) of labor trafficking victims were Hispanic. Asians represented 10 percent of sex trafficking victims and 31 percent of labor trafficking victims. Approximately two-thirds of human trafficking victims were either 17 years old or younger (27 percent) or 18 to 24 years old (38 percent). Twelve percent of human trafficking victims were 35 years old or older. Among sex trafficking victims, nearly a third (30 percent) were 17 or younger and 41 percent were 18 to 24 years old. Labor trafficking victims tended to be older than other human trafficking victims.[10] Almost 70 percent of labor trafficking victims were 25 or older. Of these victims, 28 percent were 35 years old or older. Slightly more than half (55 percent) of human trafficking victims were U.S. citizens, while the remainder were either undocumented (38 percent) or qualified (6 percent) aliens. Sixty-three percent of all sex trafficking victims, compared to 4 percent of labor trafficking victims, were U.S. citizens. Undocumented and qualified aliens accounted for 96 percent of labor trafficking victims.

Of the 232 incidents for which both suspect and victim information was available, a majority (65 percent) involved only male suspects and female victims. Of the incidents with suspect and victim information on citizenship status, 69 percent involved only citizens. In 58 percent of the 187 incidents for which data on race was available, suspects and victims were of the same race. In

---

[10] This finding is due in part to the fact that the TVPA and HTRS define any commercial sex act involving someone under the age of 18 as human trafficking.

**U.S. Department of Justice**
Office of Justice Programs



143 (68 percent) of the 212 incidents with available data on the ages of suspects and victims, all suspects and victims were in different age categories. Of these incidents, 125 involved at least one suspect 35 years old or older and at least one victim 17 years old or younger.

The data collected from non-task-force jurisdictions supported the observations from the HTRS. For example, the description of victims from the non-task force jurisdictions shows that victims of labor trafficking were as likely to be male as female, but that sex trafficking victims were predominantly female. Furthermore, most trafficking victims were under the age of 30. The race and ethnicity of victims were diverse, although Asian and Hispanic represented the highest number for each type of trafficking. Victims tended to be from other countries and were rarely U.S. citizens.

### Question 1b: The number of investigations, arrests, prosecutions and incarcerations of persons engaged in acts of severe forms of trafficking in persons by states and their political subdivisions

Only a small subset (9 percent) of all investigations reported in the HTRS had reached a point of review to determine that the case involved a confirmed human trafficking violation. Even fewer investigations yielded information about whether an arrest had been made, the case prosecuted or the suspect convicted. The data reported below therefore provide only a preliminary snapshot of the outcomes of the human trafficking investigations conducted by the task force jurisdictions during the reporting period. These data will continue to be updated in future reports.

Over the 21-month reporting period, task forces reported investigating 1,229 alleged incidents of human trafficking. About 78 percent of these incidents were still under investigation at the end of the reporting period. Investigations for the remaining 22 percent of cases were completed and closed during this period. As of Sept. 30, 2008, nearly 83 percent of the 1,229 reported incidents involved sex trafficking, 12 percent involved labor trafficking and 5 percent involved other or unknown types of human trafficking. Less than 10 percent of the alleged human trafficking incidents reported by task forces were confirmed as human trafficking, 10 percent were pending confirmation and 23 percent had been determined not to involve any human trafficking elements. The remaining cases

**U.S. Department of Justice**
Office of Justice Programs



(58 percent) lacked information on whether the alleged incident was a confirmed human trafficking case.[11]

Of the 1,160 alleged human trafficking incidents for which the type of investigating agency information was available, 83 percent involved a state or local law enforcement agency as the lead agency. Federal agencies were the lead investigating agency in about 16 percent of alleged human trafficking incidents, while victim service providers were the lead agency in 1 percent of human trafficking incidents. Federal agencies were the lead agency in 36 percent of alleged labor trafficking incidents, compared to 12 percent of alleged sex trafficking incidents. Fifty-seven percent of alleged human trafficking incidents were investigated by one agency, 32 percent by two or three agencies and 12 percent by four or more agencies. Nearly 80 percent of alleged labor trafficking incidents involved more than one investigating agency, compared to 37 percent of sex trafficking incidents.

Task forces reported arrest information for 216 of the 543 suspects in alleged human trafficking incidents. Sixty-eight percent of these suspects were arrested at the state level and 26 percent were arrested at the federal level. Task forces provided details on the charges filed against 140 human trafficking suspects. Among those suspects charged with human trafficking, 64 percent were charged in state courts and a third were charged in federal courts. Four suspects had charges filed against them in both state and federal courts.

Task forces reported court adjudication information for 113 human trafficking suspects. For these suspects, over half (61 of 113) were convicted of some offense, 6 suspects had their case dismissed and 46 suspects were awaiting adjudication. Sentencing information was reported for 45 human trafficking suspects. During the reporting period, 16 of these suspects (36 percent) were sentenced to probation, time served or prison or jail for less than one year, and 29 (64 percent) were sentenced to prison or jail for one year or more. Five suspects were sentenced to prison for more than 10 years.

---

[11] The large number of cases that lack information to be confirmed as human trafficking is due to the length of time it takes to investigate a case and collect the necessary information (78 percent of all incidents were still under investigation at the time of this report), as well as the specific criteria required to be confirmed as human trafficking as specified in the TVPA and adopted by HTRS.

**U.S. Department of Justice**
Office of Justice Programs



## STUDY 2:    SEX TRAFFICKING AND UNLAWFUL COMMERCIAL SEX ACTS

**The Congressional Mandate**

Study 2 addresses sex trafficking and unlawful CSAs in the United States and shall include, but need not be limited to:

   a. The estimated number and demographic characteristics of persons engaged in sex trafficking and CSAs, including purchasers of commercial sex acts.

   b. The estimated value in dollars of the commercial sex economy, including the estimated average annual personal income derived from sex trafficking acts.

   c. The number of investigations, arrests, prosecutions and incarcerations of persons engaged in sex trafficking and unlawful CSAs, including purchasers of commercial sex acts, by states and their political subdivisions.

   d. A description of the differences in the enforcement of laws relating to unlawful CSAs across the United States.

**What Is Currently Known About Unlawful CSAs and Sex Trafficking?**

The most commonly reported and researched unlawful CSA is prostitution. The research on unlawful strip clubs, peep shows or other commercial sexual venues is virtually nonexistent. Moreover, the degree to which prostitution and sex trafficking overlap as CSAs is difficult to determine due to insufficient specificity in the available data. Two main reasons exist for this shortfall. First is a simple lack of data specificity, wherein numerous law enforcement agencies and other potential respondents lump together all CSAs under the category of "vice" without any further details about the CSA. Second, as noted earlier, is a general confusion among respondents due to the use of numerous and varying definitions about sex trafficking when such definitions were known. In sum, research has not considered the totality of actors involved in unlawful CSAs and thus some of the topics in this study are incredibly difficult to specify.

