# EXHIBIT 13

**U.S. Department of Justice**
Office of Community Oriented Policing Services



Problem-Oriented Guides for Police
Problem-Specific Guides Series
No. 38

# The Exploitation of Trafficked Women

by Graeme R. Newman





**www.PopCenter.org**

# Center for Problem-Oriented Policing

## Got a Problem? We've got answers!

Log onto the Center for Problem-Oriented Policing website at www.popcenter.org for a wealth of information to help you deal more effectively with crime and disorder in your community, including:

• Web-enhanced versions of all currently available Guides
• Interactive training exercises
• Online access to research and police practices
• Online problem analysis module.

Designed for police and those who work with them to address community problems, www.popcenter.org is a great resource in problem-oriented policing.

Supported by the Office of Community Oriented Policing Services, U.S. Department of Justice.



**Problem-Oriented Guides for Police**
**Problem-Specific Guides Series**
**Guide No. 38**

# The Exploitation of Trafficked Women

Graeme R. Newman

This project was supported by cooperative agreement #2003CKWX0087 by the Office of Community Oriented Policing Services, U.S. Department of Justice. The opinions contained herein are those of the author and do not necessarily represent the official position of the U.S. Department of Justice. References to specific companies, products, or services should not be considered an endorsement of the product by the author or the U.S. Department of Justice. Rather, the references are illustrations to supplement discussion of the issues.

www.cops.usdoj.gov

ISBN: 1-932582-59-2

February 2006



## About the Problem-Specific Guides Series

The *Problem-Specific Guides* summarize knowledge about how police can reduce the harm caused by specific crime and disorder problems. They are guides to prevention and to improving the overall response to incidents, not to investigating offenses or handling specific incidents. The guides are written for police—of whatever rank or assignment—who must address the specific problem the guides cover. The guides will be most useful to officers who:

· **Understand basic problem-oriented policing principles and methods.** The guides are not primers in problem-oriented policing. They deal only briefly with the initial decision to focus on a particular problem, methods to analyze the problem, and means to assess the results of a problem-oriented policing project. They are designed to help police decide how best to analyze and address a problem they have already identified. (A companion series of *Problem-Solving Tools* guides has been produced to aid in various aspects of problem analysis and assessment.)

· **Can look at a problem in depth.** Depending on the complexity of the problem, you should be prepared to spend perhaps weeks, or even months, analyzing and responding to it. Carefully studying a problem before responding helps you design the right strategy, one that is most likely to work in your community. You should not blindly adopt the responses others have used; you must decide whether they are appropriate to your local situation. What is true in one place may not be true elsewhere; what works in one place may not work everywhere.



- **Are willing to consider new ways of doing police business.** The guides describe responses that other police departments have used or that researchers have tested. While not all of these responses will be appropriate to your particular problem, they should help give a broader view of the kinds of things you could do. You may think you cannot implement some of these responses in your jurisdiction, but perhaps you can. In many places, when police have discovered a more effective response, they have succeeded in having laws and policies changed, improving the response to the problem.

- **Understand the value and the limits of research knowledge.** For some types of problems, a lot of useful research is available to the police; for other problems, little is available. Accordingly, some guides in this series summarize existing research whereas other guides illustrate the need for more research on that particular problem. Regardless, research has not provided definitive answers to all the questions you might have about the problem. The research may help get you started in designing your own responses, but it cannot tell you exactly what to do. This will depend greatly on the particular nature of your local problem. In the interest of keeping the guides readable, not every piece of relevant research has been cited, nor has every point been attributed to its sources. To have done so would have overwhelmed and distracted the reader. The references listed at the end of each guide are those drawn on most heavily; they are not a complete bibliography of research on the subject.

- **Are willing to work with others to find effective solutions to the problem.** The police alone cannot implement many of the responses discussed in the guides. They must frequently implement them in partnership with


other responsible private and public entities including other government agencies, non-governmental organizations, private businesses, public utilities, community groups, and individual citizens. An effective problem-solver must know how to forge genuine partnerships with others and be prepared to invest considerable effort in making these partnerships work. Each guide identifies particular entities in the community with whom police might work to improve the overall response to that problem. Thorough analysis of problems often reveals that entities other than the police are in a stronger position to address problems and that police ought to shift some greater responsibility to them to do so.

The COPS Office defines community policing as "a policing philosophy that promotes and supports organizational strategies to address the causes and reduce the fear of crime and social disorder through problem-solving tactics and police-community partnerships." These guides emphasize *problem-solving* and *police-community partnerships* in the context of addressing specific public safety problems. For the most part, the organizational strategies that can facilitate problem-solving and police-community partnerships vary considerably and discussion of them is beyond the scope of these guides.

These guides have drawn on research findings and police practices in the United States, the United Kingdom, Canada, Australia, New Zealand, the Netherlands, and Scandinavia. Even though laws, customs and police practices vary from country to country, it is apparent that the police everywhere experience common problems. In a world that is becoming increasingly interconnected, it is important that police be aware of research and successful practices beyond the borders of their own countries.



The COPS Office and the authors encourage you to provide feedback on this guide and to report on your own agency's experiences dealing with a similar problem. Your agency may have effectively addressed a problem using responses not considered in these guides and your experiences and knowledge could benefit others. This information will be used to update the guides. If you wish to provide feedback and share your experiences it should be sent via e-mail to cops_pubs@usdoj.gov.

For more information about problem-oriented policing, visit the Center for Problem-Oriented Policing online at www.popcenter.org. This website offers free online access to:

- the Problem-Specific Guides series
- the companion Response Guides and Problem-Solving Tools series
- instructional information about problem-oriented policing and related topics
- an interactive training exercise
- online access to important police research and practices.


## Acknowledgments

The *Problem-Oriented Guides for Police* are very much a collaborative effort. While each guide has a primary author, other project team members, COPS Office staff and anonymous peer reviewers contributed to each guide by proposing text, recommending research and offering suggestions on matters of format and style.

The principal project team developing the guide series comprised Herman Goldstein, professor emeritus, University of Wisconsin Law School; Ronald V. Clarke, professor of criminal justice, Rutgers University; John E. Eck, professor of criminal justice, University of Cincinnati; Michael S. Scott, clinical assistant professor, University of Wisconsin Law School; Rana Sampson, police consultant, San Diego; and Deborah Lamm Weisel, director of police research, North Carolina State University.

Cynthia Pappas oversaw the project for the COPS Office. Stephen Lynch edited the guide. Research for the guides was conducted at the Criminal Justice Library at Rutgers University under the direction of Phyllis Schultze.

The project team also wishes to acknowledge the members of the San Diego, National City and Savannah police departments who provided feedback on the guides' format and style in the early stages of the project, as well as the line police officers, police executives and researchers who peer reviewed each guide.



# Contents

About the Problem-Specific Guides Series . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

The Problem of Exploiting Trafficked Women . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Related Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Extent of the Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    The Four Stages of Human Trafficking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        Recruitment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Transportation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        Delivery/Marketing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        Exploitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Factors Contributing to the Exploitation of Trafficked Women . . . . . . . . . . . . . . . . . 15
    The Market for Commercial Sex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Customer and Trafficker Attitudes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Divided Public Attitudes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Organized Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Attractive Locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Understanding Your Local Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Asking the Right Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        Police and Community Awareness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        Marketing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Venues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Incidents, Offenders, and Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Current Responses to the Exploitation of Trafficked Women . . . . . . . . . . . 28
    Measuring Your Effectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29



Responses to the Problem of Exploiting Trafficked Women ....................31
    General Considerations for an Effective Response Strategy ................31
    Preparatory Responses for Identifying the Problem .......................33
    Specific Responses to the Exploitation of Trafficked Women ..............40
        Enforcing Laws Against Traffickers and Men Who Purchase Sex ........40
        Reducing Demand............................................44
        Making the Local Environment Inhospitable to Exploitation of
            Trafficked Women ......................................46
    Responses With Limited Effectiveness ...............................50

Appendix A:
Summary of Responses to the Exploitation of Trafficked Women ..............53

Appendix B:
Schematic Representation of Relationships among Exploitation, Trafficking,
Migration, Smuggling, Labor, and Consent .................................59

Endnotes ............................................................61

References ...........................................................65

About the Author .....................................................75

Recommended Readings ...............................................77

Other Problem-Oriented Guides for Police ..................................81



# The Problem of Exploiting Trafficked Women

This guide begins by describing the problem of exploiting women who have been trafficked into the United States, and the aspects of human trafficking that contribute to it. Throughout the guide, the word "trafficked" shall mean internationally trafficked, unless otherwise stated. Additionally, the guide's focus is on the final period in the process of trafficking at which women are further exploited by those into whose hands they are passed. This is the point at which human trafficking becomes a problem for local police and so the guide identifies a series of questions that can help analyze local problems related to trafficking. Finally, it reviews responses to the exploitation of trafficked women and examines what is known about the effectiveness of these responses from research and police practice.

Concern about the exploitation of women who have been trafficked into the United States derives from the international issues of human trafficking and slavery.§ The characteristics of international human trafficking, including the profits, resemble those of the international drug trade.[1] In the United States, until the passage of the Trafficking Victims Protection Act (TVPA) in 2000, human trafficking was approached as an immigration problem, which meant that police viewed trafficking as a federal rather than a local responsibility. The TVPA clarified the definition of human trafficking—a

§ The trafficking of women within the United States is an old concern, dating back at least to the Mann Act of 1911, which criminalized taking persons across state lines for the purpose of prostitution. This law was directed towards prostitution in particular, without regard to immigration issues.



particularly difficult problem, as will be seen below—and introduced a number of important protections for trafficked individuals (see Box 1). The TVPA defines two forms of severe human trafficking:

a. "…sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such an act has not attained 18 years of age."
b. "…the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[2]

Because some 70 percent of internationally trafficked women end up in the sex trade, the effect of the TVPA is to define many such women as crime victims rather than criminals. Whether pressed into forced labor or prostitution, the exploitation of these individuals is continued upon entry into the United States, whether in the same hands of those who trafficked them, or whether passed on to others who profit from commercial sex or cheap, often forced, labor.

The TVPA does not require that a trafficked person be actually transported anywhere; it simply requires that the victim's freedom be constrained by force, fraud or coercion. The focus of this guide, however, is on those women who are transported into the United States for the purposes of commercial sex or forced labor. The operational elements of forced labor, such as occurs in domestic service, agriculture, and sweatshops,[3] are similar



to those of forced prostitution: in both cases women may be kept in slave-like conditions, exploited for their labor and are physically and mentally abused. They also share the same trafficked experience: a system built on fraud, coercion, and false promises, which is meant to ensure that the women remain under the control of their traffickers from the moment they are recruited continuing indefinitely through forced labor or the commercial sex trade.[4]

---

### Box 1:
### THE TRAFFICKING VICTIM PROTECTIONS ACT 2000 (TVPA)[5]

**1.** Established a task force comprising the U.S. Secretary of State, the Secretary of Labor, the Secretary of Health and Human Services, the Director General of the CIA, and the Attorney General.
**2.** Required the establishment of programs designed to increase public awareness of human trafficking, including sex trafficking, forced labor and domestic servitude.
**3.** Required an annual report from the U.S. Department of State on human trafficking around the world.
**4.** Threatened economic sanctions against countries that failed to act against trafficking.
**5.** Substantially increased punishments for offenses involving involuntary servitude and extended definitions to include traffickers or others who knowingly benefit from human trafficking.
**6.** Defined victims of severe forms of trafficking and gave them refugee status.
**7.** Removed the threat of deportation for those trafficked into the United States illegally, provided these victims cooperated with law enforcement.
**8.** Provided protection for victims in federal custody and provided government housing, detention centers, shelters, medical care, and other services commensurate with victim status.
**9.** Deemed victim consent irrelevant in determining trafficked status.



### Related Problems

Exploiting internationally trafficked women is only one of a number of problems that are related to, or are examples of, human trafficking. Other related problems not directly addressed by this guide include:

- trafficking in children, sale of babies, and illegal adoptions
- kidnapping of children
- child pornography
- sex tourism
- trading in body parts
- smuggling of immigrants
- identity theft (see Problem-Specific Guide No. 25, *Identity Theft*)
- street prostitution (see Problem-Specific Guide No. 2, *Street Prostitution*)
- serial murder of prostitutes
- illegal employment of aliens
- domestic trafficking for forced labor
- juvenile runaways who are drawn into prostitution
- stalking (see Problem-Specific Guide No. 22, *Stalking*)
- domestic abuse of mail order brides
- homeless citizens who are trafficked for forced labor
- domestic trafficking of women and juveniles.



## Extent of the Problem

Statistics concerning human trafficking are necessarily unreliable because of the clandestine nature of the activity and the difficulties in defining it.[6] The U.S. State Department estimates that between 600,000 and 800,000 persons were trafficked across national borders worldwide between April 2003 and March 2004. Eighty percent of these were female, 70 percent of whom were trafficked for sexual exploitation.[§] In 2003, between 14,500 and 17,500 were trafficked into the United States.[7] Most originate in poorer countries, where human trafficking has become a significant source of income;[§§] these include states in Latin America, Africa, Asia, the Commonwealth of Independent States of the former Soviet Union, and Central and Eastern Europe. Most women are trafficked to developed countries, with the United States being the most popular country of destination.[8] Human trafficking is reportedly as highly profitable a business as are arms smuggling and drug trafficking.[9]

In fiscal year 2003, the number of victims certified or eligible for refugee benefits under TVPA was just 151.[10] When this figure is compared to the estimated 14,500 females who were trafficked into the United States in 2003, it becomes clear that either the estimates are enormously exaggerated or trafficking victims are simply hidden from view. The answer is probably somewhere in the middle. Those who exploit trafficked women work hard at keeping their activities hidden from the authorities by constantly changing the locations and telephone numbers of their businesses and by isolating trafficked women from the public. In addition, because the requirements for meeting the TVPA are quite narrow,

§ Sixty to seventy-five percent of trafficked women in prostitution have been raped: 70 to 95 percent have been physically assaulted (U.S. State Department 2005).