Some research does exist, however, on unlawful CSAs that was responsive to the four questions Congress posed for this study. What does exist is a compilation of small-scale surveys and assessments, anecdotes, thought pieces and official government data, which together give us a snapshot of the demographics of



prostitutes and their clients and the number of arrests being made for CSA offenses. These data illustrate the importance of handling the issue in a comprehensive manner, based on empirical data, which addresses the health, social and legal consequences of unlawful CSAs. However, a constant theme throughout this study is the lack of definitive data due to the inherent difficulties in researching an illegal, mostly hidden operation with a population that is uncooperative for varying reasons.

As noted earlier, the sex trafficking literature is better developed. The research has approached a number of specific topics associated with sex trafficking, including a historical perspective, trafficking organization and operations, victim issues and comparative research. The historical sources identify how the current forms of sex trafficking are artifacts of earlier periods of trafficking and slavery. Another prominent topic is the organization and operation of trafficking groups, including the debate between specialized trafficking crime groups versus organized crime with trafficking as a component. The vast majority of these studies focus on trafficking as a form of organized crime or transnational organized crime. A third topic relates to the protection of and provision of services for victims of sex trafficking. A fourth set of studies focuses on the supply side or root causes of trafficking. These articles seek to identify the reasons why trafficking occurs from the origination side. The final set of topics is best described as comparative studies.

**Findings**

**Question 2a: What are the estimated number and demographic characteristics of persons engaged in sex trafficking and CSAs, including purchasers of CSAs?**

This section first discusses the larger context of supply and demand for sex trafficking and unlawful CSAs, then provides the estimated numbers and demographic characteristics of persons engaged in sex trafficking and CSAs. The response uses a broad definition of those engaged in sex trafficking and CSAs, and thus includes purchasers (e.g., johns) and organizers (e.g., pimps) as well as prostitutes and other providers of unlawful CSAs (including victims of sex trafficking). The response concludes with a comparison between persons involved in unlawful CSAs and those involved exclusively in sex trafficking.

Demand is primarily the result of sex buying and related activities from purchasers (i.e., johns), pressure from other beneficiaries (i.e., pimps, brothel

**U.S. Department of Justice**
Office of Justice Programs



owners) and permissive cultures that tolerate both.[12] Due to limited research conducted across time on this issue, there are only rough estimates of the scope of unlawful CSAs and sex trafficking.

In 1992, the National Health and Social Life Survey (NHSLS) collected data on sexual behavior among a probability sample of adults who were 18 to 59 years old. The survey concluded that 16 percent of adult men had ever paid for sex in their lifetime, and only about 0.6 percent of men in the U.S. visit prostitutes each year.[13] The response to demand is one of the primary reasons behind those who participate in unlawful CSAs and sex trafficking. Others include economic incentives, lack of viable alternative employment and patriarchal social forces.

A 2005 study on the state of Kentucky provided separate estimates for annual supply in various forms of CSAs:

- 200 to 400 street prostitutes.
- 48 massage parlors that engaged in prostitution.
- 54 escort services.
- 64 gentlemen's clubs.

Another study presents data considered to be a rough proxy for the numbers of prostitutes operating in each state. According to these figures, which are based on the FBI's 2000 Uniform Crime Report (UCR) statistics, a significant range exists from no arrests of prostitutes in North Dakota to high numbers of arrests per capita in states such as Nevada, New York, Arizona and California.[14] Taken together, these estimates are informative but are too disparate to be of use in drawing conclusions about the prevalence of unlawful CSAs.

Looking at sex trafficking specifically, the HTRS provides some more context. Of the 1,229 total incidents of human trafficking logged into the HTRS in 2007 and 2008, there were 1,018 incidents of sex trafficking (82.8 percent).

---

[12] Monto, Martin, *Focusing on the Clients of Street Prostitutes: A Creative Approach to Reducing Violence Against Women – Summary Report,* submitted to the National Institute of Justice October 30, 1999, citing the National Health and Life Survey 1992.

[13] Sullivan, Elroy, and William Simon, "The Client: A Social, Psychological and Behavioral Look at the Unseen Patron of Prostitution," in *Prostitution: On Whores, Hustlers and Johns,* eds. James Elias et al., Prometheus, 1998.

[14] Moffatt, Peter, "Economics of Prostitution," in *Economics Uncut: A Complete Guide to Life, Death and Misadventure,* ed. Simon Bowmaker, Edward Elgar Publishing, 2005: 199–200.

**U.S. Department of Justice**
Office of Justice Programs



*Purchasers: Demographic Characteristics*

There have been some gains in recent years in research on the purchasers of unlawful CSAs and sex trafficking.[15] The reasons why men, who remain the overwhelming source of demand, seek prostitutes are various and complex. The most comprehensive analyses of purchasers stem from a series of studies produced from a survey of 1,342 "John School" participants in San Francisco, Santa Clara, Las Vegas and Portland. The studies provide useful answers to two important questions: who purchases sex and why.

No one demographic profile of purchasers exists, but some tendencies arise from the data.[16] The survey of John School participants found that whites were the majority of purchasers, although minorities comprised 40 percent of purchasers in San Francisco and Las Vegas — results that tended to mirror the ethnic composition of the cities. The age range of those in the John School program ranged from 18 to 84, with a mean age of 38. The age range of the first purchase of sex ranged from 9 to 62, with an average age of the first prostitution encounter at 24.[17] In terms of frequency, 20 percent claimed not to have been with a prostitute,[18] 21 percent claimed they had not purchased sex within the last year, 28 percent claimed to have had at least one sex purchase in the past year, and 10 percent claimed to purchase sex more than once a month.

When the results of the survey of John School participants were compared to a nationally representative sample of all men from the General Social Survey (GSS), they revealed differences between purchasers and other men. Purchasers typically have some college education (usually more than the general population), dispelling the notion that purchasers most often have working class backgrounds.[19] Purchasers were less likely to report being married than men in the GSS (56 percent compared to 41 percent) and were more likely to report never having been married before (37 percent compared to 29 percent). Purchasers reported having less frequent consensual sexual relations over the past year than the national sample, but were twice as likely to have viewed pornographic movies than the general population. Purchasers were not more

---

[15] All statistics in this section are found in Monto 2000 unless otherwise indicated.
[16] Monto 2000.
[17] Ibid.
[18] Given that these men were arrested in the process of soliciting sex, this statistic is likely representative of first-time purchasers who were unable to purchase sex prior to arrest.
[19] Monto 2000; Holzman, Harold, and Sharon Pines, "Buying Sex: The Phenomenology of Being a John," *Deviant Behavior* 4 (1982).



likely than the general population to have been victimized or come from broken homes.[20]

Some localized studies have also revealed useful demographic characteristics concerning sex purchasers. In 2004, a survey of 159 "bar going" men in Chicago revealed that 129 (81 percent) had been at a "sex trade venue" at one stage of their life.[21] Of these 129, 67 percent of purchasers were white and 15 percent were black; there were no significant differences reported between purchasers and nonpurchasers in terms of race. The most common sex trade venue was a strip club. Some 33 percent of the men stated that they had frequented sex trade venues more than 10 times in their lifetime, and the mean age of these frequent purchasers was 34. Purchasers averaged two sex trade venues overall. Purchasers learned of sex trade venues mostly through word of mouth.