§§ In some countries, the sex trade has become an important economic development strategy and source of income, with profits amounting to 14 percent of gross domestic product (Raymond and Hughes 2001).



§ While sweatshop workers may be hidden from the community, exploited women in the sex trade are not hidden in the same way, since their services are often openly advertised. They are only hidden in the sense that the public turns a blind eye to their existence.

§§ Historically, trafficked women have been looked upon as transmitters of HIV and AIDS, rather than as victims of the disease. Measures, including forced HIV testing and medical examinations, have been implemented in order to protect the customers and the larger community—not the trafficked victims themselves (HumanTrafficking.com 2004).

§§§ In some communities, up to 86 percent of sex workers are infected with HIV (Willis and Levy 2002).

the collection of the appropriate information concerning the victim may take considerable time and resources. Thus, an important response for local police is to locate and identify trafficking victims who are hidden[§] in their communities.

Trafficking causes serious trauma to exploited women and adds to existing public health problems. Trafficked women in the sex trade are so isolated from the community that their clients and handlers physically abuse them with impunity, subjecting them to repeated rape and assault. They also deny them prenatal care or medical care in case of pregnancy, infections or injury, and force them to have abortions. Having no recourse, the women are forced to comply with client demands, the majority of whom, research has shown, refuse to use condoms.[§§] Thus, the spread of HIV and other sexually transmitted disease is more likely.[§§§] Furthermore, women are induced into heavy alcohol and drug use as a means of ensuring their continued dependency on their traffickers.[11] Needless to say, their illegal status makes it difficult or impossible for trafficked women to receive the social and health benefits that might otherwise be available to them.[12] They are understandably reluctant to seek medical attention for fear of being turned over to immigration authorities.

Because they are out of sight of the authorities (though often in plain view of local communities), sweatshops and other forms of forced labor invariably fail to meet health and safety regulations. Sub-standard housing and working conditions are associated with increased illness and injury in these populations.[13] In addition to being beaten and starved, women may be made to work long hours without breaks, or forced to work in hazardous or polluted



environments. Even in locations where the presence and employment of undocumented immigrants is known, enforcement of health, safety, and labor regulations is at best sporadic.[14] Language and cultural limits may prevent victims from understanding and appreciating both the risks in the workplace and the use of preventive measures. Injury and death rates of foreign workers have been shown to be higher than normal in some work environments.[15]

The illegal status of trafficked women also makes them ready victims of other crimes. For example, undocumented immigrants are often easy and lucrative robbery targets, because those few who manage to earn any money at all are often fearful of opening bank accounts, lest their illegal status be discovered. And when victimized, many are too fearful to report the incident to the police.[16] Furthermore, traffickers in the sex trade tend to concentrate their activities in immigrant communities that are often neglected by local government, which results in a higher incidence of crime.[17]

## The Four Stages of Human Trafficking

Table 1 displays the typical stages of human trafficking and the techniques used at each stage. These techniques are listed as examples and may differ depending on the particular recruiting locality ("catchment area") and the constraints or opportunities that may arise in moving humans across borders. Depending on the organizational sophistication of the traffickers, the third or even the fourth stage of exploitation may be directly linked to the initial stage of recruitment; that is, recruiters who are organizationally linked to the delivery end of the process



8 │ The Exploitation of Trafficked Women

§ Fees to traffickers and recruiters range from $2,000 to $47,000 and often vary by countries of origin: e.g., $40,000 to $47,000 for Chinese women, $35,000 for Korean women, and $2,000 to $3,000 for Mexican women (Raymond and Hughes 2001).

§§ In the Philippines, overseas workers are required to send back a percentage of their wage as a condition of permission to travel abroad (Gatmaytan 1997). The Dominican Republic depends on more than 100,000 women working abroad as a source of foreign exchange (Wijers and Lap-Chew 1999).

may select women specifically for particular tasks, such as domestic servitude, escort services, brothels that specialize in providing very young women, or cheap labor for garment industry sweatshops. Although the extent to which all stages of trafficking are linked is unknown, it is usually assumed that where gangs or criminal syndicates are involved, considerable linkage exists.

## Table 1: The Four Stages of Human Trafficking

| Stage | Strategies | Techniques |
|---|---|---|
| ONE **Recruitment** | • Select vulnerable women—usually poor, young, and uneducated—who are easy to trick and will believe promises of future employment<br>• Hide behind an apparently legal business, such as an employment or travel agency<br>• Get client into debt[§] or find a debt-ridden family<br>• Traffic from countries that benefit from foreign exchange resulting from export of trafficked women[§§]<br>• Offer services as "coyote" or smuggler | • False promises of work and well paying jobs<br>• False promises of work visas and passports<br>• Offer of safe passage to destination country<br>• Use person from victim's culture to recruit<br>• Use of tourist visas without work visas<br>• Recruiter buys young girl for small sum<br>• Arrange marriage to American men including serviceman<br>• Advertise for women needed for "housekeeping" work<br>• Kidnapping<br>• Trafficker convinces the woman he loves her<br>• Pay for client travel, give loan |


| Stage | Strategies | Techniques |
|---|---|---|
| TWO **Transportation and entry** | • Provide a service such as all necessary documentation and travel arrangements<br>• Use a tourist or employment agency as a front [18]<br>• Provide guide service<br>• Search for weak points of entry into the United States | • Document forgery<br>• Stolen passports and visas<br>• Bribery of border officials<br>• Transportation in concealed vehicles<br>• Provide recruits with tourist visas[19]<br>• Employers manipulate special visas<br>• Handlers (e.g. "coyotes" on Mexico/U.S. border) guide individuals across borders or over difficult terrain,[20] sometimes providing transportation |
| THREE **Delivery and marketing** | • Make contact with clients using standard marketing techniques<br>• Prearrange deals through legal or illegal businesses, such as domestic employment agencies, entertainment agencies, and escort services<br>• Market through organized crime rings for sex trade<br>• Keep trafficked woman dependent on trafficker until delivery | • Advertising in pornographic magazines and web sites and in the ethnic media<br>• Establish matchmaking web sites to advertise women<br>• Deliver to farm labor, sweat shops; domestic service agencies etc.<br>• Mail order brides and matchmaking camps<br>• Retention or confiscation of travel documents<br>• Traffic women domestically by constantly moving them between cities and states to satisfy demand for new women and to keep the women isolated |
| FOUR **Exploitation** | • Exploit alien status<br>• Threaten violence against woman's relatives in home country<br>• Use actual violence to ensure compliance and silence<br>• Create and maintain debt<br>• Create and maintain alcohol and drug dependency<br>• Exploit ambiguities in and lax enforcement of sex trade laws<br>• Keep in isolation | • Retention of passports and visas<br>• Threaten to turn over to authorities<br>• Keep imprisoned in the place of employment<br>• Sex trade: forced prostitution, off street prostitution, night clubs, exotic dancing, escort services<br>• Forced labor: bonded labor, virtual imprisonment, indentured labor, coercion and violence; labor intensive manufacturing (e.g. clothing trade) or rural farm labor<br>• Massage parlors, nail salons, employment agencies as fronts for illegal activity<br>• Move from place to place |



10 | The Exploitation of Trafficked Women

### Recruitment

§ In one excellent study of women recruited in the Philippines, all women stated that they had willingly agreed to be transported to the country of destination; some even paid the travel costs up front. All those interviewed, however, subsequently fell into heavy debt and became enslaved in the sex trade (Aronowitz 2003).

§§ The United States is the number one importer of mail order brides and the number one importer of Philippine women. One company charges men a modest sum for its catalog of Russian women and holds a "mixer" in Russia to which U.S. men travel; the company charges the women a substantial amount, often their life savings, to travel to the mixer, the catch being that there are many more women at the mixer than there are men (Caldwell et al. 2001).

§§§ Traffickers find marriage agencies and mail order bride services attractive because as legal businesses they can recruit women openly; they are also virtually unregulated (Lloyd 1999-2000). However, the overall extent to which traffickers use such businesses is unknown (Hughes 2004b:13).

Although there are many reported cases of kidnapping for trafficking purposes—as well as reports of parents selling their daughters to traffickers—it is likely that the majority of trafficked women are recruited through fraud, deception, and other enticements that exploit real social and financial needs.[21] A typical human trafficking scheme begins not with violence or coercion but rather as a confidence game—the young woman is convinced by traffickers that a desirable job awaits her in a foreign country. At that point, she believes that she is going to voluntarily participate in a smuggling scheme, in which she will incur a debt in return for being brought into the destination country. In the case of individuals trafficked for forced labor, the victim may enter into a "contract" with the trafficker that is very much against her interests.[§] The woman may be enticed by the offer of a "loan" for travel to the United States or of aid in finding employment. The complicated interplay between trafficking and smuggling is very much at work here (see Box 2). Employment agencies are used as a front for these deceptions, as are agencies for mail order brides. Mail order bride agencies[22,§§] exploit the blurred line between deception, trickery, and the voluntary attitudes of would-be brides.[§§§] However, human trafficking charges under the TVPA must always involve forced labor or commercial sex of some kind. Abuses of mail order bride situations may or may not include these elements. Nonetheless, it is clear that numerous mail order bride agencies utilize the same kind of deception that traffickers do in luring foreign women to come to the United States.



## *Transportation*

Research suggests that the main means of trafficking into the United States is by air.[23] Most often, women are trafficked according to a previously planned route, often using the services of a tourist agency that may or may not be linked to trafficking. Trafficked women may be transported across borders with or without legitimate documentation. The use of forged or stolen passports and visas and the use of tourist visas are common.[§] Again, the interplay between smuggling and trafficking (see Box 2) is evident at this stage of the process. In locations where borders are porous or stretch across inhospitable or isolated territory, smugglers may offer safe passage across established or known routes. In locations where border security is tight, traffickers may help individuals conceal themselves in trucks or trains in order to enter the country illegally. Military bases are also popular points of entry.

§ One study found that over 50 percent of trafficked women entered the Unites States with tourist visas and overstayed their visas (Raymond et al. 2001).

---

### Box 2: Trafficking vs. Smuggling

Smuggling and trafficking are closely connected. Generally, smuggling does not involve coercion, but rather is performed at the request of the alien, who pays a fee for safe, albeit illegal, passage. In its simplest form, it involves only the second stage of trafficking: transportation. However, trafficked women who begin their trip voluntarily may become victims at the delivery stage, when their illegal status is exploited by those seeking cheap labor. If the smuggling is part of an organized activity, the smuggler may deliver the smuggled individual directly into the sex trade or another form of forced labor. In this case, the individual is both smuggled and trafficked.[24]

| Trafficking | Smuggling |
|---|---|
| • Crime or violation against a person | • Unauthorized border crossing |
| • Contains element of coercion (cannot consent to enslavement) | • No coercion |
| • Subsequent exploitation and/or forced labor | • Facilitated illegal entry of person from one country to another |
| • Trafficked persons seen as victims by the law | • Smuggled persons seen as criminals by the law |



### Delivery/Marketing

Both before and after a woman has reached the United States, her services can be marketed through standard outlets, such as advertising in personal columns; but by far the most effective marketing is via Internet chat rooms, bulletin boards, and the many web sites that offer matchmaking services for men and women.[25] Where a prior arrangement has been reached, the trafficked woman is handed over to her intended employer once she reaches her destination. Forced prostitution may also be confined within particular ethnic communities, where men seek to purchase sex from women or young girls of their own ethnicity. This serves to further isolate trafficked women from the broader community.[26] Recent research suggests that there is considerable trafficking of women between various U.S. cities. Frequent movement of women serves three purposes: first, it makes detection more difficult and removes the incentive for local investigative agencies to become involved; second, it provides a variety of women for customers; and third, it inhibits women from establishing ties to their communities.[27] In cases where there is no delivery to a specific person or organization, the woman is technically not trafficked, but smuggled. In this case, if she is young, without family, and without the ability to speak English, she may end up in the sex trade, and her trafficked status will be difficult to determine by local police.



## *Exploitation*

Trafficked women are extremely vulnerable, for three reasons. First, as illegal aliens, many women who do not know they have rights are fearful of seeking assistance from police or other service agencies. Second, women and their families are often in debt to the traffickers who exploit their labor. Third, should a woman's situation, such as working in the sex trade become known back home, her family's honor may be damaged. As a result, those who "employ" trafficked women have enormous control over them. In effect, conditions of employment become conditions of slavery.§ However, the definition of exploitation is difficult, because trafficked persons—and even legal immigrants—often consent to exploitation in the hope that they can improve their circumstances by doing so.[28] This creates a serious problem for local police, because victims may refuse to cooperate and may even resist attempts to improve their circumstances.