Turning to the why question, many common beliefs were confirmed in the survey. Overall, purchasers exhibited a sense of entitlement to sex. Purchasers reported being excited by the illicit, risky and raunchy nature of purchasing sex. Some purchasers reported seeking a different form of sex than with their regular partner. Others reported having difficulties with conventional relationships.

*Procurers/Pimps/Brothel Owners: Demographic Characteristics*

There is no reliable information that allows for an estimation of the number of pimps, brothel owners and other organizers of unlawful CSAs and sex trafficking, likely because these populations represent the least studied role in the commission of unlawful CSAs and sex trafficking. Much of the existing work is fraught with severe methodological issues, not least of which is small sample sizes. This lack of information is also attributed to the reluctance of pimps to cooperate with researchers due to the illegal nature of their actions and/or fear of apprehension. Additionally, the gatekeeper role played by most

---

[20] Monto and McRee 2005; Sullivan and Simon 1998; Preston, Pamela, and Alan Brown-Hart, "John Court: Comparison of Characteristics, Sexual Behavior and Sexual Attitudes of Clients and Prostitutes," *Journal of Ethnicity in Criminal Justice* 3 (2005).

[21] Chicago Coalition for the Homeless, *Buying Sex: A Survey of Men in Chicago,* 2004. Available at: http://www.issuelab.org/click/download2/buying_sex_a_survey_of_men_in_chicago/buyingsex. pdf. For the survey, a "sex trade venue" was defined on page 2 of the report as including "street level prostitution, strip clubs (with or without physical/sexual contact), escort services, massage parlors where sexual services are an offer, private parties (such as bachelor parties) where lap dancing or sexual contact are an offer, and the solicitation of sexual services (for money or things of value) in non-street, indoor venues such as drug houses."

**U.S. Department of Justice**
Office of Justice Programs



pimps prevents researchers from interviewing prostitutes about interactions with their pimps.[22]

There is some research that provides tentative answers to one of our most basic research questions about pimps: How do they operate? According to the few studies that have been conducted in this area, approximately half of all prostitutes have a pimp, and those pimps use violence to control the prostitutes.[23] The initial process of introducing a girl or woman to the world of prostitution often involved developing emotional relationships or economic ties, or the use of outright coercion or sex, all of which helped the pimps retain control over prostitutes and their earnings.[24]

At least one research project's findings support the position that street prostitutes with pimps experience greater amounts of violence than those without pimps.[25] Approximately 45 percent of those with pimps had suffered verbal violence as opposed to 27 percent without a pimp. Similar trends held for physical violence (15 percent compared to 6 percent) and attempted rape by purchasers (15 percent compared to 7 percent). Two possible explanations were provided. First, the pimp-controlled prostitutes were more likely to be addicted to heroin, and therefore may have been easier targets for violent customers. Alternatively, those same women may have exposed themselves to more risk (i.e., riskier purchasers) as a result of the pressure to meet a certain quota each night for their pimp.[26]

Other research findings reveal a high prevalence of pimp-administered physical violence that ranged from 66 percent to 100 percent.[27] On the other hand, only

---

[22] Williamson, Celia, and Terry Cluse-Tolar, "Pimp-Controlled Prostitution," *Violence Against Women* 8 (2002): 1090.

[23] Estes, Richard, and Neil Weiner, "The Commercial Sexual Exploitation of Children in the United States," in *Medical, Legal, and Social Science Aspects of Child Sexual Exploitation* (GW Medical Publishing), eds. Sharon Cooper et al., 2005: 60. Silbert, Mimi, and Ayala Pines, "Sexual Child Abuse as an Antecedent to Prostitution," *Child Abuse and Neglect* 5 (1981). Maureen Norton-Hawk, "A Comparison of Pimp- and Non-Pimp-Controlled Women," *Violence Against Women* 10 (2004): 189. Sterk, Claire, and Kirk Elifson. "Drug-related Violence and Street Prostitution," in *Drugs and Violence: Causes, Correlates, and Consequences,* eds. Mario DeLaRosa et al., National Institute on Drug Abuse Research Monograph 103,  NIH Pub. No. 94-3715 (1990): 216.

[24] Weitzer, Ronald, "New Directions in Research on Prostitution," *Crime, Law, and Social Change* 43 (2005): 227.

[25] Norton-Hawk 2004: 189.

[26] Norton-Hawk 2004: 193.

[27] Silbert and Pines 1981. Sterk and Elifson 1990: 216. Tiggey May et al., *For Love or Money: Pimps and the Management of Sex Work,* Police Research Series Paper 134 (U.K. Home Office), 2000: 18.



one study was related to violence pimps experienced in prostitution-related homicides. After examining nine different homicide datasets over a period of several decades, only 20 homicides were located in which a "known" pimp was the victim.[28]

### Prostitutes: Demographic Characteristics

Some of the scientifically rigorous studies of prostitutes, including sex trafficking victims, have focused on small geographic locales such as cities and revealed demographic profiles of prostitutes in those areas. Well over half of the prostitutes in a study of Chicago had started as juveniles or before their eighteenth birthday.[29] A study in San Francisco found that 78 percent of street prostitutes reported starting as juveniles, with 60 percent starting when they were 16 years old or younger.[30] For those who began as juveniles, 53 percent had household members who engaged in prostitution. The Chicago study also found a higher prevalence of drug use, multiple prostitution venues and health problems.