In fact, the problem of definitions of the many activities involved in the trafficking of women is considerable. Only in recent years has a definition of human trafficking been agreed upon internationally. It was not until the passage of TVPA in 2000 that the U.S. Congress defined trafficking and its associated terms in an attempt to clarify the difficult overlap between smuggling, trafficking, coercion, consent, bondage, and exploitation. The extremely complex interplay among these terms as well as their links to other crimes is displayed in Appendix B. The definitions now accepted are reproduced in Box 3.

§ In the pre-Civil War South, replacing a slave cost the modern equivalent of $40,000. Slaves in the twenty-first century can be purchased for as little as $90. For example, a family in Thailand was reported to have sold a daughter into the sex trade in order to buy a television set (Florida State University, Center for the Advancement of Human Rights, 2003:14).



14 | The Exploitation of Trafficked Women

---

**Box 3:**
**TVPA DEFINITIONS OF TRAFFICKING AND TRAFFIC-
RELATED ACTIVITIES[29]**

*Severe human trafficking.* (a) Sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (b) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

*Sex trafficking* is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act.

*Involuntary servitude* is defined as (a) a scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint or (b) the abuse or threatened abuse of the legal process.

*Peonage* is defined as a status of involuntary servitude based upon real or alleged indebtedness.

*Debt bondage* is defined as the condition of a debtor who has pledged his or her personal services in security for debt but whose services are not reasonably applied toward relieving the debt, or the length and nature of services are not limited and defined.

*Smuggling* is having knowingly encouraged, induced, assisted, abetted, or aided any other alien to enter or try to enter the United States [illegally].[30]


# Factors Contributing to the Problem of Exploiting Trafficked Women

Understanding the factors that contribute to local trafficking problems can help frame local analysis, identify effective remedial measures, recognize key intervention points, and select appropriate responses.

## The Market for Commercial Sex

**Supply.** The international proliferation of trafficking has created a supply of trafficked women that is so large that it drives the market. Countries that make no attempt to control human trafficking[§] use the trade as a means of importing foreign currency, especially U.S. dollars and Euros. This is achieved both by encouraging sex tourism in the originating country and by tacitly approving the exportation of women to wealthy countries.[31] Globalization has facilitated the movement of cheap labor from one country to another. Thus, even those women who are not trafficked into the sex trade add to the plentiful supply of undocumented migrant labor at best, sweatshop and forced labor at worst.

§ The TVPA established a set of standards for countries to combat trafficking. Countries are rated annually according to these standards and allocated to one of three tiers: (1) full compliance; (2) some compliance; and (3) no compliance or no effort to comply. As of 2005, all countries are required by U.S. law to collect and publish prosecution and conviction statistics on human trafficking. Countries making no effort to combat trafficking are subject to various U.S. sanctions (U.S. Department of State 2004, 2005).

*U.S. Department of State*



**Some countries are deemed by the U.S. government as making no effort to comply with the Trafficking Victims Protection Act.**



16 │ The Exploitation of Trafficked Women

§ This is the rationale that underlies the Swedish legislation outlawing the purchase of sexual services. As its advocate says: "It is the market that is the driving force. Demand is defined by the services produced, not vice versa, which contradicts certain popular traditional market theories." (Sven-Axel Mansson, interviewed by Maria Jacobson 2002).

§§ There is some evidence of a growing demand by purchasers of sex for foreign women of various ethnic backgrounds. There is considerable evidence that men's sexual expectations are driven by ethnic stereotypes and myths (Hughes 2004).

§§§ Sex trade customers commonly report that it is none of their concern if prostitutes are trafficked or even imprisoned in the brothel. While some feel sorry for the prostitute's situation and may even offer help, they nevertheless continue to purchase her services and expect the same services from trafficked as from non-trafficked prostitutes (Seabrook 2001).

**Demand.** The demand issues surrounding trafficking for forced labor are simple enough: because illegal or quasi-legal businesses can gain considerable advantage by employing cheap labor, there will always be demand for such labor. The demand issues involved in trafficking for the sex trade are much more complicated and subject to considerable debate. Some argue that human trafficking for the sex trade is simply a response to a natural need; that is, men will be men. Others argue that this is a misconception, that rather than men's sexual needs being such that prostitution must exist to fulfill them, the truth is that men's sexual appetites respond to the opportunities offered them by the purveyors of prostitution.[§] (See also Response 9 for an elaboration of this point). In other words, it is the market—the trafficking in women—that creates the demand, not the customers. If there is a plentiful supply of vulnerable women and girls, a profitable business plan follows: offer the services of young women that cater to any customer preference at a competitive price and pay the women little or nothing.[§§]

## Customer and Trafficker Attitudes

**The sex trade.** The customers of the sex trade reveal callous attitudes towards the trafficked women they rent.[§§§] In the case of prostitution—whether the prostitute is trafficked or not—men adopt the view that they "own" the prostitute for the period for which they have paid and believe that they have a right to do whatever they please, including physical and psychological abuse.[32] The purveyors of prostitution, whether pimp or madam, do not demand compensation if the customer damages the woman. Indeed, they routinely abuse prostitutes themselves.[33] Here again, profit is the key. Trafficked



women in the sex trade quickly depreciate in value—particularly, where beauty and youthfulness are important to the customer. Youth and beauty are cheap to replace where there is a plentiful supply of trafficked women.

**Domestic servitude.** Employers of domestic servants who are trafficked women display attitudes not so much indifferent as paternalistic. Interviews show that employers often treat the trafficked women in their service as children without rights, sometimes subjecting them to physical and mental abuse, and placing considerable restrictions on their movements, including low pay and little or no time off. In many cases, employers feel that they are doing the trafficked woman a favor by providing employment that would otherwise be unavailable to an illegal alien.[34] In short, because the conditions of employment within households are invisible to the authorities, working conditions that would be important outside the household are seen as irrelevant.[35]

**Forced labor.** Debt bondage is the most frequent type of coercion employed against women in labor trafficking situations. Rape and sexual assault are also frequently used by traffickers to "maintain" women in labor trafficking situations. Whatever the technique used to maintain debt bondage—whether on a rural farm or in an urban sweatshop—the obvious advantage to employing trafficked women is that they are cheap, thus increasing profit and competitive pricing. Money is saved in many ways. Because these businesses are operated on premises that are hidden from public view, they can dispense with health and safety compliance. Of course wages—if any—never match the minimum wage.§ And in fact, wages are garnished to pay the "loans" that financed the trafficked individual's transportation to the country of destination.[36]

§ "Every floor is a rabbit warren of corridors and numbered doorways, a labyrinth of iron grilles and black wire mesh reminiscent of a reform school, or a prison. Behind every one of these forbidding doors is a garment shop, where mostly undocumented immigrant workers toil away with scissors, sewing machines and industrial irons for poverty-level wages for up to 12 hours a day." Description of a sweat shop in the south end of downtown Los Angeles (Gumbel 2001).



18 | The Exploitation of Trafficked Women

### Divided Public Attitudes

§ The focus on the victimization of trafficked women has put the spotlight on all prostitutes, making it clear that the trafficked prostitutes are victims, not offenders. Thus, many now advocate that enforcement attention should be shifted to the purchasers of sex. The recent announcement by the U.S. Department of Defense that military personnel purchasing sex will face court martial is the first significant indication of this shift (Jelinek 2004).

**Prostitution.** Sex trafficking of women involves commercial sex where the victim's ability to legally consent to the sex act is negated through some form of force, fraud or coercion that is employed against her. There are widely differing views of prostitution and in general who is responsible for it.[37] These often conflicting opinions affect community responses and the extent of police intervention. Public ambivalence is reflected in the incredible patchwork of state and local prostitution laws and ordinances, some punishing the purchase of sexual services, some punishing its sale, some targeting pimps and brothel owners, and still others criminalizing all of the above. The result is inconsistent enforcement by local police, who carry out well-publicized crackdowns from time to time. There is growing evidence that women who are trafficked into prostitution do not differ greatly from domestic prostitutes who have not been trafficked: neither group has chosen the profession voluntarily. Many report that they do not want to work as prostitutes, would leave the profession if they could, and that they were recruited into prostitution as girls or teenagers.[38,§] Of course, those women who entered into the sex trade as minors, could not have done so voluntarily from a legal standpoint.

**Immigration.** There are widely differing public views of immigrants, both legal and illegal. During economically difficult times, immigrants are often blamed for stealing jobs and committing crimes, even though there is no definitive evidence to prove either accusation.[39] There is



good reason, therefore, for trafficked women to perceive that they are not welcome in their country of destination. In contrast, there is a tradition in some parts of the United States of public support for illegal aliens, stemming from the aid given to political refugees from Central and South America during the 1980s. There continue to be a number of "sanctuary" states and cities that have policies—and in some cases (e.g., Oregon) even laws—that prohibit state and local police agencies from using money or equipment to apprehend suspected violators of federal immigration law.[40] Even many states and cities that are not designated sanctuaries do not report illegal immigrants to the authorities simply because immigration is seen as a matter for federal rather than local law enforcement. All these conflicting views result in one thing: they make it easier for traffickers to keep their victims isolated and out of sight of the authorities.

§ Drug use is common in prostitution, serving as another weapon to keep trafficked women dependent on their pimps or managers and isolated from the outside world (Raymond and Hughes 2001).

## Organized Crime

Europol[41] classifies trafficking networks into three groups:

(1)  Large scale mafia-like networks such as the Russian and Albanian syndicates that control about 60 percent of prostitution in Western Europe. These networks also traffic in drugs,§ but more recently have turned to trafficking in women because the profit margins are higher. Highly organized from the recruitment to the exploitation stages, these groups are well connected financially and politically and are typically cruel and brutal in doing business.



20 | The Exploitation of Trafficked Women

§ Military bases are magnets for trafficked women. For example, as a result of the presence of 16,000 U. N. soldiers in Cambodia between February 1992 and September 1993, the number of prostitutes in Phnom Penh reportedly increased from 6,000 to 20,000 (Ekberg 2004:1197). This pattern is repeated around military bases within the United States (Raymond and Hughes 2001).

(2)  Medium scale networks that specialize in trafficking women from a particular recruitment country to a particular destination country. These networks usually arrange transportation and also own their own brothels in the destination country.

(3)  Informal "family" networks of individuals who have come together to reap the financial benefits of the opportunities provided by trafficking. These individuals usually have legitimate jobs in other fields and operate trafficking businesses on the side. Much of the buying, selling, and delivery arrangements take place via the Internet.

In general, these observations of the organizational aspects of trafficking have been confirmed for the United States.[42] However, the degree to which trafficking is part of well established organized criminal organizations is unknown.[43]

### Attractive Locations

Locations that provide cover for the deployment of trafficked women include the following.

- Communities that tolerate red light districts, strip clubs, and late night bars and clubs. Where domestic prostitutes are plentiful, internationally trafficked women can blend in without drawing much attention.

- Areas around military bases, where there is a constant supply of men willing to purchase sexual services, frequently from foreign women.[§]



- Old warehouse and manufacturing districts, where sweatshops can flourish out of sight of local communities.

- Well-off suburbs, where residents employ domestic servants who may be trafficked.

- Isolated rural areas, where trafficked women may be employed as seasonal farm laborers or be used to provide sexual services to male seasonal laborers.

- Locations close to poorly patrolled border entry points or in immigrant communities that are neglected by local government.[44]

- Areas with large immigrant or foreign-born populations that may frequent establishments set up in culturally familiar styles.



## Understanding Your Local Problem

The information provided above is only a generalized description of the exploitation of trafficked women. You must combine the basic facts with a more specific understanding of your local problem, especially the cultural issues that may face potential victims in your area. Carefully analyzing the local problem will help you design a more effective response strategy. The most difficult problem you will face is the clandestine nature of the exploitation of trafficked women, which is made possible by the isolation and separation of trafficked women from the local community. In the case of forced labor, the locations and situations of trafficked women will be hard to uncover, especially in the case of domestic servitude, which occurs within families that have, by right and tradition, a measure of privacy and separation from government. In the case of the sex trade, although trafficked women are hidden from public view, there is one point of weakness: sex traffickers must break the isolation they maintain in order for their trafficked women to service their customers. In fact, prostitutes are often hidden in plain view; their presence is usually well known in a local community. However, the public may not recognize or know that they are also trafficked women.

### Asking the Right Questions

Some critical questions you should ask in analyzing your particular trafficking problem are listed below. The answers to these and other questions will help you choose the most appropriate set of responses later on. The main challenge is to locate the businesses and venues where trafficked women are hidden and to identify which



women are trafficked and which are not. This may be particularly difficult in regard to prostitution, because many prostitutes are coerced either into or as part of their working conditions and may also be domestically trafficked.

*Police and Community Awareness*

- Are police aware of the problem of trafficked women?
- Is the community aware of the problem of trafficked women?
- Is there an active sex trade in your jurisdiction? If so, what forms does it take? Street prostitution? Escort services? Brothels, massage parlors, strip clubs, late night bars? Are foreign women encountered in brothel raids?
- How much of the local sex trade involves recent immigrants or ethnic communities?
- Is there a hidden or rumored sex trade? Are there known telephone numbers and addresses?
- Is there a drug trade linked to the sex trade or to a particular locality?
- Are there local businesses that benefit from the sex trade or forced labor? Employment agencies? Garment industry? Bars and strip clubs? Nail salons? Hotels?
- Are there community organizations that specialize in caring for immigrants?
- Are there known smuggling operations, routes or entry points in or close to your locality?
- Does your department formally recognize the immigrant community and its problems? Have you attempted to develop collaborative partnerships to deal with such problems?
- If there is a red light district? What are business and community attitudes toward it?