The intersection of prostitution and drug use is a common theme and thus is important to recognize as a demographic characteristic. Another study demonstrated that drug use among juveniles was strongly related to entry into prostitution.[31] In Houston, prostitution arrestees were 27 percent more likely to test positive for at least one drug than other female arrestees.[32] The direction or existence of a causal link between drug use and prostitution has been elusive. Some research suggests that differences exist in both offender types. Whereas using crack cocaine has been found to be related to a greater frequency of prostitution and a greater likelihood of prostitution among younger women, the positive relationship did not appear for use of other illicit drugs.[33]

The prevalence of localized home life factors illustrates some of the unique circumstances in which prostitutes (or those at risk to become prostitutes) find themselves. For women participating in the Chicago study, 71 percent recalled

[28] Brewer, Devon et al., "Extent, Trends and Perpetrators of Prostitution-Related Homicide in the United States," *Journal of Forensic Science* 5 (2006): 1005.
[29] Ibid.
[30] Silbert and Pines 1981.
[31] Raphael, Jody, and Deborah Shapiro, *Sisters Speak Out: The Lives and Needs of Prostituted Women in Chicago*, Center for Impact Research, 2002.
[32] Yacoubnia, George et al., "A Comparison of Drug Use Between Prostitutes and Other Female Arrestees," *Journal of Alcohol and Drug Education* 46 (Winter 2000).
[33] Maxwell, Sheila, and Christopher Maxwell, "Examining the 'Criminal Careers' of Prostitutes within the Nexus of Drug Use, Drug Selling and Other Illicit Activities," *Criminology* 38 (2000).



they had friends or knew people in their neighborhoods who regularly exchanged sex for money. Some 45 percent of women in the study also reported that a friend had suggested prostitution to them.

Different forms of prostitution are often associated with different demographic profiles. Differentiation in ethnic groups between street and off-street prostitution was found.[34] For instance, Asian women, while generally not prevalent in any studies of street prostitution, are present in higher numbers in the hidden parts of the sex market, such as massage parlors.[35] Other works have highlighted the differences between indoor and street prostitutes, suggesting the stratified and hierarchical nature of prostitution as a profession.[36] In other ways, indoor prostitution may pose just as great if not a greater danger to the welfare of the women involved in this trade. While studies have shown that indoor prostitutes receive more pay, there is also an understanding that trafficking rings may operate indoors in areas with a large demand for prostitution.[37] Therefore, there may be a greater likelihood that women from indoor prostitution rings are actually victims of trafficking, concealed even further than the typical street prostitute.

Violence and victimization are important components of any demographic profile of prostitution. Many women become targets of violence and other forms of victimization such as robbery and rape. Compounding this is the fact that violence and other crimes committed against prostitutes are rarely reported to the police.[38] Research has shown that the most common perpetrators of violence against prostitutes are the other two primary actors in this illicit trade — pimps and clients. Other research has shown that victimization is a common occurrence in the lives of prostitutes prior to and throughout their years as prostitutes. Roughly half of the women in the Chicago study had been victims of violence while growing up in their homes. A small-scale study of prostitutes in St. Paul, Minn. also found frequent victimization, including assault and rape by clients

---

[34] Lever, Janet, and David Kanouse, "Using Qualitative Methods to Study the Hidden World of Offstreet Prostitution in Los Angeles County," in *Prostitution: On Whores, Hustlers and Johns,* eds. James Elias et al., Prometheus, 1998.
[35] Research has shown that African-American women are overrepresented in prostitution (Farley and Kelly 2000).
[36] Weitzer, Ronald, *Sex for Sale: Prostitution, Pornography, and the Sex Industry,* Routledge, 2000.
[37] Potter 2005.
[38] McKeganey, Neil, and Marina Bernard, *Sex Work on the Streets: Prostitutes and Their Clients* Open University Press, 1996. Silbert and Pines 1981.

**U.S. Department of Justice**
Office of Justice Programs



and victimization prior to their entering the sex trade.[39] Earlier research had similar findings, adding that many prostitutes accept violence as part of their life, suggesting a psychological component to the cycle of violence and victimization.[40]

*Comparison Between Persons Involved in Sex Trafficking and Unlawful CSAs*

OJP collected data from eight non-task-force jurisdictions to explore whether perpetrators and victims of trafficking are similar to populations involved in unlawful CSAs. Data were collected from law enforcement agencies in the eight selected counties through a series of questions designed to try to locate differences between sex trafficking and unlawful CSAs. The survey revealed that there was little if any difference between the two in terms of perpetrators, other participants or even investigative approaches to sex trafficking and unlawful CSAs. Perpetrators tended to be male with some women perpetrators in both trafficking and CSAs, although more women were found to be involved in the operation of CSA-related brothels or massage parlors. Women were the main participants in unlawful CSAs, similar to the profile of trafficking victims. Men served as the main source of demand for both sex trafficking and CSAs. In terms of age, victims of sex trafficking tended to be younger than those involved in CSAs. Perpetrators of sex trafficking mirrored those in CSAs, ranging from 20 to 49 years old and age did not serve as much of a difference between purchasers in sex trafficking or CSAs.

Other demographic identifiers did not prove useful in segregating participants in trafficking and CSAs. While some differences were noted in the literature, they more often than not were based on too few observations to make generalizations. For example, researchers have found that service providers and others are reluctant to discuss race for fear of racially profiling trafficking victims and those involved with unlawful CSAs. Thus, race did not serve as a useful category of comparison. Residence and locality also did not serve to segregate participants. Both sex traffickers and CSA perpetrators tended to be mobile. Sex traffickers, while overwhelmingly foreign, tended to establish themselves in a locality, grew to understand how it operated, stayed in the locality for a while and then moved on to a new locality. Victims tended to be from outside the

---

[39] Parriot, Ruth, *Health Experiences of Twin Cities Women Used in Prostitution: Survey Findings and Recommendations* (May 1994). Available at: http://www.angelfire.com/mn/fjc/healthex2.html.
[40] Silbert and Pines 1981.



locality in both sex trafficking and CSAs, while purchasers were almost exclusively local.

Another similarity between sex trafficking and unlawful CSAs is the growing use of a common investigative strategy for both. As advertising on the Internet has become the main form of locating demand for sex trafficking and unlawful CSAs, law enforcement has made the Internet the central tool for investigating both crimes. Moreover, law enforcement is increasingly focusing on the identification of juveniles involved in prostitution and escalating efforts to remove them as victims rather than arrest them as perpetrators, reflecting a shift in thinking already established in the investigation of sex trafficking cases. In general, law enforcement did not indicate a different strategy for investigating unlawful CSAs as opposed to sex trafficking.

**Question 2b: What is the estimated value in dollars of the commercial sex economy, including the estimated average annual personal income derived from acts of sex trafficking?**

Estimations of the size and value of the commercial sex industry are very difficult to derive for a host of reasons, including the inability to survey clandestine populations, lack of database development and limited funding for a national study. However, NIJ explored the possibility of a more accurate estimation at the local level among a representative sample of non-task-force jurisdictions.[41] Respondents to the survey were asked to identify the three most likely locations in which CSAs and sex trafficking were occurring in their jurisdiction. Respondents were then asked to provide their best estimate of the overall number of locations where these illegal activities took place, the average number of purchases that occurred at each location in a 24-hour period and the cost of each purchase.