- Do local employers typically report job applicants who attempt to obtain work without proper documentation?

*Marketing*

- Do brothels advertise very young prostitutes with exotic foreign characteristics, and at very low prices?
- How do brothel owners market their services? Phone numbers? Yellow pages? Word of mouth? Solicitations in bars and strip clubs? Street corner pimps?
- Are any labor intensive products manufactured in your area?
- Do advertisements in local newspapers and magazines offer menial jobs at unrealistically high wages? Are there notices or advertisements in ethnic media?
- Are there local web sites or chat rooms that deal with sexual services?
- Do advertisements for mail order brides appear in local newspapers and magazines, local free or community papers? Do the ads promise foreign women?
- Do escort services advertise in the yellow pages? On the Internet? In other media? Does your agency monitor them?
- Does the sports page of the local newspaper advertise massage parlors?

*Venues*

- Do massage parlors and brothels constantly move to different locations? What kinds of buildings or housing do they occupy?
- Are there locations where bars or sexually oriented businesses cater to a particular immigrant or ethnic community?



- Are there locations where legal businesses (massage parlors, nail salons) may be fronts for sex trafficking?
- Are there farms that require low paid workers or seasonal labor? How do they find and recruit their workers?
- Are there sweatshops in your area? Is there a garment district?
- Are there industrial based businesses that employ low paid workers and how do they recruit them?
- Are there employment agencies in your area? Do they place persons of foreign birth? Into what kinds of jobs? Do they place individuals who speak little English?
- Are there travel agencies that promote matchmaking or sexual tourism?
- Are there dating or escort services in your area that offer women of foreign birth?
- Are there massage parlors in your area? If so, are they licensed or supervised by local health authorities?
- Does your jurisdiction contain a run-down warehouse or manufacturing district?
- Are there suburbs where domestic servants are routinely employed?
- Is tourism a major business in your jurisdiction? Are there hotels, motels, or restaurants that suddenly appear to be employing foreign women as maids, waitresses, or kitchen help?
- Do certain employers recruit workers from local homeless shelters? Are homeless persons transported to remote locations to work?
- Are there bus stations where runaway teenaged girls tend to congregate?

*Incidents, Offenders, and Victims*

- Have prostitutes been assaulted or murdered? If so, were they foreign-born?
- Are there cases of drug use or dealing involving foreign women? Does drug dealing occur in locations close to areas where the sex trade is plied?
- Are there local prostitutes who are unable to speak English?
- Are prostitutes typically drug users?
- Do hospitals report battered women who may be illegal immigrants?
- Are there local or ethnic healthcare providers who are "off-line" from the normal healthcare system?[45]
- What information is collected by officers and others concerning prostitutes? Is background information collected, such as age, country or place of birth, and where and how they were recruited?
- What pricing system is employed in brothels? How much are prostitutes paid?
- Who are the pimps and brothel managers? Where do they come from?
- What are the backgrounds of the purchasers of sex? How do they find their "partners"? How do they reach the venue? Walk from local hotels? Drive from suburbs?
- Are other crimes reported in the areas where prostitution or forced labor are located?
- Are undocumented migrants frequent robbery victims?
- Do incidents of domestic violence occur where the wife is an immigrant?
- Do local domestic violence shelters care for immigrant victims?



28 │ The Exploitation of Trafficked Women

§ See Problem-Oriented Guide No. 2, *Street Prostitution*, for additional questions that may also be relevant to women trafficked into the sex trade.

§§ See the U.S. Department of Health & Human Services, Office for Minority Health for Culturally and Linguistically Appropriate Services (CLAS) standards at http://www.omhrc.gov/assets/pdf/checked/finalreport.pdf.

*Current Responses to the Exploitation of Trafficked Women* §

- What is your departmental policy for dealing with prostitution? What is the prosecutor's policy regarding prostitution-related offenses? What are the typical sentences handed out to those who are convicted? Do prostitutes and their clients complete those sentences? What effect, if any, does the imposition of a sentence have on subsequent involvement in prostitution?
- What responses do police officers use, other than arrest and prosecution? Are any of these responses effective?
- Are social, healthcare, or substance abuse treatment services available to prostitutes? Do prostitutes use these services?
- What is your departmental policy on reporting illegal immigrants to immigration and customs officials?
- Are specific officers allocated to identify trafficked women?
- Do you have sufficient access to interpreters and cultural advisors?§§
- Is there a special vice squad? What are its duties?
- Are assault cases and domestic violence situations considered as possible crime scenes in which human trafficking may be the real offense being perpetrated?
- Have your victim service specialists been trained about human trafficking? Are they called to potential human trafficking crime scenes? Are they present when potential human trafficking victims are interviewed?
- What foreign language capabilities does your unit have? Are there local universities, military personnel, or immigrant advocacy groups that could assist you with translation needs?



## Measuring Your Effectiveness

Measurement will allow you to determine the degree to which your efforts have been successful and can also suggest how your responses can be modified to produce the intended results. Measuring the extent of your problem before you implement remedial responses will allow you to determine how serious the problem is; it will also give you a baseline against which to measure the effectiveness of the responses that you choose to implement. All measures should be taken in both the target area and the surrounding area. For more detailed guidance on measuring effectiveness, see the companion guide to this series, *Assessing Responses to Problems: An Introductory Guide for Police Problem-Solvers.*

The following are potentially useful measures of the effectiveness of responses to the problem of the human trafficking of women. Their utility, however, will depend upon the specific conditions in your locality, and especially upon the particular aspect of trafficking that you choose to focus upon. For example, if you decide to focus on separating trafficked women from their handlers, the number of foreign women in the sex trade will probably drop. Your follow-up should show that these women have not been trafficked elsewhere and have been provided with the protections afforded them under TVPA.

- Reduced number of trafficked women in the sex trade. Your initial success should uncover significant numbers of trafficked women. Your subsequent success should see a rapid decline in the numbers of trafficked women in the sex trade.



- Increased number of trafficked women seeking help at health facilities and other community care groups, churches, or domestic violence shelters. Over time, this figure should decrease as fewer women require help.
- Reduction or elimination of brothels.
- Reduced number of escort services, massage parlors, and other fronts for the sex trade.
- Reduced number of rentals of local warehouses and run-down office buildings.
- Reduced total reported crime in target areas, compared to control areas. Keep in mind that changes may be due to other factors and that reported crime does not always correlate with actual crime.
- Reduced number of undocumented migrants employed in businesses.
- Reduced number of advertisements for domestic help.
- Reduced number of drug offenses in the area near the sex trade.
- Reduced number of assaults against women reported in local emergency rooms.
- Reduced number of domestic abuse cases that involve non-English speaking women.



# Responses to the Problem of Exploiting Trafficked Women

Analyzing your local trafficking problem will give you a better understanding of the factors that contribute to it. Once you have analyzed your local problem and established a baseline for measuring effectiveness, you can consider possible responses to the problem.

The following strategies provide a foundation for addressing local trafficking problems. These strategies are drawn from a variety of studies and police reports; several may apply in your community. It is critical that you tailor responses to local circumstances and that you can justify each response based upon reliable analysis. In most cases, an effective strategy will involve implementing several different responses, because law enforcement alone is seldom effective in reducing or eliminating the problem. Do not limit yourself to considering what police can do: instead, carefully consider who else in your community shares responsibility for the problem and can help address it. The cooperation of local businesses, community organizations, local service providers, and—where applicable—military bases will be essential.

## General Consideration of an Effective Response Strategy

Although estimates vary, it is likely that at least one-third of prostitutes are either internationally or domestically trafficked women.[46] The police response to trafficking in women will therefore likely be closely linked to its response to the sex trade. Many of the responses described in Problem-Oriented Guide No. 2 on *Street*



§ A proactive approach to enforcement is necessary because very few cases will be reported to local police. "Physical and psychological control by the traffickers, fear of law enforcement, illegal immigration status, and language barriers are all factors in limiting the possibility of complaints." (National Trafficking Alert System)

*Prostitution* may therefore apply. However, from the point of view of human trafficking, some reconsideration of established police responses to prostitution is necessary.

The response to the exploitation of trafficked women depends on attitudes—attitudes held by the public, stereotypes held by the purchasers of sex and users of forced labor, and police attitudes towards prostitutes. As far as the sex trade is concerned, from a human trafficking point of view, prostitution is primarily an exploitative activity perpetrated against prostitutes, both by their handlers and by the purchasers of sex. Prostitutes are therefore victims, not offenders. Although controversial, this view is crucial in responding to the problem of trafficked women, because those who traffic women for sex often use the women's criminal designation as a means of exploitation and of keeping the women out of sight of the authorities. It may also provide a ready excuse for purchasers, who may believe that their culpability is lessened because the prostitutes are "just" illegal immigrants. In addition some researchers have argued that stereotypes of prostitutes and the failure to take the exploitative nature of prostitution seriously is stronger in the mostly male dominated field of criminal justice.[47] As far as forced labor is concerned, the public, including criminal justice personnel,[48] find it difficult to believe that slave-like working conditions still exist in the twenty-first century, even in America.

Both situations of exploitation make it very difficult to convince trafficked individuals to testify against their traffickers.§ Although TVPA was designed to correct this problem, the number of individuals eligible for protection under the act is still very low, for two reasons: first, the definitions of eligibility for TVPA protection are quite restrictive; second, the police—often the first contact with exploited women—are neither trained to identify



trafficked women nor to report them to the appropriate authorities according to TVPA requirements. Thus, educating police, prosecutors, and judges is central to solving the problem of exploiting trafficked women.

In addition to the information provided in this guide, you can also draw on the resources offered by the U.S. Department of Justice,[§] the Department of State, and the Department of Health and Human Services to develop training courses that will introduce police to the ethnic and cultural issues embedded in this problem and to the skills necessary in interviewing and uncovering victims of trafficking.

Besides training, there are a number of preparatory responses that should be undertaken before attempting any of the specific responses recommended below. These are clearly necessary, because it is not possible to reduce the exploitation of trafficked women without having the skills, training, and experience to identify the problem. You should consult the earlier section called *Asking the Right Questions* as you read the following, which describes the steps that should be taken to prepare for the responses that are directed specifically at reducing and preventing the exploitation of trafficked women.

## Preparatory Responses for Identifying the Problem

1. **Locating trafficked women.**[49] Illegal immigrants are not necessarily trafficked, and trafficking victims are not always illegal immigrants. Thus, although brothels are commonly placed in migrant areas, police should not assume that they will always find trafficked women in those areas. In fact, exploiters may keep victims away from areas where their languages are spoken, even while catering to customers who speak those languages. The obvious place to begin looking

§ In conjunction with the U.S. Bureau of Justice Assistance, the Institute for Intergovernmental Research (IIR) has developed a detailed instructional program for trainers who can then return to their departments and train local officers (SPOG 2005). For further information, visit the IIR web site at http://www.iir.com/.



34 | The Exploitation of Trafficked Women

for evidence of trafficking is with the vice squad, which will certainly have had contact with trafficked women, although unless they have been trained to look for them, they may not know it. Indicators of the presence of trafficked women and venues where they may be found include:

- buildings with heavy on-premises security, such as barred windows, locked doors, and electronic surveillance
- buildings in which women both live and work
- nail salons, bars, and strip clubs that serve as fronts for prostitution
- parks and recreation areas where nannies, au-pairs, and other domestic servants congregate
- brothels that advertise only in foreign language newspapers or that restrict services to members only
- advertisements for escorts or other sexual services
- Internet web sites and chat rooms
- workers in hotels, restaurants, domestic situations who cannot speak English
- hospital emergency rooms and health and abortion clinics
- ethnic healthcare providers
- immigrant support groups
- HIV/AIDS community groups
- locations with large numbers of transient males, such as military bases, sports venues, conventions, and tourist attractions.

If there are no visible signs of the sex trade in your area, you should investigate the informal network that exists in all localities. Word of mouth, whether from a bartender or a taxi driver, is a typical way of finding out about the underground sex trade. Remember, the purveyors of sex must advertise their services; if customers can learn about these services, so can you.



2. **Identifying trafficked women.** Interviewing women to determine their immigration status requires training and skill. It is particularly difficult to overcome the deep-seated fear and distrust that many such women have of police and other government officials. And in fact, until the passage of TVPA this fear was well grounded, because women who were identified as trafficked were arrested and deported. Furthermore, many trafficked women are trained in what to say to police by their exploiters.[50] They may also be fearful of reprisals by their exploiters for speaking to police, or anyone outside their organization for that matter. The following are indications of possible trafficking:[51]

- workers who are frightened to speak, especially to police or other officials, including healthcare and social workers
- the presence of very young prostitutes in brothels and massage parlors
- workers who look sickly or who display signs of physical abuse
- prostitutes who cannot speak English
- women who are unable or unwilling to explain how they came into the United States or what they did before gaining entry
- women who are closely supervised when taken to a doctor or hospital
- women who are denied clothing other than those provided by a brothel
- prostitutes whose legal representation is supplied by their trafficker, often as a means of controlling their testimony
- women who appear fearful of collaboration between traffickers and police
- women who do not know how their travel documents were obtained or where they are



- women who paid a fee to obtain travel documents or make travel arrangements
- domestic workers who appear frightened or apprehensive.