The survey collected this information from local law enforcement agencies located in 60 counties across the nation. Overall, the analysis noted that the size and value of the illicit economy varied widely across counties. This suggests that it is difficult to extrapolate a national estimate using sampled county-level data. The survey further corroborated the findings through conversations with law enforcement, many of whom were not confident in even their own rough

---

[41] Ibid., at 52-4. The authors of the study note that this is not a scientific enumeration but rather a rough estimation from local experts.



estimates. Therefore, the following data, which were derived from one of the non-task-force jurisdictions and, are presented for illustrative purposes only.

The jurisdiction provided data on three major types of CSAs. The first major group of locations was prostitution in illegal massage parlors. The jurisdiction reported that profits from one CSA averaged $20 per hour plus $40 in tips, and that the money was either split with madams or kept entirely by the prostitutes. The typical spa would have 10 purchasers per day. Thus, the daily yield for a spa was $600 [10 one-hour transactions ($200) plus 10 tips ($400)]. Per annum, therefore, a spa can earn approximately $218,400 from unlawful CSAs. Since the county in question had 10 of these spas, the annual intake from unlawful CSAs in massage parlors and spas could be $2.2 million annually.

Similar numbers were found in "high-end" prostitution and illegal escort services, a second major location for unlawful CSAs and sex trafficking. The ledger of one prostitute who kept meticulous records on purchasers provided the amount charged, tips and other information. In this particular case, which may not be representative of all high-end prostitutes, the prostitute traveled up and down the east coast. She never grossed less than $9,000 in a given day and earned approximately $1 million per year.

The numbers grow larger when we consider street prostitution. Looking at one county as an illustration, the survey noted that on any given night roughly 50 prostitutes worked one of three street corners in the county. Prices were $20 for oral sex, $40 for vaginal sex and $60 for both. Assuming 10 purchases per day for a total of 500 transactions per day (broken down into 50 oral sex, 150 vaginal sex and 300 involving both), the total daily earnings for street prostitution in the county was $25,000. Per year, this totaled $9.1 million.

Totaling the earnings for all three types of CSAs, the commercial sexual enterprise amounted to $10.2 million per annum for one jurisdiction. Two cautions are in order. First, these numbers likely underestimate the true size of the commercial sexual economy in this specific county. For example, the estimate only included one "enterprise" to represent each for the three types of CSAs. Second, these numbers cannot be generalized to other counties. It would be necessary to collect area-specific data to determine a national estimate.

Other research used three separate online sources, none of them relying on official records, to estimate income earned in the commercial sex industry in the



state of Kentucky.[42] The study developed separate estimates for street prostitution, massage parlors, escort services and gentlemen's clubs. A minimum estimate for combined income across all types of service providers was $108 million, though the study suggests that the true figure could be several times larger.[43]

In sum, the available research, acknowledging reluctance of participants to disclose details of their finances, reveals little dispute that the average personal income for those persons involved in unlawful CSAs is well above the wages of low-skilled workers in legitimate employment situations. Some studies have attempted to explain this large variation in prices paid for unlawful CSAs.[44] One study cites differing physical and social attributes of providers, the level of "dedication" in performance and the use of higher prices as screening devices. Higher prices are associated with a lower probability of adverse effects, such as disease or detection.

**Question 2c: What is the number of investigations, arrests, prosecutions and incarcerations of persons engaged in sex trafficking and unlawful CSAs, including purchasers of CSAs, by states and their political subdivisions?**

Unlawful CSA laws, ordinances and regulations differ greatly across jurisdictions. Vice enforcement is currently the only available data source on this topic, and thus we are unable to differentiate data for different forms of unlawful CSAs, including sex trafficking. The Law Enforcement and Management Administration Statistics (LEMAS) collection solicits information on vice enforcement, which at least partially (and in some police departments largely) accounts for differential enforcement, or resource allocation and operational attention to, combating unlawful CSAs. Among the 2,858 police agencies sampled by LEMAS, only 63.1 percent reported vice enforcement as a primary function by U.S. police agency types. Table 2 shows that vice enforcement is a primary focus at the local level of law enforcement except in tribal areas.[45]

**Table 2**

---

[42] Potter 2005: 3.
[43] Ibid., at 11.
[44] Moffatt 2005: 195.
[45] Tribal areas often lack police agencies, and the police agencies within those areas are often lacking in resources and manpower to undertake numerous functions simultaneously. See Stewart Wakeling et al., *Policing on American Indian Reservations*, NIJ Award No. 95-IJ-CX-0086, 2001. Available at: http://www.ncjrs.gov/pdffiles1/nij/188095.pdf .

**U.S. Department of Justice**
Office of Justice Programs



**Vice Enforcement by Law Enforcement Agency Type**

| Agency Type | Does Agency Identify Vice Enforcement as Primary Responsibility or Regular Basis Function? | | |
|---|---|---|---|
| | Sample Size | Yes | No |
| Sheriff's Office | 863 | 54.7% | 45.3% |
| County Police | 39 | 87.2% | 12.8% |
| Municipal Police | 1889 | 67.8% | 32.2% |
| Primary State Agency | 49 | 30.6% | 69.4% |
| Tribal Police | 17 | 17.6% | 82.4% |
| Regional Police | 2 | 0.0% | 100.0% |

*Source: Law Enforcement Management and Administration Statistics (LEMAS): 2003 Sample Survey of Law Enforcement Agencies*

**Table 3**
**Vice Enforcement by Law Enforcement Agency Size**

| Agency Size (Full-Time Sworn Officers)[46] | Does Agency Identify Vice Enforcement as Primary Responsibility or Regular Basis Function? | | |
|---|---|---|---|
| | Sample Size | Yes | No |
| 0 – 50 | 1,587 | 49.3% | 50.7% |
| 51 – 100 | 390 | 76.9% | 23.1% |
| 101 – 250 | 530 | 82.3% | 17.7% |
| 251 – 500 | 190 | 82.6% | 17.4% |
| 501 – 1,000 | 79 | 75.9% | 24.1% |
| Over 1,000 | 82 | 82.9% | 17.1% |

*Source: Law Enforcement Management and Administration Statistics (LEMAS): 2003 Sample Survey of Law Enforcement Agencies*

Table 3 shows that the lack of focus on vice enforcement mainly exists within small agencies, but that these smaller agencies comprise the vast majority of law enforcement agencies nationwide. Only half of the law enforcement agencies with 50 or fewer full time employees included vice enforcement as a primary or regular function, but at least three-quarters of agencies with 51 or more full time employees included vice as a primary or regular function. The vast majority (87

---

[46] Numbers based on 2,858 U.S. police agencies. A random sample was drawn of all small agencies (less than 100 full-time sworn officers) and all large agencies (100 or more full-time sworn officers) were surveyed. For more information on the LEMAS survey methodology, see http://www.icpsr.umich.edu/cocoon/ICPSR/STUDY/04411.xml#methodology.