3. **Protecting trafficked women.** How you deal with specific incidents of trafficking is important, not only to the welfare of the victim, but also to establishing relationships with other trafficked women and community groups that may be able to assist in solving the problem of trafficked women. Once you have identified trafficked women, you must protect them from their traffickers and inform them of their rights under TVPA. In cases of severe victimization, you should prevent the woman from returning to her home or workplace, because the risk is very high that the victim will be quickly trafficked to another location and will remain in constant threat of physical abuse. You can help the victim by doing the following:

- Call the national hotline and report the case.
- Obtain information from Federal and State task forces such as the Trafficking in Persons and Worker Exploitation Task Force.
- Contact a local community group that specializes in protecting victims from abuse, such as a women's shelter or a group that has a tradition of caring for immigrants. To help locate these groups, call The Office for Victims of Crime (OVC) (800.851.3420). The OVC provides a comprehensive list of victim services throughout the United States and the world. These groups can support trafficked victims until they attain certification under TVPA.



- Arrange for medical assistance where necessary.
- Obtain brochures and cards that inform the victim of her rights under TVPA. Many of these are available in several languages on the web, via the hotline, or from the National Trafficking Alert System (NTAS).
- Contact the FBI or the Civil Division of the Justice Department and make sure that you speak to someone who is familiar with the rights afforded to victims under TVPA.
- Ensure that members of your department are informed of the specific criteria for establishing whether a victim qualifies for continued presence, a T-Visa, or other protections under TVPA. There are ample materials and information available from many governmental and private organizations. For a good example of a clear and concise brochure that covers all the basic facts concerning trafficked persons, including how to establish immigrant status and how to determine eligibility for benefits, see Trafficking In Persons, published by the Texas Office of Immigration and Refugee Affairs (available at www.dhs.state.tx.us/programs/refugee). Many states have developed similar brochures and information services.



38 | The Exploitation of Trafficked Women

---

**Box 4: HELP FOR VICTIMS**

The toll-free Trafficking in Persons and Worker Exploitation Task Force complaint line, at 888.428.7581 (voice and TTY), is staffed by personnel who have access to interpreters and can speak with callers in many languages. Located at the U.S. Department of Justice, it helps answer questions, takes a case forward, and refers to prosecutors.

For translation assistance and other advice on identifying trafficking cases, call the National Trafficking in Persons Hotline: 866.US.TIPLINE

**Other Hotlines:**

- Department of Health and Human Services Hotline: 888.373.7888. Provides links to service providers working with trafficked persons across the country.
- U.S. Office of Refugee Settlement: 202.401.4825
- U.S. Conference of Catholic Bishops/Migration and Refugee Services: 202.541.3385
- Lutheran Immigration and Refugee Services: 410.230.2725
- National Korean Hotline: 888.9.POLARIS
- National Thai Hotline: 866.856.THAI
- National Spanish Hotline: 888.80.AYUDA

---

4. **Working with service organizations.** As noted, the chances of a trafficked woman revealing her status to a police officer are limited. She may, however, reach out to other groups or agencies. You should therefore:

- work closely with and support community groups that provide refuge for battered women or that have an interest in taking care of immigrants
- develop partnerships with local social service agencies, hospital emergency rooms, ethnic healthcare providers, and others who may provide services to sick or injured trafficked women.

These can be important sources of information on identifying trafficked women and for supporting and assisting trafficked



women once they are identified. Do not assume that these organizations are aware of the plight of trafficked women. The idea that something like slavery still exists in the United States is difficult for most people to believe.

5. **Educating the public about human trafficking.**
Public education through outreach programs and publicizing particular cases that have been successfully prosecuted through the media can raise awareness of human trafficking problems. Efforts to enforce laws against the exploitation of trafficked women, especially prostitution, will be severely limited without public support. Many of the responses below require money, resources, and changes in the local community environment. It will be difficult or impossible to accomplish these goals without community support.§ There are many web sites that provide posters, brochures, and other materials that can be useful in educating the public about human trafficking; many of these are available in multiple languages. However, probably the most effective means of publicity is informing the media when cases of human trafficking are discovered in your community or elsewhere. There are many such cases available on the web, such as those reported by the *Palm Beach Post* in Florida.[52]

§ The learning module on Street Prostitution (available on the POP Center web site at http://www.popcenter.org/learning/) provides an excellent opportunity to learn how to respond to the problem of prostitution and emphasizes especially the role of community support in accomplishing the goals of problem-oriented policing.

*U.S. Department of Health and Human Services*



**A search on the web for anti-slavery and anti-human trafficking web sites produces many promotional materials.**



### Specific Responses to the Exploitation of Trafficked Women

There are three approaches to reducing or preventing the exploitation of trafficked women:

- enforcing laws directed against exploiters, traffickers, and men who purchase sex
- reducing demand for commercial sex and cheap labor
- changing the environment so that it is inhospitable to traffickers and exploiters.

*Enforcing Laws Against Traffickers and Men Who Purchase Sex*

**6. Adopting an unambiguous enforcement policy.**
Enforcement attitudes to the sex trade are currently in flux. At the international level, some countries such as Sweden argue that trafficked prostitutes are victims rather than offender and that the purchasers of sex should be punished, not the sex workers themselves. This view was first translated into law in Sweden in 1998, and has increasingly become policy of the U.S. Department of State, and the Department of Defense. It is too early to tell whether this approach will be translated into policy or law at the local levels of criminal justice, or whether it will contribute to the reduction of trafficking in women for the sex trade, as claimed by some early Swedish research (see Response 8).[53] Whatever policy your department adopts, it should be clear and unambiguous, leaving no room for ambivalent enforcement, such as occasional sweeps and raids (see Response 17). The success of any policy



also depends upon training officers to understand the diverse ethnic and cultural issues outlined in the preparatory responses above, and the clarity with which the policy of enforcement is applied in that setting.

---

**Box 5: HELP FOR LOCAL POLICE**

The U.S. Department of Health and Human Services Administration for Children and Families Campaign to Rescue and Restore Victims of Human Trafficking provides an excellent tool kit for police. This kit includes:

- Tips for Identifying and Helping Victims of Human Trafficking (pdf version)
- Screening Questions to Assess Whether a Person is a Trafficking Victim (pdf version)
- Understanding the Mindset of a Trafficking Victim (pdf version)
- Communicating with Victims of Human Trafficking (pdf version)
- Health Problems Seen in Traffic Victims (pdf version)
- PowerPoint Presentation for Health Care Providers (ppt)
- Health Care Provider Poster (pdf)
- Health Care Provider Brochure (pdf)
- Health Care Provider Pocket Card (pdf)

*U.S. Department of Health & Human Services*



You can download this entire kit at:
http://www.acf.hhs.gov/trafficking/campaign_kits/index.html#law



**7. Working with immigration and Labor Department officials.** Developing a close working relationship with immigration officials is essential to the successful investigation and prosecution of human trafficking cases because the victim is always the key witness. It will also help in identifying trafficked women and in establishing their immigrant or refugee status. Unfortunately, there is a long history of conflict between local police and federal immigration officials in many parts of the United States. Even though local police have the legal and constitutional responsibility to enforce federal immigration law, they may lack the local authority to intervene or be concerned that enforcing immigration laws will damage their acceptance in local immigrant communities.[54] As noted, some states and sanctuary cities have even passed laws forbidding police from enforcing immigration laws. Because the situation of trafficked women is complicated by their ambiguous status as both illegal aliens and crime victims, extensive policies and procedures must be worked out between local and federal officials, especially in terms of establishing the status of one who has suffered a "severe form of human trafficking" as defined by the TVPA. Without cooperation on both sides, a trafficking victim could be deported or detained for immigration related crimes, thus losing the valuable eyewitness testimony needed to prosecute traffickers. Indeed, in fiscal year 2004, only 43 individuals were convicted of trafficking offenses under the TVPA by the U.S. Department of Justice.[55]

When potential traffickers are encountered, their immigration status can often be verified if they have been issued an Alien Number (also known as an "A number"). ICE (Immigration and Customs



Enforcement) maintains a 24/7 hotline (866.347.2423) for U.S. law enforcement officers (called the Law Enforcement Service Center) that can be called to see if a trafficker is already in the ICE system. If a trafficker is not legal, he or she can often be held on immigration charges (smuggling, transporting, or harboring illegal aliens) while a human trafficking investigation continues.

Department of Labor (DOL) officials can also be crucial allies in combating the exploitation of women through forced labor. Federal officials from the Wage and Hour Division of DOL can walk onto a worksite and immediately demand to see the I-9 forms of all immigrant workers employed there (law enforcement officials might otherwise need a subpoena to see these same documents). The DOL Wage and Hour Division can also ensure that immigrant workers are paid what they are owed under the law and can help verify subsequent victim claims for legal compensation from their traffickers for lost wages and benefits.

8. **Using the Racketeer Influenced and Corrupt Organizations Act of 1996 (RICO).** Because their labor costs are minimal and they do not comply with standard health and safety regulations, the owners of brothels and sweatshops who use trafficked labor have an unfair competitive advantage over their rivals. Thus, they are ripe for civil suits aimed at their bottom line. RICO can be especially effective in that regard, as it allows for treble damages. Originally enacted by the U.S. Congress to facilitate the prosecution of organized crime, a number of significant RICO cases have found against sweatshops that benefit economically from employing illegal immigrants or trafficked labor.[56] This approach has been used successfully in prostitution cases as well.§ Additionally, as recommended in

§ In 2001, police and state and federal prosecutors combined their efforts to prosecute a network of competing pimps. The men were convicted of extortion and involuntary servitude as well as forming a RICO conspiracy (de Baca and Tisi 2002).



44 | The Exploitation of Trafficked Women

§ The enforcement of this law has proven very difficult, not only because of attitudes of law enforcement about prostitution, but also because of serious difficulty in interpreting the language of the law, which in many circumstances seems to leave open the possibility of prosecuting prostitutes. In some cases prostitutes have threatened to expose their clients unless they were paid more money. Others have questioned the Swedish government's claim that prostitution by trafficked women has not increased at the same rate as other more liberal European countries (Kulick 2003). It is reasonable to conclude that there are no studies of sufficient scientific quality to support either side of the argument.

Problem-Oriented Guide No. 2, *Street Prostitution*, strict enforcement of zoning laws, nuisance abatement ordinances, and business licensing regulations against properties that allow prostitution can serve to make your community inhospitable to exploiters and traffickers (See also Responses 13-16).

### Reducing Demand

9. **Punishing the purchasers of sexual services and not the sex trade workers.** As noted above, in 1998, Sweden passed a law prohibiting the purchase of sexual services. Although the punishment of commercial sex traffickers continued, the law made it clear that rather than being the sellers of sex, prostitutes were in fact the product that was being sold. Swedish authorities claim that as a result of the law the majority of sex purchasers have disappeared and that the number of women trafficked to Sweden has not increased, as it has in other Western European nations.[57] Sweden found, however, that although the law had widespread public support, judges and prosecutors were slow to adopt the view that they should prosecute the buyers rather than the prostitutes. The Swedish police also opposed the law when it was originally enacted.§

Although U.S. laws that specify punishments for men who solicit prostitutes vary enormously, they usually impose fines, probation, community service, and publicity; in almost every case they constitute misdemeanors. Publishing the names of buyers of sex has been found to be effective—although there are some difficult legal issues involved[58]—and community



service has been found to be more effective than fines or jail time (see the Problem-Oriented Guide on *Street Prostitution*). Some U.S. cities, such as Los Angeles, California and West Palm Beach, Florida, have introduced car confiscation programs for men who solicit prostitutes. Other programs combine these punishments with attempts to educate offenders about the social consequences of their acts (see Response 10). The extent to which these programs have been effective in reducing the prostitution of trafficked women in the United States has not been thoroughly researched, but early indications are that they may be effective.[59] For example, in response to the recent announcement by the U.S. Department of Defense of a zero tolerance policy for military personnel who solicit prostitutes, Korea has announced that it will close all red light districts that are adjacent to U.S. military bases.[60]

§ "Of the 1512 men completing the First Offender Prostitution Program in San Francisco (from 3/95 to 3/98), only 14 men had been re-arrested for soliciting a prostitute anywhere in California" (Hughes 2004a:40).

**10. Changing the attitudes of prostitution customers.**
A number of cities have introduced "john schools," in which men convicted of purchasing sex are educated about the damaging consequences that their behavior has on the lives of prostitutes. Various programs of this kind operate in cities such as Portland, Oregon and St. Paul, Minnesota. These may be applied to first time offenders only, as is the case in San Francisco, California, or to all offenders. In general, studies in the United States and Canada have found these programs to be very effective in reducing recidivism.§ When enforcement is focused on the buyers, the cost of providing sexual services is increased, because johns, fearful of getting caught, demand higher levels of security, such as private escorts to the place of



46 | The Exploitation of Trafficked Women

business.[61] However, commercial sex clients in ethnic or immigrant communities may display differences in their approach to purchasing sex. The cultural orientation of those from regions of the world where prostitution is either legal, tolerated, or encouraged may influence both their behavior and their response to arrest.

11. **Notifying those with influence over client conduct.** Employers, schools, the military, convention organizers, and other individuals and groups can often exert significant informal influence over the conduct of the clients of prostitution. This influence can be leveraged by seeking third-party cooperation to discipline clients who come to police attention. This strategy is not intended merely to shame clients; rather, it is intended to change their behavior through disciplinary systems outside the formal justice system. Keep in mind, however, that some forms of discipline, such as termination of employment, can be severe.