**U.S. Department of Justice**
Office of Justice Programs



percent) of police agencies in the United States employed 50 or less full-time employees.[47]. The size of an agency, therefore, makes a difference in whether or not it will address unlawful CSAs as a part of its regular duties or as a primary focus of its mission.

Data across 12 years from the FBI's UCRs show a national trend toward a reduction in prostitution arrests (see table 4). Because the UCR data rely on crimes reported to police, arrest rates and law enforcement agency reporting to the FBI, they are generally accepted as an underestimate of the actual amount of crime, particularly for those crimes where victims may be less likely to file a police report. The UCR arrest rate for prostitution, however, does provide some estimate of the prevalence of CSAs known to police nationwide. A major spike in the arrest rate occurred in 2004, warranting further investigation. This spike was not replicated in the total male arrest rate and the arrest rate for males 18 year old and older.

**Table 4**
**Persons Arrested for Prostitution and Commercialized Vice**

| Year | Arrests |
|------|---------|
| 1995 | 97,700 |
| 1996 | 99,000 |
| 1997 | 101,600 |
| 1998 | 94,000 |
| 1999 | 92,200 |
| 2000 | 87,620 |
| 2001 | 80,854 |
| 2002 | 79,733 |
| 2003 | 75,190 |
| 2004 | 90,231 |
| 2005 | 84,891 |
| 2006 | 79,673 |
| 2007 | 77,607 |

*Source: FBI, Crime in the United States, 1995–2007, Table 29.*

The statistics from the UCRs also suggest that there is either a difference in the incidence of prostitution by state or that policing tactics across the states result in different arrest rates. A listing of rates of arrests for prostitution and other

---

[47] Reaves, Brian, *U.S. Census of State and Local Law Enforcement Agencies, 2004,* U.S. Department of Justice, Bureau of Justice Statistics, 2007, NCJ 212749. Available at: http://www.ojp.usdoj.gov/bjs/pub/pdf/csllea04.pdf.

**U.S. Department of Justice**
Office of Justice Programs



unlawful CSAs by state vary widely (see table 5). Although there is no available research that adequately identifies the cause of these differences, some differences noted in the literature are explored in more depth in the response to question 2d below.

Any conclusions drawn from UCR data should be taken with caution, however. The data are based on voluntary reporting from law enforcement agencies and do not represent all arrests. Trends in prostitution arrest data can be masked by trends in other crimes that often co-occur with prostitution, such as drug crimes, as the UCR will only report the "top" charge from each event and prostitution is most often the "lowest" charge in the UCR's hierarchy. Furthermore, "prostitution and commercialized vice" is a crime category that can include prostitution, transporting and procuring women for the purposes of sex, and certain pornography offenses.

**U.S. Department of Justice**
Office of Justice Programs



**Table 5**
**Arrests for Prostitution and Commercialized Vice by State (2005)**

| State | Arrest Rate per 100,000 pop | State | Arrest Rate per 100,000 pop |
|---|---|---|---|
| Nevada | 192 | New York | 18 |
| Illinois | 172 | Delaware | 17 |
| Georgia | 50 | Utah | 16 |
| Minnesota | 44 | Connecticut | 16 |
| Tennessee | 44 | Arkansas | 14 |
| California | 39 | Massachusetts | 14 |
| Indiana | 39 | Oklahoma | 14 |
| Missouri | 35 | Virginia | 13 |
| Maryland | 34 | Rhode Island | 13 |
| Hawaii | 33 | West Virginia | 11 |
| Florida | 32 | Nebraska | 9 |
| Arizona | 30 | Iowa | 8 |
| Washington | 29 | New Hampshire | 7 |
| New Jersey | 28 | Mississippi | 4 |
| Texas | 27 | Alabama | 4 |
| Pennsylvania | 24 | Wisconsin | 3 |
| New Mexico | 21 | Maine | 1 |
| Colorado | 20 | South Dakota | 1 |
| Ohio | 20 | Kansas | 1 |
| South Carolina | 19 | Wyoming | 1 |
| Alaska | 19 | Idaho | <1 |
| Kentucky | 19 | Montana | <1 |
| Oregon | 19 | Vermont | <1 |
| North Carolina | 18 | North Dakota | <1 |
| Louisiana | 18 | DC | <1 |
| Michigan | 18 | | |

*Source: FBI, Crime in the United States, 2005, Table 69.*

The HTRS contained more specific information concerning arrests and
adjudication of sex trafficking cases between state and federal agencies
participating in task forces. Overall, states were more active than federal
agencies in making arrests and charging suspects through the task forces. Of 180

**U.S. Department of Justice**
Office of Justice Programs



suspects arrested for sex trafficking, state agencies apprehended 149 suspects (83 percent). Out of 118 suspects charged by prosecuting agencies, states charged 88 suspects (75 percent).[48]

## Question 2d: What are the differences in the enforcement of laws relating to unlawful CSAs across the U.S.?

By the end of December 2008, 39 states had adopted human trafficking statutes, although standardization and comprehensiveness vary across states. In states with anti-trafficking laws, law enforcement officials were marginally more proactive in identifying and investigating traffickers then those states without state statutes. Findings from non-task force jurisdictions, however, demonstrated that prosecutors were often reluctant or unable to prosecute under available trafficking statutes, noting the difficulty associated with prosecuting and obtaining a conviction on trafficking charges. In states without trafficking statutes, prosecutors tended to charge under other criminal statutes such as false imprisonment, abduction, involuntary servitude, peonage, money laundering, extortion, kidnapping and enticement/kidnapping into slavery.

The presence or absence of state legal codes, and the differences among them, have had a definitive impact on how state and local law enforcement and service providers perceive human trafficking. In those states with human trafficking laws, law enforcement and service providers tended to identify trafficking more readily. For example, we collected data from 406 cases of crimes that are closely associated with sex trafficking (i.e., kidnapping) from non-task-force jurisdictions in four states — two with anti-trafficking laws and two without. Of the 35 cases (9 percent) that contained elements suggestive of sex trafficking, 77 percent came from states with anti-trafficking laws on the books.[49]

The manner in which most of these 35 cases came to the attention of the authorities might explain the disproportionate results. Most were the result of proactive law enforcement strategies, with 43 percent derived from vice operations. All of the cases that showed signs of trafficking in those states without anti-trafficking laws were the result of reactive policing, such as responding to calls from the public or from trafficking victims themselves. Law enforcement in states with anti-trafficking laws tended to have more training to recognize and respond to trafficking than law enforcement agencies in states

---

[48] This number includes those suspects who state agencies apprehended directly and those who they apprehended in concert with federal partners.
[49] NORC 2008: 46.