### *Making the Local Environment Inhospitable to Exploitation of Trafficked Women*

While focusing on the demand side of sexual exploitation shows considerable promise, it cannot on its own eradicate prostitution from your locality. This is because the alleged demand by men for sex is not really that strong. For example, in the United States, where about 16 percent of men report having paid for a sex act, only 0.6 percent admit to doing so on a regular basis.[62] In other countries, particularly Latin and Asian countries, the percentage of men who admit to paying for sex is as high as 70 percent. It follows that the demand by men for sex is related to the opportunities and cultural norms that prevail



in their respective environments. Therefore, reducing opportunities to buy sex by removing the sex trade from your area stands a very good chance of drastically reducing both prostitution and the exploitation of women.

It can be argued that such a response will merely displace the activity. Although there has been no research on displacement of prostitution, research on the displacement of other crimes suggests that sometimes displacement occurs and sometimes it does not, depending on the particular crime and environment.[63] It has also been found that other crimes may decrease as a result of successful efforts to thwart a specific crime ("diffusion of benefits"). The following responses are adapted from the Problem-Oriented Guide on *Street Prostitution*. We strongly recommend that you consult that Guide for further information.

*http://richmondthenandnow.com*



**Making an area inhospitable for prostitution helps discourage the exploitation of trafficked women.**



§ The Nassau County Police Department (New York) eliminated illegal massage parlors by targeting property owners, in partnership with the local county clerk, fire marshal, and building department (Goldstein submission: http://www.popcenter.org/library/goldstein/1995/95-52.PDF). In 1999, similar results were achieved by the Chattanooga Police Department (Tennessee), which served eviction notices and initiated building condemnations (Goldstein submission: http://www.popcenter.org/library/goldstein/1999/99-07.PDF).

§§ In 1998, the South Mountain Police Precinct (Arizona) identified nuisance rental properties owned by absentee landlords as contributing to prostitution and drug dealing. To alleviate the problem, landlords were required to attend seminars that detailed the debilitating effects of property neglect and offered training on property management. In combination with considerable community support and the release of successful cases to local media, the program led to a successful neighborhood revitalization (Goldstein submission: http://www.popcenter.org/library/goldstein/1998/98-57.pdf).

12. **Enforcing zoning laws, nuisance abatement ordinances, and business licensing regulations against the owners of properties used for prostitution or forced labor.** Prostitution markets depend on other businesses to support them. The police and other enforcement agencies can exert pressure on those businesses by enforcing civil laws and business regulations. Zoning regulations that restrict the sorts of businesses that support prostitution, such as adult entertainment, can be effective. Zoning restrictions have been key in the redevelopment of Times Square in New York City, where prostitution has significantly declined.[64] The police and private parties can file nuisance abatement actions against businesses that support prostitution or forced labor. You should get advice and support from legal counsel before pursuing these options.§

13. **Warning and educating property owners about the use of their premises for prostitution or forced labor.** Many property owners unwittingly support street prostitution because they fail to appreciate how their business practices allow it to flourish.§§ You can remind them of their legal obligations and provide business owners and their employees with specific training to help them prevent their properties from being used for prostitution. It is also possible that owners of property that house sweatshops may not realize that the workers are trafficked. You should make sure that they know the warning signs of trafficking. Developing training programs by partnering with businesses in entertainment districts should also assist in identifying trafficked women whether into forced labor or the sex trade.



14. **Establishing a highly visible police presence.** A highly visible police presence, typically with extra uniformed officers, can discourage street prostitution and may discourage off-street prostitution as well. An extra police presence is expensive, of course, and is only effective if followed up with more permanent strategies; remember too that a heavy police presence can create the perception that an area is unsafe. Alternative methods for establishing a police presence include opening a police station in the area, such as in a storefront, a mobile office, or a kiosk, or affixing anti-prostitution warnings to police patrol vehicles. Private security forces can also be deployed to supplement a police presence.

§ Working with local communities to change high risk areas using civil remedies, as suggested in Responses 13, 14, and 16, can be very complicated and is not always effective (Mazerolle and Roehl 1999).

15. **Redeveloping the local economy.** The exploitation of trafficked women flourishes in substandard social and economic environments: street prostitution markets thrive under marginal economic conditions; run-down apartments in impoverished neighborhoods are often all that are available to illegal immigrants, who can afford only the cheapest housing; dilapidated buildings in old industrial areas are commonly used for sweatshops. Thus, it follows that economic redevelopment is often necessary to permanently eliminate prostitution markets and forced labor. The idea is that improved economic conditions will foster the establishment of new businesses that are less hospitable to prostitution markets and sweatshops. Although economic redevelopment usually cannot occur without a substantial investment of governmental and private resources, police can play an important role in bringing the need for redevelopment to the attention of the appropriate authorities.§



## Responses With Limited Effectiveness

**16.  Legalizing or otherwise tolerating prostitution.**
There are two closely-related reasons usually advanced for legalizing prostitution. First, decriminalization puts buying and selling sex on the same footing as other commercial enterprises, thereby removing both the moral stigma and the well-known criminal justice issues that surround the policing of the sex trade. Second, when the sex trade is treated like any other business, it becomes subject to all the usual health, safety, and environmental regulations, thus protecting the health and welfare of the prostitutes. The latter was the rationale underlying the legalization of prostitution in New Zealand in 2004. There is evidence, however, that because compliance with health and safety regulations increases the cost of doing business, legal prostitution can create a black market sex trade populated by trafficked women. Legalization can also lead to an increase in the demand for the sale of sex,[65] because as legitimate businessmen the purveyors of prostitution can use sales and advertising tactics to increase their market shares. A final issue, which is the crux of this policy debate, is the moral argument: that prostitution converts a woman's body into a commodity, even if she does it willingly.[66] Clearly, this debate involves deep philosophical questions that no single police department can solve on its own, at least not without lengthy consultation with civic and community leaders.



**17.** **Punishing prostitutes.** Although in most jurisdictions of the U.S. the prostitute remains criminally liable for her actions, the levels of enforcement or punishment that are applied against prostitutes vary enormously across jurisdictions and communities. The idea that prostitutes are both offenders and victims provides excuses either for inaction or for inconsistent and ineffective enforcement practices, such as sudden sweeps and raids—perhaps the most common police response (see Problem-Oriented Guide No. 2 *Street Prostitution*). Because of the highly vulnerable situation of a trafficked woman who is a sex worker, punishment will most likely drive her further into the clutches of her traffickers, ensuring that she will never cooperate with the police, making investigation and prosecution of traffickers that much more difficult. It will be necessary, therefore, for your department to have a clear policy on the levels of enforcement to be applied to prostitutes, and for the vice squad, should there be one, to be well trained in detecting the presence of trafficked women in advance of any crackdowns or raids.

## Appendix A:

## Summary of Responses to the Exploitation of Trafficked Women

The table below summarizes various responses to the problem of the human trafficking of women, the mechanisms by which they are intended to work, the conditions under which they should work best, and factors that should be considered before a particular response is implemented. It is critical that you tailor responses to local circumstances and that you can justify each response based upon reliable analysis. In most cases, an effective strategy will involve several different responses, because law enforcement alone is seldom effective in reducing or solving the problem.

| Response No. | Page No. | Response | How It Works | Works Best If... | Considerations |
|---|---|---|---|---|---|
| *Preparatory Responses* | | | | | |
| 1. | 33 | Locating trafficked women | Police are trained in identifying trafficking venues and marketing practices | … police know their localities well and can obtain information from informal networks | Not all illegal immigrants are trafficked and vice versa |
| 2. | 35 | Identifying trafficked women | Police interview victims looking for signs of trafficking | … police are well trained in interviewing victims of trafficking and NGOs are brought into the interviews | Victims may not talk to police because of fear of arrest or reprisals from captors |



54 | The Exploitation of Trafficked Women

| Response No. | Page No. | Response | How It Works | Works Best If… | Considerations |
|---|---|---|---|---|---|
| 3. | 36 | Protecting trafficked women | Police protect the victim from immediate violence, report the case to the national trafficking hotline, and inform the victim of her rights under TVPA | … police have a close working relationship with local community groups that can provide refuge | Police must be skilled interviewers to overcome the victim's fear of authorities |
| 4. | 38 | Working with service organizations | You educate local community groups and health agencies concerning the plight of trafficked women so that they will help identify them and provide support | … you gain their confidence, make use of their support services, and refer victims to them | Requires long-term commitment to develop enduring partnerships; some community groups may be reticent to inform police of illegal immigrants in the community |
| 5. | 39 | Educating the public | Public support makes possible changes needed in enforcement and prevention of trafficking | … you use available materials and sources concerning human trafficking | Outreach programs with schools and community groups and use of the media for publicity will help |
| *Enforcing Laws Against Traffickers and Men Who Purchase Sex* | | | | | |
| 6. | 40 | Directing enforcement at pimps and purchasers | Denies traffickers the opportunity to deploy trafficked women in your neighborhood | … you have the cooperation of both local government and the general public | Depends on changing the attitudes of public officials towards prostitution |



| Response No. | Page No. | Response | How It Works | Works Best If... | Considerations |
|---|---|---|---|---|---|
| 7. | 42 | Working closely with immigration officials | Smoothes the process of protecting the victim and obtaining witness testimony | … carefully worked out policies and procedures are agreed upon by both parties | Conflicting laws and practices work against local police enforcement of federal immigration law, especially in sanctuary states and cities |
| 8. | 43 | Using RICO | Lawsuits and ordinances are used to raise the cost of doing business, thus pressuring sweatshops and brothels to relocate | … you have close relationships with labor and business organizations, as well as the prosecutor's office | When lawyers become involved, expenses escalate |
| *Reducing Demand* | | | | | |
| 9. | 44 | Punishing the purchasers of sexual services | Serious punishments are used to deter men from buying sex | … criminal justice personnel are committed to the view that the purchase of sex is a form of male violence | Depends on the extent to which the public supports the policy |
| 10. | 45 | Changing the attitudes of prostitution customers | Offenders submit to psychological and educational programs that teach the exploitative nature of their acts | … judges and prosecutors are convinced of the effectiveness of these programs | Studies have shown these programs to be very effective in reducing recidivism, although their effectiveness in overcoming ethnic or cultural values condoning prostitution have not been tested |



56 | The Exploitation of Trafficked Women

| Response No. | Page No. | Response | How It Works | Works Best If... | Considerations |
|---|---|---|---|---|---|
| 11. | 46 | Notifying those with influence over the purchaser's conduct | Creates meaningful consequences for the purchaser | ... purchasers are influenced by informal social controls | Some penalties (e.g., termination from employment) may be harsher than some believe is fair |
| *Making the Local Environment Inhospitable to Exploitation of Trafficked Women* | | | | | |
| 12. | 48 | Enforcing zoning laws, nuisance abatement ordinances, and licensing regulations against properties used for prostitution | Restricts the availability of locations for sexual activities; discourages the use of motels and hotels for prostitution | ... sexual transactions or forced labor take place on properties subject to regulation | Civil law processes can be cumbersome and are unfamiliar to police; requires support from government lawyers |
| 13. | 48 | Warning property owners about the use of their premises for prostitution or forced labor | Increases property owners' willingness to prohibit prostitution or forced labor on their property | ... forced labor takes place on those properties | Some property owners may feel they are being unfairly accused |
| 14. | 49 | Establishing a highly visible police presence | Discourages both prostitutes and clients from negotiations | ... followed by changes to the environment where street prostitution occurs | Labor intensive; creates the perception that the area is unsafe |
| 15. | 49 | Redeveloping the area economy | Promotes legitimate activity to displace illegitimate activity | ... improvements will substantially change the conditions that allow prostitution or forced labor to flourish | Costly in the short term; potential displacement to more vulnerable areas |



| Response No. | Page No. | Response | How It Works | Works Best If... | Considerations |
|---|---|---|---|---|---|
| *Responses With Limited Effectiveness* | | | | | |
| 16. | 50 | Legalizing or otherwise tolerating prostitution | Creates a black market for cheap trafficked prostitutes | | Rests on debates concerning public morality, which police departments cannot solve on their own |
| 17. | 51 | Punishing prostitutes | Leads to inconsistent and ineffective enforcement | | Drives trafficked women into the clutches of traffickers, making investigation and prosecution difficult |


## Appendix B:

## Schematic Representation of Relationships among Exploitation, Trafficking, Migration, Smuggling, Labor, and Consent



Adapted from UNESCAP (2003:27)

## Endnotes

1. Tiefenbrun (2002:136).
2. U.S. Department of State (2005).
3. Bales and Fletcher (2004).
4. International Labour Office (2003).
5. TVPA (2000).
6. Salt (2000); Laczko and Gramegna (2003).
7. U.S. Department of State (2004). How these figures were computed remains unclear. The number of women assisted as a result of TVPA is substantially lower, in the hundreds (Bales and Fletcher 2004:10).
8. Kangaspunta (2003).
9. Tiefenbrun (2002:139-141).
10. U.S. Department of Justice (2004).
11. MacPherson and Gushulak (2004).
12. Gushulak and MacPherson (2000).
13. Gushulak and MacPherson (2000).
14. Gumbel (2001); Bales et al. (2004).
15. Walter (2002).
16. Stuart Police Department (2001).
17. National City Police Department (2000).
18. Ryf (2002:50).
19. Human Rights Watch (2001).
20. Guerette (2004).
21. Cwikel et al. (2004). Early exposure to trauma also increases the chances that a woman will be recruited.
22. Stone (2004).
23. Raymond and Hughes (2001).
24. Florida State University (2003).
25. Hughes (2001).
26. Parrado et al. (2004).
27. Raymond and Hughes (2001).
28. United Nations Economic and Social Commission for Asia and the Pacific (UNESCAP) (2003).
29. TVPA (2000).