**U.S. Department of Justice**
Office of Justice Programs



without such laws. Likewise, states with trafficking laws tended to have law enforcement officers who write incident reports that provided more detail about potential trafficking cases than in states without laws.

Within those states with legal codes, one of the more problematic issues for law enforcement was their definition of sex trafficking. The definitions of sex trafficking varied widely across state and local law enforcement agencies. While some agencies were aware of the federal definition of trafficking or the definitions established in state legal codes, most jurisdictions continued to equate trafficking with alien smuggling. The reason for this conflation is the belief that transportation is a requirement for trafficking. Many jurisdictions did not have a policy on trafficking and thus have not defined it as a criminal offense. Some of the responses that law enforcement agencies gave when asked to define human trafficking included: "illegals brought from Mexico by someone bringing them here for illegal purpose," "bringing females into the U.S. with the intent to prostitute them" and "slavery." Finally, law enforcement agencies did not separate sex trafficking from other forms of unlawful CSAs. For example, while the involvement of juveniles in prostitution was noted, it was rarely understood as a form of sex trafficking.

### *Different Strategies for Investigating Unlawful CSAs and Sex Trafficking*

Local law enforcement agencies have tried various approaches to police unlawful CSAs and sex trafficking. Empirical findings of police tactics to deter and reduce unlawful CSAs, specifically prostitution, include use of closed-circuit television (CCTV) for shaming, broken windows policing tactics, vehicle-based reduction efforts and undercover operations. None of these tactics are evidence-based or widespread, limiting the ability to determine their effectiveness in a comparative way.

One tactic, which has been particularly popular for crime prevention in the United Kingdom and is increasingly common in U.S. communities such as Washington, D.C., is the use of CCTVs in public places. The use of CCTVs for the enforcement of unlawful CSAs such as prostitution helps police identify and arrest both purchasers and prostitutes, and it serves as a deterrent to individuals who would be shamed by their offense. Other popular shaming tactics include releasing the pictures of purchasers to the community (sometimes via Web

**U.S. Department of Justice**
Office of Justice Programs



sites),[50] using television ads to reveal prostitution offenders[51] or posting billboards that list the names of individuals arrested for soliciting prostitutes.[52]

Recognizing the importance of vehicle usage in prostitution (mostly, but not solely, street prostitution), law enforcement agencies have taken various vehicle-based approaches to reducing prostitution. Traffic schemes and restrictions, in particular, have been a commonly used tactic to reduce prostitution in parts of London. Evidence suggests that the effectiveness of such approaches is contingent on both the design and the length of the restrictions.[53] Traffic schemes are not the only vehicle- or client-based approach to reducing prostitution. Police departments in the U.S. can impound vehicles used for picking up prostitutes. The impoundment results in a large fine and an inconvenience to the owner of the vehicle. Often, traffic schemes and impoundment of vehicles are used in conjunction with other tactics, such as increased fines, heavy policing of problem areas and even intervention programs.

Some of the more proactive tactics that are distinctly aimed at reducing prostitution problems include shows of force and use of undercover operations.[54] Undercover operations have been successful, particularly those using women officers as decoys. In Savannah, Ga., prostitute decoys rounded up 22 purchasers in just the first week of the operation. These operations, however, can be very resource intensive, making them difficult to sustain for long periods of time.[55] Further, many of the tactics described here are used to reduce street prostitution

---

[50] Scott, Michael, and Kelly Dedel, *Street Prostitution, 2nd Edition*, Office of Community Oriented Policing Services Award Nos. 1999-CK-WX-K004 and 2005-CK-WX-K001, November 2006. Available at: http://www.cops.usdoj.gov/files/RIC/Publications/e10062633.pdf.
[51] American Prosecutors Research Institute (APRI), *Unwelcome Guests: A Community Prosecution Approach to Street Level Drug Dealing and Prostitution,* BJS Award No. 2000-PP-CX-K0001, August 2004. Available at: http://www.ndaa.org/pdf/unwelcome_guests_04.pdf. Weisel, Deborah, *Street Prostitution in Raleigh, North Carolina,* Office of Community Oriented Policing Services Award No. 2001-CK-WX-K051, August 2004. Available at: http://www.popcenter.org/library/researcherprojects/streetprostitution.pdf. Dodge, Mary, Donna Starr-Gimeno, and Thomas Williams, "Puttin' on the Sting: Women Police Officers' Perspective on Reverse Prostitution Assignments," *International Journal of Police Science and Management* 7 (2004). Also see http://www.denvergov.org/purchaserstv for an example.
[52] Hubacher, Art, "Every Picture Tells a Story: Is Kansas City's John TV Constitutional?" *Kansas Law Review* 46 (1998).
[53] Benson, Catherine, and Roger Matthews, "Police and Prostitution: Vice Squads in Britain," in *Sex for Sale: Prostitution, Pornography and the Sex Industry,* ed. Ronald Weitzer, Routledge, 2000.
[54] Weisel 2004; Dodge et al. 2004.
[55] Weisel 2004.



and may not be applicable to off-street prostitution such as brothels or illegal escort services.[56] A focus on street tactics implies that police departments view off-street prostitution as less of a problem or not a problem at all.[57]

Overall, the research community disagrees on the relationship between unlawful CSAs and overall crime. As noted in other works on prostitution, there is a high rate of violence and drug use associated with the profession.[58] Making this more dangerous is the fact that this criminal element brought in with prostitution is rarely reported, remaining hidden to local law enforcement as well as community residents.[59] Indeed, prostitution is often located in close proximity to drug markets.[60] Looking beyond the harm that prostitution and other unlawful CSAs inflict on their participants, they can have a devastating impact on neighborhoods, including threatening home prices and inviting in other criminal elements.[61] Targeting behavior related to prostitution, such as waving down cars and loitering, is often suggested as an intervention tactic.[62] Prosecutors also have worked with other city agencies to address neighborhood characteristics that abet prostitution, such as dimly lit blocks, motels, roads allowing drivers to slow down, alleys, abandoned buildings and cars.[63]

---

[56] Ibid.
[57] Ibid; Benson and Matthews 2000.
[58] Maxwell and Maxwell 2000; Raphael and Shapiro 2002.
[59] McKeganey and Bernard 1996; Silbert and Pines 1981.
[60] Weisel 2004.
[61] Matthews 1993; Dodge et al. 2004.
[62] APRI 2004; Scott and Dedel 2006.
[63] APRI 2004.