[30] 8 U.S.C. sec. 1227(a)(1)(E)(i).
[31] U.S. Department of State (2004).
[32] Anderson and O'Connell Davidson (2003).
[33] Raymond and Hughes (2001); Hughes (2004a).
[34] Wijers and Lap-Chew (1999); Zarembka (2000); Anderson and O'Connell Davidson (2003).
[35] Human Rights Watch (2001); Anderson and O'Connell Davidson (2003).
[36] Bales et al. (2004).
[37] Scott (2000).
[38] Hughes (2004a).
[39] See generally Freilich and Newman (2005).
[40] Seghetti et al. (2004).
[41] Nordic Institute for Women's Studies and Gender Research (2002).
[42] Raymond and Hughes (2001); Ryf (2002:20).
[43] Salt (2000).
[44] Kansas City, Missouri Police Department (2004).
[45] Mackenzie et al. (2003).
[46] Raymond and Hughes (2001).
[47] Hughes (2004a).
[48] Torrey and Dubin (2003).
[49] Hughes (2003).
[50] National Trafficking Alert System (no date).
[51] Venkatraman (2003).
[52] See http://www.palmbeachpost.com/moderndayslavery/content/moderndayslavery/.
[53] Jacobsen (2002).
[54] Edwards (2003).
[55] SPOG (2005).
[56] King (2003).
[57] Ekberg (2004).
[58] Persons (1996).
[59] Hughes (2004a).
[60] Hughes (2004a).

[61] Hughes (2004a:27).
[62] Hughes (2004a).
[63] Hesseling (1994).
[64] Weidner (1999).
[65] Raymond (2004).
[66] Hughes (2004a); Ekberg (2004); Nordic Institute for Women's Studies and Gender Research (2002).


## References

Anderson, B., and J. O'Connell Davidson (2003). *Is Trafficking in Human Beings Demand Driven? A Multi-Country Pilot Study.* IOM Research Series, No. 15. Geneva: International Organization for Migration.

Aronowitz, A. (2003). *Coalitions Against Trafficking in Human Beings in the Philippines: Research and Action. Final Report.* Geneva: United National Office on Drugs and Crime, Anti-Human Trafficking Unit.

Bales, K., L. Fletcher and E. Stover (2004). *Hidden Slaves: Forced Labor in the United States.* Washington, D.C.: Free the Slaves; Berkeley (California): Human Rights Center, University of California, Berkeley.

Caldwell, G., S. Galster and N. Steinzor (1997). *Crime & Servitude: An Expose of the Traffic in Women for Prostitution from the Newly Independent States.* Washington, D.C.: Global Survival Network.

Cwikel, J., B. Chudakov, M. Paikin, K. Agmon & R.H. Belmaker (2004). "Trafficked female sex workers awaiting deportation: comparison with brothel workers." *Archives of Women's Mental Health* 7: 243-249.

de Baca, L., and A. Tisi (2002). "Working Together to Stop Modern-Day Slavery." *Police Chief* August: 78-80.

Edwards, J. (2003). *Officers Need Backup: The Role of State and Local Police in Immigration Law Enforcement. Backgrounder.* Washington, D.C.: Center for Immigration Studies. www.cis.org/articles/2003/back703.html.



Ekberg, G. (2004). "The Swedish Law That Prohibits the Purchase of Sexual Services." *Violence Against Women* 10(10): 1187-1218.

Florida State University, Center for the Advancement of Human Rights (2003). Florida Responds to Human Trafficking. Tallahassee: Florida Department of Children & Families, Office of Refugee Services.

Freilich, J., and G. Newman, eds. (2005). *Migration, Crime and Terrorism*. Burlington (Vermont): Ashgate.

Gatmaytan, D. (1997). "Death and the Maid: Work, Violence, and the Filipina in the International Labor Market." *Harvard Women's Law Journal* 20: 229-261.

Guerette, R. (2004). Migrant death and the border safety initiative: An application of situational crime prevention to inform policy and practice. Unpublished Ph.D. dissertation. Rutgers University, Newark (New Jersey).

Gumbel, A. "Fashion Victims: Inside the Sweat Shops of Los Angeles." *Independent / UK*, August 3, 2001. http://www.commondreams.org/headlines01/0803-02.htm.

Gushulak, B., and D. MacPherson (2000). "Health issues associated with the smuggling and trafficking of migrants." *Journal of Immigrant Health* 2: 67-78.

Hesseling, R. (1994). Displacement: a review of the empirical literature. In *Crime Prevention Studies*, edited by R.V. Clarke, Vol. 3, Ch. 7. New York: Willow Tree Press.

Hughes, D. (2001). *The Impact of the Use of New Communications and Information Technologies on Trafficking in Human Beings for Sexual Exploitation: A Study of the Users.* Strasbourg: Council of Europe, Committee for Equality between Women and Men.

———— (2003). *Hiding in Plain Sight: A Practical Guide to Identifying Victims of Trafficking in the U.S. With Particular Emphasis on Victims of Sexual Trafficking as Defined by the Trafficking Victims Protection Act 2000.* Providence: University of Rhode Island. www.uri.edu/artsci/wms/hughes/hiding_in_plain_sight.pdf.

———— (2004a). Best Practices to Address the Demand Side of Sex Trafficking. Washington D.C.: U.S. Department of State.

———— (2004b). "The Role of 'Marriage Agencies' in the Sexual Exploitation and Trafficking of Women from the Former Soviet Union." *International Review of Victimology* 11(1): 49-71.

Hughes, D., K. Chon and D. Ellerman (2002). "Modern-Day Comfort Women: The U.S. Military, Transnational Crime, and the Trafficking of Women." *Violence Against Women* (forthcoming).

Human Rights Watch (2001). *Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States.* Vol. 12, No. 2(G). New York: Human Rights Watch.

HumanTrafficking.com (2004). http://www.humantrafficking.com/humantrafficking/trafficking_ht3/topic_HIV_health.htm.



International Labour Office (2003). *Trafficking in Human Beings: New Approaches to Combating the Problem.* Geneva: International Labour Organisation.

Jacobsen, M. (2002). "Why do Men Buy Sex? An interview with Sven-Axel Mansson." *Journal of the Nordic Institute for Women's Studies and Gender Research* 1: 22-15.

Jelinek, P. "Anti-Prostitution Rule Drafted for U.S. Forces." *Washington Post*, September 22, 2004.

Kangaspunta, K. (2003). Mapping the inhuman trade: preliminary findings of the database on trafficking in human beings. *Forum on Crime and Society*, Vol. 3, No. 1 and 2: 81-104. United Nations Office on Drug Control.

Kansas City (Missouri) Police Department (2004). "Westside CAN Center - Day Laborer Project." Submission for the Herman Goldstein Award for Excellence in Problem-Oriented Policing. http://www.popcenter.org/library/goldstein/2004/04-18.pdf.

King, M. (2003). *RICO: A New Tool for Immigration Law Enforcement. Backgrounder.* Washington, D.C.: Center for Immigration Studies.

Kulick, D. (2003). Sex in the new Europe: The criminalization of clients and Swedish fear of penetration. *Anthropological Theory*, vol. 3(2): 199-218. London, Thousand Oaks (California), and New Delhi: Sage Publications.

Laczko, F., and M. Gramegna (2003). "Developing Better Indicators of Human Trafficking." *Brown Journal of World Affairs* 10(1): 179-194.

Lloyd, K. (2000). "Wives for Sale: The Modern International Mail-Order Bride Industry." *Northwestern Journal of International Law & Business* 20(2): 341-368.

Mackenzie, E., L. Taylor, B. Bloom, D. Hufford and J. Johnson (2003). "Ethnic minority use of complementary and alternative medicine (CAM): a national probability survey of CAM utilizers." *Alternative Therapies in Health and Medicine* 9: 50-56.

MacPherson, D., and B. Gushulak. (2004). Irregular Migration and Health. Global Commission on International Migration, research paper series no. 7, October. http://www.gcim.org/en/ir_gmp.html.

Mazerolle, L., and J. Roehl, eds. (1999). *Civil Remedies and Crime Prevention.* Crime Prevention Studies, vol. 9. Monsey (New York): Criminal Justice Press.

National City (California) Police Department (2000). "Q Avenue Project." Submission for the Herman Goldstein Award for Excellence in Problem-Oriented Policing. http://www.popcenter.org/library/goldstein/2000/00-19.PDF.

National Trafficking Alert System (no date). *Criminal Justice Briefing Materials.* Polaris Project.



Nordic Institute for Women's Studies and Gender Research (2002). "Bodies Across Borders – Prostitution and Trafficking in Women." *NIKK Magasin*, no. 1.

Parrado, E., C. Flippen and C. McQuiston (2004). "Use of Commercial Sex Workers among Hispanic Migrants in North Carolina: Implications for the Spread of HIV." *Perspectives on Sexual and Reproductive Health* 36: 150-156

Persons, C. (1996). "Sex in the Sunlight: The Effectiveness, Efficiency, Constitutionality, and Advisability of Publishing Names and Pictures of Prostitutes' Patrons." *Vanderbilt Law Review* 49: 1525-1575.

Raymond, J. (2004). "Prostitution on Demand: Legalizing the buyers as sexual consumers." *Violence Against Women* 10(10): 1156-1186.

Raymond, J., and D. Hughes (2001). *Sex Trafficking of Women in the United States: International and Domestic Trends.* North Amherst, Mass.: Coalition Against Trafficking in Women. http://action.web.ca/home/catw/attach/sex_traff_us.pdf.

Ryf, K. (2002). "The First Modern Anti-Slavery Law: The Trafficking Victims Protection Act of 2000." *Case Western Research Journal of International Law* 34: 45-71.

Salt, J. (2000). "Trafficking and Human Smuggling: A European Perspective." *International* Migration 38(3): 31-56.

Scott, M. (2000). *Street Prostitution.* Problem-Specific Guide for Police No. 2. Washington D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services.

Seabrook, J. (2001). *Travels in the Skin Trade: Tourism and the Sex Industry*, 2d ed. London, Sterling (Virginia): Pluto Press.

Seghetti, L., S. Vina and K. Ester (2004). Enforcing Immigration Law: The Role of State and Local Law Enforcement. CRS Report for Congress. Washington, D.C.: Congressional Research Services, Library of Congress.

Senior Policy Advisory Group (SPOG) (2005). Assessment of U.S. Government Efforts to Combat Trafficking in Persons in Fiscal Year 2004. http://www.usdoj.gov/ag/annualreports/tr2005/assessmentofustipactivities.pdf.

Stone, S. (2004). *Mail Order Brides: Taking a Look from a New Perspective.* http://www.wsu.edu/~sorense1/sexexploitation/.

Stuart Police Department (2001). "Building Bridges by Mending Fences." Submission for the Herman Goldstein Award for Excellence in Problem-Oriented Policing. http://www.popcenter.org/library/goldstein/2001/01-67.pdf.

Tiefenbrun, S. (2002). "The Saga of Susannah: A U.S. Remedy for Sex Trafficking in Women: The Victims of Trafficking and Violence Protection Act of 2000." *Utah Law Review* 2002: 107-175.



Torrey, M., and S. Dubin, eds. (2003). *Demand Dynamics: The Forces of Demand in Global Sex Trafficking: Conference Report. Chicago*: International Human Rights Law Institute, DePaul University College of Law.

TVPA (2000). Victims of Trafficking and Violence Protection Act (2000). Pub. L. No. 106-386, Div. A, 114 Stat. 1464, enacted October 28, 2000. Division A of this law is referred to as The Trafficking Victims Protection Act of 2000.

U.S. Department of Justice (2004). *Assessment of U.S. Government Activities to Combat Trafficking in Persons.* Washington, D.C.: U.S. Department of Justice.

U.S. Department of State (2004). *Trafficking in Persons Report.* Washington, D.C.: U.S. Department of State. http://www.state.gov/g/tip/rls/tiprpt/2004/.

———— (2005). *Trafficking in Persons Report.* Washington, D.C.: U.S. Department of State. http://www.state.gov/g/tip/rls/tiprpt/2005/.; http://www.state.gov/g/tip/rls/tiprpt/2005/46606.htm.

United Nations (2000). *Protocol Against the Smuggling of Migrants by Land, Sea and Air, Supplementing the United Nations Convention Against Transnational Organized Crime.* Vienna: United Nations.

United Nations Economic and Social Commission for Asia and the Pacific (UNESCAP) (2003). *Combating Human Trafficking in Asia: A Resource Guide to International and Regional Legal Instruments, Political Commitments and Recommended Practices.* Bangkok, Thailand: UNESCAP. www.unescap.org/publications/detail.asp?id=841.

Venkatraman, B. (2003). "Guide to Detecting, Investigating, and Punishing Modern-Day Slavery." *Police Chief* 70(12): 34-43.

Walter, N. (2002). "Social context of work injury among undocumented day laborers in San Francisco." *Journal of General Internal Medicine* 17: 221-229.

Weidner, R. (1999). "'I Won't Do Manhattan': A Study of the Causes and Consequences of a Decline in Street Prostitution." Ph.D. dissertation, Rutgers University, Newark (New Jersey).