**U.S. Department of Justice**
Office of Justice Programs



## CONTINUING OJP ACTIVITIES

This first biennial report to Congress on (1) severe forms of trafficking in persons and (2) sex trafficking and CSAs highlights the limited data available to respond to the questions posed by Congress. Through ongoing and newly initiated activities, OJP is addressing the limitations in this body of knowledge to provide more comprehensive statistics and findings in our future reports. In particular, BJS is enhancing the quality of the data that are reported to the HTRS and exploring the expansion of the system to include a more nationally representative sample of jurisdictions. NIJ will be supporting research in severe forms of human trafficking, sex trafficking and CSAs and will prioritize funding for those projects that address the limitations in our existing knowledge. Finally, OJP will continue to coordinate with other key agencies within the DOJ and other departments as indicated, including the State Department.

### The HTRS as a Comprehensive and National Reporting Platform

The data entered into the HTRS are constantly updated and validated by the task forces and OJP, so more complete and accurate estimates of severe human trafficking are continually available. In the three months since our most recent report was released (between Oct.1 and Dec. 31, 2008), an additional 297 suspected incidents of human trafficking were entered into the system, for a total of 1,526 incidents opened for investigation by the task forces since Jan. 1, 2007. The task forces have also identified a total of 1,157 suspects and 1,956 victims. These data will be included in our next report.

BJS is also building upon the lessons learned from both studies to enhance the HTRS in the coming months and develop more national-level estimates of the level of human trafficking. For purposes of enhancing data quality, OJP and its partners monitor the data entered by the task forces to report on the data quality. These reports offer suggestions for potential modifications to the web-based system, target follow-up technical assistance with selected task forces, and provide recommendations for maintaining, improving and expanding the HTRS in the future. Ongoing data monitoring is expected to lead to increased data reliability among the task forces already entering information in the system.

With our partners, BJS is also exploring ways to enhance the quality of the data that are already entered by the task force jurisdictions through summary screens and periodic prompts that remind users to update case status, victim characteristics and suspect case processing information. We further plan to



expand the system beyond jurisdictions with OJP-funded task forces. There are a number of other jurisdictions that have state legislation targeting human trafficking, as well as task forces created to focus on this issue. Reporting could be expanded to these additional sites that are already focused on human trafficking and/or to a national-level sample that is representative of large metropolitan areas. Reporting can also expand in the area of labor trafficking. OJP plans to pursue a number of these activities over the coming year to improve its estimates of the level and type of human trafficking in the U.S.

**Support for Research in Human Trafficking and CSAs**

NIJ will continue to support research and evaluation into the scope, characteristics, causes and consequences of severe forms of human trafficking, sex trafficking and CSAs. We will prioritize support for those studies that address the methodological and other concerns identified in the literature and described in more detail above. Areas for future research to address include:

- **Definitions.** Variations exist between definitions of sex trafficking, unlawful CSAs and other important terms (e.g., participants) among agencies at the state and federal levels. Definitions for trafficking in particular varied widely between states with trafficking laws. Some state-level definitions were at odds with the federal definition of trafficking this report adopted from the Trafficking Victims Protection Act (TVPA), while other states have deliberately crafted statutes that seek to complement and thus not overlap the federal definition of trafficking. It is premature to attempt to derive a national estimate of sex trafficking and unlawful CSAs in the absence of a single and clearly understood definition of sex trafficking and adequate recordkeeping and statistical systems for documenting such cases. The HTRS is a significant step in the right direction in this regard, but as noted earlier does not yet apply to jurisdictions that are not members of federally sponsored task forces.

- **Methodological Concerns.** Concerns remain about the ability of researchers to derive nationally informative answers to the questions posed in this report in the future. Sex trafficking and unlawful CSAs are clandestine activities and thus present the usual challenge of how to locate and confirm data without exposing the researcher or victim to potential harm. On the quantitative side, moving beyond the aforementioned definitional issue, there exists a series of issues concerning access to structured data. Few if any databases on unlawful

**U.S. Department of Justice**
Office of Justice Programs



CSAs exist, though recent changes to the UCRs will provide more structured data in the future. Access to victims to provide detailed case studies or ethnographic research is also problematic. Obvious care is needed when interviewing victims, which in turn means that researchers must undergo additional training prior to conducting such interviews.

- **Identification of Knowledge Gaps.** NIJ's research for this report found that some law enforcement agencies were unable to identify the basic elements of trafficking or to tell the difference between human trafficking and migrant smuggling. These and other knowledge gaps in basic information on trafficking impede our ability to collect data about the nature and scope of human trafficking in the US. Identifying these gaps and making recommendations for addressing them (e.g., additional training) remains a priority.

- **Bridge the divide between professionals and scholars.** Professionals have first-hand knowledge to provide to scholars, while scholars, who have more time for reflection, often are able to see broader trends. Although these two perspectives ought be brought together in order to complement and enhance one another, a number of structural hurdles have traditionally impeded the formation of relationships between the two. Overcoming these barriers should lead to a leap forward in our knowledge of trafficking.

- **Develop knowledge concerning the demand for trafficking.** There is growing recognition of the interconnectedness of some aspects of CSAs and sex trafficking. Recent studies of demand-reduction programs, such as John Schools, support the observation that prostitution and sex trafficking derive from common sources of demand.[64] Research on policy choices in Sweden and other countries support this as well. In 2008, NIJ funded a national assessment of sex trafficking demand-reduction efforts. This study seeks to assess criminal justice strategies and collaborative programs that have emerged over the past 20 years and that focus on reducing the demand for commercial sex. Additional studies of demand and how demand and supply intersect are needed to lead to informed policy choices.

---

[64] Monto 2000. Michael Shively et al., *Final Report on the Evaluation of the First Offender Prostitution Program*, NIJ Award 2005-DD-BX-0037, 2008. Available at: http://www.ncjrs.gov/pdffiles1/nij/grants/221894.pdf.

**U.S. Department of Justice**
Office of Justice Programs



## Coordination Across Federal Agencies

Finally, OJP will continue its coordinating efforts with other agencies in the DOJ, the Department of State and other relevant agencies as they are identified. The Criminal Justice Information Services (CJIS) Division in the FBI is responsible for collecting arrest information from law enforcement agencies and reporting these statistics in its annual UCRs. CJIS is currently developing a means for reporting human trafficking arrests as a separate category in its reports, which will likely require redefining other categories, including arrests for prostitution and commercialized vice. BJS and its partners will coordinate with CJIS as indicated to share information about the HTRS and to avoid duplication of efforts while ensuring data comprehensiveness, validity and reliability. OJP will also continue to collaborate with other key agencies through the Senior Policy Operating Group, which was created to respond to congressional mandates and develop and prioritize agency activities related to human trafficking. These and other information-sharing forums ensure timely responses to congressional inquiry while also developing a comprehensive platform to understand and respond to severe forms of human trafficking, sex trafficking and CSAs in the U.S.