Wijers, M., and L. Lap-Chew (1999). *Trafficking in Women: Forced Labour and Slavery-like Practices in Marriage, Domestic Labour and Prostitution.* Utrecht (Netherlands): Foundation Against Trafficking in Women; Bangkok (Thailand): Global Alliance Against Traffic in Women.

Willis, B., and B. Levy (2002). "Child Prostitution: Global Health Burden, Research Needs, and Interventions." *Lancet,* April 20.

Zarembka, J. (2000). "Modern Slavery: Abuse of Domestic Workers." *Off Our Backs* 30(7): 12, 19.



## About the Author

### *Graeme R. Newman*

Graeme R. Newman is a distinguished teaching professor at the School of Criminal Justice, University at Albany, State University of New York. He has published works in the fields of the history and philosophy of punishment, comparative criminal justice, private security, situational crime prevention, and ecommerce crime, and has written commercial software. He was the CEO of a publishing company for 15 years and, in 1990, established the United Nations Crime and Justice Information Network. Among the books he has written or edited are *Superhighway Robbery: Preventing Ecommerce Crime* (with Ronald V. Clarke), and *Rational Choice and Situational Crime Prevention* (with Ronald V. Clarke and Shlomo Shoham).



## Recommended Readings

· ***A Police Guide to Surveying Citizens and Their Environments***, Bureau of Justice Assistance, 1993. This guide offers a practical introduction for police practitioners to two types of surveys that police find useful: surveying public opinion and surveying the physical environment. It provides guidance on whether and how to conduct cost-effective surveys.

· ***Assessing Responses to Problems: An Introductory Guide for Police Problem-Solvers***, by John E. Eck (U.S. Department of Justice, Office of Community Oriented Policing Services, 2001). This guide is a companion to the *Problem-Oriented Guides for Police* series. It provides basic guidance to measuring and assessing problem-oriented policing efforts.

· ***Conducting Community Surveys***, by Deborah Weisel (Bureau of Justice Statistics and Office of Community Oriented Policing Services, 1999). This guide, along with accompanying computer software, provides practical, basic pointers for police in conducting community surveys. The document is also available at www.ojp.usdoj.gov/bjs.

· ***Crime Prevention Studies***, edited by Ronald V. Clarke (Criminal Justice Press, 1993, et seq.). This is a series of volumes of applied and theoretical research on reducing opportunities for crime. Many chapters are evaluations of initiatives to reduce specific crime and disorder problems.



- ***Excellence in Problem-Oriented Policing: The 1999 Herman Goldstein Award Winners.*** This document produced by the National Institute of Justice in collaboration with the Office of Community Oriented Policing Services and the Police Executive Research Forum provides detailed reports of the best submissions to the annual award program that recognizes exemplary problem-oriented responses to various community problems. A similar publication is available for the award winners from subsequent years. The documents are also available at www.ojp.usdoj.gov/nij.

- ***Not Rocket Science? Problem-Solving and Crime Reduction***, by Tim Read and Nick Tilley (Home Office Crime Reduction Research Series, 2000). Identifies and describes the factors that make problem-solving effective or ineffective as it is being practiced in police forces in England and Wales.

- ***Opportunity Makes the Thief: Practical Theory for Crime Prevention***, by Marcus Felson and Ronald V. Clarke (Home Office Police Research Series, Paper No. 98, 1998). Explains how crime theories such as routine activity theory, rational choice theory and crime pattern theory have practical implications for the police in their efforts to prevent crime.

- ***Problem Analysis in Policing***, by Rachel Boba (Police Foundation, 2003). Introduces and defines problem analysis and provides guidance on how problem analysis can be integrated and institutionalized into modern policing practices.


- ***Problem-Oriented Policing**,* by Herman Goldstein (McGraw-Hill, 1990, and Temple University Press, 1990). Explains the principles and methods of problem-oriented policing, provides examples of it in practice, and discusses how a police agency can implement the concept.

- ***Problem-Oriented Policing and Crime Prevention**,* by Anthony A. Braga (Criminal Justice Press, 2003). Provides a thorough review of significant policing research about problem places, high-activity offenders, and repeat victims, with a focus on the applicability of those findings to problem-oriented policing. Explains how police departments can facilitate problem-oriented policing by improving crime analysis, measuring performance, and securing productive partnerships.

- ***Problem-Oriented Policing: Reflections on the First 20 Years**,* by Michael S. Scott (U.S. Department of Justice, Office of Community Oriented Policing Services, 2000). Describes how the most critical elements of Herman Goldstein's problem-oriented policing model have developed in practice over its 20-year history, and proposes future directions for problem-oriented policing. The report is also available at www.cops.usdoj.gov.

- ***Problem-Solving: Problem-Oriented Policing in Newport News**,* by John E. Eck and William Spelman (Police Executive Research Forum, 1987). Explains the rationale behind problem-oriented policing and the problem-solving process, and provides examples of effective problem-solving in one agency.



- ***Problem-Solving Tips: A Guide to Reducing Crime and Disorder Through Problem-Solving Partnerships*** by Karin Schmerler, Matt Perkins, Scott Phillips, Tammy Rinehart and Meg Townsend. (U.S. Department of Justice, Office of Community Oriented Policing Services, 1998) (also available at www.cops.usdoj.gov). Provides a brief introduction to problem-solving, basic information on the SARA model and detailed suggestions about the problem-solving process.

- ***Situational Crime Prevention: Successful Case Studies***, Second Edition, edited by Ronald V. Clarke (Harrow and Heston, 1997). Explains the principles and methods of situational crime prevention, and presents over 20 case studies of effective crime prevention initiatives.

- ***Tackling Crime and Other Public-Safety Problems: Case Studies in Problem-Solving***, by Rana Sampson and Michael S. Scott (U.S. Department of Justice, Office of Community Oriented Policing Services, 2000) (also available at www.cops.usdoj.gov). Presents case studies of effective police problem-solving on 18 types of crime and disorder problems.

- ***Using Analysis for Problem-Solving: A Guidebook for Law Enforcement***, by Timothy S. Bynum (U.S. Department of Justice, Office of Community Oriented Policing Services, 2001). Provides an introduction for police to analyzing problems within the context of problem-oriented policing.

- ***Using Research: A Primer for Law Enforcement Managers***, Second Edition, by John E. Eck and Nancy G. LaVigne (Police Executive Research Forum, 1994). Explains many of the basics of research as it applies to police management and problem-solving.


## Other Problem-Oriented Guides for Police

**Problem-Specific Guides series:**

1. **Assaults in and Around Bars.** Michael S. Scott. 2001.
   ISBN: 1-932582-00-2
2. **Street Prostitution.** Michael S. Scott. 2001. ISBN: 1-932582-01-0
3. **Speeding in Residential Areas.** Michael S. Scott. 2001.
   ISBN: 1-932582-02-9
4. **Drug Dealing in Privately Owned Apartment Complexes**.
   Rana Sampson. 2001. ISBN: 1-932582-03-7
5. **False Burglar Alarms.** Rana Sampson. 2001. ISBN: 1-932582-04-5
6. **Disorderly Youth in Public Places.** Michael S. Scott. 2001.
   ISBN: 1-932582-05-3
7. **Loud Car Stereos.** Michael S. Scott. 2001. ISBN: 1-932582-06-1
8. **Robbery at Automated Teller Machines.** Michael S. Scott. 2001.
   ISBN: 1-932582-07-X
9. **Graffiti.** Deborah Lamm Weisel. 2002. ISBN: 1-932582-08-8
10. **Thefts of and From Cars in Parking Facilities.** Ronald V.
    Clarke. 2002. ISBN: 1-932582-09-6
11. **Shoplifting.** Ronald V. Clarke. 2002. ISBN: 1-932582-10-X
12. **Bullying in Schools.** Rana Sampson. 2002. ISBN: 1-932582-11-8
13. **Panhandling.** Michael S. Scott. 2002. ISBN: 1-932582-12-6
14. **Rave Parties.** Michael S. Scott. 2002. ISBN: 1-932582-13-4
15. **Burglary of Retail Establishments.** Ronald V. Clarke. 2002.
    ISBN: 1-932582-14-2
16. **Clandestine Drug Labs.** Michael S. Scott. 2002.
    ISBN: 1-932582-15-0
17. **Acquaintance Rape of College Students.** Rana Sampson. 2002.
    ISBN: 1-932582-16-9
18. **Burglary of Single-Family Houses.** Deborah Lamm Weisel.
    2002. ISBN: 1-932582-17-7
19. **Misuse and Abuse of 911.** Rana Sampson. 2002.
    ISBN: 1-932582-18-5



20. **Financial Crimes Against the Elderly.**
Kelly Dedel Johnson. 2003. ISBN: 1-932582-22-3
21. **Check and Card Fraud.** Graeme R. Newman. 2003.
ISBN: 1-932582-27-4
22. **Stalking.** The National Center for Victims of Crime. 2004.
ISBN: 1-932582-30-4
23. **Gun Violence Among Serious Young Offenders.** Anthony A.
Braga. 2004. ISBN: 1-932582-31-2
24. **Prescription Fraud.** Julie Wartell and Nancy G. La Vigne. 2004.
ISBN: 1-932582-33-9
25. **Identity Theft**. Graeme R. Newman. 2004. ISBN: 1-932582-35-3
26. **Crimes Against Tourists.** Ronald W. Glesnor and Kenneth J. Peak.
2004. ISBN: 1-932582-36-3
27. **Underage Drinking.** Kelly Dedel Johnson. 2004. ISBN: 1-932582-39-8
28. **Street Racing.** Kenneth J. Peak and Ronald W. Glensor. 2004.
ISBN: 1-932582-42-8
29. **Cruising.** Kenneth J. Peak and Ronald W. Glensor. 2004.
ISBN: 1-932582-43-6
30. **Disorder at Budget Motels**. Karin Schmerler. 2005.
ISBN: 1-932582-41-X
31. **Drug Dealing in Open-Air Markets.** Alex Harocopos and Mike
Hough. 2005. ISBN: 1-932582-45-2
32. **Bomb Threats in Schools.** Graeme R. Newman. 2005.
ISBN: 1-932582-46-0
33. **Illicit Sexual Activity in Public Places.** Kelly Dedel Johnson. 2005.
ISBN: 1-932582-47-9
34. **Robbery of Taxi Drivers.** Martha J. Smith. 2005. ISBN: 1-932582-50-9
35. **School Vandalism and Break-Ins.** Kelly Dedel Johnson. 2005.
ISBN: 1-9325802-51-7
36. **Drunk Driving.** Michael S. Scott, Nina J. Emerson, Louis B.
Antonacci, and Joel B. Plant. 2005. ISBN: 1-932582-57-6
37. **Juvenile Runaways.** Kelly Dedel. 2006. ISBN: 1932582-56-8
38. **The Exploitation of Trafficked Women.** Graeme R. Newman.
2006. ISBN: 1-932582-59-2



**Response Guides series:**

- **The Benefits and Consequences of Police Crackdowns.** Michael S. Scott. 2003. ISBN: 1-932582-24-X
- **Closing Streets and Alleys to Reduce Crime: Should You Go Down This Road?** Ronald V. Clarke. 2004. ISBN: 1-932582-41-X
- **Shifting and Sharing Responsibility for Public Safety Problems.** Michael S. Scott and Herman Goldstein. 2005. ISBN: 1-932582-55-X
- **Video Surveillance of Public Places.** Jerry Ratcliffe. 2006. ISBN: 1-932582-58-4

**Problem-Solving Tools series:**

- **Assessing Responses to Problems: An Introductory Guide for Police Problem-Solvers.** John E. Eck. 2002. ISBN: 1-932582-19-3
- **Researching a Problem.** Ronald V. Clarke and Phyllis A. Schultz. 2005. ISBN: 1-932582-48-7
- **Using Offender Interviews to Inform Police Problem Solving.** Scott H. Decker. 2005. ISBN: 1932582-49-5
- **Analyzing Repeat Victimization.** Deborah Lamm Weisel. 2005. ISBN: 1-932582-54-1

**Upcoming Problem-Oriented Guides for Police**

Problem-Specific Guides
Domestic Violence
Mentally Ill Persons
Student Party Riots
Bank Robbery
Witness Intimidation



84 | The Exploitation of Trafficked Women

Drive-by Shootings
Problem with Day Laborer Sites
Child Pornography on the Internet
Crowd Control at Stadiums and Other Entertainment Venues
Traffic Congestion Around Schools
Theft from Construction Sites of Single Family Houses
Robbery of Convenience Stores
Theft from Cars on Streets

Problem-Solving Tools
Partnering with Business to Address Public Safety Problems
Risky Facilities
Implementing Responses to Problems
Designing a Problem Analysis System

Response Guides
Crime Prevention Publicity Campaigns
Crime Prevention Through Environmental Design

For more information about the *Problem-Oriented Guides for Police* series and other COPS Office publications, please call the COPS Office Response Center at 800.421.6770 or visit COPS Online at www.cops.usdoj.gov.

FOR MORE INFORMATION:

U.S. Department of Justice
Office of Community Oriented Policing Services
1100 Vermont Avenue, N.W.
Washington, D.C. 20530

To obtain details on COPS programs, call the
COPS Office Response Center at 800.421.6770

Visit COPS Online at the address listed below.



e02061007
ISBN: 1-932582-59-2

Date: February 9, 2006



**www.cops.usdoj.gov**